# APPENDIX 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| In re Application of the Republic of Turkey for an Order Under 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings | ) ) ) ) ) ) |

Case No.

### STATEMENT OF FACTS IN SUPPORT OF PETITIONER'S *EX PARTE* APPLICATION FOR AN ORDER UNDER 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS

1.      The Republic of Turkey ("Petitioner"), by and through undersigned counsel, hereby submits the following statement of facts in support of its *Ex Parte* Application for an Order Under 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings:

### Introduction

2.      Concept Schools ("Concept"), its officials, and the 31 charter schools falling under its umbrella have been long besieged by allegations of corrupt practices. Various whistleblowers have alleged that Concept (and other similarly organized charter school management companies throughout the United States) were created to siphon public, tax-payer funds away from the education of children in order to finance the international political activities of Fethullah Gulen, an exiled Turkish cleric residing in the State of Pennsylvania.  *See U.S. Charter Schools Tied to Powerful Turkish Imam*, CBS News – 60 Minutes (May 13, 2012), http://www.cbsnews.com/news/us-charter-schools-tied-to-powerful-turkish-imam/.

3.      According to whistleblowers who have gone public with their concerns, Turkish ex-patriots who are loyal to Mr. Gulen created Concept and a shadowy web of insider companies to illicitly divert millions in federal and state education dollars away from the education of children

4842-1121-7865, v.1

in order to finance Mr. Gulen's international political ambitions.  These insider companies provide necessary goods and services to Concept that include, but are not limited to, construction, classroom supplies and furniture, real estate, and internet and technology services, among others.

4.      In addition to various fraud schemes, the whistleblowers have publicly alleged that Concept and the insider companies further their conspiracy by abusing the immigration system through the sponsorship of large numbers of predominantly Turkish followers of Gulen for employment based visas and green cards.  The recipients of these immigration benefits are generally put to work as teachers in Concept schools or in other positions within insider companies.  According to the whistleblowers, the foreign national teachers lack the training and certification necessary to educate children but are utilized in the classrooms because of their willingness to "kickback" a portion of their salary to various organizations affiliated with the Gulen Movement—a requirement often referred to as "Tuzuk" (a Turkish word translating to "bylaw" in English).

5.      In furthering this conspiracy, whistleblowers allege that Concept, its officials, and other Gulen loyalists are violating a host of federal and state laws, including those prohibiting securities and wire fraud, tax fraud, money laundering, procurement fraud, campaign finance laws, and various rules governing charitable organizations.  Petitioner has initiated an investigation within its' own borders to determine whether the proceeds derived from these illegal activities in the United States are being unlawfully transported and transmitted to individuals in Turkey in violation of Turkish criminal law, including international money laundering and fraud.  *See* Letter from Hon. Serdar Kilic, Turkish Ambassador to the United States (Aug. 28, 2020), attached hereto as **Exhibit 1**.

6.    These allegations have not gone entirely unnoticed by United States law enforcement. In 2014 the U.S. Department of Justice ("DOJ") revealed that it was conducting a criminal investigation into Concept when the Federal Bureau of Investigation ("FBI") executed search warrants on various Concept schools and related companies. According to an affidavit filed in support of those warrants, the focus of the FBI's investigation was on allegations that Concept was engaged in fraud and other abuses of the "E-Rate" program, a Federal Communications Commission ("FCC") program that provides federal funding to enhance internet access at schools and libraries. *See* FBI Search Warrant Affidavit, Case No. 1:14-mc-00288 (N.D. Ill. 2014), attached hereto as **Exhibit 2**. In particular, the FBI found that Concept School officials were awarding E-Rate funded contracts to insiders and other suspected Gulen loyalists in violation of federal rules requiring that such contracts be awarded through a competitive bidding process. *Id.*

7.    Various media outlets have also published extensive investigative reports, raising concerns regarding Concept's operations and describing conduct that suggests Concept and affiliated companies are engaged in criminal activity. *See, e.g.*, *Charter Official Made $100,000 on Deal*, Chicago Sun-Times (Dec. 23, 2013), https://www.pressreader.com/usa/chicago-sun-times/20131223/282454231816690.

8.    This reporting also includes troubling allegations that Concept insiders and school officials have violated a host of federal election laws in order to attempt to influence the U.S. political system through illicit campaign contributions and influence campaigns. *See, e.g.*, *Ohio Taxpayers Provide Jobs to Turkish Immigrants Through Charter Schools*, Beacon Journal (July 5, 2014), https://www.beaconjournal.com/article/20140705/NEWS/307059540.

9.      Concept consistently denies these allegations and publicly maintains that the schools operate independently under the governance of their local board.

### The Petitioner's Investigation

10.     Petitioner retained undersigned counsel and a team of former federal prosecutors and investigators to investigate these whistleblower allegations and to determine whether funds that were transferred into Turkey by companies and individuals affiliated with Concept Schools may have been derived from criminal activity in the United States. As is set forth in greater detail below, this investigation has validated many of the whistleblower's allegations and revealed substantial indicia of criminal activity.

11.     Among other findings, the investigation has uncovered substantial evidence that schools operating under the Concept umbrella have secretly and unlawfully awarded millions of dollars in contracts to shell companies formed by insiders.

12.     Construction permits and other public records demonstrate that large construction contracts were awarded to insiders, several of whom appear to have no prior track record of performing construction work and may not even be licensed as contractors or engineers.

13.     The awarding of several of these construction contracts to insiders suggests that Concept's affiliates may have committed securities fraud.  Several of these contracts were funded with the proceeds of municipal bonds and appear to have been awarded in violation of material promises made to potential investors that the bond proceeds, earmarked for school renovations, would only be expended through strict competitive bidding processes. Stunningly, the beneficiaries of many of these construction contracts were the same insider companies and individuals who

were later awarded millions in federal "E-Rate" contracts that are the subject of the FBI investigation.

14.     Petitioner's investigation also uncovered evidence of abuses of federally funded Child Nutrition Programs contracts.  Despite U.S. Department of Agriculture rules that require schools to follow stringent procurement processes in selecting school lunch vendors, several Concept schools have awarded lucrative contracts worth millions of dollars to an obscure catering company that used the same address as the personal residence of Concept's Chief Financial Officer.

15.     The investigation uncovered other instances of suspected procurement fraud, including purchases of classroom furniture and equipment from companies formed by Concept insiders.

16.     Millions more appear to be wasted through sham arm's length real-estate transactions.  Several Concept-managed schools recently purchased real estate at dramatically inflated prices from shell companies controlled by individuals with ties to Concept officials.  In one recent example, a shell company sold a building to a Concept-managed school for $1.25 million—more than three times the price paid by the shell company just eight years earlier.  Notably, the shell company had been leasing the building to the school at incredibly generous terms, grossing more than $1 million in rent payments during the eight years before the sale.  Not surprisingly, this shell company was controlled by an individual with ties to Concept insiders, but these ties were never publicly disclosed.

17.     These real estate transactions are not isolated incidents.  Although more overt in nature, Concept managed schools frequently pay rent at above market rates to companies controlled by insiders and created solely to lease property to Concept-managed schools. These lease agreements siphon millions away from students' actual education, obfuscate the manner in which the schools utilize public funds and likely violate federal prohibitions on insider dealings within charitable organizations.

18.     In a recent report, the Auditor of the State of Ohio expressed serious concerns with Concept's governance, finding:

> Although maintaining sovereignty from and denying relations with Concept Schools, Inc., regular overlapping of Board members between New Plan Learning and Concept Managed schools has been documented, in addition to New Plan Learning personnel relations with Concept Schools, Inc. . . . In all, these members of New Plan Learning have served on the board for twelve of the seventeen Concept managed community schools in Ohio; nine of which have held leases with a New Plan Learning subsidiary, *which constitutes a conflict of interest*.

Auditor of the State of Ohio, Public Interest Report, Community School Facility Procurement at 20 (Jan. 10, 2019), attached hereto as **Exhibit 3** [hereinafter "Ohio State Auditor's Report"].

19.     Petitioner's investigation also identified strong support for longstanding whistleblower allegations regarding the schools' widespread sponsorship of visas and green cards for Turkish foreign nationals. As discussed in more detail below, a review of U.S. Department of Labor records support allegations that Concept is committing immigration and visa fraud in order to generate illicit kickbacks and re-locate Turkish supporters of Gulen into the United States.

20.    Analysis of these records demonstrates that Concept sponsors far more foreign nationals for teaching positions than does almost any other school district in the United States. Between the years 2017 and 2020 alone, Concept affiliated schools sponsored at least 174 individuals for H-1B visas and 94 individuals for permanent residence ("green cards"). According to a 2014 Cincinnati Inquirer article, Concept affiliated schools sponsored more than 474 individuals in the years 2005 to 2013. James Pilcher, *Charter Schools Use Turkish Ties, Visas to Get Teachers*, Inquirer (Oct. 5, 2014), http://www.cincinnati.com/story/news/2014/10/05/charter-school-turns-turkish-teachers/16791669/.

21.    Unlike other sponsors of foreign labor, Concept Schools show almost no diversity of citizenship in their hiring. Almost all of the foreign nationals sponsored by Concept and the insider companies come from a single country—Turkey.

22.    Analysis of Ohio teacher pay records lends further support to the whistleblower allegations that these Turkish teachers are required to kickback a portion of their salary to further the Gulen movement (as required by the "Tuzuk"). This data indicates that Turkish teachers are paid at a significantly higher rate than their non-Turkish counterparts, despite the fact that most of these teachers lack the credentials necessary to achieve professional certification as a teacher in the State of Ohio.

23.    It is not only the schools themselves who frequently sponsor Turkish nationals for visas. U.S. Department of Labor records further reveal that the same insider companies that receive large contracts from Concept and its related entities are themselves frequent sponsors of visas and permanent residency for foreign nationals. Not surprisingly, these same companies appear to only sponsor Turkish nationals for green cards.

24. The investigation has also established that Concept, the individual schools and the insider companies frequently misrepresent key information in various public forums.[1] In recently filed litigation in the State of Ohio, these schools claimed that "each independent school board separately contracts with Concept Schools." *State ex rel., Horizon Science Academy of Lorain, Inc. v. Ohio Dept. of Education*, Supreme Court of Ohio, Case No. 2020-0749. However, as the Auditor of the State of Ohio has noted, the same individuals are shuffled from one entity to another or are transferred in from outside organizations long affiliated with Concept schools. *See* Ex. 3 at 20.

25. Finally, whistleblower allegations regarding attempts to influence the United States political system through illicit campaign contributions also appear to have merit. As is documented below, many of the school executives and insiders who benefit from Concept contracts have made several large and suspicious campaign contributions to various public officials. In many cases, the contributions appear larger than an individual's reported salary would support and it is difficult to identify an ideological or regional basis for many of the contributions.

26. This and other evidence, which is documented more fully below, demonstrates the need for additional information to further the Petitioner's investigation.

---

[1] Although not grounds upon which this application is made, Petitioner's investigation revealed that Concept appears to mislead parents and the public about the quality of a Concept-managed education. Despite holding itself out as being "among the highest-performing charter support organizations in the nation," *Mission & Vision*, Concept Schools, https://www.conceptschools.org/mission-vision/, recent performance scores for Concept's seventeen Ohio-based schools tell a different story. Ohio Department of Education school "report cards" show that for the 2018-2019 academic year, fourteen of those schools received an overall grade of "C" or below (ten of which received a "D"), three schools received an "F," and only one school received an "A." *See School Report Cards*, Ohio Dept. Ed., https://reportcard.education.ohio.gov/.

## Relevant Individuals and Entities

27.    *Concept Schools*: Concept Schools ("Concept") is an Illinois 501(c)(3) that operates a network of 31 charter schools across Ohio, Illinois, Indiana, Michigan, Minnesota, Wisconsin and Missouri. Falling under Concept's umbrella are, among others, all of the Horizon Science Academy schools and the Chicago Math & Science Academy.

28.    *New Plan Learning, Inc.*: *New Plan Learning, Inc.*: New Plan Learning, Inc. is an Illinois-based 501(c)(3) non-profit organization formed by Concept insiders specifically to purchase real estate that is then leased to Concept's charter schools. At least fourteen Concept Schools in Ohio and Illinois lease property from New Plan Learning. In 2011, New Plan Learning secured over $32 million in municipal bonds in Pima County, Arizona to purchase and renovate facilities for use by four Concept schools in Ohio and Illinois. In the municipal bond offering statement, New Plan Learning made numerous promises to potential investors, including that construction projects financed by the bond funds would be subjected to a "rigorous" procurement process and the "lowest bidder who is also a responsible bidder capable of completing its subcontract work on time and within budget" would be selected. Official Statement, The Industrial Development Authority of the County of Pima Educational Facility Revenue Bonds (New Plan Learning, Inc. Project), Series 2011 (2011) at 20, attached hereto as **Exhibit 4** [hereinafter "Bond Statement"]. These promises were illusory, as construction permit records for these projects and other records demonstrate that insider companies were instead awarded these projects with no evidence of a competitive bidding process.

29.    *MDN of Dayton LLC*: MDN of Dayton LLC is an Ohio limited liability company owned by Mr. Ahmet Duran, an individual with numerous ties to Concept officials and other charter school districts linked to the Gulen Movement. In 2011, MDN of Dayton acquired the real property upon which Horizon Science Academy Dayton (Downtown) is located for $414,344, and thereafter leased the property back to the school for approximately $130,000 per year for an eight-year term. After receiving over $1,000,000 from Horizon Science Academy Dayton (Downtown) through that arrangement, in 2019 MDN of Dayton sold the property back to the school for $1,250,000—a threefold increase over the 2011 purchase price.

30.    *Core Group, Inc.*: Core Group, Inc. is an Illinois corporation operated by Ertugrul Gurbuz. The search warrant affidavit submitted in connection with the FBI's E-Rate fraud investigation discussed above revealed Core Group to be one of the largest insider recipients of FCC E-Rate funds for services connected to Concept schools. *See* Ex. 2 ¶ 73.  Core Group received over $2,500,000 from the E-Rate program between 2010 and 2013. *Id.*

31.    *CR/Daccord, Inc.*: CR/Daccord, Inc. was an Illinois corporation in which an individual named Chris Hill was a partner at the time of the 2011 Pima Bond offering. In the bond offering statement, Mr. Hill was listed as a paid advisor to New Plan Learning, the corporation that issued the bonds. *See* Ex. 4 at A-6, A-7. CR/Daccord was hired to perform a variety of pre-construction services for the Chicago Math & Science Academy projects financed by the bond offering, despite Mr. Hill's conflicted role as an advisor to New Plan Learning. These projects ultimately resulted in insider firms being awarded millions in bondholder funds, despite promises to utilize a fair and open bidding process.  CR/Daccord was dissolved 2013 and now operates as Daccord LLC, an Illinois limited liability company where Mr. Hill remains a partner.

4842-1121-7865, v.1

32.     *Design Furniture and Lab Systems, Inc./d/b/a PCF Works*: Design Furniture and Lab Systems, Inc./d/b/a PCF Works ("Design Furniture/PCF Works") is an Illinois corporation owned by Mevlut Cinar. Evidence suggests that Design Furniture/PCF Works is an insider company that may have been unlawfully awarded Concept contracts, including painting and flooring projects for various Concept schools. Upon information and belief, Design Furniture/PCF may serve as a supplier of classroom furniture for Concept schools as well. Design Furniture/PCF Works advertises itself as a supplier of classroom furniture to elementary and middle schools and corporate records show that the company also lists the same corporate address as Core Group— the company at the heart of the E-Rate fraud. Through Design Furniture/PFC Works, Mr. Cinar has sponsored four Turkish nationals for permanent residency in the United States.

33.     *Edip Pektas*: Edip Pektas is an Illinois citizen who has held a number of positions in Concept schools while also serving as President of Quality Builders of Midwest ("Quality Builders"). Leveraging his insider status with Concept, Mr. Pektas and Quality Builders have received numerous lucrative construction contracts from Concept-managed charter schools in Ohio and Illinois. Pektas profited handsomely from his connections with Concept and New Plan Learning through the 2011 Pima County municipal bond offering as Quality Builders was awarded lucrative construction contracts financed by the bond proceeds, despite promising investors that these contracts would be subject to a competitive bidding process. Notably, at the time these contracts were awarded to his company, Mr. Pektas was serving as both a paid advisor to New Plan Learning and as a board member at Chicago Math and Science Academy (a Concept-managed charter school that was a beneficiary of bond-financed construction projects). Construction permit records demonstrate that Mr. Pektas and Quality Builders have since landed other construction contracts

from Concept schools. In addition to his role as President of Quality Builders, Mr. Pektas is also the managing partner of Maestro International Cargo, a subsidiary company to Maestro Corporate Group LLC, another company run by Mevlut Cinar, who, as discussed above, is the owner of other companies receiving Concept contracts, including Design Furniture/PCF Works. Mr. Cinar and Mr. Pektas are also partners together in other ventures. Further, according to U.S. Department of Labor records, Mr. Pektas has sponsored at least one Turkish national for permanent residency through Quality Builders and at least two other Turkish individuals through Maestro Air Cargo. Mr. Pektas is currently listed as the Secretary of the Turkish American Society of Chicago, a 501(c)(3) organization which is the owner and operator of the Science Academy of Chicago, located in Mount Prospect, Illinois, and he has made nearly $50,000 in campaign contributions to various political campaigns since 2012.

34. *Ertugrul Gurbuz*: Ertugrul Gurbuz is an Illinois citizen, who was formerly affiliated with Quality Builders and is the owner of Core Group. Mr. Gurbuz is also the owner of Euclid Properties LLC, a company that sold various parcels of land housing at least one Concept charter school to HLC Euclid Properties LLC, a company for which Ozgur Balsoy (see below) is listed as the registered agent.

35. *Mevlut Cinar*: Mevlut Cinar is an Illinois citizen who is the president of Design Furniture/PCF Works and the CEO of Maestro Corporate Group LLC. Mr. Cinar and Mr. Pektas are closely linked to one another, including through Maestro International Cargo, a company for which Mr. Pektas serves as the managing partner, and through Inoa Ventures, a Chicago-based venture capital firm. Mr. Cinar owns and operates numerous businesses, including others that focus on the education sector. Through Maestro Corporate Group LLC, Design Furniture/PCF Works

and other entities, Mr. Cinar has sponsored multiple Turkish nationals for residency in the United States. Mr. Cinar is the former President of the Niagara Foundation, a non-profit organization long known for its ties to Mr. Gulen.

36. *Ozgur Balsoy*: Ozgur Balsoy is an Illinois citizen with many ties to Concept. Mr. Balsoy was formerly a Horizon Science Academies Director and is the registered agent for Concept Schools Ohio, Inc. He has also served as a teacher, school director, and development director for Concept. Mr. Balsoy is the owner of Advanced Solutions for Educations, Inc., and the registered agent of HLC Euclid Properties LLC, a company that purchased parcels of land housing Concept charter schools from another company owned by Ertugrul Gurbuz.

37. *Signature Maker, Inc.*: Signature Maker, Inc. is an Illinois corporation that is operated by former Wisconsin Career Academy (a former Concept and Gulen-affiliated charter school) Board President Ergun Koyuncu and shares an address with Sundance International LLC (a subject of the FBI E-Rate investigation). Signature Maker was the beneficiary of much of Concept's insider dealing. As established in the FBI's search warrant affidavit, Signature Maker was awarded thousands of dollars in FCC E-Rate funding through contracts awarded by Concept officials. *See* Ex. 2 ¶ 51. Moreover, as discussed in more detail below, according to City of Toledo, Ohio Division of Building Inspection, Signature Maker was issued construction permits to perform renovations at Horizon Science Academy Toledo. Signature Maker shares the same registered address as Sundance International LLC d/b/a Price PC.com.

38. *Star Consultants, Inc.*: Star Consultants, Inc. is an Ohio corporation that served as the "design-builder" under the 2011 Pima IDA bond offering. *See* Ex. 4 at 9. Although required

in that role to competitively bid and award major Concept charter schools subcontracts to the lowest bidder, Star Consultants awarded all such contracts to Concept insiders, including Quality Builders and Signature Maker.

39. *Quality Builders of Midwest, Inc.*: Quality Builders of Midwest, Inc. ("Quality Builders") is an Illinois corporation created by Concept insiders and headed by Edip Pektas. Quality Builders bills itself as a successful construction company, but appears to have no clients other than Concept managed charter schools as well as businesses controlled by other Concept insiders. Quality Builders was awarded millions of dollars in construction contracts paid for with funds raised through the 2011 Pima IDA bond offering. Many of these contracts were for work performed at Horizon Science Academy Springfield, Horizon Science Academy Toledo, and Chicago Math & Science Academy ("CMSA"). In addition to Mr. Pektas, Quality Builders has employed other Concept insiders, including Mustafa Celik, a former teacher of children with special needs at Horizon Science Academy Dayton (Downtown), and Ertugrul Gurbuz.

40. *Advanced Solutions for Education, Inc.*: Advanced Solutions for Education, Inc. ("ASE") is a corporation registered in both Illinois and Ohio that is owned by Ozgur Balsoy. In 2009, ASE attempted to become a service provider to Concept under the FCC E-Rate program, but its application was denied. Nonetheless, according to the FBI search warrant affidavit, it received more than $1,000,000 in other deposits from Concept schools between 2009 and 2012. *See* Ex. 2 ¶ 71. ASE also serves as the registered agent for Horizon Child Development Center, Inc., a company that operates publicly funded day-care centers in Ohio and is associated with Concept Schools Ohio Director Cengiz Altuna and located on property formerly owned by a company operated by Ertugrul Gurbuz.

41.     *Figs Café and Bakery LLC*: Figs Café and Bakery LLC ("Figs") is an Ohio limited liability company owned by Florence Freeman that has received millions of dollars in federal funding as a Child Nutrition Programs vendor for at least five Ohio-based Concept schools: Horizon Science Academy Cincinnati, Horizon Science Academy Columbus High School, Horizon Science Academy Columbus Middle School, Horizon Science Academy Dayton (Downtown), and Noble Academy Columbus. *See* Figs Child Nutrition Programs Contracts, attached hereto as **Exhibit 5**. Although both federal and state regulations require a fair bidding process for Child Nutrition Programs contracts, corporate records and the contracts with Concept schools reveal that Figs used the personal address of Concept Chief Financial Officer Ridvan Uysaler as its corporate location.

42.     *Ridvan Uysaler, Chief Financial Officer Concept Schools*: Ridvan Uysaler is an Illinois citizen who is the current Chief Financial Officer of Concept. He formerly served as Concept's Treasurer and as a physics teacher at Horizon Science Academy Columbus Middle School. Between 2007 and 2019, Mr. Uysaler held title to real property located at 2223 Sunleaf Court, Columbus, Ohio 43235—the same address that was registered to Figs between 2015 and 2018.

43.     *Maestro Corporate Group LLC*: Maestro Corporate Group LLC ("Maestro") is an Illinois limited liability company that is owned by Mevlut Cinar and that shares the same registered address as DSFL/PCF Works and Core Group. Maestro serves as a holding company for more than twenty subsidiary companies, including Maestro International Cargo LLC, a company for which Edip Pektas serves as the managing partner. Between 2017 and 2020, Maestro subsidiaries applied to sponsor at least 10 Turkish nationals for permanent residency.

### Evidence Indicates that Concept is Rife with
### Corrupt Insider Dealing

44.     Various whistleblowers have alleged that Concept is rife with conflicts of interest and corrupt insider dealing, allowing the organization to secretly siphon funds away from the educational purposes for which they are intended. Evidence uncovered during the preliminary investigation indicates that there is a substantial amount of truth to those allegations. Concept appears to consistently and unlawfully award contracts to insiders. Review of Concept's conduct relating to both construction projects financed through the multimillion-dollar 2011 Pima IDA bond offering IT projects funded by the FCC E-Rate program shed light on the mechanics of such schemes; however, additional evidence suggests that Concept's corrupt insider dealings do not stop there.

### New Plan Learning Appears to Have Committed Securities Fraud in Connection with the 2011 Municipal Bond Offering.

45.     As part of its investigation, Petitioner's counsel conducted a thorough review of construction permit applications, corporate records, and other public documents to determine how Concept awarded bond-financed contracts for major construction projects at its schools. This investigation revealed that, despite promising potential investors it would select vendors through a fair and open bidding process, Concept awarded such contracts almost exclusively to insiders tied to its organization, including to school officials who founded construction companies that appear to have no other clients but Concept-managed schools and affiliated entities.

*The 2011 Pima IDA Bond Offering*

46.     In 2011, the founders of Concept Schools created New Plan Learning, Inc. New Plan Learning was organized as a non-profit corporation with the primary goal of acquiring real

estate for Concept managed schools.  *See* Ex. 4 at 2; *About New Plan Learning*, New Plan Learn-ing,  http://www.newplanlearning.com/about/.    That same year, New Plan Learning issued $32,575,000 in Educational Facility Revenue Bonds (Series 2011A Bonds) and an additional $545,000 in Educational Facility Revenue Bonds (Series 2011B – Taxable Bonds) through the Pima County IDA. *See* Ex. 4 at 1.

47.    Pursuant to the bond's offering statement, the funds were to be used in part to "fi-nance and refinance the acquisition, construction, improvement, and equipping" of four Concept campuses: Chicago Math & Science Academy ("CMSA"); Horizon Science Academy Toledo; Horizon Science Academy Dayton; and Horizon Science Academy Springfield.  *Id.* at 2, 8-10.

48.    Those projects were to be managed by New Plan Learning and a "design-builder." *Id.* at 9.  The design-builder selected was Star Consultants, Inc., an Ohio corporation owned by Mr. Hamid Mukhtar. *See id.*; Star Consultants, Certificate of Amendment (June 5, 1998), https://bizimage.ohiosos.gov/api/image/pdf/199816000557.

49.    As part of that arrangement, New Plan Learning promised investors that Star Con-sultants would "competitively bid the major subcontracts using a process similar to typical public construction projects whereby it will advertise for bids in the local newspapers and construction trade publications, hold a pre-bid conference, accept pre-bid requests for clarification and then open sealed bids at the time and date set for bid opening." Ex. 4 at 10. New Plan Learning also promised investors that Star Consultants would "award those major subcontracts to the lowest bidder who is also a responsible bidder capable of completing its subcontract work on time and within budget." *Id.*

50.     Despite such assurances, a review of public documents reveals that the sub-contracts were simply awarded to insiders connected to Concept Schools.

*Quality Builders of Midwest, Inc.*

51.     New Plan Learning, possibly working through Star Consultants, awarded a majority of the bond-funded sub-contracts to Quality Builders. According to construction permit records, Quality Builders was hired for bond-financed construction work at Horizon Science Academy Springfield, Horizon Science Academy Toledo, and Chicago Math and Science Academy ("CMSA").

52.     At Horizon Science Academy Toledo, Quality Builders was hired to construct a new addition for the school gymnasium and to perform interior alterations at the school.  Commercial Building Interior Alteration, Record BB12-00880 (Horizon Science Academy Toledo), attached hereto as **Exhibit 6**. At Horizon Science Academy Springfield, it was hired to "demolish [an] existing rear addition (pool) and build new addition in its place."  Commercial Building Permit, Record BB11-00599 (Horizon Science Academy Springfield), attached hereto as **Exhibit 7**. New Plan Learning also hired Quality Builders to construct a new, 11,500 square-foot gymnasium at CMSA—a $1,170,000 project, according to the Quality Builders website. *See CMSA Gym Addition*, Quality Builders of Midwest, http://www.qbmidwest.com/projects/commercial-projects/cmsa-gym-addition/.

53.     Quality Builders is very much an insider organization.  According to Illinois business records, its President is Mr. Edip Pektas—the same individual who was both a board member at CMSA and was listed in the Bond Statement as a Financial Advisor to New Plan Learning. *See*

CMSA Annual Report at 22 (2013-2014), http://www.cmsaonline.net/wp-content/uploads/2015/05/CMSA-ANNUAL-REPORT-2014.pdf. Nowhere in the Bond Statement, however, were investors warned about these significant conflicts of interest. Moreover, Quality Builders formerly employed Mr. Ertugrul Gurbuz and Mr. Mustafa Celik, a former special needs teacher at Horizon Science Academy Dayton (Downtown).

54.     In fact, it appears from various public records that Quality Builders has *only* worked for Concept schools or other companies affiliated with Concept insiders. *See Gallery*, Quality Builders of Midwest, http://www.qbmidwest.com/gallery/ (exclusively showing projects completed for Concept charter schools, including Horizon Science Academy McKinley Park and Horizon Science Academy Southwest, in addition to the CMSA gymnasium renovation); *see also Summary: Quality Builders of Midwest*, BuildZoom, attached hereto as **Exhibit 8**.

*Signature Maker, Inc.*

55.     The remainder of the related bond-offering sub-contract work was awarded to Signature Maker, Inc., an Illinois corporation operated by an individual named Ergun Koyuncu. *See* Illinois Secretary of State, Corporation Search for Signature Maker, Inc., attached hereto as **Exhibit 9**. Construction permit records show that New Plan Learning, potentially through Star Consultants, hired Signature Maker to perform interior alterations at Horizon Science Academy Toledo. *See* Commercial Building Interior Alteration, Record BB 10-00540 (Horizon Science Academy Toledo), attached hereto as **Exhibit 10**.

56.     Perhaps unsurprisingly, Signature Maker is another company formed by Concept insiders with a history of questionable contracts with the schools. Signature Maker was a subject of the FBI investigation into E-Rate program fraud and, on numerous immigration petitions, Mr.

Koyuncu was listed as the point of contact and Board President of the Wisconsin Career Academy (a charter school with ties to Concept that has since ceased operations). Ex. 2 ¶ 18.

*CR/Daccord, Inc.*

57.    Pursuant to the Bond Statement, over $1,000,000 of the bond funding was to be used to finance the construction of a new gymnasium at CMSA. Ex. 4 at 10.

58.    In connection with that project, New Plan Learning hired CR/Daccord, Inc., an Illinois corporation,[2] to provide "preconstruction services including a conceptual design budget for the new gymnasium, which includes hard costs, soft costs, FFE, financing costs and contingency." *Id.* The Bond Statement described CR/Daccord as a company with "30 years of public and private sector construction experience" that had "worked on approximately 17 new school projects and 135 renovations projects since 1993." *Id.* But in reality, CR/Daccord was just one of several insider companies hired to perform work on Concept Schools Projects.

59.    Under a section of the Bond Statement labeled "NPL Management and Governance," an individual named Chris Hill is listed as Project Management Advisor to New Plan Learning. The Bond Statement sought to bolster investors' confidence by touting Mr. Hill's past experience in the area of project management. *See id.* at A-6, A-7 (noting that Mr. Hill worked in the Mayor of Chicago's cabinet as Commissioner of the Planning and Development Department and previously served as the Executive Director of the Public Building Commission of Chicago).

---

[2] CR/Daccord is presently operating as Daccord LLC, an Illinois limited liability company. *See* https://www.daccordllc.com/.

60.     What the Bond Statement failed to disclose, however, was that Mr. Hill at the time (and remains today) a partner in CR/Daccord—the very company profiting from performing pre-construction services for the project. *See id.* at 10; *see also In brief: Glenview | 444 N. Michigan | Shorewood*, Crain's Chicago Business (Sept. 2, 2010), https://www.chicagobusiness.com/article/20100902/CRED03/100909967/in-brief-glenview-444-n-michigan-shorewood; *David & Goliath*, Bisnow (Jan. 26, 2011), https://www.bisnow.com/chicago/news/commercial-real-estate/David--Goliath-9170.

### Concept Appears to Have Unlawfully Awarded U.S. Department of Agriculture Child Nutrition Program Contracts to Companies Affiliated with Concept Officials

61.     Concept's awarding of insider contracts financed by the 2011 Pima IDA bond offering was not the only instance in which this investigation uncovered evidence of corruption.  As the investigation revealed, Concept's awarding of insider contracts even extends to its selection of USDA Child Nutrition Programs providers.

62.     Under the Child Nutrition Programs, schools are required to select vendors through a formal procurement process, which generally includes soliciting competitive sealed bids or requests for proposals. *See* 7 C.F.R. § 210.21; *see also* Oh. Admin. Code 125:5-1-08, 1 Oh. Rev. Code 125.071. Federal procurement rules also mandate that "no employee, officer, or agent may participate in the selection, award, or administration of a contract supported by a Federal award if he or she has a real or apparent conflict of interest."  2 CFR § 200.318(c).

63.     Despite these clear mandates, Concept awarded Child Nutrition Program contracts for at least five of its Ohio schools—Horizon Science Academy Cincinnati, Horizon Science Academy Columbus High School, Horizon Science Academy Columbus Middle School, Horizon Science Academy Dayton (Downtown), and Noble Academy Columbus—to Figs Café and Bakery,

an obscure catering company that shared its corporate address with the personal residence owned by Concept's Chief Financial Officer, Ridvan Uysaler. *See* Ex. 5. According to public records, Figs was awarded federally funded child nutrition contracts, worth approximately $958,829 annually.

64.     Setting aside concerns regarding Fig's ability to safely feed hundreds of school children, the use of a shared address with Mr. Uysaler raises serious questions that require further investigation and merit additional discovery.

### The Investigation Uncovered Evidence of Insider Real Estate Dealings

65.     Petitioner's counsel's investigation uncovered not only evidence related to securities and federal procurement fraud, but also widespread evidence of real estate deals that deprive students of millions of dollars and enrich Concept insiders.

66.     The acquisition, lease, and sale of the real property upon which Horizon Science Academy Dayton (Downtown) is located is one particularly egregious example.  That property was purchased in 2011 by MDN of Dayton LLC in 2011 for $414,344.  MDN of Dayton is owned by Mr. Ahmet Duran, an individual with a number of ties to Concept insiders, who has long been alleged of unlawful and unethical insider dealings with Harmony schools (a Texas-based school district also associated with the Gulen Movement).[3]

67.     According to Horizon Science Academy Dayton (Downtown's) audited financial statements, Mr. Duran, through MDN of Dayton, leased the property back to the school for approximately $130,000 per year for a term of eight years. *See* Horizon Science Academy Dayton

---

[3] Mr. Duran was also a jointly represented co-defendant with Edip Pektas and Quality Builders in a civil cause of action filed in Ohio state court by a sub-contractor who claimed he was underpaid in connection with work he performed for Horizon Science Academy Dayton (Downtown).

(Downtown) Audit at 32, attached hereto as **Exhibit 11**. In entering into this lease agreement, neither Concept nor Mr. Duran publicly disclosed his ties to Concept insiders.

68.     After reaping more than $1 million in lease payments from Horizon Science Academy Dayton (Downtown), in 2019, Mr. Duran sold the property back to the school for $1.25 million, a threefold increase over the 2011 purchase price. In total, this insider transaction deprived the students of Horizon Science Academy Dayton (Downtown) of more than $2.25 million—far more than the school would have had to pay for its lease on the open market.

69.     There have been several similar sales of real estate from insider companies back to Concept-managed schools in recent years. In 2019, a New Plan Learning subsidiary sold the Horizon Science Academy Columbus Middle School back to the school for $3,645,000—more than double what it initially paid for the property (which appears to have formerly been a lot for used car sales). Notably, this sale came years after New Plan Learning rented the property to the school at above market rates, including more than $500,000 in 2019 alone. Similarly, Breeze, Inc., another New Plan Learning subsidiary, recently flipped the property that houses Horizon Science Academy Columbus High School back to school for $3,600,000—more than double the original purchase price from ten years earlier of $1,500,000. Each of these sales appears to have been made at an inflated price and leaves the schools in a materially worse financial position. Moreover, these sales all occurred after the schools paid massive rents to the property owners for years.

### Conflicts of Interest Enable Concept to Enter into Egregious Lease Agreements

70.     Yet another way that Concept funnels funds away from students is through inflated lease agreements with New Plan Learning. As mentioned, the majority of Concept charter schools do not own the property upon which their campuses are located. Rather, those properties are held

by New Plan Learning, which leases them back to the schools.

71.     A review of various Concept schools lease agreements conducted by the Ohio State Auditor's office revealed that they contained provisions consistently disfavoring Concept charter schools, while simultaneously benefitting New Plan Learning—effectively taking away millions in taxpayer dollars from the very students those funds are intended to benefit. *See* Ex. 3 at 15, 21.

72.     One category of lease agreements reviewed by the State Auditor were those involving properties financed by the 2011 Pima IDA bond offering. The State Auditor found that, although New Plan Learning's cost of issuance was just over $1,000,000, it stands to gain over $14,000,000 by the time the leases terminate. *See id.* at 15. The State Auditor also found that all of those leases were "absolute net" agreements, meaning that the schools were responsible "for all costs associated with the property including structural maintenance and reimbursement to New Plan Learning of its allocable portion of any fees, charges, or expenses incurred in association with the bond issuance or leased property," despite paying hundreds of thousands of dollars in rent payments to New Plan Learning each year. *Id.* The State Auditor additionally found concerning arrangements involving sale and leaseback agreements between Concept schools and New Plan Learning, whereby property was sold to New Plan Learning at below-market rates and then leased back to at least some Concept schools at rental rates above fair market value. *See id.* at 21.

73.     Perhaps unsurprisingly, these unfavorable lease agreements were revealed to be the result of numerous conflicts of interest among members of the Concept and New Plan Learning Boards. The State Auditor found that the Board President of New Plan Learning was one of the initial directors of Concept Schools – Ohio, Inc., and as of 2019 served as President of the governing board for several Horizon Science Academy schools. *Id.* at 20. It also found similar issues for

24

other members of New Plan Learning's staff, including its Secretary and Treasurer, each of whom has served on several Concept school boards. According to the State Auditor, "these members of New Plan Learning have served on the board for twelve of the seventeen Concept managed community schools in Ohio; nine of which have held leases with a New Plan Learning subsidiary, which constitutes a conflict of interest." *Id.*

### Evidence Suggests Mr. Cinar's Companies Routinely Receive Concept Contracts

74.     Another example of this potentially corrupt pattern and practice relates to Mr. Mevlut Cinar, a Chicago based businessman with extensive ties to Concept officials and the Gulen Movement.

75.     Mr. Cinar is the CEO or President of several Illinois companies, including Maestro Corporate Group, LLC ("Maestro").  Maestro is a holding company comprised of more than twenty different companies, including Maestro International Cargo—a company for which Edip Pektas serves as the managing partner. *See Maestro Announces Partnership with Emirates Skycargo in Chicago*, Aircargo News (Dec. 17, 2019), https://www.aircargonews.net/cargo-airport/maestro-announces-partnership-with-emirates-skycargo-in-chicago/.   Mr. Cinar and Mr. Pektas also claim a partnership in a venture capital firm named Inoa Ventures. *See* Inoa Ventures, https://www.inoaventures.com/.

76.     Mr. Cinar has also promoted his ownership of Maestro Education, which claims to have managed the Milwaukee Math and Science Academy (a school now formally affiliated with Concept) as well as North American University, a private Texas based post-secondary school also reputed to be affiliated with the Gulen Movement.

77.     Curiously, Mr. Cinar's LinkedIn page does not mention that he also serves as the president of an Illinois corporation known as Design Furniture and Lab Systems, Inc., a company that shares the same registered address as Maestro, which, in turn, both share the same address as Core Group—the company founded by Ertugrul Gurbuz and implicated in the FBI's E-Rate fraud investigation.[4]

78.     Design Furniture is described on Bloomberg as a company that provides "school furniture and equipment . . . [and] offers plastic injecting molding chairs and tables, as well as school renovation like carpeting, gym flooring, and painting." *Design Furniture & Lab Systems Inc*, Bloomberg, https://www.bloomberg.com/profile/company/1063731D:US. Moreover, Design Furniture's LinkedIn page states that it "mostly work[s] with K-12 schools in Midwest in the USA and [has] completed many projects successfully . . ." *Design Furniture and Lab Systems*, LinkedIn, https://www.linkedin.com/company/design-furniture-and-lab-systems. It further boasts that the company has a 90% "repeat customer rate," a supposed "testament to the trust and satisfaction our customers have in our staff's ability to meet their needs." *Id.*

79.     Corporate records show that Design Furniture does business under several other names, including "PCF Works." According to the Contractor's Blue Book, PCF Works' "main lines of business include: Athletic Court Flooring, Painting Contractors, Playground Equipment." *PCF Works*, Blue Book, http://www.thebluebook.com/iProView/1185193/pcf-works/subcontractors/. A media gallery on that same website displays a number of past PCF Works projects, including playground construction at Horizon Science Academy McKinley, as well as other paint

---

[4] Customs records also indicate that Design Furniture is one of just two U.S. importers of products manufactured by Turkish company Gurkan Ofis Mobilyalari. The only other company to import those products to the United States is Winport Group LLC, a company owned by Ahmet Duran—the same individual who owns MDN of Dayton.

and flooring projects at what are clearly other Concept campuses. *See Image Gallery*, Blue Book, http://www.thebluebook.com/iProView/1185193/pcf-works/subcontractors/gallery/.

**The Department of Justice Investigation into Concept Corroborates Petitioner's Findings**

80.     Similar patterns of misconduct were discovered upon review of evidence related to the FBI's investigation of Concept and insider parties for defrauding the FCC E-Rate Program. Notably, many of the parties implicated in this investigation are beneficiaries of other significant Concept contracts and/or linked to current Concept officials.

*The FBI E-Rate Investigation*

81.     In 2014, the FBI, Department of Education-Office of Inspector General, and FCC-Office of Inspector General conducted an investigation into Concept's use of federal grant dollars granted through the FCC E-Rate program. The E-Rate program is designed to distribute federal funds to eligible schools and libraries for the purchase, installation, and maintenance of telecommunications services, internet access, and internal connections.  In order to receive E-Rate funds, participating schools are required to have a "fair and open competitive bidding process." *See* 47 C.F.R. §54.503(a)-(b).

82.     According to a publicly available affidavit in support of a search warrant, however, the FBI established probable cause to believe that Concept was violating the E-Rate program's bidding requirements with respect to various IT contracts awarded using E-Rate funding. *See* Ex. 2. The FBI more specifically alleged that Concept, through its Chief Information Officer Huseyin Ulker and other officials, had been unfairly awarding IT contracts to insider companies since at least 2007. *Id.*

*Core Group, Inc.*

83.    One of the primary service providers to Concept under the E-Rate program was an Illinois corporation known as Core Group, Inc. *Id.* at ¶ 63. The owner of Core Group is Ertugrul Gurbuz, the same individual who was formerly associated with Quality Builders—the company that was awarded a majority of the sub-contracted work under the 2011 Pima IDA bond offering, discussed *supra*. According to the FBI, Core Group received over $2,500,000 from the E-Rate program between 2010 and 2013. *Id.* at ¶ 73.

*Signature Maker, Inc.*

84.    Another major recipient of Concept's E-Rate service contracts was Sundance International d/b/a Price PC.com ("Sundance"), an Illinois limited liability company owned by former Wisconsin Career Academy Board Member Galip Kuyuk. *See id.* at ¶ 18; *see also* Illinois Secretary of State, Corporation Search for Sundance International, attached hereto as **Exhibit 12**. Between 2010 and 2013, Sundance received over $1,000,000 in E-Rate funding for work performed on behalf of Concept schools. Ex. 2 at ¶ 79.

85.    Public records reveal that during this same time, Sundance shared a corporate address with Signature Maker—the company owned by former Wisconsin Career Academy Board Member Ergun Koyuncu that was awarded construction contracts financed with the proceeds of the 2011 Pima IDA bond offering. Incredibly, Signature Maker, which was awarded significant construction contracts, was also awarded thousands of dollars of Concept's E-Rate service contracts. *See id.* at ¶ 51. There is nothing to suggest that Signature Maker was qualified to act as both a general construction contractor and an IT vendor. Indeed, the FBI found that Cambridge Technologies, a Concept E-Rate service provider, was directed to sub-contract with Signature Maker despite Signature Maker charging unusually high rates for its work. *See id.* at ¶ 50.

*Advanced Solutions for Education, Inc.*

86.     The final company targeted under the FBI search warrant in connection with its E-Rate fraud investigation was Advanced Solution for Education, Inc. ("ASE"), a company incorporated in both Illinois and Ohio. *See id.* at ¶ 66.  ASE provides continuing education for teachers and administrators, as well as other school consulting services.  *Id.* at ¶66.  Similar to Quality Builders, ASE almost exclusively conducted its business with Concept schools. *Id.* at ¶ 18.

87.     In late 2009, ASE attempted to become an E-Rate service provider for Concept. *Id.* at ¶ 66. Due to issues with its application, the company ultimately did not receive E-Rate funding, but the FBI nonetheless determined that ASE received more than $1,000,000 in other deposits from Concept schools between 2009 and 2012. *See id.* at ¶ 71.

88.     Although ASE did not receive public E-Rate money from Concept, the company remains of interest due to its ownership by an individual named Ozgur Balsoy.  Mr. Balsoy's connections with Concept are plenty.  He was formerly a Horizon Science Academy Director and is the registered agent for Concept Schools Ohio, Inc. *Id.* at ¶ 66.  He has also served as a teacher, school director, and development director for Concept.  *Id.*  at ¶ 86(d).

89.     Mr. Balsoy and ASE have further been found to be tied to other individuals and entities involved in Concept's insider dealings.  For example, on several records submitted under the E-Rate program, Mr. Ulker, Concept's Chief Technology Officer, listed his contact email as an address serviced by "as4ed.com," the same domain used by Mr. Balsoy for the ASE website. *Id.*  at ¶ 67; *Advanced Solutions for Education*, https://as4ed.com/.

90.     There are also ties between Mr. Balsoy and Mr. Gurbuz, the owner of Core Group and founder of Quality Builders.  According to public records, in 2016, Mr. Gurbuz, through his

company Euclid Properties LLC, sold various parcels of land housing Concept-managed or affiliated entities to a company called HLC Euclid Properties LLC, the registered agent of which is Mr. Balsoy. One of those parcels housed Horizon Child Development Center, which was run by Horizon Child Development Center Inc. and associated with Concept Schools Ohio Director Cengiz Aluntas. As of 2010, however, ASE was identified as the company's new registered agent.

91.    All told, the total amount of public funding received by Concept Schools insiders was over $5 million dollars. In comparison, non-related entities contracted for E-Rate work by Concept Schools during the same time period was just above $100,000—a mere 2.1% of the total E-Rate funds received by all Concept Schools charter schools. *Id.* at ¶ 81.

### Evidence Supports Allegations that Concept Abuses the U.S. Immigration System and Requires Turkish Teachers to Kickback Salaries

92.    Whistleblowers have long publicly alleged that Concept abuses the U.S. immigration system and siphons taxpayer dollars away from children's education by importing large numbers of Turkish teachers to its schools and thereafter requiring those teachers (under the Tuzuk) to kickback portions of their salaries to fund the political activities of the Gulen Movement. After investigating such claims furthers and conducting an independent review of publicly available documents, we have determined that there is significant evidence to suggest those allegations are true.

93.    A review of U.S. Department of Labor data suggests that, between 2017 and 2020, Concept Schools sought certifications that would allow them to sponsor 174 individuals for H-1B visas and 94 individuals for permanent residence in the United States. Of the 94 individuals sponsored for permanent residence, 87, or all but seven, were from Turkey. The remaining seven were from Turkmenistan, Kyrgyzstan, and Somalia, countries known to have large numbers of Gulen

supporters. *See* Bayram Balci, *Turkey's Religious Outreach in Central Asia and the Caucasus*, Carnegie Endowment for Int'l Peace (Jan. 27, 2014), https://carnegieendowment.org/2014/01/27/turkey-s-religious-outreach-in-central-asia-and-caucasus-pub-54357. Moreover, according to a 2014 Cincinnati Inquirer article, Concept affiliated schools sponsored more than 474 individuals in the years 2005 to 2013. *See* James Pilcher, *Charter Schools Use Turkish Ties, Visas to Get Teachers*, Cincinnati Inquirer (Oct. 5, 2014), http://www.cincinnati.com/story/news/2014/10/05/charter-school-turns-turkish-teachers/16791669/.

94.     To put these numbers in perspective, Concept schools sponsored far more individuals for work visas and permanent residence than did any other school district in Ohio or Illinois.  By comparison, the Columbus City School District, which educates 50,219 students and is the largest school district in Ohio, filed only two H-1B sponsorship applications and no applications for permanent residency during the same time period.  Horizon Science Academy's Columbus schools alone sponsored 36 H-1B applicants and 13 permanent residency applications (12 for Turkish citizens) for its 1,900 students.  Cincinnati Public School District, the third largest school district in Ohio with 36,000 students enrolled, did not file any H-1B or permanent residency sponsorship applications from 2017 to 2020.  By contrast, Horizon Science Academy Cincinnati, with only 250 students enrolled, filed 15 H-1B sponsorship applications and 19 permanent residency applications.  All 19 permanent residency applications were filed on behalf of Turkish citizens.  As for Toledo, which is Ohio's fifth largest school district with nearly 23,000 enrolled students, Toledo Public Schools filed only one H-1B sponsorship application and it did not file any permanent residency applications from 2017 to 2020.  With a mere 500 students enrolled and for the same time period, Horizon Science Academy Toledo filed 13 H-1B sponsorship applications and

ten permanent residency applications.  All ten of Horizon Science Academy Toledo's permanent residency applications were for Turkish citizens.

95.     In Illinois, Chicago Public Schools is the third largest school district in the entire United States and enrolls over 355,00 students.  Despite the school district's size, Chicago Public Schools only applied to sponsor 38 H-1B applicants and four for permanent residency between 2017 and 2020.  Conversely, just one of the Concept Schools in Illinois, Horizon Science Academy Belmont, which enrolls only 500 students, applied to sponsor six H-1B teachers and 13 for permanent residency.  Eleven of the thirteen permanent residency applicants were Turkish citizens and the other two were citizens of Kyrgyzstan.

96.     Analyzed on a per-student basis, with 14,000 students enrolled in all Concept Schools, the schools sponsored one individual for an H-1B work visa for every 80 students.  With 1,800 staff, Concept Schools sponsored nearly one in ten staff members for an H-1B visa.

97.     By comparison, during the same time period, the New York City Department of Education, the largest school district in the country and with over 1.1 million enrolled students, sponsored only 185 individuals for H-1B visas and only 57 for permanent residency between 2017 and 2020. Houston Independent School District, which has over 209,000 enrolled students and is the seventh largest school district in the country, sponsored 288 H-1B visas (of which nearly half were for bilingual teachers) and nine for permanent residency. With 75,000 teachers in the New York City school district, the New York City school district sponsored only one in 405 teachers for an H-1B visa.

98.     In fact, the only school district that utilizes foreign national teachers at the same level as does Concept is Harmony Public Schools—another district long reputed to be connected

to Gulen and his movement.  Harmony, with only 34,479 students, is the leading user of H-1B visas of all K-12 schools in the United States.

99.     The lack of diversity in Concept and Harmony's foreign national hiring is striking.  Like Concept, the vast majority of sponsored individuals came from Turkey.  In fact, 91% percent of all individuals sponsored for permanent residency by Harmony Public Schools were Turkish citizens and the remaining 9% all originated from Turkmenistan, Tajikistan, and Kyrgyzstan.

100.     Unsurprisingly, other school districts that have sponsored teachers for permanent residency show far more diversity in their hiring. For example, the New York City Department of Education sponsored permanent residency applications for individuals from China, Philippines, Taiwan, Dominican Republic, South Korea, Mexico, Japan, Jamaica, Indonesia, and Colombia; Chicago Public Schools sponsored individuals from India, Spain, and China; and Houston Independent School District filed permanent residency applications for individuals from Spain, Philippines, Nigeria, Poland, Malaysia, Mexico, and Grenada.

101.     According to interviews of former teachers and employees of the schools, foreign national teachers are required to pay kickbacks, under the Tuzuk, to the Gulen Organization. In 2013, for example, a former Concept Schools teacher stated that her husband and his fellow Turkish teachers at a Concept school in Ohio had been required to kickback 40% of their salaries to a secret fund used by the Gulen Movement. *See* Valerie Strauss, *Fethullah Gulen: The Islamic Scholar Turkey Blames for the Failed Coup*, Wash. Post (June 5, 2012), https://www.washingtonpost.com/news/answer-sheet/wp/2016/07/16/fethullah-gulen-the-islamic-scholar-turkey-blames-for-failed-coup/.

102.    Similar allegations were made by a former math teach at a Gulen-affiliated charter school in Utica, New York.  That teacher stated he was forced to pay nearly $10,000 to the school and two charities as a condition of his employment, which was then funneled to the Gulen Movement. Chris Bragg, *Teacher Who Made 'Tithe' Charge at Charter School Gets $2,000 Check*, Times Union (Aug.  2017), https://www.timesunion.com/news/article/Teacher-who-made-tithe-charge-at-charter-school-11868205.php.

103.    The allegations of kickbacks raise further red flags when considered alongside allegations that Turkish teachers are paid higher salaries than their non-Turkish counterparts. In 2007, a former teacher at the Harmony Science Academy in El Paso, TX filed a complaint against the school alleging that she, a Hispanic woman of Mexican origin, was paid just $26,000 per year, whereas Turkish teachers at the same school were paid $40,000 per year. See *Couch v. Harmony Science Academy-El Paso*, Case No. 2:07-cv-01314 (D.N.M. 2007).

104.    Similar allegations have been raised. In 2014, the U.S. Equal Employment Opportunity Commission and Department of Justice entered into a consent decree with Harmony Public Schools related to allegations made by a former teacher at Harmony Science Academy in Austin, TX.  That teacher—who had been teaching at the school for five years, held a State of Texas teaching certification, and met the state's "Highly Qualified" teacher's criteria— made $40,000 in her fifth year of teaching.  In comparison, Harmony paid an uncertified male Turkish art teacher with no previous teaching experience an annual salary of $44,000 to teach art at another Austin-area charter school. *See* Press Release, EEOC, Federal Agencies Resolve Equal Pay and Retalia-

tion Claims Against Harmony Public Schools (Mar. 6, 2014), https://www.eeoc.gov/news-room/federal-agencies-resolve-equal-pay-and-retaliation-claims-against-harmony-public-schools.

105.  An analysis of teacher salaries in Ohio lends credence to these allegations. This analysis indicates that teachers whose names suggest Turkish heritage are paid at a higher rate than are those teachers whose names do not.[5] The data further suggests that teachers at Concept schools whose names suggest a Turkish heritage are paid approximately 12% more than those without a Turkish name. In fact, those Concept school teachers whose names suggest a Turkish heritage were paid an average of $40,613. All other teachers were only paid $36,031. *See* Ohio 2018-19 School Year Education Employee Salary.

### Concept's Conduct Amounts to Criminal Activity in the United States

106.  The above outlined indicia of fraud suggest that Concepts Schools and its affiliated entities and members have been involved in both federal and state crimes. In general, Concept Schools' scheme as described above is indicative of wide-ranging wire fraud and money launder-ing. *See* 18 U.S.C. §1343 (wire fraud); 18 U.S.C. §1956 (money laundering).

107.  In particular, Concept's material misstatements contained in the 2011 Pima IDA bond offering suggest that New Plan Learning engaged in wire fraud fraud in violation of federal fraud statutes, *see* 18 U.S.C. § 1343 (wire fraud), not to mention that these misstatements likely run afoul of federal securities law, *see* 15 U.S.C. § 78q.

---

[5] An analysis of teacher salaries for the 2018-2019 school year was conducted using the Ohio Treasurer's Transparency Project tool. *See* Office of the Ohio Treasurer, Treasurer's Transparency Project, 2018-19 School Year Education Employee Salary, http://treasurer.ohio.gov/Teacher_Salary/-any-/-any-/-any-/Hori-zon-space-Science-space-Academy-space-Dayton-space-Downtown/-any-/-any-/-any- [hereinafter Ohio 2018-19 School Year Education Employee Salary"].

108. Furthermore, the FBI's investigation of Concept's participation in the E-Rate program suggests that it violated federal laws related to defrauding the United States in furtherance of federal programs bribery, *see* 18 U.S.C. § 666 (federal programs fraud), or theft of federal funds, *see* 18 U.S.C. § 641.

109. The schools' use of the H-1B program and permanent residency process also indicate potential violations of federal visa fraud laws *See* 18 U.S.C. 1546(a) (visa fraud).

110. It is likely that further investigation would reveal specific instances of additional crimes such as making false statements, filing a false tax return, obstruction, or even witness tampering. *See* 18 U.S.C. § 1001 (false statements) and 26 U.S.C. §7 206 (false statement on tax return).

111. The above outlined indicia of fraud also suggest that Concept and related entities have committed state law crimes and violations. Concept's pattern of rewarding lucrative contracts to its insiders is just one example of potential state conflicts of interest crimes and ethics violations. *See* Ohio Rev. Code 29 § 2921.42 (unlawful interest in public contract); Ohio Rev. Code 33 § 3314 (community schools conflict of interests); Ohio Rev. Code 13 § 1315.51 (money laundering).

## Conclusion

112. In light of the foregoing, Petition requests that the Court grant its simultaneously submitted *Ex Parte* Application for an Order Under 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings in support of which this Statement of Facts is filed.

Date: September 2, 2020

Respectfully submitted,

/s/ *Kelly A. Callam*
Maura L. Hughes (0061929)
Kelly A. Callam (0092349)
Calfee, Halter & Griswold LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH  44114-1607
(216) 622-8233
mhughes@calfee.com
kcallam@calfee.com

*Applications for Pro Hac Vice Admission*
*Forthcoming:*

John R. Sandweg
NIXON PEABODY LLP
799 Ninth Street, NW, Suite 500
Washington, D.C. 20001-4501
(202) 585-8819 (telephone)
jsandweg@nixonpeabody.com

Christopher P. Hotaling
NIXON PEABODY LLP
70 W. Madison, Suite 3500
Chicago, IL 60602
(312) 977-4418 (telephone)
chotaling@nixonpeabody.com

Alper Tosun
NIXON PEABODY LLP
55 W. 46th St., Tower 46
New York, NY 10036
(212) 940-3098 (telephone)
atosun@nixonpeabody.com

*Counsel for Petitioner*

# EXHIBIT 1



*Ambassador*

*Embassy of Turkey*
*Washington, D.C.*

August 28, 2020

**RE: Criminal Investigation into Fetullah Gulen and His Organization**

To Whom It May Concern:

This letter confirms that Law Enforcement Authorities of the Republic of Turkey are conducting various criminal investigations into Fetullah Gulen and his organization for suspected criminal activity.

The current focus of one of these investigations is widespread and includes the suspected laundering of criminal proceeds in violation of Turkish laws and regulations, including Article 282 of the Criminal Code, Law No. 5549 on Prevention of Laundering Proceeds of Crime, and the Regulation on Measures Regarding Prevention of Laundering Proceeds of Crime.

Specifically, Turkish authorities are investigating a scheme through which criminally derived funds are being laundered from certain corporations and individuals throughout the United States, and then returned to Turkey for the continued financing of illicit activities in violation of Turkish laws.

In furtherance of competent Turkish authorities' investigative efforts, please be advised that the Government of Turkey has retained U.S.-based counsel, Nixon Peabody LLP, to receive more information about the criminal activities of these corporations and individuals in the United States. We are optimistic that the assistance of the U.S. judicial system in compelling the production of information relevant to these investigations will assist in bringing the responsible parties to justice in Turkey and the United States.

Please be advised that this letter should not be deemed or interpreted as waiver of immunity of the Ambassador of the Government of Turkey to the United States, as well as any member of the Turkish Embassy in Washington, D.C. from jurisdiction of the U.S. courts, which is recognized by the Vienna Convention on Diplomatic Relations of 1961.

We appreciate your time and assistance with this important matter.

Sincerely,

Serdar Kılıç

# EXHIBIT 2

Case: 1:14-mc-00288 Document #: 1 Filed: 06/04/14 Page 1 of 85 PageID

**FILED**

JUN 04 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

CONCEPT SCHOOLS SUITE 302
2250 East Devon Avenue, Suite 302
Des Plaines, IL 60018

Case No. **14M288**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is incorporated fully herein and attached hereto.

located in the _____ Northern _____ District of _____ Illinois _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated fully herein and attached hereto.

*DOCKETED*

APR 14 2015

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1341 | Mail Fraud |
| 18 U.S.C. Section 1343 | Wire Fraud |
| 18 U.S.C. Section 1349 | Conspiracy to Commit Mail/Wire Fraud |

The application is based on these facts:

See Affidavit, which is incorporated fully herein and attached hereto.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Geoffrey Wood
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 06/04/2014 _____

_____
*Judge's signature*

City and state: Chicago, Illinois

Daniel G. Martin, US Magistrate Judge
*Printed name and title*

Case: 1:20-mc-00085-DAP  Doc #: 1-4  Filed: 09/03/20  43 of 350.  PageID #: 164
Case: 1:14-mc-00288 Document #: 1 Filed: 06/04/14 Page 2 of 85 PageID #:2
MASTER AFFIDAVIT

## INTRODUCTION

I, Geoffrey Wood, being duly sworn, hereby depose and state that I am a Special Agent for the United States Department of Education, Office of Inspector General, duly appointed according to law and acting as such state the following:

### I.    Your Affiant

1.    Your Affiant is a Special Agent with the United States Department of Education, Office of Inspector General (the "ED-OIG") and has been so employed since November 2004 (hereinafter, "Your Affiant").  Your Affiant is an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.  Prior to working with ED-OIG, Your Affiant was employed from September 1998 to November 2004 as a Special Agent with the United States Secret Service and from September 1996 to September 1998 as a Uniformed Division Officer with the United States Secret Service.  Your Affiant is authorized to conduct criminal investigations in connection with the administration and enforcement of laws, regulations, orders, contracts, and programs in which the Department of Education is, or may be, a party of interest and perform other duties on behalf of the Secretary of Education.  Your Affiant's chief responsibility is the criminal investigation of fraud involving federally funded grants and loans for education.  Your Affiant has received criminal investigator training at the Federal Law Enforcement Training Center.  Your Affiant bases this affidavit upon his training and experience, personal knowledge of the information revealed in this investigation, interviews conducted by

Your Affiant and other federal agents, and the knowledge of other agents in the investigation, all of which are described in more detail below.

2.      This Affidavit is submitted in support of an application for a search warrant, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, authorizing the search of the locations described below and in each corresponding Attachment A (for example, Attachment A – Signature Maker, Inc.) for the items specified in each corresponding Attachment B attached to this Affidavit (for example, Attachment B – Signature Maker, Inc.).

<u>LOCATIONS TO BE SEARCHED</u>

3.      Your Affiant believes the items described in each corresponding Attachment B constitute instrumentalities, fruits and evidence of the foregoing violations and can be found at the locations described below. Your Affiant is requesting authority to search the entire premises, including the office space, residential dwelling, garages, loading docks, storage areas, curtilage, and any computer and computer media located therein where the items specified in each corresponding Attachment B may be found, and to seize all items listed in each corresponding Attachment B as instrumentalities, fruits, and evidence of criminal activity, namely violations of 18 U.S.C. § 1341 (Mail Fraud), 18 U.S.C. § 1343 (Wire Fraud), and 18 U.S.C. § 1349 (Conspiracy to Commit Mail and Wire Fraud). The following list provides details on the places to be searched:

| Location | Brief Description |
|---|---|
| CONCEPT SCHOOLS SUITE 215 2250 East Devon Avenue Suite 215 Des Plaines, IL 60018 | The premises consists of a three story yellow/white brick office building located within the O'Hare Lake Office Complex. The number "2250" appears above the central door. The premises includes the entirety of Suite 215, |

| | including individual offices, common areas, meeting rooms, storage areas, closet space, and file rooms. |
|---|---|
| CONCEPT SCHOOLS SUITE 301<br>2250 East Devon Avenue<br>Suite 301<br>Des Plaines, IL 60018 | The premises consists of a three story yellow/white brick office building located within the O'Hare Lake Office Complex. The number "2250" appears above the central door. The premises includes the entirety of Suite 301, including individual offices, common areas, meeting rooms, storage areas, closet space, and file rooms. |
| CONCEPT SCHOOLS SUITE 302<br>2250 East Devon Avenue<br>Suite 302<br>Des Plaines, IL 60018 | The premises consists of a three story yellow/white brick office building located within the O'Hare Lake Office Complex. The number "2250" appears above the central door. The premises includes the entirety of Suite 302, including individual offices, common areas, meeting rooms, storage areas, closet space, and file rooms. |
| PRICEPC/SUNDANCE<br>7093 North Barry Street<br>Rosemont, IL 60018 | The premises consists of a single story yellow brick building within an industrial/commercial area. The entrance of the business is to the right of a large white garage door which opens to a loading dock/storage area attached to the office space. A business name plate with logo appears next to an all glass entry door and reads "SUNDANCE INTERNATIONAL." The premises includes the entire office, including individual offices, common areas, meeting rooms, storage areas, closet space, file rooms, and the attached loading dock/storage area. |
| SIGNATURE MAKER<br>7093 North Barry Street<br>Rosemont, IL 60018 | The premises consists of a single story yellow brick building within an industrial/commercial area. The entrance of the business is to the right of a large white garage door which opens to a loading dock/storage area attached to the office space. A business name plate with logo appears next to an all glass entry door and reads "SUNDANCE INTERNATIONAL." The premises includes the entire office, including, individual offices, common areas, meeting rooms, storage areas, closet space, file rooms, and the attached loading dock/storage area. |
| KOYUNCU RESIDENCE<br>570 Jamison Lane | The premises consists of a single family split level home in a residential neighborhood. The premises has blue |

Case: 1:14-mc-00288 Document #: 1 Filed: 06/04/14 Page 5 of 85 PageID #:5

| | |
|---|---|
| Hoffman Estates, IL 60169-4127 | siding and brick trim, with an attached garage. The premises includes the entire residence, including the garage and curtilage. |
| CORE GROUP<br>500 West Algonquin Road<br>Suite B<br>Mt. Prospect, IL 60056 | The premises consists of a single story commercial/office building near the entrance of the Lake Center Corporate Park, situated between W. Algonquin Road and a CVS/Caremark distribution facility. The building has a bluish panel/glass exterior. Two large garage doors with loading docks are at the rear of the building. The premises includes the entirety of Suite B, including individual offices, common areas, meeting rooms, storage areas, closet space, file rooms, and the attached loading dock/storage area at the rear of the building. |
| ASE - ILLINOIS<br>939 North Plum Grove Road<br>Suite E<br>Schaumburg, IL 60173 | The premises is situated within a professional office complex named Woodfield Lake Office Court, which is comprised of many single story dark brown brick office suites clustered together. The suite utilized by ASE has its own entrance. The premises includes the entirety of the school facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| BALSOY RESIDENCE<br>1535 South Redwood Drive<br>Mt. Prospect, IL 60056 | The premises is a two story brick apartment/townhome located within an apartment complex. 1535 S. Redwood Dr. is an end unit in a row of four units. The four units comprise one building situated perpendicularly to Redwood Drive with 1535 being the unit furthest away from Redwood Drive. Each of the townhome buildings is separated by a shared sidewalk. Each unit has its own entry and the residents' parking lot is adjacent to the 1535 unit. The premises includes the entire residence, including the curtilage. |
| ULKER RESIDENCE<br>200 Brookston Drive<br>Unit D1<br>Schaumburg, IL 60193 | The premises is a two story brick with white siding triplex. Three apartment units share one entry and there is an attached four car garage. The garages are not marked and appear to be accessed from within the building. The premises includes the entire residence, including the curtilage and garage accessible from Unit D1. |

4

| | |
|---|---|
| CHICAGO MATH AND SCIENCE ACADEMY<br>7212 North Clark Street<br>Chicago, IL 60626 | The premises is a brick school building situated in a busy urban area of downtown Chicago.   The premises is bordered by a metal fence and has a parking lot adjacent to the facility.  The letters "CMSA" appear on the building.   The premises includes the entirety of CMSA, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| GURBUZ RESIDENCE<br>262 Greenbriar Street<br>Elk Grove Village, IL 60007 | The premises is a single family residence with an attached garage.   It is a single story brick with light tan siding residence.  The residence is located in a neighborhood comprised primarily of single family homes with a similar layout. The premises includes the entire residence, including the curtilage and attached garage. |
| ASE - OHIO<br>8303 Tyler Blvd.<br>Mentor, OH 44060 | The premises consists of a single story building located near the intersection of Center Street and Tyler Boulevard.  There is only one main point of entry into the building.  The premises includes the entirety of the school facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| HSA – DAYTON HIGH SCHOOL<br>250 Shoup Mill Road<br>Dayton, OH 45415 | The premises is a large brick building located on the south side of Shoup Mill Road, on the corner of Shoup Mill Road and Sue Ann Boulevard.  It has a front that contains portions of brick, decorative tile, and light blue paint.  The main entrance is also on the front of the building and contains several glass doors with the number "250" located on a glass section between the doors.  The building is connected to an additional large light brown cement structure located on the south west corner of the business.  The premises includes the entirety of the school facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| HSA – CINCINNATI<br>1055 Laidlaw Avenue<br>Cincinnati, OH 45237 | The premises is a two story tan brick commercial building.  The north entrance to the building contains a blue and white sign that reads "HORIZON SCIENCE ACADEMY."  The north side of the building also |

| | |
|---|---|
| | contains the numbers "1039" in blue, affixed to the structure, and a red banner with white lettering. The premises includes the entirety of the school facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| CONCEPT SCHOOLS NORTH OHIO REGIONAL OFFICE<br>2265 Columbus Road<br>Cleveland, OH 44113 | The premises is a large brick three story school building situated in a mixed residential-commercial area. The parking lot along the side of the building extends to the rear portion of the school where the entrance of CONCEPT SCHOOLS' office is located. An unmarked brown door with a small glass window and overhead awning is located at the back of the building adjacent to additional parking. There is a fenced in playground area located in a courtyard area near the back of the building. The premises includes the entirety of the office facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| HSA - DENISON ELEMENTARY<br>2261 Columbus Road<br>Cleveland, OH 44113 | The premises is a large brick three story school building situated in a mixed residential-commercial area. There are multiple entrances to the school portion of the building. There is a fenced in playground located in a courtyard area near the back of the building. The premises includes the entirety of the school facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| CONCEPT SCHOOLS SOUTH OHIO REGIONAL OFFICE<br>2356 Morse Road<br>Columbus, OH 43229 | The premises is a school, comprised of a dark brick and glass faced single story building with several modular buildings adjacent to the main building and joined by a covered ramp/walkway. The premises includes the modular buildings adjacent to the main building, and the entirety of the office facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| HSA - COLUMBUS MIDDLE SCHOOL<br>2350 Morse Road | The premises is a school comprised of a dark brick and glass faced single story building with several modular buildings adjacent to the main building and joined by a |

| | |
|---|---|
| Columbus, OH 43229 | covered ramp/walkway.  The premises includes the modular buildings adjacent to the main building and the entirety of the school facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| CONCEPT SCHOOLS TOLEDO REGIONAL OFFICE & HSA-TOLEDO HIGH SCHOOL 2600 West Sylvania Avenue Toledo, OH 43613 | The premises is a stand-alone brick single story building on the north end of the DeVeaux Village Shopping Center at the northwest corner of the intersection of Sylvania Avenue and Douglas Road.   The building appears to be a former grocery or retail store that has since been converted to a school.  The words "Horizon Science Academy" appear on the façade.  The premises includes the entirety of the school and office facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| CONCEPT SCHOOLS SOUTHWEST REGIONAL OFFICE & QUEST CHARTER ACADEMY HIGH SCHOOL 2503 North University Avenue Peoria, IL 61604 | The premises is a two story brick school building located at the intersection of N. University Ave. and W. McClure Ave.  A sign reading "Quest" is located along the walk leading to the main entrance.  A playground/park and parking lot are located behind the building.  The premises includes the entirety of the school and office facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| CONCEPT SCHOOLS INDIANA REGIONAL OFFICE & INDIANA MATH AND SCIENCE ACADEMY - NORTH 7435 North Keystone Avenue Indianapolis, IN 46240 | The premises consists of a large single story white brick building located within a shopping plaza.  There are multiple entrances along the front of the building.  This location has its own parking lot with multiple access points to the main shopping plaza.  The premises includes the entirety of the school and office facility, including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
| CONCEPT SCHOOLS CINCINNATI / DAYTON REGIONAL OFFICE 8565 North Dixie Drive Dayton, OH 45414 | The premises is situated within a multi-use red brick with brown roof office building located on the west side of North Dixie Drive.  The premises has a sign next to a glass door entry way with the numbers "8565."  The premises includes the entirety of the office facility, |

| | including individual offices, common areas, meeting rooms, loading dock/storage areas, closet space, and file rooms. |
|---|---|
| KUYUK RESIDENCE<br>100 Parkwood Drive<br>Streamwood, IL 60107 | The premises is a single family residence with an attached garage. It is a two story residence with grayish/green siding. There is an open front yard, but the back yard is fenced. This residence is situated at the corner of Parkwood Drive and Woodland Heights Blvd. The residence is located in a neighborhood comprised primarily of single family homes with a similar layout. The premises include the entire residence, including the curtilage and attached garage. |

## PROBABLE CAUSE

II.    Summary Of The Fraudulent Scheme

4.    Your Affiant has probable cause to believe that beginning in at least 2007 through the present, CONCEPT SCHOOLS, a charter school management company, many of the charter schools it manages, as well as certain charter schools' service providers and contractors, engaged in a scheme to defraud a federal program known as the E-Rate Program. Regulated by the Federal Communications Commission (the "FCC") and administered by the Universal Services Administrative Company ("USAC"), a not-for-profit corporation, the E-Rate Program is designed to distribute funds to economically disadvantaged schools and libraries for the purchase, installation, and maintenance of telecommunication services, internet access, and internal connections.

5.    In applying for E-Rate funds, the charter schools, the service providers, and their representatives conspired and used the mails and interstate wires to certify, among other things, that the applicants reviewed all applicable FCC, state, and local competitive bidding

8

Case: 1:14-mc-00288 Document #: 1 Filed: 06/04/14 Page 10 of 85 PageID #:10

requirements and that the entities listed on the application had complied with them. Among

other requirements, the FCC's bidding regulations required that all entities participating in the E-

Rate Program must conduct a fair and open competitive bidding process.  By way of illustration,

the regulation listed as one violation of this requirement, among several others, the following:

when the applicant for supported services has a relationship with a service provider that would

unfairly influence the outcome of a competition or would furnish the service provider with inside

information.  Through various different ways and means that evolved over time, CONCEPT

SCHOOLS, many of the charter schools it managed, as well as the charter schools' service

providers, made false certifications to conceal from the FCC and USAC that they had

relationships in place among themselves to divert E-Rate Program funds away from the charter

schools for purposes of enriching themselves and their designees.

III.    Overview Of The Charter School Program

6.    Charter schools are statutorily created educational institutions that are funded

publicly through federal, state, and local taxes, but are managed privately with public oversight.

Charter schools are required to utilize their funds and abide by the same financial rules and

regulations that their state requires public schools to follow.  Charter schools are required to use

the public funds they receive for the purpose of the operation of the charter school.  The federal

funding of charter schools is primarily disbursed through Title I of the Elementary and Secondary

Education Act of 1965.  See 20 U.S.C. § 6301, et seq.  The purpose of Title I funding is to ensure

that all children have a fair, equal, and significant opportunity to obtain a high-quality education

and reach, at a minimum, proficiency on state academic achievement standards and state

academic assessments.

7.    The Title I grants are awarded to the states and then distributed to public and charter schools via pass-thru grants. Title I, Part A ("Title I") of the Elementary and Secondary Education Act, as amended (the "ESEA") provides financial assistance to local educational agencies (the "LEAs") and schools with high numbers or high percentages of children from low-income families to help ensure that all children meet state academic standards. Federal funds are currently allocated through four statutory formulas that are based primarily on census poverty estimates and the cost of education in each state. Title I, Part B funds are disbursed to charter schools through the states to provide assistance with meeting the excess costs of providing special education and related services to children with disabilities. To be eligible for funding, states must serve all children with disabilities between the ages of 3 through 21, except that they are not required to serve children of ages 3 through 5 or 18 through 21 years if services are inconsistent with state law or practice or the order of any court.

8.    Charter schools are also eligible to apply for many different federal grants that are available to public schools as well. These grants are typically one time funding, and the funds have a specific purpose for their use. Typically, most charter schools receive a start-up grant from the federal government. This grant is to be used to provide extra capital for expenses incurred during the planning and start-up phase of a charter school. The grant funds typically are not pass-thru funds; rather, they are most often direct funding from the U.S. Department of Education to the individual charter schools.

IV.    Overview Of The E-Rate Program

9.    As summarized above, this Affidavit establishes probable cause to believe that CONCEPT SCHOOLS, many of the charter schools it manages, and certain service providers

10

have participated in a scheme to defraud a federal program regulated by the FCC, known as the

E-Rate Program. Based upon my knowledge, training, experience, employment, participation in

investigations, as well as having read the E-Rate Program description publications, I know that:

      a.     The Telecommunications Act of 1996 (47 U.S.C. § 251, et seq.) directed

the FCC to gather funds from telecommunications users and establish a program (hereinafter "E-

Rate," "E-Rate Program," or the "Program") to distribute funds to economically disadvantaged

schools and libraries for telecommunication services, internet access, and internal connections

(such as wiring and servers, but not end user equipment like computers, telephone sets, and

printers). E-Rate Program funds come from the Universal Service Fund (the "USF"), which is

funded through fees charged to companies that provide interstate and/or international

telecommunications services. The FCC designated the Universal Service Administrative

Company ("USAC"), a not-for-profit corporation, to administer the E-Rate Program. USAC

began distributing E-Rate funds for goods and services delivered in E-Rate Funding Year 1998,

and yearly demand for E-Rate funds has been greater than the total funds available. USAC

subcontracts with Solix Inc., located in Parsippany, New Jersey, to handle all communications

and paperwork between vendors, schools, and the USAC.

      b.     The Program operates through a yearly application, review, and

disbursement process. Over 30,000 applications are received and approved each year. E-Rate

Program funds available for disbursement are capped at $2.25 billion, but that cap is

automatically increased for inflation; the current cap for the 2014 E-Rate funding year is $2.4

billion. The E-Rate funding year runs fairly coextensively with a school year, that is, from July 1

to June 30. For instance, Year 2 of the E-Rate Program ran from July 1, 1999, to June 30, 2000,

although schools typically seek bids from vendors beginning in December of the year prior. The

E-Rate Program is administered by USAC and its subdivision, the Schools and Libraries

Division (the "SLD"). The FCC oversees and regulates USAC and the SLD.

      c.     Several features of the E-Rate Program are relevant to this Affidavit:

          i.     E-Rate requires schools seeking funding to follow not only local

and state procurement laws and competitive bidding rules and regulations to select the vendors

("service providers") for the telecommunications goods and services, but also the federal rules

and regulations set forth in the Code of Federal Regulations and elsewhere. See 47 C.F.R. §

54.503.

          ii.     E-Rate provides up to 90% funding for the projects and requires

the applicant school to pay the remaining amount (referred to as the "co-pay"), some of which

may be funded by grants from the Department of Education. See 47 C.F.R. §§ 54.505, 54.523.

          iii.     A school may employ a consultant to help it determine its

telecommunication needs, assist in the competitive bidding process, and help complete the E-

Rate application and back-up documentation. However, a consultant must be independent of the

service providers chosen for the projects and may not steer contracts to, or hand pick, a favored

service provider. See 47 C.F.R. § 54.503.

          iv.     E-Rate prioritizes needy schools based on the percentage of

students in the school or school district that are eligible for the United States Department of

Agriculture's (the "USDA") National School Lunch Program (the "NSLP"). The rate of student

participation is used to determine a school's co-pay level and its priority of funding (i.e., schools

with higher levels of children in the NSLP program get higher funding and, for certain types of

E-Rate funding, get funded before schools with lower numbers of children in the NSLP program). For example, if 75% to 100% of the students in a school are eligible for the NSLP, USAC will pay for 90% of the cost of eligible telecommunications equipment and services for that school (i.e., a 90% discount rate), while if a range of 50% to 74% of the students in a school are eligible for the NSLP, the resultant discount rate is 80%. A school district's discount is determined by taking the average of its constituent schools' discount rates. See 47 C.F.R. § 54.505.

        v.     An applicant may elect to use other methods to calculate its funding percentage. A survey is one of the federally-approved alternative methods for determining the percentage of eligible students, subject to certain requirements including that the survey is no more than two-years old and is not a standard NSLP Free and Reduced Lunch Application. Participation in certain other income-based assistance programs is also an acceptable measure of eligibility. However, a school must verify that it only counted each eligible student once. See 47 C.F.R. § 54.505; 12 F.C.C. Rcd 8776, ¶510 (May 8, 1997).

        d.     E-Rate funding is broken into two categories, Priority 1 and Priority 2. Historically, requests for Priority 1 funding, which cover eligible telecommunications and internet services, have been granted to all applicants at their applicable discount rate. Money left under the cap after granting Priority 1 funding is used to fill requests for Priority 2 services, which includes internal connections and basic maintenance. Priority 2 funding is provided first to those schools or districts with the highest discounts, e.g., first at the 90% discount level, then, if any funds are available, at the 89% discount level, and so on, until funds are exhausted. Historically, the point at which Priority 2 funding has been exhausted has varied from the 70% to

the 86% discount level. In recent years, insufficient money may be unavailable to provide grants

to schools or districts below the 90% discount level, or even fully unavailable due to Priority 1

requests. See 47 C.F.R. § 54.507.

      e.    In applying for E-Rate funds, a school first submits to USAC a Form 470.

Form 470 is the Description of Services Requested and Certification form and describes services

and equipment the school will need to implement its technology plan as well as the school's

eligibility. The completed form is posted to USAC's website for potential bidders to review,

which opens the competitive bidding process for services eligible for discounts under the E-Rate

Program. The competitive bidding process is conducted exclusively by the applicant and is a

requirement of participating in the E-Rate Program. As discussed below, this process must be a

fair and open competitive procurement. The applicant school must consider all bids it receives

before selecting a service provider and is responsible for ensuring an open, fair, competitive

process. The applicant school must select the most cost-efficient provider of the desired services

with cost being the primary factor. Once a service provider is selected, the applicant school

orders products and services through the selected provider. See 47 C.F.R. §§ 54.503, 54.511.

      f.    A "service provider" is a company that participates in universal service

programs and provides telecommunications or internet services, equipment, hardware, or

software. A "Service Provider Identification Number" ("SPIN") is a unique number that USAC

assigns service providers upon submittal of an FCC Form 498. This form is used to collect

contact, remittance, and payment information for service providers that receive universal service

support. The SPIN and Contact Information Form (Form 498) must be filed by service providers

to participate in any of the universal service programs. Every service provider is required to have

14

a SPIN to participate in the E-Rate Program and to receive payments from USAC.

g.    A contract may be awarded to a single service provider or to multiple service providers. Once a school selects a winning bidder (or bidders), it enters into a contract with that service provider to purchase the required services and equipment at the rates specified in the service provider's proposal or bid. The school must submit to USAC a Form 471, which is titled the Services Ordered and Certification Form. Applicants file Form 471 to report services ordered and discounts requested. Form 471 states the service provider that was selected and will be used. Form 471 also specifies the percentage of the contract that the school is required to pay and lists the individual funding requests, which must be separated by service category (e.g., telecommunication service, internet access, internal connections) and service provider. The Item 21 Attachment to FCC Form 471 provides details on the products or services requested. See 47 C.F.R. § 54.504.

h.    USAC makes all payments directly to the service provider. The invoicing process starts with USAC's commitment of funds to the E-Rate project. Following the letter sent to the applicant and service provider that a certain amount of funds are committed in response to the applicant's Form 471, the applicant can file its Form 486 (the Receipt of Service Confirmation form), certifying that services have begun. A service provider must also have filed a Form 473 (Service Provider Annual Certification form) for the relevant funding year. Only when the Form 473 and Form 486 are received and approved by USAC can the service provider invoice USAC. Invoicing can take two methods. The first method is the service provider can bill the applicant for 100% of the bill and the applicant can request reimbursement of the discount from USAC using the Form 472 (the Billed Entity Reimbursement form). The service

15

provider must approve the applicant's Form 472 before the applicant submits it to USAC. The second method is that the service provider can bill the applicant for its non-discount share and then can seek reimbursement of the discount amount from USAC using the Form 474 (the Service Provider Invoice form).

      i.     Service providers can submit invoices through email, through the USAC's web portal, or through paper. When USAC receives an invoice, it goes through an automated review process that looks for errors, certain flagged parameters and other issues. If it passes that review, the invoice is paid shortly thereafter. If the invoice is kicked out of the automated system, it triggers a manual review by the employees at Solix in New Jersey. They will usually review the customer bills, delivery times, and other information that was collected and check it against the Form 471 filings. Once an invoice clears the review process, the file of approved payments is transmitted to USAC for payment. Invoices are paid when they are received, so it is possible that a single provider may have accumulated invoices waiting for payment; those multiple invoices will be paid via a single payment, typically through an ACH transfer. After payments go out, USAC performs some post-payment quality control audits of various automatic payments to check for accuracy.

      j.     There is a record retention requirement for all schools and service providers that participate in the E-Rate Program. These participants are required to keep all related documents for five years from the last day of service delivered in a particular funding year. See 47 C.F.R. § 54.516. Schools are required to retain all documents related to the application for, receipt, and delivery of, discounted telecommunications equipment and other support and services. Schools and libraries shall maintain asset and inventory records of

16

equipment purchased as components of supported internal connections services sufficient to

verify the actual location of such equipment for a period of five years after purchase. Likewise,

service providers are required to retain documents related to the delivery of discounted

telecommunications and other supported services for at least five years after the last day of the

delivery of discounted services. Any other document that demonstrates compliance with the

statutory or regulatory requirements for the schools and libraries mechanism shall be retained as

well. See 47 C.F.R. § 54.516.

V.     E-Rate Competitive Bidding Requirements and Certifications in General

10.     The E-Rate Program relies on a "fair and open" competitive bidding process to

protect the program from waste, fraud, and abuse. While the FCC has determined that state and

local procurement laws should provide the foundation for the process, the FCC has, nevertheless,

promulgated numerous specific E-Rate Program rules to supplement state and local

requirements. Compliance with these E-Rate rules is mandatory for program participation. As

the FCC has stated, "we cannot rely solely upon state and local laws to effectuate our goals of

ensuring support is provided without waste, fraud and abuse" and "[c]ompliance with state and

local procurement rules is necessary, but not to the exclusion of compliance with other

Commission requirements." See Ysleta Order (2003), 18 FCC Rcd. 26407, ¶¶ 42-43.

11.     Thus, for example, while state and local rules could exempt applicants from

undergoing a competitive bidding process for products and services under a certain dollar

threshold, the E-Rate rules require an E-Rate applicant to seek competitive bids for all such

services, regardless of the dollar amount.

12.     Code of Federal Regulations §§ 54.503(a) and (b) generally set forth the E-Rate

17

Program's competitive bidding requirements as follows

> (a) All entities participating in the schools and libraries universal service support
> program must conduct a fair and open competitive bidding process, consistent with
> all requirements set forth in this subpart. Note to paragraph (a): The following is an
> illustrative list of activities or behaviors that would not result in a fair and open
> competitive bidding process: the applicant for supported services has a relationship
> with a service provider that would unfairly influence the outcome of a competition or
> would furnish the service provider with inside information; someone other than the
> applicant or an authorized representative of the applicant prepares, signs, and submits
> the FCC Form 470 and certification; a service provider representative is listed as the
> FCC Form 470 contact person and allows that service provider to participate in the
> competitive bidding process; the service provider prepares the applicant's FCC Form
> 470 or participates in the bid evaluation or vendor selection process in any way; the
> applicant turns over to a service provider the responsibility for ensuring a fair and
> open competitive bidding process; an applicant employee with a role in the service
> provider selection process also has an ownership interest in the service provider
> seeking to participate in the competitive bidding process; and the applicant's FCC
> Form 470 does not describe the supported services with sufficient specificity to
> enable interested service providers to submit responsive bids.

> (b) Competitive Bid Requirements. Except as provided in § 54.511(c), an eligible
> school, library, or consortium that includes an eligible school or library shall seek
> competitive bids, pursuant to the requirements established in this subpart, for all
> services eligible for support under § 54.502. These competitive bid requirements
> apply in addition to state and local competitive bid requirements and are not intended
> to preempt such state or local requirements.

C.F.R. §§ 54.503(a) and (b) (emphasis added).

13.     Further, all potential bidders must have access to the same information and be

treated in the same manner throughout the process. Any additions or modifications to a Form

470 or RFP, or other requirements or specifications must be available to all potential bidders at

the same time and in a uniform manner. See 2010 E-Rate Order, 25 FCC Rcd. 18762, ¶86.

14.     USAC provides additional guidance to applicants on conflicts of interest that

would not result in a fair and open competitive bidding process. For example, regarding

consultants: "[A] conflict of interest exists when the applicant's consultant is associated with a

18

service provider that is selected and is involved in determining the services sought by the

applicant and the selection of the applicant's service provider(s)." See USAC rules summarized

at http://www.usac.org/sl/applicants/step02/competitive-bidding.aspx.

15.     Though Form 470 has changed over time, the Code of Federal Regulations

requires that the applicants make certain certifications under oath on Form 470 as follows:

> (2) The FCC Form 470 shall be signed by the person authorized to order eligible services for the eligible school, library, or consortium including such entities and shall include that person's certification under oath that:
>
> (i) The schools meet the statutory definition of "elementary school" or "secondary school" as defined in § 54.500(c) or (k) of these rules, do not operate as for-profit businesses, and do not have endowments exceeding $ 50 million.
>
> (ii) The libraries or library consortia eligible for assistance from a State library administrative agency under the Library Services and Technology Act of 1996 do not operate as for-profit businesses and whose budgets are completely separate from any school (including, but not limited to, elementary and secondary schools, colleges, and universities).
>
> [ . . . ]
>
> (v) The services the school, library, or consortium purchases at discounts will be used primarily for educational purposes and will not be sold, resold, or transferred in consideration for money or any other thing of value, except as allowed by § 54.513.
>
> [ . . . ]
>
> (vii) All bids submitted for eligible products and services will be carefully considered, with price being the primary factor, and the bid selected will be for the most cost-effective service offering consistent with § 54.511.

See C.F.R. § 54.503(c)(2) (emphasis added).

16.     Though Form 471 has also changed over time, the Code of Federal Regulations

requires that the applicants make certain certifications under oath on Form 471 as follows:

(1) The FCC Form 471 shall be signed by the person authorized to order eligible services for the eligible school, library, or consortium and shall include that person's certification under oath that:

(i) The schools meet the statutory definition of "elementary school" or "secondary school" as defined in § 54.500(c) or (k) of these rules, do not operate as for-profit businesses, and do not have endowments exceeding $ 50 million.

(ii) The libraries or library consortia eligible for assistance from a State library administrative agency under the Library Services and Technology Act of 1996 do not operate as for-profit businesses and whose budgets are completely separate from any school (including, but not limited to, elementary and secondary schools, colleges, and universities).

[ . . . ]

(vi) The entities listed on the FCC Form 471 application have complied with all applicable state and local laws regarding procurement of services for which support is being sought.

(vii) The services the school, library, or consortium purchases at discounts will be used primarily for educational purposes and will not be sold, resold, or transferred in consideration for money or any other thing of value, except as allowed by § 54.513.

(viii) The entities listed in the application have complied with all program rules and acknowledge that failure to do so may result in denial of discount funding and/or recovery of funding.

[ . . . ]

(x) The applicant recognizes that it may be audited pursuant to its application, that it will retain for five years any and all worksheets and other records relied upon to fill out its application, and that, if audited, it will make such records available to the Administrator.

(xi) All bids submitted to a school, library, or consortium seeking eligible services were carefully considered and the most cost-effective bid was selected in accordance with § 54.503 of this subpart, with price being the primary factor considered, and is the most cost-effective means of meeting educational needs and technology plan goals.

See C.F.R. § 54.504(a)(1) (emphasis added).

20

17.    Likewise, though Form 473 has changed over time, the Code of Federal

Regulations requires that the Service Provider make certain certifications under oath on Form

473 as follows:

> (f) The FCC Form 473 shall be signed by an authorized person and shall include that person's certification under oath that:

> (1) The prices in any offer that this service provider makes pursuant to the schools and libraries universal service support program have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to those prices, the intention to submit an offer, or the methods or factors used to calculate the prices offered;

> [ . . . ]

> (3) No attempt will be made by this service provider to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

See C.F.R. § 54.504(f) (emphasis added).

VI.    Reference List Of Persons And Entities Involved In The Investigation

18.    The following list provides details about individuals and entities discussed in this

Affidavit that investigators believe are involved in, or may have information or documentation

concerning, the criminal schemes under investigation. When an individual's employment is

mentioned in this Affidavit, the source of information is one or more of the following: (1) the

employer's web site; (2) public records; or (3) open source information:

> ADVANCED SOLUTIONS FOR EDUCATION ("ASE"). ASE was operated by OZGUR BALSOY, a former Horizon Science Academy director, and conducted business with the CONCEPT SCHOOLS charter schools almost exclusively. ASE was selected as a service provider by several CONCEPT SCHOOLS charter schools, though no funding was disbursed, and later served as an E-Rate consultant and contact person for several CONCEPT SCHOOLS charter schools.

21

BALSOY, OZGUR: BALSOY is the owner of ASE. This company attempted to become an E-Rate service provider for CONCEPT SCHOOLS charter schools. BALSOY is currently listed with the FCC as an E-Rate Program consultant for several CONCEPT SCHOOLS charter schools. BALSOY was also employed as the Development Director of CONCEPT SCHOOLS. From 2007 to 2009, BALSOY was the registered agent in Ohio for Horizon Science Academy Inc. As of 2006, BALSOY has remained the registered agent for Concept Schools – Ohio, Inc.

Cambridge Technologies: Cambridge Technologies ("Cambridge") was an IT company owned by Stephen Draviam that functioned as an E-Rate service provider for several CONCEPT SCHOOLS charter schools.

CORE GROUP, INC. ("CORE GROUP"):   CORE GROUP was a CONCEPT SCHOOLS charter school service provider operated by ERTUGRUL GURBUZ.

DizaynIT Solutions ("DizaynIT"):  A company that ULKER directed Cambridge to use as a subcontractor for E-Rate work Cambridge was to perform at several CONCEPT SCHOOLS charter schools.

Draviam, Stephen:  Draviam is the owner of Cambridge Technologies, an E-Rate service provider for CONCEPT SCHOOLS charter schools from 2006 - 2009.

Duman, Sedat:  Duman is the president of CONCEPT SCHOOLS. He is a former principal and former business manager at Horizon Science Academy - Dayton. Duman signed the E-Rate Certification forms for work completed by CORE GROUP INC. at Michigan Math and Science Academy in 2010 and Chicago Math and Science Academy in 2011. He also signed the E-Rate Certification form for work completed by Cambridge Technologies at Horizon Science Academy-Cleveland in 2004 and 2005. Duman signed the E-Rate Certification form for work completed by Cambridge Technologies at Wisconsin Career Academy in 2007 and Horizon Science Academy 2008.

Emanet, Mustafa:  Emanet was a former network administrator/teacher at HSA-Denison Middle School.

Ertekin, Taner:  From 2002 through 2006, Ertekin was the founder, president, and CEO of CONCEPT SCHOOLS. Ertekin was also the principal at Horizon Science Academy in Cleveland, Ohio.

GURBUZ, ERTUGRUL:  GURBUZ is the owner of CORE GROUP INC.

HGF IT Solutions ("HGF IT"):  A company that ULKER directed Cambridge to use for E-Rate work Cambridge was to perform at several CONCEPT SCHOOLS charter

schools that later became a service provider.

KOYUNCU, ERGUN "ERIC":   KOYUNCU is the registered agent for
SIGNATURE MAKER. In 2004, KOYUNCU was listed as the point of contact on
four petitions for immigrant workers for the Wisconsin Career Academy (a
CONCEPT SCHOOLS managed charter school). On one application, KOYUNCU
was listed as the board president of Wisconsin Career Academy.

KUYUK, GALIP: KUYUK is the owner of SUNDANCE INTERNATIONAL, LLC
d/b/a PRICE PC.COM, a company which provided E-Rate services for many of the
CONCEPT SCHOOLS charter schools, including Wisconsin Career Academy. He
is a former board member at Wisconsin Career Academy.

SUNDANCE INTERNATIONAL LLC D/B/A PRICEPC.COM ("PRICEPC/
SUNDANCE"):   A company that ULKER directed Cambridge to use for E-Rate
work Cambridge was to perform at several CONCEPT SCHOOLS charter schools
that later became a service provider.

Sagnak, Murat:   Sagnak was a teacher at Horizon Science Academy from 2001
through 2005. From 2005 through 2010, Sagnak was the Director of Horizon
Science Academy Denison. From 2010 to the present, Sagnak has been the Director
at Horizon Science Academy Dayton.

ULKER, HUSEYIN "SHANE":   ULKER is the current chief information officer of
CONCEPT SCHOOLS and has gone by the titles technology coordinator and director
of technology. As of 2013, ULKER was the point of contact for E-Rate services for
the Wisconsin Career Academy. ULKER is affiliated with three companies: HGF
IT, DizaynIT Solutions, and Ulkerim Solutions. HGF IT was an approved E-Rate
vendor and was the approved service provider on several requests for different
charter schools under CONCEPT SCHOOLS' management. These companies
submitted invoices to Cambridge Technologies for E-Rate services.

Ulkerim Solutions:   A company that ULKER directed Cambridge to use as a
subcontractor for E-Rate work Cambridge was to perform at several CONCEPT
SCHOOLS charter schools.

VII.    The Present Investigation

19.    The information contained in this Affidavit is based on information conveyed to

me by other law enforcement and government officials, and my review of records, documents,

and other evidence obtained during this investigation. Because this Affidavit is submitted for the

limited purpose of establishing probable cause in support of the application for a search and

seizure authorization, I have not included every detail of every aspect of the investigation.

Further, not every document related to this matter in the government's possession has been

reviewed.

20.    The FCC-OIG routinely works with the United States Department of Justice, the

Federal Bureau of Investigation (the "FBI"), and the ED-OIG on matters involving competitive

bidding violations or other fraudulent conduct by participants in the E-Rate Program. ED-OIG

and the FBI, with the aid of the FCC-OIG, are jointly investigating a network of charter schools

and associated vendors/business entities acting as service providers participating in the federal E-

Rate Program.

21.    This investigation is being carried out under the authority of a federal grand jury

in the U.S. District Court of the Northern District of Ohio and concerns, among other things,

fraud in connection with the CONCEPTS SCHOOLS family of charter schools located in Ohio,

Illinois, and Indiana obtaining E-Rate funds.

### *Concept Schools*

22.    Based on its own website, CONCEPT SCHOOLS is a charter school management

company that contracts with thirty member charter schools situated across six states. CONCEPT

SCHOOLS manages its umbrella of charter schools much like a public school district would.

"Concept Schools NFP" is an active non-profit corporation registered to do business in Illinois.

Sedat Duman is the registered agent. "Concept Schools – Ohio, Inc." is an active non-profit

corporation registered to do business within Ohio, which was incorporated by OZGUR

BALSOY.

24

23.    CONCEPT SCHOOLS is headquartered in Des Plaines, Illinois, and has the

following regional management offices:

>       Central Office – Chicago
>       2250 East Devon Avenue
>       Suites 215, 301, 302
>       Des Plaines, IL 60018
>
>       North Ohio Regional Office – Cleveland, Lorain, Youngstown, Euclid
>       2265 Columbus Road
>       Cleveland, OH 44113
>
>       South Ohio Regional Office – Columbus
>       2356 Morse Road
>       Columbus, OH 43229
>
>       Toledo Regional Office – Toledo, Center Line (Michigan)
>       2600 West Sylvania Avenue
>       Toledo, OH 43613
>
>       Southwest Regional Office – Peoria, St. Louis
>       2503 North University Avenue
>       Peoria, IL 61604
>
>       West Regional Office – Chicago, Minneapolis, Milwaukee
>       2250 East Devon Avenue
>       Suite 215
>       Des Plaines, IL 60018
>
>       Indiana Regional Office – Indianapolis
>       7435 North Keystone Avenue
>       Indianapolis IN 46240
>
>       Cincinnati/Dayton Regional Office
>       8565 North Dixie Drive
>       Dayton, OH 45414

24.    Based on a review of the addresses, the regional offices are situated within,

adjacent to, or sometimes separately from, one of their managed charter schools.  Based on

interviews with former employees and review of public source information, Your Affiant knows

25

that the management structure of CONCEPT SCHOOLS consists generally of the following: (a)

executive management is primarily located in the Chicago, Illinois area; (b) superintendents,

business managers, and treasurers are located at the regional offices; and (c) directors (or

principals), assistant principals, and business managers are located at each school location.

Through interviews and reviews of school records, Your Affiant knows that employees holding

these positions are frequently transferred between different charter schools and CONCEPT

SCHOOLS' main and regional offices. Because employees transfer among and between offices,

your Affiant believes that documents from one school may be located at any other school or

CONCEPT SCHOOLS offices throughout the different regions. The charter schools managed by

CONCEPT SCHOOLS operate under the following school names:

1. Chicago Math and Science Academy (CMSA)
2. Gateway Science Academy – St. Louis
3. Gateway Science Academy – South
4. Horizon Science Academy – Cincinnati
5. Horizon Science Academy – Cleveland High School
6. Horizon Science Academy – Cleveland Middle School
7. Horizon Science Academy – Cleveland Elementary School
8. Horizon Science Academy – Columbus High School
9. Horizon Science Academy – Columbus Middle School
10. Horizon Science Academy – Columbus Elementary School
11. Horizon Science Academy – Dayton Elementary School
12. Horizon Science Academy – Dayton High School
13. Horizon Science Academy – Dayton Downtown
14. Horizon Science Academy – Denison Middle School
15. Horizon Science Academy – Denison Elementary School
16. Horizon Science Academy – Lorain
17. Horizon Science Academy – Springfield (Toledo)
18. Horizon Science Academy – Toledo High School
19. Horizon Science Academy – Toledo Downtown
20. Horizon Science Academy – Youngstown
21. Horizon Science Academy – Belmont
22. Horizon Science Academy – McKinley Park
23. Indiana Math and Science Academy (IMSA) – West

24. Indiana Math and Science Academy (IMSA) – North
25. Indiana Math and Science Academy (IMSA) – South
26. Michigan Math and Science Academy (MMSA)
27. Milwaukee Math and Science Academy
28. Noble Academy – Cleveland
29. Noble Academy – Columbus
30. Quest Charter Academy – Peoria
31. Minnesota School of Science
32. Wisconsin Career Academy

25. Through a review of FCC and USAC E-Rate records, many of the above referenced charter schools became recipients of E-Rate Program funding for various internet connectivity improvements. From 2003 through 2013, those charter schools under CONCEPT SCHOOLS' management received a combined approximate amount of $5.1 million in E-Rate Program funding.

### *Cambridge Technologies, LLC*

26. Based on the Ohio Secretary of State records, Cambridge Technologies, LLC ("Cambridge") is an Ohio limited liability company owned and operated by Stephen Draviam. Beginning in or around December 2013, Draviam was interviewed and provided information to the Government related to the E-Rate Program. As further described herein, Draviam's information has been corroborated by documents and other source reporting. Draviam has no criminal history. Draviam has neither requested, nor has he received, any financial consideration for providing information on this matter. Furthermore, no promises have been made to Draviam about his potential criminal liability related to this matter, nor has Draviam asked for consideration related to his potential criminal liability. In 2009, CONCEPT SCHOOLS charter schools terminated its E-Rate relationship with Cambridge. Thereafter, Draviam filed two lawsuits against CONCEPT SCHOOLS and its charter schools for non-payment of invoices

27

unrelated to the E-Rate Program, which according to the court dockets, were voluntarily, or by

stipulation, dismissed.

27.     According to Draviam and E-Rate documents, in 2003, Cambridge became a

licensed service provider participating in the E-Rate Program. Pursuant to records received from

and reviewed with the FCC-OIG, Your Affiant knows that between 2003 and 2009, Cambridge

received approximately $1,214,419.10 in E-Rate Program funds for services provided

exclusively to CONCEPT SCHOOLS charter schools. Cambridge conducted business with the

following CONCEPT SCHOOLS and received the following E-Rate Funds:

| Fund Year | School | Disbursed E-Rate Funds |
|---|---|---|
| 2003 | Horizon Science Academy – Columbus High School | $138,924.00 |
| 2004 | Horizon Science Academy – Cleveland High School | $155,601.00 |
| 2007 | Horizon Science Academy – Dayton<br>Horizon Science Academy – Cleveland<br>Horizon Science Academy – Cincinnati<br>Horizon Science Academy – Denison Middle School | $481,116.10 |
| 2008 | Horizon Science Academy – Dayton<br>Indiana Math and Science Academy<br>Noble Academy – Columbus<br>Horizon Science Academy – Springfield<br>Horizon Science Academy – Cincinnati<br>Horizon Science Academy – Cleveland<br>Horizon Science Academy – Denison Middle School | $438,777.00 |
| | Total Funding | $1,214,418.10 |

### The Fraudulent Scheme

28.     Through the investigation, Your Affiant has learned that the E-Rate Program

28

fraud discussed in this Affidavit evolved over time. Each phase of its evolution increasingly

violated Program rules and further defrauded the E-Rate Program.

*Phase 1 – Cambridge Becomes*
*Concept Schools Service Provider*

29.     Beginning in or around December 2013, Draviam interviewed with the FBI and

ED-OIG. Draviam explained that he learned of the CONCEPT SCHOOLS charter schools'

requests for proposal through online postings on USAC's website. Draviam reviewed the FCC

Form 470s to see what could be provided, what the costs were, and what was paid for by the

government. Draviam went to CONCEPT SCHOOLS' charter schools and submitted bids for

the work. Draviam advised investigators that after he submitted Cambridge's bids with the

CONCEPT SCHOOLS charter schools, he was told by HUSEYIN ULKER, the CIO for

CONCEPT SCHOOLS, that he was selected.[1]

30.     Draviam initially assumed HUSEYIN ULKER was the CONCEPT SCHOOLS

network administrator for Horizon Science Academy - Columbus area schools. Draviam

believed that HUSEYIN ULKER became the main contact person for Cambridge at the

CONCEPT SCHOOLS charter schools because ULKER was fluent in English and acted as a

translator when speaking with the school's management—most of whom primarily spoke

Turkish. According to Draviam, ULKER eventually moved to the Toledo-area schools and then

to the main office of CONCEPT SCHOOLS in Chicago.

31.     Several emails voluntarily provided to the government by Mustafa Emanet show

---

[1] Based on a review of Department of Labor records and other public sources, HUSEYIN ULKER is an employee
of CONCEPT SCHOOLS and resides in Schaumburg, Illinois. Records reviewed from the FCC-OIG and copies of
emails provided in this investigation by other sources reveal that ULKER has used or uses the following titles during
his employment at CONCEPT SCHOOLS: technology coordinator, director of technology, and chief information

that ULKER was the primary coordinator for all CONCEPT SCHOOLS' E-Rate Program

applications to USAC and for the installation of the E-Rate funded equipment. These same

emails show ULKER corresponding and providing direction to CONCEPT SCHOOLS charter

school directors on how to have their schools receive E-Rate funding. For instance, on

November 1, 2007, ULKER sent an email describing the E-Rate Program to school managers. A

portion of the email—originally written in Turkish, with approximate Turkish translation

provided—stated as follows:

> [ . ... ] Brothers, Please do not ignore as what I am about to say is very important.  I
> am sure you are aware of a federal grant called E-Rate ... What do we need to do to
> receive the award?  First, there is an application form 470, then 471, then 486 etc to
> fill out.  Each form detailed separately.  In addition to the forms, each applicant is
> required to submit service agreements, paperwork proofs, technology plans, budget
> estimates, etc, etc.  In actuality, there is a lot there if you were to compile everything.
> Also, 2-3 years can pass after the award and they'll notify you of a site visit, we'll be
> "sooooo what do you want" and they will respond "3 years ago we awarded you a
> grant, facilitated this that and the other, we would like to see if the funding has
> actually been useful."  With them, they'll bring a checklist to inspect documents.
> Their checklist contains 20 something requirements, and our biggest issue is the
> inability to produce dated documents as requested.  The average rotation of 2-3
> managers once every 3 years, will of course lead to lost or missing documents.
> Careful documentation and filing can prevent this from reoccurring. . . . The only
> thing I require of you all is timely and accurate responses to my questions. . . .  We
> need to fill out whatever document or form in a timely manner as they have set
> deadlines for completion.

(emphasis added).  In addition to providing direction on the E-Rate Program, ULKER signed at

least one FCC Form 470 and was listed on several other Forms as the schools' contact person.

Based on USAC records, ULKER often communicated with USAC representatives via email on

behalf of many CONCEPT SCHOOLS charter schools.

32.  According to Draviam, Cambridge initially used unrelated, third party

officer.

subcontractors to price bids for the E-Rate contracts and to perform the installation and

maintenance work at the schools. While Cambridge was acting as the CONCEPT SCHOOLS

charter schools servicer provider, however, Draviam eventually stopped submitting written bids

to the CONCEPT SCHOOLS charter schools pursuant to their Form 470s. Rather, according to

Draviam, and contrary to E-Rate Program rules, Cambridge verbally advised ULKER and others

at the schools what his services would cost. Draviam told investigators that he was unaware

whether there were other bidders for the E-Rate funded work at these schools.

33.     The CONCEPT SCHOOLS charter schools that selected Cambridge as one of

their service providers, as well as Cambridge itself, made certifications to the SLD in the Forms

470, 471, and 473, that were inconsistent with how the E-Rate work was being bid and

performed. For instance, a Form 471, application ID 566292, was certified and submitted

electronically on USAC's website under the name Murat Sagnak as the contact person for HSA-

Denison Middle School for funding year 2007 wherein certifications were made.[2] Specifically,

this Form 471 certified, in part, that

> 27. I certify that all bids submitted were carefully considered and the most cost-
> effective service offering was selected, with price being the primary factor
> considered, and is the most cost-effective means of meeting educational needs and
> technology plan goals.
>
> 28. I certify that the entity responsible for selecting the service provider(s) has
> reviewed all applicable FCC, state, and local procurement/competitive bidding
> requirements and that the entity or entities listed on this application have complied
> with them.

---

[2] This Form 471, as well as many other 471s discussed in this Affidavit were submitted electronically and thus
contained no signature. Your Affiant believes, however, that the certifications were still valid and enforceable under
15 U.S.C. § 7001, which provides that "with respect to any transaction in or affecting interstate or foreign
commerce— (1) a signature, contract, or other record relating to such transaction may not be denied legal effect,
validity, or enforceability solely because it is in electronic form; and (2) a contract relating to such transaction may
not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was
used in its formation."

[ . . . ]

30. I certify that I and the entity(ies) I represent have complied with all program rules
and I acknowledge that failure to do so may result in denial of discount funding
and/or cancellation of funding commitments. There are signed contracts covering all
of the services listed on this Form 471 except for those services provided under
noncontracted tariffed or month-to-month arrangements. I acknowledge that failure
to comply with program rules could result in civil or criminal prosecution by the
appropriate law enforcement authorities.

[ . . . ]

33. I certify that I am authorized to order telecommunications and other supported
services for the eligible entity(ies) listed on this application. I certify that I am
authorized to submit this request on behalf of the eligible entity(ies) listed on this
application, that I have examined this request, that all of the information on this form
is true and correct to the best of my knowledge, that the entities that are receiving
discounts pursuant to this application have complied with the terms, conditions and
purposes of this program, that no kickbacks were paid to anyone and that false
statements on this form can be punished by fine or forfeiture under the
Communications Act, 47 U.S.C. Secs. 502, 503(b), or fine or imprisonment under the
Title 18 of the United States Code, 18 U.S.C. Sec. 1001 and civil violations of the
False Claims Act.

(emphasis added). The Form 471 also instructed:

The data in the report will be used to ensure that schools and libraries comply with
the competitive bidding requirement contained in 47 C.F.R. § 54.504.

[ . . . ]

If we believe there may be a violation or a potential violation of any applicable
statute, regulation, rule or order, your application may be referred to the Federal,
state, or local agency responsible for investigating, prosecuting, enforcing, or
implementing the statute, rule, regulation or order.

(emphasis added).

34. Likewise, with respect to the same 2007 funding year, on or about February 28,

2007, Draviam signed and soon after mailed to the SLD in Lawrence, Kansas, a Form 473 on

32

behalf of Cambridge wherein the instructions provided:

> A Service Provider Annual Certification Form is required to be completed by each
> service provider, for each separate Service Provider Identification Number (SPIN), to
> confirm that the Invoice Forms submitted by each service provider are in compliance
> with the FCC's rules governing Universal Service for Schools and Libraries.
>
> [ . . . ]
>
> The information reported in the Form will be used to inform the fund administrator
> that a service provider is aware of and is in compliance with the FCC's rules
> governing Universal Service for Schools and Libraries.
>
> If we believe there may be a violation or potential violation of a FCC statute,
> regulation, rule or order, your Service Provider Annual Certification Form may be
> referred to the Federal, state, or local agency responsible for investigating,
> prosecuting, enforcing or implementing the statute, rule, regulation or order. In
> certain cases, the information in your Service Provider Annual Certification Form
> may be disclosed to the Department of Justice or a court or adjudicative body when
> (a) the FCC; or (b) any employee of the FCC; or (c) the United States Government, is
> a party in a proceeding before the body or has an interest in the proceeding.

(emphasis added).

35.     By signing the certifications and participating in the E-Rate program, ULKER and

Draviam agreed to follow the E-Rate Program rules and regulations. By discussing and verbally

advising ULKER of Cambridge's bid for the work, Draviam and ULKER violated the Program

rules and bypassed the competitive bidding requirement. The certifications discussed above exist

to ensure the integrity of the E-Rate Program. Both service providers and applicants are required

to adhere to the fairness standards set forth by their respective certifications to keep the program

fair to all participants. Although they certified to the contrary, ULKER and Draviam initiated a

business relationship that unfairly influenced the outcome of the service provider selection

process. Without a true competitive bidding process, each of them could no longer certify that

the most cost-effective bid was selected. Draviam and ULKER's relationship defrauded the E-

Rate Program through their failure to ensure a fair and open competitive bidding process.

### Phase II -- ULKER Usurps The Work
#### Cambridge Should Be Performing And Bills For It

36.     Draviam informed investigators that prior to 2007, Cambridge supplied all of the

hardware and installation services to the charter schools through subcontractors that Cambridge

had selected.  Later, however, ULKER informed Draviam that he (ULKER) intended to provide

the installations, the service, and the upgrades to the schools.  In other words, ULKER would

perform the schools' E-Rate-funded work himself, while serving as a CONCEPT SCHOOLS and

charter school employee.  In a February 4, 2007 email to Cambridge, ULKER wrote, in English,

the following:

> From: ulker@horizontoledo.org

> To: camtrl@aol.com

> Once again, we will be using your name [Cambridge] for profiting all 3 parties.  I'll
> [ULKER] do the 21 Attachment and the price breakdown and follow the whole
> procedure till the end including the tech plans.  All you [Cambridge] need to do will
> be ordering and shipping the products listed in your proposal and that's it.

As explained above, the Item 21 Attachment is a listing of the intended equipment and services

to be purchased with E-Rate Program funds.  Your Affiant believes that the phrase "profiting all

3 parties" references profiting the applicant, ULKER himself, and Draviam.

37.     According to Draviam, from 2007 through 2008, contrary to Program rules,

ULKER did all the work himself.  Cambridge only ordered and supplied the servers and cabling.

All products that Cambridge ordered were shipped to the charter schools.  ULKER did the work

himself, which, according to Draviam, consisted of configuring servers, installing e-mail

networks, and performing maintenance.  During this period, ULKER continued to be a full time

employee of CONCEPT SCHOOLS and its charter schools.

38.     In performing the work himself or at his direction, ULKER established an invoicing scheme wherein he remitted invoices to Cambridge as though the invoicing company was performing the work as Cambridge's subcontractor.  ULKER remitted the invoices to Cambridge under the following business names:  DizaynIT Solutions, Ulkerim Solutions, and HGF IT.  Draviam told investigators that he was unsure whether the schools' directors knew ULKER was invoicing, and getting paid directly by, Cambridge.  All funds Cambridge paid to ULKER were drawn from E-Rate Program funding.

39.     In furtherance of the scheme, ULKER, who resided in Illinois, faxed and emailed the DizaynIT invoices to Cambridge, located in Ohio.   Draviam provided ULKER'S invoices to case agents who reviewed the checking account records Cambridge used to pay the invoices.  Based on this review, Cambridge paid ULKER pursuant to his businesses' invoices directly by check.  The DizaynIT Solutions invoices, for example, each state to "make checks payable to HUSEYIN ULKER."  In total, Cambridge paid the following amounts to ULKER:

| ULKER's Companies | Invoice Dates | Amount Paid by Cambridge |
|---|---|---|
| Ulkerim Solutions | June 1, 2006 | $   1,500 |
| DizaynIT Solutions | August 2008 through April 2009 | $ 75,584 |
| HGF IT Solutions | Throughout 2008 | $ 60,000 |
|  | Total: | $137,084 |

40.     Based on a review of bank accounts maintained by ULKER, in December of 2008, ULKER deposited $16,000 into a bank account in the name of HGF IT.  The $16,000

consisted of checks that ULKER received from Cambridge. Shortly after the $16,000 deposit,

another deposit of $8,000 was made.[3]  Following those deposits, a wire transfer of $20,000 was

made to a bank account at the Bank of Asya in Turkey.

41.     The CONCEPT SCHOOLS charter schools that selected Cambridge as one of

their service providers, as well as Cambridge itself, made certifications to the SLD in the Forms

471s and 473s, that were inconsistent with how the E-Rate work was being bid and performed.

For instance, based upon Your Affiant's review of the Ulkerim Solutions invoice, ULKER

invoiced Cambridge for the amount of $1,500 for work performed at HSA-Cleveland that was

funded in 2005.  HSA-Cleveland certified to the SLD in its Form 471, application ID 414708,

that, among other certifications, it "complied with all applicable state and local laws regarding

procurement of services," the services purchased would "be used solely for educational

purposes," and that it "ha[d] complied with all program rules," including the "the competitive

bidding requirement."  Cambridge also made certifications in its Form 473.  Specifically,

Cambridge certified and was instructed that the Form 473 was "true, accurate and complete,"

"that the Invoice Forms submitted by each service provider [were] in compliance with the FCC's

rules," that Cambridge was "aware of and [was] in compliance with the FCC's rules," and that a

"violation of a FCC statute, regulation, rule or order . . . may be referred to the Federal, state, or

local agency responsible for investigating [and] prosecuting."

42.     Similarly, DizaynIT Solutions submitted invoices to Cambridge for work

purportedly performed at HSA-Dayton Elementary School that was funded in 2007 and 2008.

HSA-Dayton submitted Form 471s for funding year 2007, application ID 564535, and year 2008,

---

[3] The $8,000 came from a source other than Cambridge.

application ID 636710, wherein HSA-Dayton certified in both years that, among other things,

that "all bids submitted were carefully considered and the most cost-effective service offering

was selected, with price being the primary factor considered, and is the most cost-effective means

of meeting educational needs," that "the entity responsible for selecting the service provider(s)

has reviewed all applicable FCC, state, and local procurement/competitive bidding requirements

and that the entity or entities listed on this application have complied with them," that "the

services the applicant purchases . . . will be used solely for educational purposes," and that the

"entity(ies) I represent have complied with all program rules," and that "failure to comply with

program rules could result in civil or criminal prosecution by the appropriate law enforcement

authorities." Cambridge used the U.S. mails and private commercial carrier to submit its Form

473s for funding years 2007 and 2008, wherein it certified and was instructed on the Forms,

among other things, that the Forms were "true, accurate and complete," "that the Invoice Forms

submitted by each service provider [were] in compliance with the FCC's rules," that Cambridge

was "aware of and [was] in compliance with the FCC's rules," and that a "violation or potential

violation of a FCC statute, regulation, rule or order . . . may be referred to the Federal, state, or

local agency responsible for investigating [and] prosecuting."

    43.    DizaynIT Solutions also submitted invoices to Cambridge for work performed,

based on the face of the invoices, at HSA-Denison Middle School, and funded in 2007 and 2008.

HSA-Denison Middle School submitted Form 471s for funding year 2007, application ID

566292, and year 2008, application ID 599263, wherein HSA-Denison Middle School made

similar certifications in its 471s from 2007 and 2008 that HSA-Dayton made in paragraph 41.

    44.    DizaynIT Solutions likewise submitted invoices to Cambridge for work performed

at, based on the face of the invoices, HSA-Cincinnati, and funded in 2007 and 2008. HSA-

Cincinnati submitted Form 471s for funding year 2007, application ID 559558, and year 2008,

application ID 634697, wherein HSA-Cincinnati made similar certifications in its 471s from

2007 and 2008 that HSA-Dayton made in paragraph 41.

45.     Because he prepared many of the FCC application documents, ULKER knew the

amount of the maintenance portion of the E-Rate contracts. By directing Cambridge to use

ULKER's IT companies, and through issuing his own invoices, it is Your Affiant's belief that

ULKER was trying to usurp the entire maintenance portion of the E-Rate contract for himself

and his co-conspirators. This practice of ULKER invoicing Cambridge ceased when CONCEPT

SCHOOLS parted ways with Cambridge in late 2009.

46.     Based on the evidence described herein, Your Affiant believes that ULKER, in his

capacity as CIO/director of technology of CONCEPT SCHOOLS, had a relationship with

Cambridge that unfairly influenced the outcome of any competitive bidding process. ULKER, in

directing Cambridge how to bid E-Rate projects and to use his companies as subcontractors for

the work, was acting as a de facto service provider while at the same time serving as a contact

person on several FCC Form 470s. Moreover, ULKER was an employee with a role in the

service provider selection process also having a financial interest in choosing Cambridge as the

service provider. ULKER was listed on the FCC's Forms 470 and 471 as the contact person for

many schools. ULKER is involved in determining the services sought by the CONCEPT

SCHOOLS charter schools and the selection of the CONCEPT SCHOOLS' service providers.

47.     Based on these facts, there is probable cause to believe there has been a violation

of the competitive bidding regulations imposed by the E-Rate Program. There cannot be a fair

38

and open competitive bidding process when: (1) the applicant for supported services has a relationship with a service provider that would unfairly influence the outcome of a competition or would furnish the service provider with inside information; (2) a service provider representative is listed as the FCC forms contact person and allows that service provider to participate in the competitive bidding process; and (3) an applicant employee with a role in the service provider selection process also has an ownership interest in the service provider seeking to participate in the competitive bidding process.

*Phase III – Concept Schools Directs*
*Cambridge to Contract With Related Party Subcontractors*

48.     As an employee of CONCEPT SCHOOLS, ULKER was required by E-rate rules to act independently of the service providers chosen for the school projects. He should not have steered contracts to, or hand-picked, favored service providers. In early 2009, however, ULKER began to direct Cambridge to use specific businesses for the installation and configuration work being funded by the E-Rate Program. According to Draviam, along with ULKER, Dayton School director, Taner Ertekin, also directed Draviam to use certain subcontractors for the E-Rate funded work. This is further evidenced by a June 15, 2009 email provided by Dravium wherein ULKER directed Cambridge to use "GALIP." The email reads:

> From: ulkerim@gmail.com
> To: camtrl@aol.com
>
> Stephen,
>
> both schools are ready to be served.
> when you order the equipment, please order it for all schools including noble.
> springfield is desperately asking for the items.
>
> and they gave me the list of what extra they ll need. i ll share it with you shortly.

39

please expedite the orders and everything.

i insist on using galip for springfields installation and configuration. he is one of
the best tech person I ve met in years. and im sure he ll do a great job in terms of
satisfying schools all needs. and I dont believe someone will do what he ll do for
a better price. i talked to mr. arslan also, they want him too.

please update me about where we are.
do you want me to get the academic CALs?

-shane

(emphasis added).

49.     Through discussions with Draviam, investigators determined that the "galip"

discussed in the June 15, 2009 email references GALIP KUYUK, the owner of SUNDANCE

INTERNATIONAL LLC., d/b/a PRICEPC.COM  (hereinafter "PRICEPC/SUNDANCE").

According to public records and agent surveillance, this business is located at 7093 Barry Street,

Rosemont, Illinois.  According to public records and documents provided by Draviam, another

business, SIGNATURE MAKER INC., is also located at this same address.  Based on interviews

with Draviam, ULKER and a director at the Toledo school, Gultekin "John" Aytekin, directed

Draviam to use SIGNATURE MAKER as well.  Draviam told investigators that he argued with

ULKER about this requirement due to the higher rates that SIGNATURE MAKER charged

Cambridge, but was told by ULKER that the CONCEPT SCHOOLS charter school directors

wanted to use these companies.  Therefore, at the direction of ULKER and CONCEPT

SCHOOLS and contrary to Program rules and regulations, Cambridge began to coordinate

services with SIGNATURE MAKER and GALIP KUYUK of PRICEPC/SUNDANCE.

50.     Cambridge's bank records indicate that Cambridge made several payments to

SIGNATURE MAKER and PRICEPC/SUNDANCE throughout 2009.  The funds paid to these

40

companies were made entirely with E-Rate Program funds. Based on several invoices Draviam

provided, the amounts paid were as follows:

| Approximate Date | Vendor: | School | Approximate Amount Paid |
|---|---|---|---|
| June 2009 | Signature Maker | Indiana Math & Science | $ 5,050 |
| June 2009 | Signature Maker | HSA – Springfield | $ 9,000 |
| July 2009 | PricePC | School not listed | $11,200 |
| November 2009 | Signature Maker | HSA – Springfield | $ 2,900 |

51.    Cambridge's only clients were the CONCEPT SCHOOLS charter schools.

Cambridge had no other customers. Draviam stated that over time, ULKER submitted invoices

to Cambridge with increasing costs. Draviam told investigators that ULKER was always trying

to squeeze him on price while insisting on using PRICEPC/SUNDANCE or SIGNATURE

MAKER for materials and equipment, even when Cambridge could procure cheaper materials or

services from another vendor.

52.    For instance, Draviam, consistent with ULKER's direction, used SIGNATURE

MAKER for work performed at what appears to be Indiana Math and Science, which submitted a

Form 471 to SLD, application ID 631795, for funding year 2008. Draviam received an invoice

from SIGNATURE MAKER for this work. ULKER served as the contact person for Indiana

Math and Science's 2008 Form 471, wherein ULKER made similar certifications outlined in

paragraph 41. Cambridge's 2008 Form 473 certifications and instructions also applied and were

discussed above.

53.    Likewise, SIGNATURE MAKER submitted an invoice to Cambridge for work

41

performed at what appears to be HSA-Springfield, which submitted a Form 471 to SLD,

application ID 631543, for funding year 2008. ULKER served as the contact person for Indiana

Math and Science's 2008 Form 471, wherein ULKER made similar certifications outlined in

paragraph 41. Cambridge's 2008 Form 473 certifications and instructions also applied and were

discussed above.

54. Based on the evidence described herein, Your Affiant believes that ULKER, in his

capacity as CIO/director of technology of CONCEPT SCHOOLS, and Draviam had a

relationship that unfairly influenced the outcome of any competitive bidding process. ULKER,

in directing Cambridge to use PRICEPC/SUNDANCE and SIGNATURE MAKER, while at the

same time serving as a contact person on several FCC Form 470s was unduly influencing the

bidding process. ULKER was listed on the FCC's Forms 470 and 471 as the contact person for

many schools. ULKER is involved in determining the services sought by the CONCEPT

SCHOOLS charter schools and the selection of the CONCEPT SCHOOLS' service providers.

55. Based on these facts, there is probable cause to believe there has been a violation

of the competitive bidding regulations imposed by the E-Rate Program. There cannot be a fair

and open competitive bidding process when the applicant for supported services has a

relationship with a service provider that would unfairly influence the outcome of a competition

or would furnish the service provider with inside information.

### Phase IV – Concept Schools Replaces
#### Cambridge With Related Party Service Providers

56. Draviam recalled that while Cambridge was providing E-Rate funded services to

the charter schools, one of the school's directors, Sedat Duman, along with ULKER, asked

42

Draviam about how to become an E-Rate service provider. Believing that the schools intended

to perform the E-Rate funded work entirely by themselves at the total exclusion of Cambridge,

Draviam did not respond to these inquiries. Draviam explained, however, it was not long before

CONCEPT SCHOOLS replaced Cambridge with related party service providers.

57.     According to Draviam, in late 2009, ULKER told Draviam that other service

providers would perform the E-Rate funded work at the schools. ULKER told Cambridge that

the directors wanted to set up their own service provider companies. Draviam understood this to

mean that CONCEPT SCHOOLS' management wanted itself to retain as much of the E-Rate

profits as possible. Even though there were still some schools that selected Cambridge for E-

Rate work, ULKER told Draviam that the CONCEPT SCHOOLS' board in Chicago, Illinois,

decided to replace Cambridge and transfer the work to others by filing a service provider change

with USAC.

58.     Corroborating Draviam's belief that CONCEPT SCHOOLS intended to use

related parties as service providers, was a former CONCEPT SCHOOLS network administrator,

Mustafa Emanet, who was interviewed by the FBI and ED-OIG on November 14, 2013. As

further described herein, Emanet's information has been corroborated by documents and other

source reporting. Emanet has neither requested, nor has he received, any financial consideration

for providing information on this matter. Mary Addi, Mustafa Emanet's wife, publicly

advocates, both in person and via social media, against individuals associated with CONCEPT

SCHOOLS and its charter schools.

59.     According to Emanet, in 2006, CONCEPT SCHOOLS hired Emanet as a network

administrator for Horizon Science Academy. Shortly after he arrived in the United States from

43

Turkey, however, Emanet was advised that he had to teach computer classes at the Noble

Academy. Emanet told investigators that Murat Sagnak, the school director at that time,

indicated that CONCEPT SCHOOLS wanted to use vendors/individuals it had a close

relationship with as service providers for E-Rate funded work. From Emanet's employment at

the charter schools, he believed that Sagnak sought to obtain more E-Rate funds, which Sagnak

would direct to certain vendors who would charge more than an unrelated contractor. By giving

work to related vendors, CONCEPT SCHOOLS was able to direct large portions of E-Rate

Program money away from the charter schools and the E-Rate Program and enrich those

particular vendors or their designees. Emanet was fired from his information technology position

at the HSA-Denison Middle School in or around June 2008. His wife was also fired from her

position at the same school. According to Emanet, they were fired because Emanet and his wife

did not support CONCEPT SCHOOLS' ideology. Emanet and his wife were later re-hired by

HSA-Denison Middle School through negotiations with the school, though they later resigned.

Emanet has no criminal history in the United States, but in September of 2009, right after his

resignation, Emanet was arrested in Turkey for possession of heroin. He was convicted, but the

conviction was later reversed on appeal. Emanet believes that his arrest and conviction, though

reversed, were false and in retaliation for his ideological differences, and dealings with,

CONCEPT SCHOOLS.

60.     During Emanet's time with the CONCEPT SCHOOLS charter school, he recalled

Cambridge purchasing and setting up computers, wiring, servers, racks, web content filters, and

firewalls. Emanet knew ULKER was coordinating the E-Rate Program funding for the schools.

Emanet installed wireless access points that were part of the E-Rate contract. Emanet handled all

44

of the software service and upgrades to the network that were installed by Cambridge and also

part of the E-Rate Program.

61.　Further evidencing the development of this phase of the fraudulent scheme was a

September 1, 2006 email provided to investigators by Emanet from Murat Sagnak, to Vedat

Akgun and OZGUR BALSOY.  The email forwarded an email sent on behalf of Akgun, whose

signature block identified him as PhD and employee of CONCEPT SCHOOLS, to "CS

Directors" regarding "E-Rate info."  In the forwarded email, Akgun, or someone on his behalf,

wrote—originally in Turkish, with approximate Turkish translation provided—the following:

> The observation on E-Rate is this, a school with 75% of its students qualifying free &
> reduced lunch could potentially generate $170,000 in funding. In exchange, you have
> to have $25-30K worth of work done (just ask Rauf Tanriseven).  The school pays
> 10% of the costs and the remainder is on the guy doing the work, based on the free &
> reduced ratio.
>
> Which means the school will have to pay a minimum of $17K.  Although there's a
> significant delay in work completion with that guy named Steve [Draviam], we profit
> a "few pennies" from that.
>
> I suppose it is not permitted, but I am sure we could find 2 or 3 others who are
> experienced and would not question the money aspect of work completion. Let's just
> say, 10 schools x $170,000 equals $1,700,000.  If you figured $400K for everything,
> would leave you $1.3 million.
>
> It's a sensitive subject.  Or, each school will find someone to complete the work,
> without any expectations of a profit.

### HGF IT Solutions and Sundance International LLC

62.　Investigation has revealed that two of the related service providers that

CONCEPT SCHOOLS used, or attempted to use, were PRICEPC/SUNDANCE and HGF IT.  As

provided above, Cambridge paid $60,000 to HGF IT at ULKER's direction in 2008.

Subsequently in 2009, according to FCC-OIG and USAC records, HGF IT sought funding as a

standalone service provider apart from working with Cambridge by filing a Form 498. In the

Form 498, HGF IT listed Gulenay Ulker as its CEO, who Your Affiant believes is the wife of

SHANE ULKER. Your Affiant has this belief because Gulenay Ulker shares ULKER's last

name and she is listed as a co-tenant with ULKER in a database of a residential apartment

complex believed to be ULKER's former residence. Several Horizon Science Academy schools,

including HSA-Columbus Middle School, Indiana Math and Science, HSA-Cleveland High

School, HSA-Columbus High School, and Wisconsin Career Academy, submitted Form 471s to

USAC selecting HGF IT as its Service Provider.

63.     Then, in late 2009, Murat Efe, the CONCEPT SCHOOLS NORTH OHIO

REGIONAL OFFICE superintendent, served as the applicant/contact person for HSA-Cleveland

High School's request with USAC, faxed from CONCEPT SCHOOLS in Illinois, to change

service providers from HGF IT to PRICEPC/SUNDANCE. All the remaining HGF IT

applications for funding never materialized and went unfunded by USAC. But, from 2009

forward, PRICEPC/SUNDANCE and CORE GROUP, discussed below, became the primary

recipient of CONCEPT SCHOOLS' E-Rate service provisions. Cambridge was no longer a

service provider for any CONCEPT SCHOOLS charter schools, and ULKER's companies were

no longer receiving funding from Cambridge. From 2009 through 2013, PRICEPC/

SUNDANCE and CORE GROUP received approximately $3.8 million in E-Rate Program

funding as service providers.

64.     Further corroborating this fraudulent scheme, the FCC-OIG provided agents with

documentation comparing the visual format of two separate contracts: One from

PRICEPC/SUNDANCE (dated July 2011) and the other from HGF IT (dated July 2009). The

46

format, layout, and wording of these contracts were almost identical with the exception of the

header logos. ULKER signed the HGF IT contract for the school, and a review of the metadata

of the document's properties provided that ULKER authored the 2009 HGF IT document.

Additionally, bank account opening documents for HGF IT indicated that ULKER was the

company's treasurer. The 2011 SUNDANCE contract, on the other hand, was signed by

KUYUK. As stated above, in a June 15, 2009 email provided by Cambridge, ULKER directed

Cambridge to use "GALIP," which Your Affiant believes to be the same GALIP KUYUK that

signed the 2011 SUNDANCE contract. Moreover, due to the identical nature of the two

documents, there is probable cause to believe that PRICEPC/SUNDANCE, HGF IT, ULKER,

and KUYUK were all associated in a collaborative way such that either company's

documentation related to E-Rate Programs could be located at one another's place of business or

residence.

65.     As a service provider, KUYUK acted as contact person for PRICEPC/

SUNDANCE and sent using the U.S. mails Form 473s in 2009 and 2011 to the SLD, wherein he

made certifications, and received instructions, similar to those outlined in paragraph 41. The

Form 471s for HSA-Cincinnati in 2009, application ID 687575, HSA-Denison Middle in 2009,

application ID 687686, and Indiana Math & Science in 2009, application ID 690754, made

similar certifications outlined in paragraph 41. Cambridge's 2008 Form 473 certifications and

instructions were discussed above.

*Advanced Solutions for Education*

66.     Yet another related party servicer provider that attempted to replace Cambridge

during this phase of the fraudulent scheme was ADVANCED SOLUTIONS FOR EDUCATION

47

("ASE"). According to the Illinois Secretary of State website, other public source databases, and

a review of bank records, ASE was operated by OZGUR BALSOY, a former Horizon Science

Academy Director, and conducted business with the CONCEPT SCHOOLS charter schools

almost exclusively. According to public source records, ASE operates out of three locations:

Dublin, Ohio, Mentor, Ohio, and Schaumburg, Illinois. All three locations are within close

distance to a CONCEPT SCHOOLS facility. In late 2009, BALSOY submitted a Form 498 for

ASE to seek funding from the FCC E-Rate Program as a service provider. Fourteen applications

for work consisting of "maintenance of internal connections" were submitted for five Horizon

Science Academies in Cleveland, Toledo, Columbus, and Lorain. ULKER was listed as the FCC

Form 470 contact person for three of these schools. Pursuant to this work, ASE sought

$263,820.00 in E-Rate funded services. These applications were denied, however, because the

schools did not respond to the USAC inquiries in a timely manner.

67.     In reviewing the USAC contact records, ULKER submitted several email

addresses at which he could be contacted, one of which was "eratep1@as4ed.com." The "as4ed"

is the same domain for ASE's website (www.as4ed.com) and email addresses for BALSOY. The

physical address associated with ULKER's "as4ed" contact information is 2250 East Devon

Avenue, Des Plaines, Illinois; the same address for CONCEPT SCHOOLS. Further, all of the IP

addresses from which the FCC Form 470s and most of the FCC Form 471s submitted on behalf

of ASE resolve to Des Plaines, Illinois, the home of CONCEPT SCHOOLS.

68.     According to Emanet, OZGUR BALSOY was the Horizon Science Academy

Director in Cleveland prior to Murat Sagnak becoming the school's Director. In July 2008, in

response to an IRS inquiry concerning non-profit status of a business associated with CONCEPT

48

SCHOOLS, OZGUR BALSOY was listed as the Development Director of CONCEPT

SCHOOLS. BALSOY was also one of the certifying individuals on the FCC Form 471 for work

performed at several schools by Cambridge in 2006. Because of the relationship among

BALSOY, CONCEPT SCHOOLS, and ULKER, there is probable cause to believe that ULKER

directed, attempted to influence, or coordinated with BALSOY to seek funding from the E-Rate

Program.

69.     Based on public searches, ASE does not appear to be a telecommunications

company, cabling company, or an internet service provider. Rather, ASE appears to be a

company that provides the schools with continuing education for teachers and administrators and

other school consulting services. BALSOY served as the "schools contact person" on many of

the FCC Form 470s for applications where PRICEPC/SUNDANCE (from 2011 through 2013)

and CORE GROUP (from 2010 through 2013) were ultimately selected as the service providers.

70.     As further evidence of the relationship among BALSOY, ASE, CONCEPT

SCHOOLS, and its charter schools, after BALSOY and ASE had applied for and received a SPIN

number and had already been selected by several CONCEPT SCHOOLS charter schools as a

service provider, he then registered with USAC in February 2011 to also become an E-Rate

consultant. Realizing that BALSOY and ASE had both a SPIN and a consultant number, USAC

inquired about the conflict. In September 2012, BALSOY submitted documentation to USAC in

response to its conflict of interest inquiry wherein he wrote on ASE letterhead the following: "I

had registered as a service provider a couple years ago, however, later I became a consultant for

the schools I work with. I have never entered into a bidding process and never received any

disbursement from USAC." It is true that ASE was not disbursed any E-Rate Program funding,

however, if ASE/BALSOY had followed the E-Rate Program rules, the bidding process should

have occurred. According to the records, FCC Forms 471s were filed/certified by the schools to

fund ASE. Form 471 is filed with USAC after the bidding process has supposedly taken place.

Therefore, Your Affiant cannot conclusively state that a bidding process took place or that a bid

was submitted by BALSOY. But either way, the E-Rate Program rules were violated. BALSOY

had a conflict of interest in his involvement with CONCEPT SCHOOL and association with

ULKER. BALSOY's letter attempted to explain away a conflict of interest inquiry which could

have resulted in a stoppage of E-Rate funding to the charter schools had there been an improper

relationship, but because of his response, additional funding was disbursed.

71.     Review of banking records for ASE for the period of February 9, 2009 through

February 29, 2012 revealed approximately 351 deposits in the total amount of approximately

$1,147,763.04. Agents calculated that approximately 93% of these deposits came from

CONCEPT SCHOOLS charter schools. The remaining 7% of deposits came from BALSOY and

cash deposits.

*Core Group*

72.     Contemporaneously with ASE's 2010 service provider submissions, CORE

GROUP also initiated several requests for E-Rate funding from USAC. According to the Illinois

Secretary of State website, CORE GROUP is located at 500 West Algonquin Road, Suite B,

Arlington Heights, IL, 60056, and is owned by ERTUGRUL GURBUZ. Also according to the

Illinois Secretary of State website, CORE GROUP was incorporated in September of 2005 in the

State of Illinois and has several additional names under which it conducts business: Core Design

and Production, Core Electronics, Core 2B, and Shots and Cuts, Inc.

50

73.     Consistent with Emanet's and Draviam's belief about CONCEPT SCHOOLS

establishing its own, related service providers, CORE GROUP sought to be, and was approved

as, an E-Rate service provider on January 26, 2010. Since then, according to bank records,

CORE GROUP provided the CONCEPT SCHOOLS charter schools with products such as

school uniforms, printing supplies, and computer equipment. CORE GROUP's largest vendor,

however, was PRICEPC/SUNDANCE, which was also an approved E-Rate service provider that

dealt with the CONCEPT SCHOOLS charter schools in regard to the E-Rate Program.

Moreover, as early as 2011, it was BALSOY who served as the charter schools' contact person

on CORE GROUP's FCC Form 470s. CORE GROUP received over $2.5 million from the FCC

E-Rate Program from 2010 through 2013.

74.     According to public record searches, HUSEYIN ULKER has been the chief

information officer (or other related title) for CONCEPT SCHOOLS most of the time that CORE

GROUP has been an approved service provider for the E-Rate Program. ULKER has the overall

responsibility to oversee the E-Rate Program within the CONCEPT SCHOOLS. Checks

received from Cambridge show ULKER was continuing to enrich himself from his work with the

E-Rate Program through receiving payments from a service provider. In 2011, ULKER

submitted the following email to USAC requesting a consultant registration number:

> From: Shane Ulker [mailto:ulkerim@gmail.com]
> Sent: Wednesday, February 16, 2011 8:49 AM
> To: sld-consultant
> Subject: Consultant Registration Number request
>
> Hi,
>
> My name is Shane Ulker. I would like to get a consultant registration number to
> consult some schools in their erate applications. I am the only person at my

51

organization who will work on this.

My company contact information is as follows:

Shane Ulker
Chief Information Officer, Concept Schools
Concept Schools
2250 E. Devon Ave. Suite 215
Des Plaines, IL 60018
Phone: 847-824-3380
Fax: 847-824-3382
Email: ulker@conceptschools.org
Web: www.conceptschools.org

USAC responded to ULKER as follows:

From: sld-consultant
To: 'Shane Ulker'
Subject: RE: Consultant Registration Number request- Case 22-170849

Shane,

Your Consultant Registration number (CRN) is 16063629. ...

Kristi Proctor
Technical Client Service Bureau
Schools and Libraries Division

ULKER's email was sent to USAC during the time frame that CORE GROUP was receiving E-Rate contracts from CONCEPT SCHOOLS' charter schools. Your Affiant believes that ULKER was setting himself up to have exclusive contact with the service providers. The email address from which ULKER sent the above email was the same email address used by one of his entities, ULKERIM SOLUTIONS, in invoicing Cambridge for E-Rate work.

75.     Since 2010, the CONCEPT SCHOOL entities, including the charter schools and other entities, have generated over 92% of CORE GROUP's business. It appears that approximately 8% of CORE GROUP's business is derived from entities that are not known to be

52

related to CONCEPT SCHOOLS. CORE GROUP received approximately $2.8 million in

revenue from CONCEPT SCHOOLS entities from January 2010 through February 2012. These

funds did not include the $2.5 million it received directly from the FCC for the E-Rate Program.

76.    As a service provider, GURBUZ acted as contact person for CORE GROUP and

used a private commercial carrier to mail Form 473s in 2011 and 2012 to the SLD, wherein he

made certifications, and received instructions, similar to those outlined in paragraph 41. The

Form 471s for HSA-Dayton High in 2012, application ID 874548, HSA-Cincinnati in 2012,

Application ID 874098, HSA-Denison Middle in 2012, Application ID 874446, and Chicago

Math & Science Academy in 2012, application ID 874618, selected CORE GROUP as a Service

Provider and made similar certifications outlined in paragraph 41.

77.    By giving work to related vendors, CONCEPT SCHOOLS was able to direct large

portions of E-Rate Program money away from the charter schools and the E-Rate Program and

enrich those particular vendors or their designees

VIII.    Financial Relationship Among The Entities

78.    Investigation has revealed that PRICEPC/SUNDANCE, SIGNATURE MAKER,

and CORE GROUP moved funds among each other and, primarily, to PRICEPC/SUNDANCE.

Your Affiant has reviewed bank account records for, among others, these three entities and found

that the majority of funding received by these entities originated from the various academies of

CONCEPT SCHOOLS and USAC E-Rate Program funding.

79.    For instance, these records reveal that from August 2008 through August 2013,

the CONCEPT SCHOOLS charter schools paid approximately $418,666.52 to PRICEPC/

SUNDANCE. During this same period, SIGNATURE MAKER also paid approximately

53

$371,626.73 to PRICEPC/SUNDANCE. CORE GROUP paid approximately $424,490.85 to

PRICEPC/SUNDANCE between January 7, 2010 and January 29, 2012. From 2010 through

August 2013, USAC remitted approximately $1,039,577.03 in E-Rate Program funds to

PRICEPC/SUNDANCE. Business from the CONCEPT SCHOOLS charter schools accounted

for 89% of CORE GROUP's deposits, which did not include funding from the FCC E-Rate

Program. The funding received by PRICEPC/SUNDANCE from the E-Rate Program, from

CONCEPT SCHOOLS entities, and from CORE GROUP and SIGNATURE MAKER made up

approximately 63% of PRICEPC/SUNDANCE's funding from August 1, 2008 through August

31, 2013. The following flow chart visually represents the flow of funds among CONCEPT

SCHOOLS, its charter schools, and the related entities discussed in this Affidavit:

54

55

80.    A review of PRICEPC/SUNDANCE's bank records has revealed that in December 2010, PRICEPC/ SUNDANCE sent approximately $321,600.00 to an individual named Ibrahim Kuyuk, a person believed to be GALIP KUYUK's father.

81.    The following table shows all of the E-Rate funding from 2003-2013 received by the vendors that performed E-Rate work for the charter schools managed by CONCEPT SCHOOLS.  Table 1 reflects all of the funds received by vendors with known connections to CONCEPT SCHOOLS.  Table 2 reflects all of the vendors that are well known corporations that have no known connections to CONCEPT SCHOOLS.  The largest amount of funds received by a CONCEPT SCHOOLS non-related E-Rate vendor was $41,636 by Ohio Bell Telephone.  The largest amount of funds received by a CONCEPT SCHOOLS related vendor was Core Group, which received over $2.8 million in E-Rate funds.  The total amount of E-Rate funds received by all of the CONCEPT SCHOOLS non-related entities was just over $100,000 and the total CONCEPT SCHOOLS related E-Rate vendors was over $5 million.  The amount of E-Rate funds paid to non-related vendors was approximately 2.1% of the total E-Rate funds received by all CONCEPT SCHOOLS charter schools.

| Total E-Rate Funds disbursed for Concept Schools | | |
|---|---|---|
| Concept Schools Related Entities | | |
| Core Group | | $2,814,150.80 |
| Cambridge Technologies | | $1,214,418.10 |
| PricePC/Sundance International, LLC | | $1,039,577.03 |
| | Total | $5,068,145.93 |
| | | |
| Non-Related Entities | | |
| The Ohio Bell Telephone Company | | $41,636.53 |
| XO Communication Services LLC | | $22,426.34 |

| | |
|---|---|
| Cincinnati Bell Telephone LLC (OH) | $11,043.52 |
| Indiana Bell Telephone Company, Incorporated | $8,640.00 |
| Choice One Communications of Ohio Inc. | $5,682.86 |
| Windstream Communications, Inc. | $5,400.00 |
| Wisconsin Bell, Inc. | $2,880.00 |
| Time Warner Cable Information Services (Wisconsin), LLC | $2,380.38 |
| Buckeye Telesystem, Inc. | $1,815.52 |
| Time Warner Cable Information Services (Ohio), LLC | $715.73 |
| Sprint Communications Co. L.P. | $601.21 |
| Southwestern Bell Telephone Company | $349.16 |
| SBC Long Distance, LLC. | $324.00 |
| Total | $103,895.25 |

IX.     Probable Cause To Believe Documents Are Maintained At The Search Sites

82.     Based upon Your Affiant's training and experience, it is known that in the normal course of business, financial records are maintained and stored at the place of business and in the personal residences of individuals involved in the business. Based upon Your Affiant's training and experience, an individual who claims to be the signatory on a bank account and the owner of a business will maintain the records of the business at the place of business and in the personal residences of individuals involved in the business. Based upon Your Affiant's training and experience, an individual who maintains control of personal checking, personal savings, or personal loan accounts typically maintains records, including statements, correspondence, check copies, and promissory notes of such accounts at his personal residence.

83.     As provided above, schools participating in the E-Rate Program are required to keep "all documents related to the application for, receipt, and delivery of discounted telecommunications and other supported services for at least 5 years after the last day of service delivered. . . . Any other documents that demonstrate compliance with the statutory or regulatory requirements for the schools and libraries mechanism shall be retained as well." See 47 C.F.R.

54.516(a)(1).  Service providers have a similar requirement.  See 47 C.F.R. 54.516(a)(2).  USAC

has provided an illustrative list of documents that service providers and program beneficiaries

must retain pursuant to the recordkeeping requirement:

        a.      Pre-bidding Process.  Beneficiaries must retain the technology plan and

technology plan approval letter.  If consultants are involved, beneficiaries must retain signed

copies of all written agreements with E-rate consultants.

        b.      Bidding Process. All documents used during the competitive bidding

process must be retained. Beneficiaries must retain documents such as: Request(s) for Proposal

(RFP(s)) including evidence of the publication date; documents describing the bid evaluation

criteria and weighting, as well as the bid evaluation worksheets; all written correspondence

between the beneficiary and prospective bidders regarding the products and service sought; all

bids submitted, winning and losing; and documents related to the selection of service provider(s).

Service providers must retain any of the relevant documents described above; in particular, a

copy of the winning bid submitted to the applicant and any correspondence with the applicant.

Service providers participating in the bidding process that do not win the bid need not retain any

documents.

        c.      Contracts. Both beneficiaries and service providers must retain executed

contracts, signed and dated by both parties. All amendments and addendums to the contracts

must be retained, as well as other agreements relating to E-rate between the beneficiary and

service provider, such as up-front payment arrangements.

        d.      Application Process. The beneficiary must retain all documents relied

upon to submit the Form 471, including National School Lunch Program eligibility

documentation supporting the discount percentage sought; documents to support the necessary

resources certification pursuant to section 54.505 of the Commission's rules, including

budgets;91 and documents used to prepare the Item 21 description of services attachment.

   e. Purchase and Delivery of Services. Beneficiaries and service providers

should retain all documents related to the purchase and delivery of E-rate eligible services and

equipment. Beneficiaries must retain purchase requisitions, purchase orders, packing slips,

delivery and installation records showing where equipment was delivered and installed or where

services were provided.

   f. Invoicing.  Both service providers and beneficiaries must retain all

invoices. Beneficiaries must retain records proving payment of the invoice, such as accounts

payable records, service provider statement, beneficiary check, bank statement or ACH

transaction record. Beneficiaries must also be able to show proof of service provider payment to

the beneficiary of the BEAR, if applicable. Service providers must retain similar records showing

invoice payment by beneficiary to the service provider, USAC payment to the service provider,

payment of the BEAR to the beneficiary, through receipt or deposit records, bank statements,

beneficiary check or automated clearing house (ACH) transaction record, as applicable.

   g. Inventory. Beneficiaries must retain asset and inventory records of

equipment purchased and components of supported internal connections services sufficient to

verify the location of such equipment. Beneficiaries must also retain detailed records

documenting any transfer of equipment within three years after purchase and the reasons for such

a transfer.

   h. Forms and Rule Compliance. All program forms, attachments and

59

documents submitted to USAC must be retained. Beneficiaries and service providers must retain

all official notification letters from USAC, as applicable. Beneficiaries must retain FCC Form

470 certification pages (if not certified electronically), FCC Form 471 and certification pages (if

not certified electronically), FCC Form 471 Item 21 attachments, FCC Form 479, FCC Form

486, FCC Form 500, FCC Form 472. Beneficiaries must also retain any documents submitted to

USAC during program integrity assurance (PIA) review, Selective Review and Invoicing

Review, or for SPIN change or other requests. Service providers must retain FCC Form 473,

FCC Form 474 and FCC Form 498, as well as service check documents. In addition,

beneficiaries must retain documents to provide compliance with other program rules.

84.    Based upon Your Affiant's training and experience, businesses and individuals

keep records for lengthy periods of time. In addition to regulatory compliance, businesses and

individuals keep records for tax purposes and operational purposes, such as for warranty records,

maintenance work, transfers of equipment, and obsolescence records. Indeed, Cambridge, one of

the primary E-Rate service providers discussed in this Affidavit, kept some records dating back

to 2003.

85.    Your Affiant is aware that it is common in business that business executives, such

as the owner of a small company, frequently take business documents home. Executives often

keep calendars, telephone lists, and other scheduling information at home and at the office, which

affords ready access to this important business information. Many of these items are often

accessed through a computer, including a home computer. Moreover, as provided above, some

individuals used Google and AOL based email addresses, which Your Affiant knows can be

accessed from a personal computing device, such as a laptop, computer, and smart phone, all of

which may be found in a home.

86.    In addition to the foregoing paragraphs, Your Affiant submits the following in support of probable cause for each search site listed in the Attachment As.

a.    CONCEPT SCHOOLS, Main Office. CONCEPT SCHOOLS is the management company responsible for all facets of each school. Its areas of responsibility include financial, technology, education, and management. CONCEPT SCHOOLS has been the management company for the charter schools at least from 2003 to the present. HUSEYIN ULKER is currently the Chief Information Officer of CONCEPT SCHOOLS and has an office at this location. Several of the current employees were the contact persons or certifiers on E-Rate contracts for the CONCEPT SCHOOLS charter schools. CONCEPT SCHOOLS has access to and maintains the bank accounts for all of the charter schools. CONCEPT SCHOOLS has the ability to pay bills for the charter schools. In your Affiant's experience, businesses require appropriate invoices and financial documentation prior to paying a bill. Therefore, Your Affiant believes that documents and invoices related to vendors that conducted business with the charter schools will be located at CONCEPT SCHOOLS.

b.    PRICEPC/SUNDANCE (to include GALIP KUYUK residence). PRICEPC/SUNDANCE was an E-Rate authorized service provider. It provided the CONCEPT SCHOOLS charter schools with over $1 million in hardware, services, and maintenance for the E-Rate Program. A review of PRICEPC/SUNDANCE's bank records revealed that it received over $400,000 in funds from CORE GROUP during the period of January 2010 thru February 2012. As part of the E-Rate Program, PRICEPC/SUNDANCE invoiced the charter schools for the FCC required 10% of the total E-Rate contract. PRICEPC/SUNDANCE is located in

61

Chicago, Illinois, and most of the schools are located in states other than Illinois, therefore, there

will be travel required to provide the required E-Rate services. Cambridge was directed by

CONCEPT SCHOOLS employees to conduct business with PRICEPC/SUNDANCE, and

Cambridge made payments to PRICEPC/SUNDANCE for products or services. ULKER, while

working under the auspices of his business, HGF IT Solutions, directed Cambridge to use

PRICEPC/SUNDANCE. Consequently, ULKER may have communicated with

PRICEPC/SUNDANCE about Cambridge through HGF IT Solutions. Moreover, due to the

identical nature of the PRICEPC/SUNDANCE, HGF IT invoices described above, there is

probable cause to believe that PRICEPC/SUNDANCE, HGF IT, ULKER, and KUYUK were all

associated in a collaborative way such that either company's documentation related to E-Rate

Programs could be located at one another's place of business or residence. Finally, the

government has obtained one check from December 2008 that included both names, KUYUK

and PRICEPC/SUNDANCE, at 100 Parkwood Drive, which is KUYUK's residence.

      c.    SIGNATURE MAKER (to include all addresses and ERGUN

KOYUNCU's RESIDENCE ). SIGNATURE MAKER has been co-located with PRICEPC/

SUNDANCE at the Rosemont, Illinois address since 2008. In July of 2013, SIGNATURE

MAKER was involuntarily dissolved by the State of Illinois. Your Affiant is aware that it is

common for companies to continue to conduct business after an involuntary dissolution as

another type of company other than a corporation. Cambridge was directed by ULKER and

others to use SIGNATURE MAKER for E-Rate cabling at some of the CONCEPT SCHOOLS

charter school locations. Bank records reveal that SIGNATURE MAKER continued to conduct

business with PRICEPC/SUNDANCE and CORE GROUP. SIGNATURE MAKER also

conducted business with many of the CONCEPT SCHOOLS charter schools. Through

surveillance of the PRICEPC/SUNDANCE search site location, Your Affiant believes that the

garage/loading dock space is in the middle of two suites and may be shared with both tenants.

PRICEPC/SUNDANCE is on one side of the garage/loading dock door, and a similar glass entry

door is situated on the other side of the garage door with a logo on the glass door reading "SMI"

and the address number of 7095. It is unknown to Your Affiant whether SMI stands for

Signature Maker Inc. or another entity, but after observing the layout of the building, it is

reasonable to conclude that the space behind the garage door is both accessible and shared by

each tenant. Further with respect to KOYUNCU's residence, signature cards and bank

statements for JP Morgan Chase ("JPMC") accounts, including JPMC Chase Business Classic

*5250, JPMC Mastercard *7963, and lines of credit, *9001 and *9002, in the name of

SIGNATURE MAKER INC., for the period of February 13, 2008 through August 30, 2013 (the

last statement provided by the bank in response to subpoena requests) display the address of:

> 570 Jamison Ln
> Hoffman Estates, IL 60169-4127

Signature cards and bank statements for JPMC accounts, including JPMC checking accounts

*4390 and *7981 and JPMC savings account *4715 in the name of ERGUN KOYUNCU or

ERGUN KOYUNCU or Betul Servan for the period of February 13, 2008 through September 13,

2013 (last statement prodiced) display the same address of:

> 570 Jamison Ln
> Hoffman Estates, IL 60169-4127

Based on Your Affiant's training and experience, because KOYUNCU used his personal

residence as an address for his business's bank accounts, there is probable cause to believe that

there will be business and financial records kept at the KOYUNCU residence.

        d.     CORE GROUP (to include ERTUGRUL GURBUZ RESIDENCE).

CORE GROUP is an E-Rate authorized service provider.  It provided the CONCEPT SCHOOLS

charter schools with over $2.8 million in hardware, services, and maintenance for the E-Rate

Program from January 2010 to the present.  Currently, CORE GROUP has over $4 million in

additional requests for E-Rate funds that have yet to be approved for 2014.  BALSOY (the owner

of ASE), ULKER, and other CONCEPT SCHOOLS employees have been the contact persons

and/or certifiers on E-Rate contracts with the CONCEPT SCHOOLS charter schools.  Both

ULKER and BALSOY have been the contact or certifier for CORE GROUP E-Rate contacts and

were in control of companies that obtained a USAC service provider number.  ULKER has been

the chief information officer overseeing all technology programs for CONCEPT SCHOOLS

during the period of time that CORE GROUP was receiving E-Rate contracts from the

CONCEPT SCHOOLS.  CORE GROUP has paid over $400,000 to SUNDANCE (owned by

GALIP KUYUK) from January 2010 through February 2012.  Both CORE GROUP and

PRICEPC/SUNDANCE were authorized E-Rate service providers.

        e.     ADVANCE SOLUTIONS FOR EDUCATION (to include both addresses

and the OZGUR BALSOY RESIDENCE).  The owner of ASE, OZGUR BALSOY, has held

several different positions within the CONCEPT SCHOOLS organization and its charter schools

from 2008 to the present.  BALSOY has been a school teacher, school director, and development

director of CONCEPT SCHOOLS.  BALSOY obtained a SPIN for ASE and was selected as the

E-Rate service provider for five schools in 2010.  These requests were denied by USAC due to

non-responsiveness by the charter schools.  ULKER was the E-Rate contact person on at least

three of the contracts that BALSOY signed as an E-Rate representative of ASE. BALSOY has

been the CONCEPT SCHOOLS point of contact/consultant for the E-Rate Program on contracts

involving PRICEPC/SUNDANCE and CORE GROUP up through the present. The following

chart provides total deposits ASE received from 2009 to 2012 from CONCEPT SCHOOLS and

related entities.

Total Deposits for ASE from 2009 to 2012

| Payer | Amount |
|---|---|
| CONCEPT SCHOOL ENTITIES | $1,066,699.82 |
| OZGUR BALSOY or a person believed to be his wife | $    59,469.44 |
| CASH DEPOSITS | $    18,050.00 |
|  |  |
|  | $1,144,219.26 |

Over 90% of ASE's business comes from entities related to CONCEPT SCHOOLS. CONCEPT

SCHOOLS itself paid ASE over $100,000 during this same period of time. At one point in the

past, BALSOY maintained a virtual office[4] for ASE and had all mail forwarded to himself at a

CONCEPT SCHOOLS location. Thereafter, according to ASE's own website, BALSOY moved

his operation to 8303 Tyler Blvd., Mentor, Ohio, where he operated ASE, Horizon Learning

Center, and other parts of ASE's business. Also according to ASE's website, ASE maintained

another office at 939 N. Plum Grove Rd., Suite E, Schaumberg, Illinois. Your Affiant is aware

that it is common in business that business executives, such as the owner of a small company,

frequently take business documents home. Executives often keep calendars, telephone lists, and

other scheduling information at home and at the office, which affords ready access to this

important business information. It is also common for business owners to take a lap top

---

[4] Based on your Affiant's experience, a virtual office is a physical office space that can be shared by numerous businesses where no business necessarily maintains a permanent presence there, but rather shares office services.

computer to and from work. Further with respect to BALSOY's residence, BALSOY used the

residential address of 2750 Algonquin Rd. Apt. 106, Rolling Meadows, IL 6008 on several of the

initial ASE incorporation documents in 2009. Based on Your Affiant's training and experience,

when people move residences, they often take with them, including but not limited to, their

important financial documents, work and business related documents, personal effects, and tax

records. Furthermore, according to the JPMC bank account records, from February 9, 2009

through August 31, 2012, ASE had a business address of 545 Metro Pl S STE 100, Dublin, OH

43017, the virtual office address discussed above. According to JPMC bank account records

from February 17, 2012 through April 17, 2012, BALSOY used that same virtual address for his

personal bank account.

      f.     HUSEYIN ULKER RESIDENCE. ULKER has held several different

positions within CONCEPT SCHOOLS and its charter schools from 2003 to the present.

ULKER has been an Information Technology employee, Technology Coordinator, Director of

Technology, and Chief Information Officer. As having held all of these positions within

CONCEPT SCHOOLS, ULKER has conducted business with CORE GROUP (beginning in

2010), PRICEPC/SUNDANCE (beginning in 2008), SIGNATURE MAKER (beginning in 2008)

and ASE (beginning in 2008). ULKER has invoiced Cambridge (owned by Stephen Draviam)

through the following companies: HGF IT (beginning in 2008), DizaynIT (beginning in 2008),

and Ulkerim Solutions (beginning in 2006). According to LexisNexis Accurint searches, several

of these addresses returned as being a former residence of ULKER. For instance, the address on

the bank account of HGF IT Solutions was the same address as the address on the DizaynIT

invoices, which according to a LexisNexis Accurint search, returned to an apartment number

formerly occupied by ULKER. Moreover, ULKER used the following addresses on invoices for

companies that were conducting fraudulent business with Cambridge:

> 2435 Old Stone Ct. #1
> Toledo, OH 43614

> 6376 Cherylbrook Ln.
> Dublin, OH 43017

> 4800 Essex Way Unit 102
> Rolling Meadows, IL 6008

All of these addresses are attributed to ULKER as residences according to a LexisNexis Accurint

search. The Rolling Meadows address was used on an IRS form 1099, which was issued to HGF

IT Solutions by Cambridge. Based on Your Affiant's training and experience, when people

move residences, they often take with them, including but not limited to, their important financial

documents, work and business related documents, personal effects, and tax records. Further,

ULKER often used the email address ulkerim@gmail.com to direct Cambridge to ship product

and otherwise instruct Draviam. This email address was also used for email communications

with USAC. ULKER also directed the E-Rate Program for all of the CONCEPT SCHOOLS

charter schools' directors via email. This email address was not an email address attributed to

CONCEPT SCHOOLS or its charter schools. Rather, it was a Google based "gmail" that could

be accessed from anywhere with an internet connection, including his residence.

        g.     All CONCEPT SCHOOLS charter schools to be searched. Many of the

CONCEPT SCHOOLS charter schools that applied for E-Rate funding selected as their service

provider one or more of the following:  CORE GROUP (beginning in 2010),

PRICEPC/SUNDANCE (beginning in 2008), ASE (beginning in 2008), and Cambridge

(beginning in 2003). Even though there is a five year records retention requirement, it is

common for businesses to retain documents longer than the five-year period. There was a five-

year records retention requirement for all E-Rate records pertaining to bids, invoices, payments,

and other E-Rate records as provided in detail above. ULKER has instructed and directed the

school directors and network administrators at these schools as to the administration of the E-

Rate Program. One of the emails between ULKER and the school directors discussed how to

realize profit through the E-Rate Program. There are various emails between ULKER, the school

directors, and school network administrators discussing the E-Rate Program. By way of

example, in 2012, according to USAC records, a Form 471 was completed by Chicago Math and

Science charter school ("CMSA") that requested, and later received approval for, $191,874.00

for internal internet connections as part of the E-Rate Program. This request was for three DELL

network servers and other various pieces of network equipment as well as installation and

maintenance. That same Form 471 stated that CORE GROUP was selected , that a contract was

signed between CMSA and CORE GROUP, and that the contract number was CMSA-ICBM-

2012. Likewise, in 2009, CMSA submitted a Form 471 to USAC requesting E-Rate funding and

stating that it selected HGF IT Solutions (ULKER's company) as the service provider for the

contract. In a subsequent document, Sedat Duman submitted an Operational SPIN Change

Request on behalf of CMSA. The document requested that USAC change the service provider

on the current request from HGF IT Solutions to PRICEPC/SUNDANCE. The new service

provider point of contact was GALIP KUYUK, the owner of PRICEPC/SUNDANCE. Also in

2009, Ali Yilmaz, the principal at CMSA submitted a letter on CMSA letterhead to USAC,

informing USAC that ULKER was its technology and E-Rate coordinator. In total, CMSA

requested $1.1 million in E-Rate funds from 2005 to 2013, utilizing PRICEPC/SUNDANCE,

CORE GROUP, HGF IT Solutions and other vendors. It received $191,874.00 less the ten

percent the school was responsible to pay the vendors. To date, CMSA has requested funds to

pay PRICEPC/SUNDANCE $1,079.00 that has been committed, but not yet funded. By way of

another example, on February 20, 2013, Engin Blackstone, the superintendent for CONCEPT

SCHOOLS SOUTHWEST REGIONAL OFFICE, signed an E-Rate Form 470 application for

QUEST CHARTER ACADEMY HIGH SCHOOL in Peoria, Illinois. The Form requested E-

Rate funding for the 2013 funding year. The consultant on the Form 470 was OZGUR

BALSOY, the owner of ASE in Chicago, Illinois. The CONCEPT SCHOOLS SOUTHWEST

REGIONAL OFFICE address used on the Form 470 was the same address as QUEST

CHARTER ACADEMY HIGH SCHOOL's address. The selected vendor for the E-Rate service

was PRICEPC/SUNDANCE.

      h.     All CONCEPT SCHOOLS regional offices to be searched. The

CONCEPT SCHOOLS regional offices are responsible for the day to day operation of the charter

schools in their regions, including the schools' educational, financial, and technological

management. Typically, there is a superintendent located within each CONCEPT SCHOOLS

regional office who serves in a leadership position for the regional CONCEPT SCHOOLS

charter schools. For instance, on HSA-Cleveland Middle School's own website, the leadership

of the school is provided as, among others, Murat Efe, who is the regional office superintendent

for CONCEPT SCHOOLS NORTH OHIO. On at least one occasion, Efe served as the contact

person/applicant for a filing made with USAC to change service providers. Moreover, Efe

served as the customer on an agreement with PRICEPC/SUNDANCE and GALIP KUYUK, for

internet services at HSA-Cleveland High School. Further, on several IRS Form 990s for HSA-

CINCINNATI, HSA-DAYTON HIGH SCHOOL, HSA-DENISON ELEMENTARY SCHOOL,

and HSA-COLUMBUS MIDDLE SCHOOL, the charter schools stated that the schools'

superintendent and treasurer were appointed and compensated by CONCEPT SCHOOLS, which

provided instructional, administrative, and financial management to the charter schools. Finally,

the government recently executed a search in another part of the country of a charter school and

its management company's regional office (located in the same building as the charter school

itself) that had structural similarities with and tangential connections to CONCEPT SCHOOLS.

During the search of the regional office, the government located and seized, among other things,

categories of documents also relevant to this Affidavit, including board meeting minutes wherein

charter school operations were discussed, charter school financial documents (including vendor

lists, income statements, revenue reports, sources of federal funds), audit documents,

communications between the regional management office and the Department of Education, and

communications regarding the charter school.

X.      Safes

        87.     To minimize intrusion, it is the government's intention to obtain the combination

to any safes found to be maintained on the premises from any adult person found present there.

If this is not reasonably possible, the safe may be damaged in order to gain access to its contents.

XI.     Computers, Electronic Storage, And Forensic Analysis

        88.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the premises, in whatever form they are found. One

form in which the records might be found is data stored on a computer's hard drive or other

storage media. Thus, the warrant applied for would authorize the seizure of electronic storage

media or, potentially, the copying of electronically stored information, all under Rule

41(e)(2)(B).

89.    Your Affiant submits that if a computer or storage medium is found on the

premises, there is probable cause to believe those records will be stored on that computer or

storage medium, for at least the following reasons:

90.    Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been downloaded

onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a

storage medium can be stored for years at little or no cost. Even when files have been deleted,

they can be recovered months or years later using forensic tools. This is so because when a

person "deletes" a file on a computer, the data contained in the file does not actually disappear;

rather, that data remains on the storage medium until it is overwritten by new data.

91.    Therefore, deleted files, or remnants of deleted files, may reside in free space or

slack space—that is, in space on the storage medium that is not currently being used by an active

file—for long periods of time before they are overwritten. In addition, a computer's operating

system may also keep a record of deleted data in a "swap" or "recovery" file.

92.    Wholly apart from user-generated files, computer storage media—in particular,

computers' internal hard drives—contain electronic evidence of how a computer has been used,

what it has been used for, and who has used it. To give a few examples, this forensic evidence

can take the form of operating system configurations, artifacts from operating system or

application operation, file system data structures, and virtual memory "swap" or paging files.

Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

93.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

94.    Based on actual inspection of other evidence related to this investigation, I am aware that computer equipment was used to generate, store, and print documents used in the scheme. There is reason to believe that there is a computer system currently located on the premises.

95.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Premises because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information

72

about the dates files were created and the sequence in which they were created, although this

information can later be falsified.

       b.    Forensic evidence on a computer or storage medium can also indicate who

has used or controlled the computer or storage medium.  This "user attribution" evidence is

analogous to the search for "indicia of occupancy" while executing a search warrant at a

residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail

address books, "chat," instant messaging logs, photographs, the presence or absence of malware,

and correspondence (and the data associated with the foregoing, such as file creation and last-

accessed dates) may be evidence of who used or controlled the computer or storage medium at a

relevant time.

       c.    A person with appropriate familiarity with how a computer works can,

after examining this forensic evidence in its proper context, draw conclusions about how

computers were used, the purpose of their use, who used them, and when.

       d.    The process of identifying the exact files, blocks, registry entries, logs, or

other forms of forensic evidence on a storage medium that are necessary to draw an accurate

conclusion is a dynamic process.  While it is possible to specify in advance the records to be

sought, computer evidence is not always data that can be merely reviewed by a review team and

passed along to investigators.  Whether data stored on a computer is evidence may depend on

other information stored on the computer and the application of knowledge about how a

computer behaves.  Therefore, contextual information necessary to understand other evidence

also falls within the scope of the warrant.

       e.    Further, in finding evidence of how a computer was used, the purpose of

its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

XII.    Specifics Regarding Searches Of Computer Systems

96.    Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.    Computer storage devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.    Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is

74

designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

97.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drives) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

98.     In addition, a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

XIII.   Procedures To Be Followed In Searching Computers

99.     The warrant sought by this Application does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather the warrant sought by this Application authorizes the removal of computers and related media so that they may be searched in a secure environment.

100.    With respect to the search of any computers or electronic storage devices seized from the location identified in the Attachment As hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

examination of all of the data contained in such computer hardware,

computer software, and/or memory storage devices to determine whether that data falls within

the items to be seized as set forth herein;

b.      searching for and attempting to recover any deleted, hidden, or encrypted

data to determine whether that data falls within the list of items to be seized as set forth herein

(any data that is encrypted and unreadable will not be returned unless law enforcement personnel

have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the

criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the

offenses specified above);

c.      surveying various file directories and the individual files they contain to

determine whether they include data falling within the list of items to be seized as set forth

herein;

d.      opening or reading portions of files in order to determine whether their

contents fall within the items to be seized as set forth herein;

e.      scanning storage areas to discover data falling within the list of items to be

seized as set forth herein, to possibly recover any such recently deleted data, and to search for

and recover deliberately hidden files falling within the list of items to be seized; and/or

f.      performing key word searches through all storage media to determine

whether occurrences of language contained in such storage areas exist that are likely to appear in

the evidence described in the Attachment Bs.

101.    Any computer systems and electronic storage devices removed from the premises

during the search will be returned to the premises within a reasonable period of time not to

exceed 30 days, or unless otherwise ordered by the Court.

XIV.    Evening Search

102.    To minimize disruption on any educational function, the government intends to

execute the search warrants in the late afternoon when a majority of the students have left the

facilities.  Due to the size of the building, complexity of the search, and the time necessary to

image the computers, Your Affiant believes that the search, while begun during the day time, will

continue into the night and early morning hours.  This Affidavit seeks permission to continue the

search into the night in order to minimize disruption that could potentially occur during the

school day.

RETURN PROTOCOL

103.    The government recognizes that the search warrant may call for documents

necessary to performing school business, private business, or household related business.  For

example, a household member may need copies of outstanding bills seized in the warrant to

satisfy the obligation by the due date.  Likewise, employees may need a copy of their calendars

from the date of the search forward, which recorded future meeting dates, or copies of current

contracts in order to perform on the contract.  To minimize the search warrant's impact on such

business, the government will entertain written requests from authorized representatives for

copies of specific documents necessary to operate the business or household.  This request must

identify the specific documents requested and the specific location within the household/business

from which the documents were seized.  General requests for copies of every item seized will not

be entertained. Requests from items seized from other locations over which the representative

has no standing will not be entertained.  The request must also state why providing copies of

77

each document at that time is necessary for the operation of the office or household. The

Government will endeavor to provide copies of such documents as soon as practically possible.

## CONCLUSION

104.    Your Affiant submits that the evidence set forth in this affidavit establishes

probable cause to believe that a search of the locations set forth in Attachment A, for the items

listed in Attachment B, will reveal evidence, fruits and instrumentalities of the criminal

violations listed above.

## REQUEST FOR SEALING

105.    I request that the search warrant applications and this Affidavit be sealed. This

investigation is ongoing. Premature disclosure of the contents of this Affidavit and application

would (a) frustrate this investigation by immediately alerting the targets of this investigation to

the nature of the probe, the techniques employed, the evidence developed to date; and (b) limit

the use of the grand jury to develop further admissible evidence.

_____
Geoffrey Wood
United States Department of Education,
Office of Inspector General

Subscribed to and sworn before me on this 4th day of June, 2014.

_____
UNITED STATES MAGISTRATE JUDGE

78

## ATTACHMENT A

### CONCEPT SCHOOLS – SUITE 302
2250 East Devon Avenue
Suite 302
Des Plaines, IL 60018

The premises consists of Suite 302 within a three story yellow/white brick office building located within the O'Hare Lake Office Complex.  The number "2250" appears above the central door. Two floors of the building are above ground, one floor is semi-below ground level.  Concept Schools has Suite numbers 215, 301, and 302 within the building.   Each Suite appears to have a small reception area and several smaller individual offices within the Suite.   The office building itself has a main entrance at the center and side entrances on either end of the building.   The side entrances open to a split level stairwell.    The main entrance opens to the main floor (2nd floor) with open stairwell and elevator access.   The premises includes the entire office Suite 302, including individual offices, common areas, meeting rooms, storage areas, closet space, and file rooms.



## CONCEPT SCHOOLS – SUITE 302

Unless otherwise noted, for the time period January 1, 2003 to the present:

1. All documents related to the E-Rate Program, including but not limited to, the following: contracts, subcontracts, bids, requests for proposals, invoices, services agreements, payments, documents reflecting the contemplated and actual scope of work, bid tabulations, correspondence, memoranda, notes, minutes, documents reflecting communications about E-Rate work, documents reflecting the work performed, documents reflecting the identities of those performing the work, documents reflecting the time taken to perform the work, maintenance records, documents reflecting the removal, transfer, or disposal of E-Rate equipment, documents reflecting E-rate rules and regulations, and all communications with USAC, the Federal Communications Commission (the "FCC"), and the Schools and Libraries Division (the "SLD"). This also includes all documents related to the contractor and service provider selection process.

2. All documents related to actual and contemplated work pertaining to the install, or upgrade of a computer network and/or internet connectivity, including but not limited to, the following: contracts, subcontracts, bids, requests for proposals, invoices, services agreements, payments, documents reflecting the contemplated and actual scope of work, bid tabulations, correspondence, memoranda, notes, documents reflecting communications about the work, documents reflecting the work performed, documents reflecting the identities of those performing the work, and documents reflecting the time taken to perform the work. This also includes all documents related to the contractor and service provider selection process.

3. For the time periods listed below, all documents related to the following entities, employees, agents, and contractors:

      A.      Advanced Solutions for Education (January 1, 2008 to present)
      B.      Cambridge Technologies (January 1, 2003 to present)
      C.      Core Group Inc. (January 1, 2010 to present)
      D.      Dizaynit Solutions (January 1, 2008 to December 31, 2009)
      E.      HGF IT Solutions (January 1, 2008 through December 31, 2008)
      F.      PricePC/Sundance (January 1, 2008 to present)
      G.      Signature Maker (August 1, 2008 to present)
      H.      Ulkerim Solutions (January 1, 2006 to December 31, 2006)
      I.      Ozgur Balsoy (January 1, 2008 to present)
      J.      Stephen Draviam (January 1, 2003 to December 31, 2009)
      K.      Ertugrul Gurbuz (January 1, 2010 to present)
      L.      Galip Kuyuk (January 1, 2008 to present)
      M.      Huseyin Ulker (January 1, 2003 to present)

4.  All FCC, SLD, and USAC handbooks, manuals, newsletters, and any other FCC, SLD, and USAC program publications.

5.  All documents reflecting wireless/cellular telephones used by Huseyin Ulker.

6.  All telephone records, telephone lists, and contact lists.

7.  All calendars.

8.  All documents reflecting any cabling, IT, internet, computer and electrical work performed by Huseyin Ulker and any other school and Concept Schools employee or representative.

9.  All personnel documents for Huseyin Ulker and Sedat Duman, including but not limited to documents reflecting their compensation package.

10.  The following accounting documents: (1) All general ledgers, (2) Accounts payables journals, accounts receivables journals and cash receipts journals, together with all supporting documentation (including but not limited to purchase orders, work orders, invoices, notes and payment details).

11.  All documents relating or referring to any audit or audit report, whether conducted internally, externally, or by a government entity.

12.  All bank records.

13.  All documents related to employee travel, including but not limited to: expense reports, reimbursements, credit card receipts, frequent flyer records, and hotel receipts.

14.  Any container, file box, filing cabinet, or other storage facility which exclusively or virtually exclusively contains any items authorized to be seized pursuant to this warrant.

15.  All records and items that identify other areas (e.g., off-site storage units) where additional financial and other business records may be maintained, and evidence of indicia of control over any such areas.

16.  All computer hardware, software, documentation, passwords, and data security devices that contain any items authorized to be seized pursuant to this warrant.

17.  All records and information authorized to be seized pursuant to this warrant that is stored electronically, on a computer hard drive, or on other storage media.  The search procedure of the electronic data may include the following techniques:

    a.  Surveying various file "directories" and the individual files they contain (analogous

to looking at the outside of a file cabinet for the markings it contains and opening a
drawer believed to contain pertinent files);

    b.    "opening" or cursorily reading the first few "pages" of such files in order to
determine their precise contents;

    c.    "scanning" storage areas to discover and possibly recover recently deleted files;

    d.    "scanning" storage areas for deliberately hidden files; or

    e.    Performing key word searches through all electronic storage areas to determine
whether occurrences of language contained in such storage areas exist that are
intimately related to the subject matter of the investigation.

18.    Items in the paragraphs above that are stored in computer media, including media capable
of being read by a computer (such as external and internal computer hard drives, memory
sticks, and thumb drives), and electronic devices that are capable of analyzing, creating,
displaying, converting, or transmitting electronic or magnetic computer impulses or data
(such as cellular telephones, and personal digital assistants (PDAs)), shall be searched in
accordance with the attached Addendum.


### Attachment B:  Definitions

The terms "records," "document," and "materials," include all of the following items of evidence
in whatever form and by whatever means such items may have been created or stored, including
drafts, and including (but not limited to) any handmade form (such as writing, drawing, sketching,
with any implement on any surface directly or indirectly), any mechanical form (such as printing
or typing), and any electrical, electronic, or magnetic form (such as computer or digital
information on an electronic or magnetic storage device, such as floppy diskettes, hard disks,
backup tapes, CD-ROMs, optical discs, smart cards).

The terms "hardware," "software," "documentation," "passwords" and "data security devices"
include the following:

    a.    Hardware: Consists of all equipment which can collect, analyze, create, display,
convert, store, conceal, or transmit electronic, magnetic, optical, or similar
computer impulses or data.  Hardware includes any data processing devices (such
as central processing units (CPUs), memory typewriters, and self-contained
"laptop" or "notebook" computers); internal and peripheral storage devices (such
as fixed disks, external hard disks, floppy disks drives and diskettes, tape drives and
tapes, optical storage devices, transistor-like binary devices, and other memory
storage devices); peripheral input/output devices (such as keyboards, printers,
scanners, plotters, video display monitors, and optical readers); and related

3

recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well an any devices or mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b.   Software: Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work.   Software is stored in electronic, magnetic, optical, or other digital form.   It commonly includes programs to run operating systems, applications (like word-processing), utilities, compilers, interpreters, and communications programs.

c.   Documentation: Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items.

d.   Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data.   Data security devices may consist of hardware, software, or other programming code.   A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

All of which constitute evidence, fruits, and property designed for use, intended for use, or used in committing a crime, of violations of Title 18, United States Code, Sections 1341, 1343 and 1349.

4

Case: 1:20-mc-00085-DAP  Doc #: 1-4  Filed: 09/03/20  126 of 350.  PageID #: 247
Case: 1:14-mc-00288 Document #: 1 Filed: 06/04/14 Page 85 of 85 PageID #:85
Addendum to Attachment B

This warrant does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather this warrant authorizes the removal of computers and related media so that they may be searched in a secure environment. The search shall be conducted pursuant to the following protocol:

With respect to the search of any computers or electronic storage devices seized from the residence in Attachment A hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

      a.      examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

      b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will be not returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

      c.      surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

      d.      opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

      e.      scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for an recover deliberately hidden files falling within the list of items to be seized; and/or

      f.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

The government will return any computers or electronic storage devices seized from the residence described in Attachment B hereto within 30 days of the seizure thereof, unless contraband is found on the seized computer and/or electronic storage device.

# EXHIBIT 3



**STATE OF OHIO**
**FRANKLIN COUNTY**

**PUBLIC INTEREST REPORT**

**COMMUNITY SCHOOL FACILITY PROCUREMENT**



Dave Yost · Auditor of State

# Table of Contents

Background ........................................................................................................................... 3

Methodology ........................................................................................................................ 4

Community School Property Ownership Structure in Ohio ................................................... 4

State Law and the Effects on Ohio Community School Facility Procurement ...................... 5

    Contract Bidding Process and Exceptions ..................................................................... 6

    The Right of First Refusal .............................................................................................. 6

    Inability to Levy Taxes .................................................................................................... 7

    Inability to Issue Tax Secured Bonds ............................................................................ 8

    Limited Availability of State Sponsored Facility Assistance ........................................... 8

    Risk of Closure by the Sponsor or Ohio Department of Education ................................ 9

Current Sources of Community School Facility Funding in Ohio .......................................... 9

    State Foundation Funding .............................................................................................. 9

    Community Schools Classroom Facilities Grant Program ............................................. 10

    Philanthropic Donations ................................................................................................. 10

    Federal Government Bond Assistance ........................................................................... 10

    Conduit Bond Issuance ................................................................................................. 11

    Local Government Levy .................................................................................................. 11

Leasing Facilities ................................................................................................................ 11

    Community School Facility Lessor ................................................................................. 13

    Methods of Financing used by Management Companies and Other Private Related Companies ........ 14

        Third Party Open-Ended Mortgage Note ................................................................. 14

        Third Party Bond Issuance ...................................................................................... 14

        Sale and Leaseback Agreement .............................................................................. 15

    Lease Provisions ........................................................................................................... 17

    Board Oversight of Facility Procurement and Lease agreements .................................. 18

        National Heritage Academies ................................................................................... 18

        Imagine Schools Inc: ............................................................................................... 19

        Concept Schools, Inc. .............................................................................................. 20

    Market Analysis of Leased Properties in Ohio .............................................................. 21

    Spotlighted Schools ....................................................................................................... 23

    Effects of Spending on Academic Performance ............................................................ 26

Conclusion ......................................................................................................................... 27

**THIS PAGE INTENTIONALLY LEFT BLANK**

 # Dave Yost • Auditor of State

To the Ohio Board of Education, Superintendent DeMaria, Office of Community Schools, and the General Assembly:

The Auditor of State (AOS) conducted a review, under our Ohio Revised Code 117.11 authority, of the community school facility procurement market; the period reviewed extended from 2005 through 2018. Emphasis during this examination was focused in two parts, 1) theory; including an analysis of the current legal structure in Ohio, funding options available to community schools to obtain facilities, and issues commonly encountered by community schools in their quest to obtain facilities in Ohio and other states;. And 2) an analysis of how the current Ohio community school facility market operates in practice through a detailed review of individual schools. Items reviewed included lease agreements, historical facility information and research into possible relationships between the entities involved in those transactions.

This report, which is being provided to the General Assembly and referred to the Ohio Ethics Commission, provides an overview of funding sources and methods of finance available to Ohio community schools for facility procurement, the current legal structure and other barriers or restrictions placed on community schools which affect their ability to obtain facilities, and the current condition of the community school facility market. To provide insight into the environment in Ohio in which community schools currently operate to meet their facility financing needs a detailed review was performed over the schools operating under the oversight of three different community school management companies. ODE and the General Assembly are encouraged to use the observations and results of this report as a resource to improve current Ohio law as it applies to community schools.

This examination was not a financial or performance audit, for which the objectives would be vastly different.  It was therefore not within the scope of work to conduct a comprehensive examination of those community schools included in the review, to issue citations for any issues, failures, or noncompliance identified during the review, or to in anyway otherwise opine on the individual operations of the schools reviewed.

The majority of information included in this report was derived from public records and cooperation with other government agencies both inside and outside of Ohio. AOS reviewed both current and formerly operating community schools for 17 Concept managed community schools (of 18 currently operating in Ohio); 13 Imagine Schools, Inc. managed community schools (of 15 currently operating in Ohio); and eight National Heritage Academies managed community schools (of 10 currently operating in Ohio).

88 East Broad Street, Fifth Floor, Columbus, Ohio 43215-3506
Phone:  614-466-4514 or 800-282-0370      Fax:  614-466-4490
www.ohioauditor.gov

1

To the Ohio Board of Education, Superintendent DeMaria, Office of Community Schools, and the General Assembly
Page 2

Additional copies of this report can be requested by calling the Clerk of the Bureau's office at (614) 466-2310 or toll free at (800) 282-0370. In addition, this report can be accessed online through the AOS website at http://www.ohioauditor.gov by choosing the "Audit Search" option.

Sincerely,

**Dave Yost**
Auditor of State

2

## Introduction

This study of community-school facility leases was prompted by a complaint filed with the Ohio Auditor of State alleging that complex lease agreements entered into by some community schools involved with management companies are resulting in excessive lease payments, diverting public dollars away from educating students and into the pockets of private companies and the individuals who run them.

The aim of this study is to delineate the legal and financial circumstances faced by community schools in their efforts to acquire facilities, to detail the means used to make these acquisitions, and to test specific examples for legality and reasonableness, and to identify any potential conflicts of interest.

The study found that community schools face unique constraints on their ability to acquire and pay for facilities on their own, and some have resorted to methods that deserve scrutiny by the state legislature. The study looks to the Federal General Services Administration Acquisition Manual as an example of a system designed to help public entities acquire facilities at competitive rates.

## Background

Community schools, also known as charter schools, are tasked with educating students in the same sense as traditional school districts. However, community schools operate as independent public entities funded by taxpayer dollars. Community schools are typically opened in urban and low performing districts to help fulfill the education needs of students in certain areas identified as deficient or to provide certain services and specialized education to a specific subset of students such as children with physical or learning disabilities.

Though school districts can, and some have, created community schools of their own, oversight and management is typically run independent of traditional school districts. Each school has its own governing board of education that oversees the operations and integrity of the school. At the discretion of the school's board of education, operations can be managed internally, or may be contracted to a management company. Management companies can offer a variety of services and, depending on the provider, may be offered a la carte or as a full-service package. The degree of involvement a management company has in the operations of a school can vary significantly. A management company may assume anywhere from partial to full management of the school's day-to-day operations depending on the management agreement.

Management companies utilized for a limited number of services may manage a portion of the school's operations such as accounting or payroll processing. Full-service management companies however will do everything for the school from establishing the school's curriculum, hiring teachers and principals, handling human resources and marketing, and managing fiscal duties. In some cases, as much as 98 percent of a school's public funding may be paid to a full-service management company in return for its services in managing the school.

The schools reviewed in this examination operated under management companies that handled the vast majority of the school operations and played a large role in how the school's facilities were acquired.

## Methodology

Auditors examined Ohio laws, sources of funds available to Ohio community schools in the procurement of facilities, and other circumstances affecting community schools in relation to their facilities, and compared these with approaches used in other states. Auditors also examined the methods used by management companies to procure facilities, including an analysis of working relationships within these transactions, with an emphasis on the legality of these relationships.

Three management companies were selected as the focus for the analysis by the AOS Public Integrity Assurance Team. Lease agreements and historical financial data were examined for the schools operating under these three management companies, in addition to a sample of six other randomly selected community schools in Ohio to use as a base comparison for judgments. Historical lease information was scheduled for each year of operations, including amounts paid, relationships between lessees, lessors, and property owners, lease stipulations, percentages of operating revenues and expenditures consumed by lease payments, and any other data needed to analyze the schools operated by each management company.

AOS staff worked with personnel from the Real Estate division of the Ohio Department of Administrative Services to gain an understanding of market lease rates in the areas surrounding the schools. This allowed a comparison of average market lease rates for comparable facilities surrounding the schools to rates being paid by these community schools.

Finally, auditors made recommendations based on the results of the examination.

## Community School Property Ownership Structure in Ohio



Due to difficulties community schools often face in obtaining financing or grants for the purchase or construction of a facility, leasing is the most commonly used option. In a study performed by the Charter

4

School Facilities Initiative[1] in 2017 over the 2014-2015 school year, 69 percent of community schools in Ohio leased facilities from private parties and 8 percent leased facilities from local districts. Ohio community schools that had ownership or partial ownership of their facilities comprise only 23 percent of those surveyed. Purchasing property is typically only a viable option for community schools that are well-established and able to give lenders assurance that they will be able to make loan payments over the entire life of the term, or are able to obtain grant assistance from sources such as the Ohio Community School Facilities Grant.

In Ohio, community school facilities are most commonly leased from the private sector. Whereas some facilities are already designed as schools, these properties are not always readily available. Of the schools reviewed as part of this analysis, many were in buildings that were not originally designed to house students, such as office buildings, car dealerships, and retail storefronts. Others were in former parochial schools and privately owned former school-district facilities.

Facilities not originally built as schools can require significant renovations for school use.  With growth and expansion, these issues can become an increasingly evident and for successful schools may necessitate additional renovations to create gymnasiums, kitchens, large cafeteria spaces, and outdoor/athletic spaces. The party responsible for absorbing the cost of these building renovations both initially and overtime is dependent on the lease terms and willingness of the parties involved.

The limited resources available and the considerable expense of buying real estate prohibit most new community schools from purchasing facilities. The challenge of operating a community school is evident in the number of schools that have closed since the passage of House Bill 215 in 1997 which allowed for the establishment of a pilot community school program in Lucas County and the subsequent passage of House Bill 282 in 1999 which expanded the pilot program to other areas across the state. Of the approximately 601 community schools that have opened in Ohio since 1997, 260 have closed, 136 of these voluntarily. The remainder closed because of noncompliance, poor performance, or simply ceasing operations. Regardless of the reason for closure, financial viability was a problem for 105 schools.[2] School districts that operated community schools also experienced hardship, with 66 closed schools. This correlates to over 43% closure rate for community schools. The rate of community school failures increases the level of risk for stakeholders, making the difficult task of securing funding even harder.

## State Law and the Effects on Ohio Community School Facility Procurement

Laws governing community schools at the state level are generally unique to each state. These state laws directly affect school funding and operation structures. In addition to Ohio, community school laws were researched for California, Indiana, Florida, Massachusetts, and New York to gain an understanding of where Ohio community school laws stand in comparison.

Several issues come into play when understanding the methods used to finance community school facilities. While some exist by virtue of current law, the availability of capital can be a primary problem for many new schools and even those that have been in existence for several years. From the risk of closure, to new legal hurdles and financial obstacles, community schools face a variety of challenges in obtaining proper facilities. These issues have led to the development of new markets and sources of cash.

---

[1] Charter School Facilities Initiative is a national project developed by the Colorado League of Charter Schools. Their mission is to inform the public of policies and practices currently in place through their nationwide research about charter school facilities and their associated costs.

[2] See Exhibit B – December 2017

## Contract Bidding Process and Exceptions

ORC 3313.46 requires all projects for the construction, repair, enlargement, improvement, or demolition of school buildings which exceed $50,000 must be publicly bid. This chapter of the ORC applies to all school district boards of education, however does not apply to community schools or their governing boards. There are currently no Ohio laws in place which require community schools to bid such contracts.

Community school sponsors, which are required by the Ohio Department of Education (ODE), act as an additional level of oversight to monitor community school compliance throughout the year. The sponsorship agreement entered into by each school and their sponsor can, at the sponsor's discretion, stipulate additional rules a school must abide by beyond what is required by law. These rules can include required bidding procedures, among other things. Such rules are however discretionary and therefore the majority of sponsors currently operating in Ohio do not require their schools to implement bidding procedures.

## The Right of First Refusal

Lack of adequate facilities and efforts by school districts to prevent charter schools from employing unused district school buildings is an issue faced by community schools in acquiring facilities. Under Ohio law, community schools have the right of first refusal for conventional school buildings that have been unused for at least two years. Ohio Revised Code §3313.411 stipulates that, with exceptions, school districts are required to offer any unused school facilities for lease or sale to the governing authorities of community schools, boards of trustees of any college-preparatory boarding schools, and the governing bodies of any STEM schools that are within the district. These entities have 60 days to make an offer. In addition, priority is given to high-performing community schools within the district. The first entity to make an offer is entitled to buy or lease the property at fair market value.

Indiana has a similar law, with an additional requirement that school districts provide to the State Board of Education a listing of properties that have not been used for two years, and for the Board to publish a list of these properties (Indiana Code §20-26-7-1). Similar laws exist in Arizona (Arizona Revised Statutes §15-189,) South Carolina (South Carolina Code of Laws §59-40-170) and Tennessee (Tenn. Code Ann. §49-13-136(c)(1)).

Indiana Code §20-26-7-1 requires that if a charter school wants to use a school building on the list, the school district must lease the building for $1 a year to the charter school, or sell the building for $1 to the charter school.

In California and New York City, school districts are required to provide charter schools with adequate facilities that are reasonably equivalent to their own, and the districts are allowed only to charge the charter schools a proportionate share of their facility costs. (California Code §47614 and New York Consolidated Laws, Education Law §2853(3)(5)(a-5)(e)). As in many states across the country, Ohio requires traditional school districts disposing of property to first offer these facilities to charter schools to lease or purchase, prior to putting them on the open market. Our research showed mixed findings regarding this practice, with some districts readily complying, and others stretching out the process or refusing to sell these properties. Therefore, simply having the law is no guarantee that a charter will be able to obtain the space. School districts are hesitant to allow charter schools into property they own, and often see charter schools as competition they do not want.

An article in the Columbus Dispatch on November 7, 2017, reported that Columbus City Schools' agreement to sell a vacant property to the Ohio State University had fallen through.

6

The article reported the board members for the school district wanted to know what would be done with the building, including whether it would become a charter school that could compete with district programs in the neighborhood. As a result, the sales agreement included a final-use clause that was intended to prevent the university from allowing charter schools to use the space. The Columbus City School District held 14 vacant schools and buildings on its books for the 2015-2016 school year.[3] The District is working on selling or leasing these facilities and in 2015, sold at least three facilities to community schools, but it is clear this is not always the case.

Problems have occurred elsewhere, too. Prior to June 2012, the Cincinnati City School District was using deed restrictions to limit the ability of charter schools to obtain the facilities by prohibiting the use of the buildings for school purposes. In 2012, the Ohio Supreme Court decided that the inclusion of deed restrictions preventing properties disposed of by the district to be used for school purposes is unenforceable because the restrictions are against public policy.[4]

Ohio is not the only state where school districts fight charter schools moving into district buildings. In a story posted by Detroit's Channel 4 News on December 1, 2017, the Detroit Public Schools Community District blocked a charter school, Detroit Prep, from acquiring a building the school district sold to a private company in 2009. A deed restriction limiting the use of the building was placed by the school district in the original sale to a private entity preventing the sale to Detroit Prep. The Michigan Legislature changed the law to disallow these kinds of deed restrictions and there is a lawsuit seeking to overturn the deed restriction so Detroit Prep can acquire the building. The article quotes Michigan House Reform Committee Representative Tim Kelly as saying: "This is a political fight about charter schools versus traditional schools."[5]

Similar legal battles have occurred in Pennsylvania and Wisconsin. While these battles are under way, charter schools must find other facilities.

## Inability to Levy Taxes

Traditional school districts in Ohio are financed by a combination of federal, state, and local funds. Whereas state foundation payments for student enrollment are the same for both traditional and community schools, other sources of revenue may be limited. Factors such as the type of school and the number of students directly influence the sources of funding available at all levels. At the local level, school districts can receive funding from locally levied taxes. These levies can be passed for a variety of purposes such as to fund general operations, facility construction or renovation, and debt issuances.

ORC 3314.08(E) prohibits community schools from levying taxes. As a result, most community schools in Ohio do not receive any local revenues and must rely on federal, state, and private donations to support operations, which includes facility related expenses. Local funding mechanisms commonly used by traditional school districts not directly available to community schools include:

- Property tax revenue, which provides a source of local funding to school districts, can be levied for a variety of purposes; school districts may have multiple levies in place at the same time up to a 10 mill limitation.
- An income tax levy, which imposes a separate percentage tax on the income of individuals that live in the school district, can be levied by traditional school districts.

---

[3] http://www.dejongrichter.com/ccsoh/wp-content/uploads/sites/5/2016/01/Columbus-City-Schools-Buildings.pdf
[4] Cincinnati City School Dist. Bd. of Edn. v. Conners, 132 Ohio St.3d 468, 2012-Ohio-2447
[5] https://www.clickondetroit.com/news/detroit-public-schools-community-district-faces-lawsuit-over-abandoned-elementary-school

Ohio is not different from other states in imposing these restrictions on community schools. While variations were found in the way these laws are structured, none of the other states reviewed allowed community schools to levy taxes.

## Inability to Issue Tax Secured Bonds

Bond issuance is a source of funding often used by traditional school districts to fund large projects such as building purchases, construction, and renovation. Maturity of debt issued by school districts is determined based on the estimated useful life, and can extend up to 40 years. General obligation bonds are secured by tax revenues or the passage of a local bond levy which provides the lender assurance that the principal and interest will be paid. Bond interest costs are reduced for districts due to the decreased exposure to risk of default and because they provide tax-exempt revenue for investors.

The restrictions placed on community schools through ORC 3314.08(E) prevent them from issuing these types of bonds, even in instances in which taxes are levied on their behalf. Community schools are further restricted by ORC §3314.08(G)(1)(b), which prohibits the debt term from exceeding 15 years for any loans used to acquire facilities.

## Limited Availability of State Sponsored Facility Assistance

The State of Ohio assists with funding new buildings through the Ohio Facilities Construction Commission (OFCC), which offers several programs to assist traditional school districts.[6] These programs were not set up to provide aid to community schools. Also, ORC 3314.08(E) indirectly prevents community schools from participating in cost sharing programs.

OFCC programs to assist in facility construction and renovation in traditional school districts include:

- The Classroom Facilities Assistance Program (CFAP), which uses assessed property valuation per student to determine the state and local share for a construction project. This is not available to community schools.
- The Alternative Facilities Assistance Program (AFAP), which provides a reduced portion of projected state funds to assist eligible districts in constructing expanding, or renovating classroom facilities.  This is not available to community schools.
- The Expedited Local Partnership Program (ELPP) which gives a district not participating in the CFAP the opportunity to move forward with portions of a project that best fit the district's needs at that time. Once the district enters the CFAP, it is given credit toward its required local contribution for the work completed under ELPP.  Because CFAP is unavailable to community schools, ELPP also is not available.
- The Exceptional Needs Program (ENP) is a building replacement program that identifies school facilities most in need of replacement, and will provide assistance for replacing the building. This is not available to community schools.

---

[6] http://ofcc.ohio.gov/ServicesPrograms/K-12Schools.aspx

The primary program is the Classroom Facilities Assistance Program (CFAP). This program established in 1997 funds facilities projects for school districts utilizing a combination of state and local funding based on the assessed property valuation per student in the district. Other programs administered by OFCC, such as the Exceptional Needs Program (ENP), which provides funding to replace buildings that may pose a health risk to students, also are not available to community schools.[7] School Districts often are required to provide a local share of funding through property and income tax levies, which is not available to Ohio community schools.

### Risk of Closure by the Sponsor or Ohio Department of Education

The availability of credit and type of facilities used by community schools are affected by several factors, including the risk of closure. Community schools face the risk of closure for a number of reasons other than financial viability. Ohio Revised Code §3314.35 provides criteria for the permanent closure of community schools, including failure to offer enough grade levels and poor academic performance. Ohio Revised Code §3314.012(B) requires the Ohio Department of Education to issue an annual report card for each school, which includes academic and financial performance. Report cards can be used to prohibit a school from contracting with a new sponsor (Ohio Rev. Code §3314.034(A)(1)) and without a sponsor, the school is effectively shut down.

Aside from mandatory closures of individual schools required by the Ohio Department of Education, ORC §3314.015 requires that the department also provide oversight to sponsors themselves. Further, ORC §3314.015(B)(1)(a) specifically lists poor fiscal management as reason for the Department of Education to intervene and, if other criteria are not met, could result in the Department revoking the sponsor's ability to sponsor schools. The Ohio Department of Education assumes the role of sponsor for the schools that had been operating under the oversight of the revoked sponsor for a maximum of two years. If the school is unable to find a new sponsor in that time, the school must close.

In addition to the risk of losing a sponsor, the initial term of the sponsorship contract is limited by statute (ORC §3314.015(B)(2)) to a maximum of five years. This contract can be renewed as long as the sponsor and the school both meet certain compliance standards. For a new school, however, this limitation has the ability to prevent a school from purchasing its own facilities due to the risk the school might not be able to renew its sponsorship contract.

## Current Sources of Community School Facility Funding in Ohio

### State Foundation Funding

Ohio law dictates how funding is provided to traditional and community schools. Charter schools are funded on a per pupil formula amount in the same way that traditional school districts receive state funding. In Ohio, part of the formula for per pupil funding includes a portion for facilities funding. Ohio House Bill 64 increased the amount of funding provided to pay for facilities from $150 per pupil in 2016 to $200 per pupil in 2017 going forward for brick and mortar schools, while E-schools receive $25 per pupil.

The amount of foundation funding for facilities is a very small proportion of the total operating revenues received by schools and while helpful, does not cover the total cost of facilities. For many of the schools examined, facility costs took up significant portions of operating revenues.

---

[7] http://ofcc.ohio.gov/ServicesPrograms/K-12Schools/ENP.aspx

## Community Schools Classroom Facilities Grant Program

With the passage of Amended Substitute House Bill 64 in June 2015, Ohio created the Community School Classroom Facilities Grant Program with an initial appropriation of $25 million. The Community Schools Classroom Facilities Grant Program is available to community schools in Ohio, and operators (school sponsors) currently operating both inside and outside[8] of Ohio. In order to be eligible for this grant program, the community school or operator must be considered high-performing, as defined by the Ohio Department of Education[9]. In the first round of funding under this grant eight community schools were approved for purchase, construction, and renovation projects totaling $17,010,826 of which $6.4 million was disbursed in fiscal year 2017.[10]

As of November 2017, 18 schools and 30 operators in Ohio were eligible to participate in the program; No operators from outside of Ohio were determined to be eligible to apply for assistance under this grant.[11] After the remaining funds are awarded, without additional appropriations in the future, this program will be of no assistance to community schools in the future.

## Philanthropic Donations

Community schools are sometimes supported through philanthropy. Foundations such as the Walton Family Foundation and the Bill and Melinda Gates Foundation provide millions of dollars to charter schools across the country, helping to finance operations and facilities. One group of charter schools that has benefited from philanthropy is the Knowledge is Power Program (KIPP,) which operates 30 schools across the nation, including one in Ohio. The Walton Foundation has provided KIPP schools donations in excess of $60 million since the program was founded. It was not alone. Several other organizations regularly donate sums in excess of $1 million each year.[12] For the community schools included in our examination, we did not see evidence that philanthropic sources provided substantial aid, however they are a potential source of funding for charter schools.

## Federal Government Bond Assistance

Two types of bonds are available through the federal government. The first of these, Qualified School Construction Bonds, are a type of tax-credit bond intended to allow schools to issue zero interest or low interest bonds for the purpose of constructing facilities. These types of bonds were created during the U.S. recession in 2008 as part of the American Recovery and Reinvestment Act (ARRA) and expired in 2011. No Ohio community schools were able to take advantage of these bonds, and very few could be utilized in other states due to their inability to issue bonds directly. The second type, Qualified Zone Academy Bonds, were created in 1997 and exist to assist schools with renovations and repairs, new equipment, developing challenging curricula, and training quality teachers. To date, this program has not been utilized by any community school in Ohio. These programs were not eligible to be used by community schools in Ohio unless another local government issued them on their behalf. A few states, such as California and Texas, allow charter schools to participate in this program directly, without needing another entity to issue them on the charter schools behalf.

---

[8] Ohio Community School Facilities grant assistance funds are to be used for both existing and newly established Ohio community schools established under ORC 3314.01. School sponsors exclusively operating outside of Ohio are eligible, however must submit plans for use of funds on a Ohio community school

[9] https://www.legislature.ohio.gov/legislation/legislation-summary?id=GA131-HB-64

[10] http://ofcc.ohio.gov/Portals/0/Documents/Resources/Publications/Annual percent20Reports/OFCC_FY2017_Final_111517.pdf

[11] Data obtained from the Ohio Facilities Construction Commission news and announcements: http://ofcc.ohio.gov/NewsEvents/NewsReleases/tabid/241/ArticleID/21/Default.aspx

[12] http://www.kipp.org/kipp-foundation/kipp-national-partners/kipp-supporters/

## Conduit Bond Issuance

Not-for-profit organizations have been developed with the primary purpose of lobbying for and providing assistance to charter schools. Although schools in Ohio cannot issue bonds directly, other agencies can and sometimes do issue bond financing to assist charter schools with facilities.

Each year there are new not-for-profit organizations and businesses entering the market to provide assistance to charter schools. Complex legal restrictions and financial obstacles which prevent community schools from directly accessing certain financing mechanisms have led enterprising businesses and not for profits to begin investing in community schools by offering alternative facility financing options such as conduit bond issuances, which are now becoming a larger source of funds.

Community school facilities increasingly are being financed with bonded debt. A 2015 study published by Charter School Advisors & Local Initiatives Support Corporation (CSA & LISC) titled *"Charter School Bond Issuance: A Complete History Volume 3"* reports a growing charter school bond market with increases of 40 percent, 18 percent, and 41 percent for 2012, 2013, and 2014, respectively, while the broader tax-exempt bond market during the same period was flat. The report asserts that this "...reflects the increased demand for affordable, long-term charter school facility financing." Of the 818 transactions the report examines, 41 defaults occurred, a 5 percent default rate. In addition, a full 77 percent of the examined bonds were issued with ratings considered investment grade. Lastly, the report asserts "...that academic quality is the fundamental credit factor in school underwriting." The reason for this is there is a correlation between low academic performance and default, with lower performing schools having more difficulty maintaining attendance and meeting covenants to continue operation.

## Local Government Levy

While community schools themselves may not levy taxes, some states, including Ohio, allow other governmental entities when placing a levy on the ballot to allocate a portion of those levy revenues to community schools in the area.

There is only one instance in which this has occurred in Ohio.  The Cleveland Metropolitan School District passed a property tax levy in which part of the proceeds were earmarked for community schools. One-fifteenth of revenues from this levy are distributed among 18 Cleveland community schools based on the number of students who live in the Cleveland Metropolitan School District who attend that school. This levy was part of the Cleveland Plan, an initiative to reinvent public education in the city and to serve as a model of innovation for Ohio.

## Leasing Facilities

Due to difficulties obtaining loans or secure funding for building purchases, community schools frequently lease facilities, as was the case for more than 90% of the community schools included in this analysis. In an article published July 18, 2013, on MarketWatch titled "Bond Market gets an 'F' for Charter School Funding," Michael Rubinger, the former president of the Local Initiatives Support Corporation, a US non-profit that works to support community development,, discusses financing as being one of the largest hurdles for charter school growth. He writes, *"More dollars could go toward teachers, guidance counselors and books, if only the municipal bond market was prepared to be a ready source of affordable capital. Sadly, underwriters and investors aren't sure how to assess charter risk profiles. So, they charge a premium for the rare school that does try to tap the bond market — much more than public school districts pay to borrow. That leaves charters with less to spend in the classroom and keeps some schools from opening altogether."*

The same article also notes that in New York State, community schools not housed in district space typically spend 15 percent of their budget on rent or mortgages, and these amounts are even higher in New York City[13].

Since the real estate market in Ohio differs from that of New York, an analysis was performed to compare the percentage of lease expenditures allocated to rent. This revealed that Ohio is not immune to this issue. Two of the three management companies we examined paid percentages similar to those in New York. From 2010 to 2016, Imagine Schools had the highest median average at approximately 17.8 percent of expenditures for base rent payments, followed by National Heritage Schools with 14.9 percent. Concept Schools' median average was 11.4 percent, and our other sample community schools in Ohio median averaged 5.4 percent.



As evidenced by the table, schools of the three management companies have at minimum been allocating more than twice as much of their expendable resources towards facilities than the sample of "Other" community schools reviewed (sample other consisted of six randomly selected Ohio community schools). This is public money spent on rent rather than student education. These figures are conservative and exclude additional building-related expenditures the schools may have incurred such as building maintenance, property taxes, insurance, and leasehold improvements which, depending on individual lease provisions, also may have been the school's responsibility.

---

[13] https://www.marketwatch.com/story/bond-market-gets-an-f-for-charter-school-funding-2013-07-18
[14] Unusual fluctuations between years for Imagine managed schools are a result of several factors; but do not affect the end result. In fiscal year 2011 Imagine Schools, Inc. opened two new schools. From 2011 through 2013 Imagine Schools, Inc. made rental payments to Schoolhouse Finance, LLC on behalf of these two schools, resulting in the sharp decrease in average percentage of Imagine managed community schools in 2011 and an increase in 2014. Percentage of expenditures allocated to lease payments experienced a sharp increase again in 2016 as a result of a combination of factors including the closure of two schools that had been operating under lower lease rates and a decrease in revenues due to decreased enrollment[14] (and as a result of a decrease in expenditures) experienced by four Imagine managed community schools in fiscal year 2016 per school audited financial statements and school closeout agreed upon procedures obtained from ohioauditor.gov.

From an initial view of these trends and comparisons it may indicate overspending, however it is difficult to determine whether the lessor is in fact making a profit due to complexities such as the method of financing used by the property owner, location, and party responsible for expenses associated with the property including insurance, maintenance, renovations, and property taxes.

## Community School Facility Lessor

Community schools that rent their facilities held leases from a variety of different lessors including, churches, private companies, local school districts, and management companies. A commonality found for those community schools operating under the three management companies reviewed here -- Concept Schools, Inc. (Concept), Imagine Schools, Inc. (Imagine), and National Heritage Academies (NHA) – was that each management company had a favored real estate firm which held a stake in all or the majority of facility leases entered into by the schools operating under that management company. Community schools operating under these three management companies consistently leased properties that had either leasing or ownership ties related to their management's preferred real estate firm, as opposed to unrelated third parties. By focusing on a niche market, these real estate firms often were able to provide community schools with turn-key leases as the buildings were already fitted or had been repurposed as classrooms, a benefit many generalized third party lessors often cannot provide.

National Heritage Academies and Imagine Schools Inc. each have their own real estate division, operating as a wholly owned subsidiary or branch of the management company.

Charter Development Company (CDC) is a for-profit wholly owned subsidiary of NHA which performs real estate property finance, purchase and renovation services for NHA managed schools. All NHA school facility lease agreements were held directly with NHA, with CDC acting as "master landlord." All properties leased by NHA schools were owned by CDC.

Imagine Schools, Inc. consists of three branches – Imagine Schools for-profit, Imagine Schools not-for-profit, and Schoolhouse Finance LLC (SHF). SHF is a for-profit subsidiary of Imagine Schools, Inc provides real estate financing services. All twelve of the Imagine managed community schools included in this review held leases that were run through SHF: Properties owned by SHF were leased directly to schools; properties not owned by SHF were leased to SHF by the property owner and subleased to the school. SHF has owned the property rented by those community schools for ten of the twelve Imagine community schools reviewed, of which eight have since been sold to third parties after entering into a sale and leaseback agreement. Leased properties without former ownership ties to SHF are currently owned by the Catholic Church and a private commercial real estate development company that each act as "Prime Landlord" on the sublease agreements held between SHF and the schools for those properties.

The majority of schools operating under the third management company, Concept Schools Inc., held leases with subsidiaries of New Plan Learning, LLC. New Plan Learning, LLC (NPL) is a separate unrelated not for profit real estate management firm dealing exclusively with Concept-managed community schools. NPL is designated as a 501(c)(3) tax-exempt organization because it provides facilities and facilities management to the charter schools it manages. Property acquisition is performed by NPL through a series of single member LLC's that act as pass through entities acting on behalf of the parent company; these individual single member LLC's only function to collect and distribute lease proceeds to NPL. All revenues and activity of the single member LLC's are reported by NPL on its consolidated financial statements, and therefore are considered disregarded entities. NPL also has a subsidiary, known as Breeze, Inc. that is a 501(c)(2) title-holding corporation, which holds several properties and reports its own Form 990 to the IRS.

## Methods of Financing used by Management Companies and Other Private Related Companies

The methods of financing those management-company-related real estate firms used in procuring properties included large open-ended mortgage notes, sale and leaseback agreements with real estate investment trusts (REITs), issuance of individual mortgage notes, and issuance of public bond notes. Each of these methods has varying complexities which could affect lease rates.

### Third Party Open-Ended Mortgage Note

Large open-ended mortgage notes to finance properties were used by all three management company real estate firms. This gives the mortgagee access to funds which can be used continuously for the purchase of any number of properties as well as any renovation or other related costs under a single debt issuance. Open ended mortgages give the mortgagee more freedom in purchasing, renovating, or repurposing properties,  and can eliminate the need for supplemental debt issuances should the costs exceed estimates.

Although this method is likely the simplest from a purchaser standpoint, it is difficult to tie individual properties to their allocated portion of debt as a single open-ended mortgage can be used to finance multiple properties across any number of states.

These notes often contain debt covenants requiring the borrower to maintain a certain level of capital or maintain a reserve balance account. In fact, multiple instances were noted with New Plan Learning having to temporarily borrow capital from Concept managed schools to maintain compliance with debt covenants.

### Third Party Bond Issuance

Bonded debt can be a significant factor in determining lease rate. Required annual payments typically increase over the life of a bond; as a result the lessor must charge a rate concurrent with these annual payments to avoid an operating loss, noncompliance with debt covenants, or default on payments.

Of the three management companies reviewed, New Plan Learning was the only school that issued bonds to finance purchases. In 2011 New Plan Learning (Concept) issued $33,120,000 public educational facility revenue bonds to finance the purchase and renovation of four Concept managed schools: three in Ohio and one in Illinois. The bonds are 30-year variable-term bonds with interest rates ranging from 7 percent to 9.5 percent and were Fitch rated BBB-. The bonds are collateralized by the four school's lease obligations.

The chart below shows that the annual lease payments required from each school, the sum of those payments, the bond payments due and the gain that NPL makes as a result.

| Fiscal Year Ending: | HSA Dayton HS | HSA Springfield | HSA Toledo | Chicago MSA | Total School Lease Payments paid to NPL | NPL Bond Payments Due |
|---|---|---|---|---|---|---|
| 2012* | 310,781** | 175,200 | 276,000 | 1,092,319 | 1,854,300 | 2,132,913 |
| 2013* | 531,324 | 494,964 | 503,477 | 1,165,000 | 2,694,765 | 2,620,644 |
| 2014* | 711,279 | 591,141 | 662,461 | 1,165,000 | 3,129,881 | 2,620,644 |
| 2015* | 777,324 | 644,376 | 716,278 | 1,245,000 | 3,382,978 | 2,835,644 |
| 2016* | 777,800 | 650,516 | 734,136 | 1,255,000 | 3,417,452 | 2,835,219 |
| 2017* | 784,227 | 650,534 | 734,656 | 1,257,572 | 3,426,989 | 2,832,894 |
| 2018 | 791,516 | 664,313 | 741,967 | 1,267,756 | 3,465,552 | 2,832,669 |
| 2019 | 798,792 | 658,519 | 755,100 | 1,277,932 | 3,490,343 | 2,833,419 |
| 2020-2041 | 20,060,926 | 16,697,859 | 18,657,358 | 29,756,160 | 85,172,303 | 69,043,907 |
| **Total** | **25,543,968** | **21,227,422** | **23,781,433** | **39,481,739** | **110,034,562** | **90,587,951** |

| *Denotes actual rent payment per school | | |
|---|---|---|
| Notes to the Financial Statements | NPL Cost of Issuance: | 1,186,690 |
| ** School received a $116,291 donation | Reserve Balance Requirements: | 4,173,569 |
| from New Plan Learning, amount shown | Total Cost of Bond Issuance | 95,948,210 |
| net of donations received | Total Payments Received from Bonded Schools: | 110,034,562 |
| | New Plan Learning Gain on Bond Issuance: | 14,086,352 |

The intentioned use of bond revenues is to finance the acquisition of Chicago Math & Science Academy property and construct a gymnasium ($12,810,000), refinance and renovate Horizon Science Academy Springfield ($6,110,000), refinance and build a gymnasium for Horizon Science Academy Dayton High School ($7,350,000) and finance the acquisition and renovation of Horizon Science Academy Toledo ($6,850,000) [15]. In order to receive these benefits each of the schools entered into a 30-year absolute net lease agreement in which lessee is responsible for all costs associated with the property including structural maintenance and reimbursement to New Plan Learning of its allocable portion of any fees, charges, or expenses incurred in association with the bond issuance or leased property. Although the bond issuance is secured by lease payments, New Plan Learning will maintain full ownership and control of these properties at the end of the lease term.

**Sale and Leaseback Agreement**
Sale and Leaseback agreements are often used as a method to obtain immediate cash. The owner sells the property, which is in turn leased back to the seller by the new owner. This method of financing was used by one Concept school and several Imagine schools that were included in the examination. However, the implementation of this method of financing was different between these two management companies: the Concept school was directly involved in the transaction, while the Imagine schools were indirectly involved.

---

[15] Per New Plan Learning Series 2011 Bond Issuance Official Statement

The Concept school involved in a sale-leaseback agreement was the selling party of the transaction and Breeze, Inc., a subsidiary of NPL, was the purchaser. In 2000 the school entered into a 20-year land installment agreement for the purchase of this property for $2.8 million, at an interest rate of 10%. In 2005, the selling party exercised a debt call option that required the school to make a balloon payment of the remaining balance of the land installment agreement, which would give them the deed to the property. The school was unable to obtain financing for this balloon payment. As a result, the school sold the rights to the land installment agreement to Breeze, Inc. Breeze, Inc. paid a total of $2.7 million, of which approximately $2.5 million was paid to the former land owner for the remaining balance due on the land installment contract, and the remaining $200,000 was to be paid the school. Breeze, Inc then leased the property back to the school (see section Spotlighted Schools). Imagines' wholly owned subsidiary Schoolhouse Finance, LLC (SHF) entered into sale-leaseback agreements with REITs. Properties previously owned and renovated by SHF were sold to REITs. These properties were leased from the REIT to SHF, the property was in turn leased to the school with SHF acting as landlord and the REIT acting as master landlord, thus providing a corporate guarantee for the lease.  This transaction took place for properties of eight different Imagine schools in Ohio.

Each of the school leases associated with the REIT were 25-year, absolute net agreements with the tenant responsible for all maintenance, including structural and roof maintenance and annual rate increases[16]. Since both SHF and the REIT are private companies,  the master lease agreements between the two and amounts each had invested in the properties were not available therefore auditors were unable to concretely determine the amounts those schools were surcharged by SHF in the sublease agreements..

In 2017 and 2018 however, investment brochures were posted for 7 of the Ohio Imagine school properties under REIT ownership at which point the listed schools were all at least 7-10 years into their 25 year lease agreement. . The investment buy in price was marked up a median of 55% above the original purchase price[17], however offered investors fee simple ownership, no landlord responsibilities, and an 8.5 percent investment cap rate[18]. SHF may have been profiting off of these lease agreements is that annual rent provided in the investment brochure did not agree with the school annual base rent for any of the seven schools as detailed in the school lease agreements; school rent was higher.  Utilizing the same calculation, substituting school annual base rent paid in that fiscal year[19] averaged a 10 percent investment cap rate.  Whether the risk absorbed by SHF for acting as lease intermediary and guarantor gives adequate basis for the excess rent being paid by the schools is a subjective judgment, however in a lawsuit brought against Imagine Schools. Inc. by a Missouri based school whose leased property had also been part of a sale-leaseback transaction between SHF and a REIT alleging excessive lease payments, the federal district court judge ruled in favor of the school and ordered Imagine Schools, Inc. to reimburse the difference between the amounts paid by the school and estimated lease market value. See Section Market Analysis of Leased Properties in Ohio for additional information on the lawsuit.

In addition to the presumed surcharge on school lease rate, SHF has also been able to hedge some of the financial risk involved in being lease intermediary by use of contract provisions that require the leased school to be managed by Imagine Schools, Inc.  Three instances of the relationship between SHF and Imagine Schools, Inc. being used to mitigate risk of school sublease default were noted during the AOS analysis.

---

[16] Per School Leases
[17] Per County Auditor property records
[18] Per Marcus & Millichap offering memorandums
[19] Per School lease agreements

Two similar instances occurred at the end of fiscal year 2013, when two Imagine managed community schools leasing properties purchased via sale-leaseback agreements between SHF and the REIT were closed. One in Akron, Ohio, was ordered to close by the Ohio Dept. Of Education (ODE) as a result of continued poor academic performance; the other, in Columbus, Ohio, ceased operations as a result of governing board decision (reason unstated). The following school year, Imagine Schools, Inc. opened two new schools under different school names and sponsorship, operating in the same locations and utilizing the same lease agreements that had been held by the school's predecessor. Under current Ohio law, schools boards, not management companies, are held responsible for community school closures. As a result, management companies with sufficient resources can essentially reopen schools that have been closed under a new name and IRN with little risk involved.

A third instance in which SHF was able to hedge risk within its corporate lease guarantee with the REIT property owner was as a result of a contract provision contained in each SHF lease deeming severance of ties between the school and Imagine Schools, Inc., for any reason, a breach of contract. In fiscal year 2015, the governing board of a formerly (then currently) Imagine managed community school operating in Cleveland, Ohio, decided to contract with a different management company for the following school year rather than renew its management agreement with Imagine, Schools Inc. As a result, the school negotiated a new lease agreement directly with the REIT owner, releasing SHF from all obligations contained in the original master lease agreement between SHF and the REIT. The contract provisions of the lease agreement were not materially altered, however, school's annual base rent decreased $402,500 from the prior year when SHF had been acting as intermediary.

## Lease Provisions

Lease agreements may contain a variety of provisions which determine the party responsible for certain costs associated with the property above and beyond base rent. In a traditional lease, the landlord retains the responsibility for paying property taxes, insurance premiums and maintenance costs; these costs covered by the landlord as they are built into the standard base rent paid by the tenant leases. Other lease types include single net, double net, triple net, and absolute net.

Each "net" represents an additional cost category the tenant absorbs responsibility for payment. Single net leases are the least common of the four in which the tenant is typically responsible for paying the property taxes associated with the rented property; double net leases require the tenant to pay two cost items, typically property taxes and insurance associated with the property; triple net leases require the tenant to pay three cost items, typically property taxes, insurance, and non-structural maintenance associated with the property; and absolute net leases require the tenant to pay all costs associated with the property including property taxes, insurance, both structural and nonstructural maintenance of the property which includes maintaining the roof and structure of the building, and any other costs associated with the property that the landlord may incur.

When costs associated with the rental property are absorbed by the tenant, the need to build those costs into the base rent fee is removed. This is reflected by lower lease rates, reduced from what they otherwise would be had the parties entered into a traditional lease agreement.

Auditors reviewed 39 separate lease agreements entered into by 37 schools included in our examination (certain schools operated in multiple buildings under separate lease agreements) which included 13 Concept schools, 10 Imagine, 8 NHA, and 6 Other. The below figure shows the percentage ratio of lease types encountered for each group.



The majority of Concept managed school leases with New Plan Learning related entities were double net leases where the tenant was responsible for property tax and insurance expenses, and contained clauses that the tenant would be responsible for leasehold improvements. Two of the four absolute net leases entered into by concept managed schools were with entities not related to NPL.

The majority of Imagine managed school leases in the first decade of the 2000's were triple net leases, however as Imagine Schools real estate branch, Schoolhouse Finance, LLC began dealings with Real Estate Investment Trusts, and entering into sale and lease back agreements, typical lease agreements for those schools have become absolute net lease agreements, on freshly renovated properties.

National Heritage Academy school leases were all discernable as absolute net leases, however were annually renewable. Since many schools often have difficulties paying for large expenses such as structural maintenance and renovations, these payments were in fact paid for by National Heritage Academies, with the caveat that the lease rate would immediately increase the following year upon renewal of the lease agreement. The Auditor of State could not however find evidence included in National Heritage Academy school work papers, board minutes, or lease agreements to substantiate the additional costs incurred by National Heritage Academies and the corresponding increase in lease rate.

## Board Oversight of Facility Procurement and Lease agreements

### National Heritage Academies
Each School operating under National Heritage Academies (NHA) that we reviewed had delegated the responsibility of procuring a school facility to NHA through a clause contained in the management agreement stating:

> "NHA shall lease or otherwise cause a facility to be made available to the Board for school classroom facilities."[20]

---

[20] This excerpt was taken directly from Orion Academy/NHA Management Agreement. This clause was included in the management agreement for all NHA schools reviewed.

The lease agreements held by NHA schools follow a uniform shell for each facility leased. All NHA school leases reviewed were one year annually-renewed, and discernable as triple net leases (tenant responsible for property taxes, insurance, and building maintenance)[21]. The consistency of terms above market value lease rates offer evidence that minimal negotiations were performed by the school's boards in the lease approval process. In review of NHA board members, schools operating in the same area tended to have the same Board of Trustees. All five board members being the same for both of the Cincinnati area NHA schools, a different five serving for both Cleveland area schools, and a different five serving for both Dayton area schools. This is an allowable practice in accordance with the ORC.

**Imagine Schools Inc:**

Provisions contained in the management agreement each school entered into when utilizing the services of Imagine emphasized the importance of Imagines' approval and role in the selection of the school's facility.

The following is included in Article I Contracting Relationship of Imagines' management agreement with each school:

> "The Board hereby contracts with Imagine, to the extent permitted by law, to provide all charter school management services on the terms and conditions set forth in this Agreement, including without limitation the administration and supervision of the personnel, materials, equipment, and facilities"[22]

The management agreement continues to state in Article III Obligations of Imagine:

> "Imagine will assist the Board in locating a facility suitable for the operation of the Charter School (the "Charter School Facility"). The Charter School Facility shall be subject to Board approval, which approval shall not be unreasonably withheld … The Board and Imagine shall consult with one another prior to making or accepting any material modification to the Charter School Facility, or any amendment or modification to the terms and conditions of any lease between the Board and a third party landlord or any purchase and sale agreement between the Board and a third-party Seller in connection with the Charter School Facility. The Board shall exercise good faith in acting upon the reasonable recommendations of Imagine related to the Charter School Facility. Imagine will review any lease for the Charter School Facility."[23]

Although the management agreement does not explicitly delegate Board authority to Imagine, subjective language used throughout the management agreement such as "The Board shall exercise **good faith** in acting upon the **reasonable recommendations** of Imagine related to the Charter School Facility" and "[Board] approval shall not be **unreasonably** withheld" allude to an assumed trust between the school Board and Imagine, which in practice can hinder the effectiveness and integrity of board oversight. This was corroborated in a report published by policymattersohio.org, a non-profit Ohio policy research group, in which a former Imagine School Board member discussed his reasons for resigning from the school Board of Trustees, including the comment, "We finally concluded that what was desired from the administration was for the board to be a rubber stamp rather than a governing body"[24]

---

[21] Per analysis performed by DAS
[22] Imagine Management Agreement Article I Section B
[23] Imagine Management Agreement Article III Section D
[24] http://www.policymattersohio.org/wp-content/uploads/2011/09/ImagineSchools2010.pdf

**Concept Schools, Inc.**

Thirteen of the eighteen Concept managed community schools in Ohio currently have or previously have held leases with a subsidiary of New Plan Learning. Although maintaining sovereignty from and denying relations with Concept Schools, Inc., regular overlapping of Board members between New Plan Learning and Concept Managed schools has been documented, in addition to New Plan Learning personnel relations with Concept Schools, Inc.

Former and current relationships between Concept Schools, Inc, and New Plan Learning with two of the original persons who founded Horizon Science Academies, and subsequently Concept Schools, Inc. One of whom also co-founded New Plan Learning, and has since served on the Board of Directors for Breeze, Inc. and Concept Management Company[25], the other of whom who also co-founded Concept formerly served on the Board of Breeze, Inc.

Currently, New Plan Learning operates a four-member board; of the four members serving in 2017, two member also served on the school boards for seven of the seventeen Concept managed schools in Ohio.

The Board President of New Plan Learning[26], also was listed as one of the initial directors of Concept Schools – Ohio, Inc. Articles of Incorporation[27], and, as of 2019, served as president on the governing board for Horizon Science Academy of Cincinnati, Horizon Science Academy of Dayton Elementary School, Horizon Science Academy Dayton High School, and Horizon Science Academy Dayton Downtown[28]. This individual also formerly served on the board for Horizon Science Academy Columbus High School and Horizon Science Academy Toledo[29].

The other individual who also served on the Board for New Plan Learning[30], in conjunction with being a Board member for Horizon Science Academy Cleveland High School, Horizon Science Academy Cleveland Middle School, and Horizon Science Academy Denison Middle School[31].

Other members of the New Plan Learning staff including the treasurer, and, secretary[32] have also served on the school boards of Concept managed community schools. Though neither currently serve, collectively they have served on the board of Horizon Science Academy of Columbus Elementary School, Horizon Science Academy of Columbus Middle School, Horizon Science Academy of Columbus High School, Noble Academy Columbus, Horizon Science Academy Toledo and Horizon Science Academy Cincinnati[33].

In all, these members of New Plan Learning have served on the board for twelve of the seventeen Concept managed community schools in Ohio; nine of which have held leases with a New Plan Learning subsidiary, which constitutes a conflict of interest

---

[25] Per New Plan Learning Series 2011A Official Bond Statement
[26] Per New Plan Learning 2016 Form 990 obtained from Guidestar
[27] Per Concept Schools – Ohio, Inc. Articles of Incorporation located at
http://www2.sos.state.oh.us/reports/rwservlet?imgc12g&Din=200613000110
[28] Per School website, last checked 12/19/17
[29] Per AOS complaint letter Horizon Science Academies 2016-CA00643
[30] Per New Plan Learning 2016 Form 990 obtained from Guidestar
[31] Per School website, last checked 12/19/17
[32] Per New Plan Learning 2016 Form 990 obtained from Guidestar
[33] Per AOS complaint letter Horizon Science Academies 2016-CA00643

## Market Analysis of Leased Properties in Ohio

Factors that aid in determining market lease rates can include location, market demand, availability, and inflation; however certain factors can affect individual lease rates that would give basis for varying from the going market rate.  Contract provisions, method used to finance the purchase of the property, lease term, condition, property size, and credit worthiness of the lessee are all factors that could affect lease rates. Community schools can be viewed as risky tenants due to the high number of community schools that close each year. In fiscal year 2017 there were 361 community schools operating in Ohio[34]. During that year, 25 closed (approximately 7 percent).[35] Reasons for a school closing vary but include financial difficulties, low academic performance, low enrollment, poorly rated sponsors and non-renewal of contract.



* Market analysis average rent per square foot was calculated utilizing the weighted average of market data from CoStar. Market data was limited to comparable Class C buildings greater than 1000 square feet available for lease within a 3 mile radius of each School's current location.

The Ohio Auditor of State requested the aid of the Ohio Department of Administrative Services (DAS) in performing a market analysis to determine the average cost per square foot for buildings in the school's direct surrounding area.[36]

---

[34] http://education.ohio.gov/Topics/Community-Schools/Directory-of-Community-Schools-Sponsors-and-Operat
[35] http://education.ohio.gov/getattachment/Topics/Quality-School-Choice/Community-School-DRAFT/Sections/Public-Documents-and-Reports/List-of-closed-schools-and-the-reason-for-closure.xlsx.aspx
[36] Note: the Ohio Department of Administrative Services (DAS) is an independent state agency. DAS's Real Estate division is responsible for analyzing and procuring lease agreements for various state agencies in Ohio. DAS's resources and expertise in this area allowed them to generate reports, enabling the AOS to analyze comparative market lease agreements. DAS had no influence in the data used for the AOS's analysis, nor gave any opinion on the matter.  Information provided to the Ohio Auditor of State strictly for informational purposes. The information contained above and in this report in no way reflects the thoughts or views of DAS.

The search area was limited to comparable Class C buildings greater than 1,000 square feet available for lease within a three-mile radius of the selected school.[37] For the analysis, three schools were haphazardly selected for each management company under review. Trends in the table above show that the majority of these community schools under management companies are being charged rental rates significantly above market value. Two of the nine community schools (both under the management of Concept, Schools, Inc.) were priced slightly below going market value, jointly the two schools paid a total of $32,350 under the assessed market value.  Seven of the nine community schools analyzed however had rent significantly higher than the going market value. Total annual amounts paid above market value for each individual school ranged from $65,560 to $867,170 with a median of $371,495[38].

All of the schools analyzed in the above table were under lease agreement with the real estate branch associated with each school's management company with the exception of Concept Schools, Inc. sample item No.1, which was housed in a former parochial school building leased from the catholic diocese. The NHA School which paid the highest rent per square foot was a result of significant renovations, construction and investment performed by CDC. From fiscal year 2006 to fiscal year 2007, the rate increased by 66 percent rent due to extensive building renovations, which were completed in July 2008, being the cause for increases in fiscal year 2007 and fiscal year 2008. In fiscal year 2009, CDC purchased an adjacent lot to be used by the school for parking, and in April 2010 (late fiscal year 2010) the parking lot was resurfaced, giving basis to rental increases in fiscal year 2009 and fiscal year 2011. Renovations/construction/lot purchase cost estimates were obtained from Hamilton County Auditor.

Much like the federal government, the State of Ohio has its own bidding requirements and procedures to obtain the best rates possible when leasing property. The Real Estate division at DAS provides its services in finding facilities to many different state agencies in Ohio. The procedures followed by DAS closely match the procedures undertaken by the federal government. In Ohio, DAS performs a market analysis by pulling historical and current real estate data for the desired area and surrounding buildings. Following a value analysis, facilities that match the desired criteria are brought to the agency to assess the options and decide which property best suits needs. Finally, DAS will directly negotiate lease terms with the property owners. For the schools examined, there was no conclusive evidence available to show any similar measures had been taken by the schools themselves or the governing boards. Although traditional school districts are required by Ohio law to follow bidding procedures in certain instances for large contracts, community schools are not.

Ohio is not the only state that does not require community schools to follow bidding procedures for large contracts, nor is this condition exclusive to Ohio. Renaissance Academy for Math & Science, an Imagine managed community school in Missouri whose property was also part of a sale and leaseback agreement entered into between SHF and a REIT, filed a lawsuit against Imagine Schools, Inc. Among various complaints, the lawsuit alleged Imagine Schools, Inc. had failed to disclose its relationship with Schoolhouse Finance, LLC and used its position of trust and confidence to negotiate, with its own sister company, leases which significantly exceeded market value, The federal district court ruled Imagine Schools, Inc. had committed a breach of fiduciary duty and as part of the ruling was ordered to repay the school $935,400, the estimated amount that the school had been charged above reasonable market value during the 46 months the school leased facilities from Imagine Schools, Inc.

---

[37] Market analysis data reflects current market availability data per CoStar accessed December 13, 2017 by DAS  provided to the Ohio Auditor of State
[38] Building square footage information obtained from County Auditor website and school leases, Rent expenditures per school audited notes to the financial statements

## Spotlighted Schools

**Concept Schools, Inc. - Horizon Science Academy of Cleveland**

Horizon Science Academy opened in 1999 and currently leases its facility from Breeze, Inc, a subsidiary of New Plan Learning, a real estate company dealing exclusively with Concept managed schools, however maintains sovereignty in its relationship with Concept Schools, Inc. The property the school is located on is owned by Breeze, Inc. and was purchased in 2005 for $2.7 million[39].

The property the School is located on was originally owned by OMH Holdings, LLC. In 2000 the Academy entered into a 20 year land installment agreement with OMH Holdings, LLC for the purchase of this land and the buildings located for $2.8 million, at an interest rate of 10%. In 2005 OMH Holdings exercised an optional call provision contained in the contract, requiring the School to make a balloon payment of the remaining balance due towards the contract.

The school was unable to obtain financing for this balloon payment, and, as a result Breeze, Inc.(a NPL subsidiary) purchased the rights to the Land installment agreement from the school for 2.7 million (2.5 million paid to OMH holdings for the remaining balance on the Land Installment contract, and 200,000 to the Academy) and the deed was transferred to Breeze, Inc. Prior to this transfer the Academy had spent approximately $1.6 million on building improvements between 2000 and 2002, which were transferred to Breeze, Inc. at the time of the sale.

In 2005 the Academy purchased and installed modular buildings on the premises at a cost of $822,000, to be paid over a 10 year period at an interest rate of 8.925%. These buildings were leased to Horizon Science Academy Middle School. In 2008 the modular buildings were sold to Breeze, Inc. for $800,000 ($317,000 was to be paid to the Academy and $483,000 allocated to the remaining balance on the modular buildings.)

The Academy did not however receive cash payment for either sale transaction. Amounts owed to the school from Breeze, Inc. were instead paid for via monthly rent credit of approximately $8,700 per month and are scheduled to be paid off at the end of June 2018, interest free.

In 2008 Breeze, Inc. constructed a gymnasium for the Academy. The cost of construction was $1.33 million, financed via a 10 year note. The Academy's monthly rent was temporarily increased in consideration of the construction for a period of 10 years, amounts tied directly to the payment schedule of the debt note obtained by Breeze, Inc.

The lease agreement currently held with Breeze, Inc. is a double net lease (Tenant responsible for real estate taxes and insurance premiums). Annual base rent when the lease was entered into in 2009 was $228,000, and has had an annual increase of 4%,  in addition to temporary $203,000 annual surcharge for reimbursement of the gym construction costs, and temporary $104,400 annual rent credit for property purchased by Breeze, Inc. from the school.

A market analysis performed over comparable buildings available for lease within a three mile radius of the area directly surrounding the building determined the market average lease rate was $10.17 per square foot. The school lease price per square foot paid in fiscal year 2016 equated to $9.67 per square foot. The resulting lease payment under market average for fiscal year 2016 was approximately $26,000.[40]

---

[39] Per Breeze Inc. Land Installment Purchase Agreement
[40] Per DAS Rent per Square Foot Spreadsheet

From July 1, 2004 through June 30, 2016 the lease payments have accounted for approximately 9.2% of all expenditures and 9.3% of all revenues received during this period.[41]

**Imagine Schools, Inc. - Harvard Avenue Performance Academy**

Harvard Avenue Performance Academy opened in 2006 and subleased its facilities from Schoolhouse Finance LLC, a branch of Imagine Schools, Inc. from September 2006 through June 2016. The building occupied by the Academy was initially purchased by Schoolhouse Finance LLC in 2006 for $700,000. The property was later sold to Jerit CS Fund I LLC (a subsidiary of EPR Properties, a real estate investment trust) in July 2007 for $6.1 million and leased back to Schoolhouse Finance LLC. The property 2017 market value was $2.68 million[42].

The sublease agreement was an absolute net sublease (subtenant responsible for all costs associated with the building including property taxes, property insurance, maintenance, structural maintenance, and reimbursement of any costs incurred by the sub-landlord in association with the management of the property) with base rent for the property is $737,388 with an annual increase of the lesser of the CPI or the maximum amount allowed by law.

Building improvement costs incurred by Schoolhouse Finance, LLC prior to the sale of the property in 2007 amounted to approximately $5.5 million[43], resulting in a total initial investment of $6.2 million. The building was sold for $6,117,606 in July 2007, prior to the sale-leaseback of the property SHF received $722,961 in lease payments from the Academy.

The sublease agreement with SHF included a provision stating "Lessee may terminate this Agreement prior to the end of the term specified … in the event of (i) the termination of the (Imagine) Operating Agreement"[44]. At the end of Fiscal year 2015 the Academy terminated its management agreement with Imagine Schools, Inc. resulting in the termination of the sublease agreement with SHF[45]. The Academy entered into a lease agreement directly with the building owner, Jerit CS Fund I LLC for the same property[46]. Upon doing this, annual rent dropped from $918,896 in fiscal year 2015[47] to $682,232 in fiscal year 2016[48].

A market analysis performed over comparable buildings available for lease within a three mile radius of the area directly surrounding the building determined the market average lease rate was $8.80 per square foot. The school lease price per square foot paid in fiscal year 2015 while leasing from SHF equated to $20.06 per square foot and $14.90 per square foot in fiscal year 2016, while leasing from Educational Capital Solutions. The resulting lease payment over market average was approximately $515,865 in fiscal year 2015 and $279,200 in fiscal year 2016.[49]

---

[41] Per Lease Agreement Spreadsheet
[42] Per Cuyahoga county Auditor
[43] Per Harvard Avenue Performance Academy First Lease Amendment
[44] Per Harvard Avenue Performance Academy Second Lease Amendment
[45] Per Harvard Avenue Performance Academy Transition Agreement with Imagine Schools, Inc.
[46] Per Harvard Avenue Performance Academy Management Agreement with performance Academies, Inc
[47] Per Harvard Avenue Performance Academy Audited 2015 Notes to the Financial Statements
[48] Per Harvard Avenue Performance Academy Audited 2016 Notes to the Financial Statements
[49] Per DAS Rent per Square Foot Spreadsheet

From July 1, 2006 through June 30, 2015 the lease payments accounted for approximately 17.2% of all expenditures and 17.3% of all revenues received during this period. From July 1, 2015 to June 30, 2016 lease payments accounted for 12.4% and 12.6% of expenditures and revenues, respectively.[50] The terms of the original Master Lease Agreement between SHF and Jerit CS Fund I LLC is unknown therefore a determination of SHF's estimated net profit/loss is not determinable for the time period from July 2007 through June 2015.

**National Heritage Academies - Orion Academy**

Orion Academy opened in 2004 and leases its facilities from its management company, National Heritage Academies (NHA). The facility occupied by Orion Academy is owned by Charter Development Company LLC (CDC), a wholly owned subsidiary of NHA operating as Master Landlord in the Lease agreement. The property was purchased by CDC in 2004 for $350,000 and held a 2017 market value of $3,094,960[51].

The lease between NHA and the Academy is either a triple net or absolute net lease[52] (tenant is responsible for all costs associated with the property, however the party responsible for structural maintenance of the building is not stated). Annual base rent was initially $736,000 in the school's first years of operations in 2004 and 2005, however has since gradually increased via lease amendments to $1,451,040, the annual rate as of 2016.[53]

The Management Agreement between Orion Academy and NHA states "NHA shall lease of otherwise cause a facility to be made available to the Board for school classroom facilities"[54], additionally the lease includes a provision stating "In the event Landlord makes capital improvements to the premises, or acquires additional property for the benefit or use of Tenant, then the rent paid by tenant shall be promptly adjusted accordingly to compensate Landlord for its additional economic investment.[55]Though legal, the result of this is reduced Board control in the determination of facility and reduced control over lease rates to be paid by the Academy. These contract provisions were included in all management and lease agreements reviewed for NHA managed schools in Ohio.

A market analysis performed over comparable buildings available for lease within a three mile radius of the area directly surrounding the building determined the market average lease rate was $10.83 per square foot. The school lease price per square foot paid in fiscal year 2016 equated to $26.91 per square foot. The resulting lease payment over market average in fiscal year 2016 alone was approximately $867,000.[56]

From July 1, 2004 through June 30, 2016 the lease payments have accounted for approximately 20.1% of all expenditures and 20.1% of all revenues received during this period.[57]

---

[50] Per Lease Agreement Spreadsheet
[51] Per Hamilton County Auditor
[52] Per Orion Academy Lease Agreement
[53] Per Lease Agreement Spreadsheet
[54] Per Orion Academy and NHA Management Agreement
[55] Per Orion Academy Lease Agreement
[56] Per DAS Rent per Square Foot Spreadsheet
[57] Per Lease Agreement Spreadsheet

**Effects of Spending on Academic Performance**



The Average rent paid per pupil for National Heritage Academies, Imagine Schools, Inc, and Concept Schools was significantly higher than that of other sampled community schools in Ohio[58].

In fiscal year 2016 Imagine Schools, Inc. more than doubled the average rent paid per student for other community schools, however these excess expenditures had little to no effect on the quality of education provided to students. The control sample selected for other community schools used in the figure above consists of a sample of six randomly selected community schools in Ohio, not operating under a management agreement. Figures computed contain exclusively base rent payments and do not take into account additional expenditures the schools may have incurred for property maintenance, insurance, or taxes.[59][60]

Schools report information annually to the Ohio Department of Education and they are graded based on six measures of performance. Not all measures of performance are applicable to all schools; however the four most commonly used measures are Achievement, Progress, Gap Closing, and K-3 Literacy. Of these four components across all community schools in Ohio, approximately 28 percent of scores were a C or above on average[61]. Report card data was reviewed for National Heritage Academies, Imagine Schools, Inc., Concept Schools, Inc., and sample of "Other" community schools to compare scores to the state averages and to determine the effect these potentially excessive lease expenditures may have had on the quality of education.

---

[58] Per review of random sample of community schools in Ohio
[59] Rent expenditures per school audited notes to the financial statements
[60] Per FY16 foundation funding FTE, located at education.ohio.gov
[61] http://education.ohio.gov/Topics/Data/Report-Card-Resources

It was however discovered that schools of the three management companies and control sample reviewed performed comparably with the overall averages of all community schools in Ohio. National Heritage Academies and the sample selected of "Other" community schools performed slightly better than the average 28 percent with 34 percent of NHA's and 32 percent of "other's" subset scores rated C or above. Concept Schools, Inc. and Imagine Schools, Inc. performed slightly below average, both with 26 percent of subset scores rated C or above[62].

## Conclusion

Shortcomings in current Ohio law, laxed oversight, and support programs geared toward community schools have allowed private companies to enter into questionable lease agreements with community schools to their advantage at the expense of those schools and the Ohio tax payers who fund their operation.  A combination of those factors and the deficiencies we identified have afforded private parties an avenue to exploit community schools, diverting public dollars away from students. Notable findings include:

> **No Required Bidding Procedures:** Although traditional school districts are required to follow certain bidding procedures under ORC 3313.46, this law does not apply to community schools. Currently, there are no laws in Ohio that require community schools to examine the market or to obtain competitive bids when identifying facilities for lease or purchase. This has resulted in community schools entering into lease agreements significantly above market rates. (See sections State Law and the Effects on Ohio Community School Facility Procurement and Market Analysis of leased Properties in Ohio)

> **Lack of Available Funding for Facility Purchase:** Community schools are not offered many of the funding options available to traditional school districts that would afford community schools the ability to access debt options or make large purchases. These options not available to community schools include the ability to levy taxes, the ability to issue bonds, and the large majority of state sponsored facility assistance programs. (See Sections State Law and the Effects on Ohio Community School Facility Procurement and Community School Property Ownership Structure in Ohio)

> **Related Party Lease Agreements/Conflicts of Interest:** National Heritage Academies and Imagine Schools, Inc. both had a direct financial interest in the companies their managed schools entered lease agreements with for all schools reviewed under those management companies. Employees of and persons with interest in New Plan Learning/Breeze, Inc., the parent company that the majority of Concept managed schools entered into lease agreements with, also served on the Board of schools while the schools were leasing from subsidiaries of New Plan Learning. (See Section Community School facility Lessor and Board Oversight of Facility Procurement and Lease Agreements)  Board members with a vested interest in a company are prohibited from voting on any measures pertaining to that company in accordance with ethics laws.

---

[62] Reportcard.education.ohio.gov

**Lease Rates not Reflective of Market Rates:** Schools operating under the management of two of the three management companies all had lease rates that exceeded local market rates by upward of 50-150%. This condition is further amplified by lease provisions which caused the majority of schools reviewed to be responsible for property related expenses normally incurred by the landlord in traditional lease agreements which including property taxes, insurance, building maintenance, and structural maintenance. (See Sections Market Analysis of Leased Properties in Ohio and Lease Provisions)

**School District Unwilling to Lease Unused Facilities:** The current education funding structure in Ohio is largely paid based on student enrollment, as a result community schools are often viewed as competition by school districts. The direct correlation between student enrollment and funding acts as a disincentive for school districts to lease or sell their unused properties to community schools. While other states have programs in place which encourage or require school districts to cooperate with community schools, Ohio does not currently have any laws or programs in place to encourage this. (See Section State Law and the Effects on Ohio Community School Facility Procurement)

**Loopholes Utilized in ORC maximum debt term:** ORC 3314.08(G)(1)(b) states "A school may also borrow money for a term not to exceed fifteen years for the purpose of acquiring facilities." Although the debt term for community schools is restricted to a maximum of 15 years, there are no restrictions in place limiting maximum contract or lease term. Private companies not restricted by ORC are able to use this to their advantage in acquiring debt for the purchase of community school facilities.

In 2011 New Plan Learning issued a 30 year term bond series to refinance and renovate properties for four different Concept managed schools. Each school associated with the bond issuance signed a 30 year absolute net lease agreement to rent those facilities, which was used as security for the debt repayment in the bond agreement. Since the Ohio community schools were not directly the obligated party, the bonds were not subject to those ORC 3314 restrictions and therefore the schools and the bond agreement were both fully compliant.

At the end of the term, although these bonds will have been paid for in full exclusively through use of lease revenues paid by these four schools to New Plan Learning, the schools will receive no share of equity in the purchased property. (See Section Methods of Financing used by Management Companies and Other Private Related Companies)

**Limitation of Board Oversight:** Clauses contained in management agreements of National Heritage Academies and Imagine Schools Inc. delegate certain powers in regards to choosing a school facility to the management company. National Heritage Academies' management agreement states the facility will be made available or leased by NHA for school use; Imagine Schools Inc. management agreement states Imagine Schools will assist in locating a facility for the school and emphasizes that Imagine Schools, Inc.'s must approve of said facility. (See Section Board Oversight of Facility Procurement and Lease Agreements)

28

Although the power of ultimate approval of choice and lease terms remain with the Board of Trustees, these clauses can place an assumed amount of trust in the hands of the management company, and blind the Board to any undisclosed transactions or relationships which may exist between the management company and the building owner and/or lessor. This includes related party transactions, sale and leaseback agreements entered into with Real Estate Investment Trusts and lease-sublease agreements between the management company and property owners with undisclosed rates that offer the management company basis to surcharge the school's rent as corporate lease guarantor which management companies are not required to disclose agreements entered into with other non-public entities as they are not subject to public record and ethics laws.

This condition is evident in an example discovered in which a school renegotiated its lease agreement directly with the property owner after severing ties with Imagine Schools, Inc who had formerly subleased the property to the school. Although the lease agreement was for the same property, the school's rent decreased over $400,000 in the year immediately following the lease negotiation after removing Imagines' real estate management branch, Schoolhouse Finance, LLC, from acting as intermediary. (See Section Methods of Financing used by Management Companies and Other Private Related Companies)

**Risk Hedging by Management Company:** Community schools often lease their facilities indirectly from the property owners with the management company or management company real estate branch acting as intermediary, or corporate lease guarantor. The rationale behind this is since community schools are viewed as high risk lessees due to their risk of closure, a corporate lease guarantor provides the original lessor assurance that lease payments will be made. As fee for acting as corporate lease guarantor, the intermediary may surcharge lease rates.

Instances where this condition was present, and contracted community schools were closed were discovered. In each of these instances however management companies were able to absolve themselves of financial impact by immediately opening a new school in the same facility the following year under new sponsorship. (See Section Methods of Financing used by Management Companies and Other Private Related Companies)

Based on the findings from our analysis for this report and the issues faced by community schools, we recommend the State of Ohio establish a committee to study and analyze community school laws in other states and specific steps taken by those state legislatures to prevent or remedy these and similar issues from occurring.

Currently, there are no laws requiring community schools in Ohio to examine the market or obtain competitive bids when obtaining facilities, through purchase or lease or leasehold improvements. We recommend the legislature establish policy such as those utilized by the federal government to be performed by entities using state funding prior to entering into a lease agreement. The federal General Services Administration was established to help manage and support the basic functioning of federal agencies. The federal government under GSAM §570 generally requires that measures be taken to obtain competitive rates on leases and leasehold improvements. Additionally, GSAM §570.106 requires that in some instances, proposed acquisitions of leasehold improvements and leases in real property be advertised to the public depending on the size of the project. For contracts that exceed $25,000 in value, it is required that the proposed lease or leasehold improvement be advertised if no exemption to this rule applies.

This section contains several provisions outlining the manner in which acquisitions are to take place, including market surveys, solicitations for offers, modifications, and even how to evaluate the offers. In our examination, we found no evidence that these steps are being taken by schools we evaluated. GSAM 570.2 provides an outline of simplified lease acquisition procedures required to be used by federal agencies when acquiring small leasehold interest in real property. These procedures include performing a market survey to identify potential locations meeting requirements; attempt to solicit competition, and lease negotiation, evaluation, and award. Should only one option present itself, documentation should be maintained explaining the lack of competition of bidding procedures.

Though management companies often dictate the day to day operations of community schools and are majorly funded by the public money paid to those schools they manage, ethics regulations and laws governing community schools do not directly apply to the management companies that run them. Current Ohio law requires very little transparency on behalf of the management companies, which has allowed them perform the majority of operations outside of the public eye and develop shady practices which skirt community school compliance regulations. As a result, we would further like to recommend legislation enact stricter standards guiding the operations of community school management companies and additional transparency requirements.

Further, it is recommended that the community school board of trustees be required to exercise power in reviewing and selecting the property, rather than delegating responsibility to the management companies. Boards should be reminded they must take the same care that an ordinary and prudent person would exercise under similar circumstances. Failure to exercise such care either through negligence or willful misconduct could result personal liability.

## Referral for Further Review

The Auditor of State is referring the **Related Party Lease Agreements/Conflicts of Interest** issues identified above to the Ohio Ethics Commission for further review by that agency.



## Dave Yost · Auditor of State

**COMMUNITY SCHOOL FACILITY PROCUREMENT**

**FRANKLIN COUNTY**

**CLERK'S CERTIFICATION**

This is a true and correct copy of the report which is required to be filed in the Office of the Auditor of State pursuant to Section 117.26, Revised Code, and which is filed in Columbus, Ohio.

*Susan Babbitt*

**CLERK OF THE BUREAU**

**CERTIFIED**
**JANUARY 10, 2019**

# EXHIBIT 4

**NEW ISSUES—BOOK-ENTRY ONLY** RATING: Fitch: "BBB-"

*In the opinion of Orrick, Herrington & Sutcliffe LLP, Bond Counsel to the Authority, based upon an analysis of existing laws, regulations, rulings and court decisions and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the Series 2011A Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986. In the further opinion of Bond Counsel, interest on the Series 2011A Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although Bond Counsel observes that such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income. Bond Counsel further observes that interest on the Series 2011B Bonds is not excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986. Bond Counsel is also of the opinion that interest on the Bonds is exempt from State of Arizona taxation. Bond Counsel expresses no opinion regarding any other tax consequences relating to the ownership or disposition of, or the accrual or receipt of interest on, the Bonds. See "TAX MATTERS" herein.*



## THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE COUNTY OF PIMA EDUCATIONAL FACILITY REVENUE BONDS (NEW PLAN LEARNING, INC. PROJECT), SERIES 2011

| **$32,575,000** | **$545,000** |
|---|---|
| Educational Facility Revenue Bonds | Educational Facility Revenue Bonds |
| (New Plan Learning, Inc. Project) | (New Plan Learning, Inc. Project) |
| Series 2011A | Series 2011B (Taxable) |

Dated: Date of Delivery Due: July 1, as shown on the inside cover

The Industrial Development Authority of the County of Pima Educational Facility Revenue Bonds (New Plan Learning, Inc. Project), Series 2011, consisting of $32,575,000 Educational Facility Revenue Bonds (New Plan Learning, Inc. Project), Series 2011A (the "Series 2011A Bonds") and $545,000 Educational Facility Revenue Bonds (New Plan Learning, Inc. Project), Series 2011B (Taxable) (the "Series 2011B Bonds" and together with the Series 2011A Bonds, the "Series 2011 Bonds" or the "Bonds"), will be issued by The Industrial Development Authority of the County of Pima (the "Authority") pursuant to a Bond Indenture, dated as of September 1, 2011 (the "Bond Indenture"), by and between the Authority and Wells Fargo Bank, National Association, as bond trustee (the "Bond Trustee"). The Authority will loan the proceeds of the Bonds to New Plan Learning, Inc., an Ohio nonprofit corporation (the "Borrower"), pursuant to a Loan Agreement, dated as of September 1, 2011, by and between the Authority and the Borrower (the "Loan Agreement") to: (i) finance and refinance the acquisition, construction, improvement and equipping (the "Project") of certain charter or community school facilities (as more fully described herein, the "Facilities") to be operated by the four charter/community schools described in APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" herein (the "Financed Charter Schools"); (ii) fund a portion of the debt service reserve fund held under the Bond Indenture; (iii) fund $1,000,000 to the capital maintenance and operating fund held under the Bond Indenture (the "Capital Maintenance and Operating Fund"); (iv) fund $500,000 to the revenue fund held under the Bond Indenture (the "Revenue Fund"); (v) pay a portion of the interest on the Bonds; and (vi) pay costs of issuance of the Bonds. The Financed Charter Schools are all managed by Concept Schools NFP, an Illinois nonprofit corporation ("Concept"). See APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" - "CONCEPT SCHOOLS" herein.

The Bonds are limited obligations of the Authority payable solely from, and secured by a pledge of: (i) all Revenues (defined herein) received by the Authority or the Bond Trustee pursuant to the Loan Agreement, consisting primarily of loan repayments required to be made by the Borrower in the amounts sufficient to pay the principal of, premium, if any, and interest on the Bonds; Base Rent Payments and Additional Payments under the Leases (defined herein) which will be assigned to the Bond Trustee (ii) amounts held in any funds created under the Bond Indenture including the Bond Reserve Account (defined herein) and, in certain circumstances, the IFF Debt Service Reserve Account (defined herein) but excluding the Rebate Fund (defined herein) and excluding certain administration fees and expenses payable to the Authority and Bond Trustee; and (iii) any amounts available for such purpose payable pursuant to New Plan Learning, Inc. Obligation No. 1 ("Obligation No. 1") dated as of September 1, 2011 in the principal amount of the Bonds made by the Borrower to the Bond Trustee, which is issued under and secured by the provisions of a Master Trust Indenture dated as of September 1, 2011 (the "Master Indenture") among the Borrower, 250 Shoup Mill LLC, and OG-Ohio LLC (each a "Member of the Obligated Group" and collectively, the "Obligated Group") and Wells Fargo Bank, National Association, as master trustee (the "Master Trustee"). Security under the Bond Indenture includes an assignment of Base Rent Payments and Additional Payments made pursuant to four Leases (defined herein) of the Facilities to the Financed Charter Schools. A default under a Lease by a Financed Charter School will not necessarily cause an immediate default on the Bonds but may cause an early or partial redemption of the Bonds. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS" and "THE BONDS - Redemption" herein. While Obligation No. 1 is a joint and several obligation of the Members of the Obligated Group, neither the Master Indenture, Obligation No. 1, the Loan Agreement nor the Bonds constitute an obligation of the Financed Charter Schools. Each Financed Charter School is responsible only for its respective rent payments under its respective Lease.

Interest on the Bonds will be payable semiannually on each January 1 and July 1, commencing January 1, 2012. The Bonds are being issued as fully registered bonds and initially will be registered in the name of Cede & Co., as nominee for The Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository for the Bonds. Purchase of beneficial interests in the Bonds will be made in book-entry-only form (without physical certificates) in denominations of $5,000 and any amounts in excess thereof in even $5,000 increments. For so long as DTC or its nominee, Cede & Co., is the registered owner of the Bonds, (i) payments of the principal of and premium, if any, and interest on such Bonds will be made directly to Cede & Co. for payment to its participants for subsequent disbursement to the beneficial owners, and (ii) all notices, including any notice of redemption shall be mailed only to Cede & Co. See APPENDIX E - "BOOK-ENTRY SYSTEM" herein.

Purchase of the Bonds involves certain risks. See "RISK FACTORS" herein.

The Bonds are subject to optional and mandatory redemption prior to maturity as described under "THE BONDS - Redemption" herein.

THE BONDS, THE PREMIUM, IF ANY, AND THE INTEREST THEREON ARE SPECIAL LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE EXCLUSIVELY FROM THE TRUST ESTATE. THE BONDS DO NOT CONSTITUTE A DEBT OR A LOAN OF CREDIT OR A PLEDGE OF THE FULL FAITH AND CREDIT OR TAXING POWER OF THE AUTHORITY, OF PIMA COUNTY, ARIZONA, THE STATE OF ARIZONA, OR OF ANY POLITICAL SUBDIVISIONS THEREOF, WITHIN THE MEANING OF ANY ARIZONA CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION AND SHALL NEVER CONSTITUTE NOR GIVE RISE TO A PECUNIARY LIABILITY OF THE STATE OF ARIZONA OR PIMA COUNTY, ARIZONA. THE BONDS SHALL NOT CONSTITUTE, DIRECTLY OR INDIRECTLY, OR CONTINGENTLY OBLIGATE OR OTHERWISE CONSTITUTE, A GENERAL OBLIGATION OF OR A CHARGE AGAINST THE GENERAL CREDIT OF THE AUTHORITY, BUT SHALL BE SPECIAL LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE SOLELY FROM THE SOURCES DESCRIBED IN THE BOND INDENTURE. THE AUTHORITY HAS NO TAXING POWER.

This cover page contains information for general reference only. It is not intended as a summary of these transactions. Investors are advised to read the entire Official Statement to obtain information essential to making an informed investment decision.

The Bonds are offered when, as and if issued by the Authority and received by RBC Capital Markets, LLC (the "Underwriter"), subject to prior sale and approval of legality by Orrick, Herrington & Sutcliffe LLP, San Francisco, California, Bond Counsel to the Authority, the approval of certain matters for the Authority by its counsel, Russo, Russo & Slania, P.C., Tucson, Arizona, the approval of certain matters for the Borrower by its counsel, Jeff Stewart Legal Services, LLC, Dayton, Ohio, and the approval of certain matters for the Financed Charter Schools by their Ohio counsel, Nicola, Gudbranson & Cooper, LLC, Cleveland, Ohio, and their Illinois counsel, Chico & Nunes, P.C., Chicago, Illinois. Certain legal matters will be passed upon for the Underwriter by Eichner & Norris PLLC, Washington, District of Columbia, Underwriter's Counsel and by Peck, Shaffer and Williams LLP, Columbus, Ohio, Disclosure Counsel to the Borrower. It is expected that the Bonds in definitive form will be available for delivery through the Depository Trust Company in New York, New York, on or about September 8, 2011.

### RBC CAPITAL MARKETS

Dated: September 7, 2011.

**MATURITY SCHEDULE**

**THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE COUNTY OF PIMA
EDUCATIONAL FACILITY REVENUE BONDS
(NEW PLAN LEARNING, INC. PROJECT),
SERIES 2011**

**$32,575,000**
Educational Facility Revenue Bonds
(New Plan Learning, Inc. Project)
Series 2011A

$1,385,000 7.000% Term Bonds Due July 1, 2021 - Yield; 7.000% CUSIP† No. 72177PAJ9
$16,605,000 7.750% Term Bonds Due July 1, 2035 - Yield; 7.750% CUSIP† No. 72177PAL4
$14,585,000 8.125% Term Bonds Due July 1, 2041 - Yield; 8.250% CUSIP† No. 72177PAK6

**$545,000**
Educational Facility Revenue Bonds
(New Plan Learning, Inc. Project)
Series 2011B (Taxable)

$545,000 9.500% Term Bonds Due July 1, 2017 - Yield; 9.500% CUSIP† No. 72177PAM2

---

† *Copyright 2011, American Bankers Association.  CUSIP data herein are provided by Standard & Poor's CUSIP Service Bureau, a Division of the McGraw-Hill Companies, Inc.  CUSIP data is included solely for the convenience of the owners of the Certificates.*

This Official Statement does not constitute an offer to sell the Bonds or the solicitation of an offer to buy, nor shall there be any sale of the Bonds by any person in any state or other jurisdiction to any person to whom it is unlawful to make such offer, solicitation or sale in such state or jurisdiction. No dealer, salesperson or any other person has been authorized to give any information or to make any representation other than those contained herein in connection with the offering of the Bonds, and, if given or made, such information or representation must not be relied upon.

The information set forth herein under the captions "THE AUTHORITY" and "ABSENCE OF MATERIAL LITIGATION — The Authority" has been furnished by the Authority. All other information set forth herein has been obtained from the Borrower and other sources that are believed to be reliable. The adequacy, accuracy or completeness of such information is not guaranteed by, and is not to be construed as a representation of, the Authority or the Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement, nor any sale made hereunder, shall under any circumstances create any implication that there has been no change in the affairs of the Authority, The Depository Trust Company or the Borrower since the date hereof.

The Master Trustee and Bond Trustee assume no responsibility for this Official Statement and have not undertaken to verify any information contained herein.

The Underwriter has provided the following sentence for inclusion in this Official Statement. The Underwriter has reviewed the information in this Official Statement pursuant to its responsibilities to investors under the federal securities laws, but the Underwriter does not guarantee the accuracy or completeness of this information.

**IN CONNECTION WITH THE OFFERING OF THE BONDS, THE UNDERWRITER MAY OVER ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS OFFERED HEREBY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.**

## CAUTIONARY STATEMENTS REGARDING FORWARD-LOOKING STATEMENTS IN THIS OFFICIAL STATEMENT

Certain statements included or incorporated by reference in this Official Statement constitute "forward-looking statements." Such statements generally are identifiable by the terminology used such as "plan," "expect," "estimate," "budget" or other similar words. Such forward-looking statements include but are not limited to certain statements contained in the information under the captions "RISK FACTORS," and APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" in this Official Statement. The achievement of certain results or other expectations contained in such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. The Borrower does not plan to issue any updates or revisions to those forward-looking statements if or when its expectations or events, conditions or circumstances on which such statements are based occur.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................................ 1

    General ................................................................................................................................................ 1
    The Bonds; Use of Proceeds ............................................................................................................. 1
    The Borrower ...................................................................................................................................... 2
    The Obligated Group ......................................................................................................................... 2
    The Facilities ..................................................................................................................................... 3
    Financed Charter Schools .................................................................................................................. 3
    Security for the Bonds: the Bond Indenture and the Master Trust Indenture ................................... 3
    The Master Trust Indenture ............................................................................................................... 5
    Purpose of the Master Indenture Structure; Limited Applicability to the Bonds ............................. 6
    Other NPL Owned Facilities ............................................................................................................. 6
    The Manager ...................................................................................................................................... 6

THE AUTHORITY .................................................................................................................................... 7

PROGRAM ADMINISTRATION ............................................................................................................. 8

    General ................................................................................................................................................ 8
    Program Administration Agreement .................................................................................................. 8
    Assignment of Administration Obligations ....................................................................................... 8
    Continuous Service ............................................................................................................................ 8

THE PROJECTS ........................................................................................................................................ 8

    Use of Funds ...................................................................................................................................... 8
    Appraisals ......................................................................................................................................... 11
    Environmental Reports and Status ................................................................................................... 11

ESTIMATED SOURCES AND USES OF FUNDS ................................................................................ 13

DEBT SERVICE SCHEDULE ................................................................................................................ 14

THE BONDS ............................................................................................................................................ 14

    General .............................................................................................................................................. 14
    Book-Entry Only System ................................................................................................................. 15
    Transfer and Exchange of Bonds ..................................................................................................... 15
    Redemption ...................................................................................................................................... 16
    Defeasance ....................................................................................................................................... 20

SECURITY AND SOURCES OF PAYMENT FOR THE BONDS ........................................................ 22

    General .............................................................................................................................................. 22
    The Bond Indenture ......................................................................................................................... 23
    The Loan Agreement ....................................................................................................................... 27
    Mortgages ........................................................................................................................................ 27
    The Leases ....................................................................................................................................... 28
    Certain Financial Covenants of the Financed Charter Schools under the Leases ........................... 28
    The Master Indenture ....................................................................................................................... 29
    Security and Enforceability .............................................................................................................. 33
    Flow of Funds .................................................................................................................................. 36

RISK FACTORS ....................................................................................................................................36

    General.............................................................................................................................................37
    Obligation of Financed Charter Schools is Several, not Joint; No Cross Collateralization of Lease
    Obligations.......................................................................................................................................38
    Tax Related Issues ...........................................................................................................................38
    Factors That Could Affect the Security Interest in the Pledged Revenues .....................................40
    Limitations on Value of the Facilities and to Remedies Under the Mortgages................................40
    Bankruptcy........................................................................................................................................41
    Factors Associated with Financed Charter Schools' Operations .....................................................42
    Other Limitations on Enforceability of Remedies ..........................................................................42
    Specific Risks of Charter Schools....................................................................................................43
    Claims and Insurance Coverage ......................................................................................................44

ABSENCE OF MATERIAL LITIGATION...........................................................................................45

    The Authority....................................................................................................................................45
    The Borrower.....................................................................................................................................45
    The Financed Charter Schools..........................................................................................................45

TAX MATTERS ......................................................................................................................................45

    The Series 2011A Bonds .................................................................................................................45
    The Series 2011B Bonds..................................................................................................................48
    For U.S. Holders..............................................................................................................................49
    For Non-U.S. Holders......................................................................................................................49
    Circular 230 .....................................................................................................................................51

APPROVAL OF LEGALITY ..................................................................................................................51

RATING ...................................................................................................................................................51

CONTINUING DISCLOSURE................................................................................................................52

UNDERWRITING ...................................................................................................................................52

MISCELLANEOUS ................................................................................................................................53


APPENDIX A  INFORMATION REGARDING NEW PLAN LEARNING, INC. AND
THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS......................................A-1

APPENDIX B  FINANCIAL STATEMENTS OF THE BORROWER AND
THE FINANCED CHARTER SCHOOLS ...........................................................................................B-1

    AUDITED  FINANCIAL  STATEMENTS  OF  THE  BORROWER  FOR  THE
    FISCAL YEAR ENDED JUNE 30, 2010

    UNAUDITED  FINANCIAL  STATEMENTS  OF  THE  BORROWER  FOR  THE
    FISCAL YEAR ENDED JUNE 30, 2011

    AUDITED  FINANCIAL  STATEMENTS  OF  CHICAGO  MATH  &  SCIENCE
    ACADEMY FOR FISCAL YEAR ENDED JUNE 30, 2010

    UNAUDITED  FINANCIAL  STATEMENTS  OF  CHICAGO  MATH  &  SCIENCE
    ACADEMY FOR THE FISCAL YEAR ENDED JUNE 30, 2011

AUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY SPRINGFIELD FOR FISCAL YEAR ENDED JUNE 30, 2010

UNAUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY SPRINGFIELD FOR THE FISCAL YEAR ENDED JUNE 30, 2011

AUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY TOLEDO HIGH FOR FISCAL YEAR ENDED JUNE 30, 2010

UNAUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY TOLEDO HIGH FOR THE FISCAL YEAR ENDED JUNE 30, 2011

AUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY DAYTON HIGH FOR FISCAL YEAR ENDED JUNE 30, 2010

UNAUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY DAYTON HIGH FOR THE FISCAL YEAR ENDED JUNE 30, 2011

APPENDIX C  SUMMARY OF PRINCIPAL DOCUMENTS ............................................................. C-1

APPENDIX D   FORM OF CONTINUING DISCLOSURE AGREEMENT ........................................D-1

APPENDIX E  BOOK-ENTRY SYSTEM.................................................................................... E-1

APPENDIX F  FORM OF OPINION OF BOND COUNSEL ................................................................F-1

APPENDIX G  COMMUNITY SCHOOL/CHARTER SCHOOL STATUTES IN
OHIO AND ILLINOIS ......................................................................................................................G-1

## OFFICIAL STATEMENT

### THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE COUNTY OF PIMA
### EDUCATIONAL FACILITY REVENUE BONDS
### (NEW PLAN LEARNING, INC. PROJECT),
### SERIES 2011

| $32,575,000 | $545,000 |
|---|---|
| Educational Facility Revenue Bonds | Educational Facility Revenue Bonds |
| (New Plan Learning, Inc. Project) | (New Plan Learning, Inc. Project) |
| Series 2011A | Series 2011B (Taxable) |

## INTRODUCTION

**General**

    This Official Statement, including the cover page and Appendices hereto (the "Official Statement"), is provided to furnish information with respect to the sale and delivery of $32,575,000 aggregate principal amount of Educational Facility Revenue Bonds (New Plan Learning, Inc. Project), Series 2011A (the "Series 2011A Bonds") and the $545,000 aggregate principal amount of Educational Facility Revenue Bonds (New Plan Learning, Inc. Project), Series 2011B (Taxable) (the "Series 2011B Bonds," and together with the Series 2011A Bonds, the "Series 2011 Bonds" or the "Bonds") of The Industrial Development Authority of the County of Pima (the "Authority").

**The Bonds; Use of Proceeds**

    The Bonds will be issued pursuant to the Constitution and laws of the State of Arizona and particularly under and pursuant to "The Industrial Development Financing Act of the State of Arizona" Title 35, Chapter 5, Articles 1 through 5, Arizona Revised Statutes, as amended (Sections 35-701 through 35-761, inclusive) (the "Act"), and a Bond Indenture, dated as of September 1, 2011 (the "Bond Indenture"), by and between the Authority and Wells Fargo Bank, National Association, as bond trustee (the "Bond Trustee"). Interest on the Bonds will be payable on January 1 and July 1 of each year, commencing January 1, 2012 (each an "Interest Payment Date") and will be subject to optional and mandatory redemption prior to maturity as set forth under "THE BONDS - Redemption" herein. The Authority will loan the proceeds of the Bonds to New Plan Learning, Inc., an Ohio nonprofit corporation (the "Borrower"), pursuant to a Loan Agreement dated as of September 1, 2011 (the "Loan Agreement"), by and between the Authority and the Borrower to: (i) finance and refinance the acquisition, construction, improvement and equipping (the "Project") of certain charter or community school facilities (as more fully described herein, the "Facilities") to be operated by four charter schools described in APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" hereto (the "Financed Charter Schools"); (ii) fund a portion of the debt service reserve fund held under the Bond Indenture; (iii) fund a $1,000,000 deposit to the capital maintenance and operating fund held under the Bond Indenture (the "Capital Maintenance and Operating Fund"); (iv) fund a $500,000 deposit to the revenue fund held under the Bond Indenture (the "Revenue Fund"); (v) pay a portion of the interest on the Bonds; and (vi) pay costs of issuance of the Bonds. A bond reserve account (the "Bond Reserve Account") will be established under the Bond Indenture and will be held in the Revenue Fund by the Bond Trustee. The Bond Indenture establishes a minimum amount to be maintained in the Bond Reserve Account (the "Bond Reserve Fund Requirement"), which initially will be funded at maximum annual debt service on the Bonds ($3,173,568.78). See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - Definitions. The

Bond Reserve Account shall be used to make up any deficiency in the payment of principal, premium, if any, and interest on the Bonds. The Bond Reserve Account will be funded initially, in part, by NCB Capital Impact at $3,000,000. Bond proceeds in the amount of $173,568.78 will provide the remaining requirements. See "SECURITY AND SOURCES OF PAYMENT - Bond Indenture" herein. The Capital Maintenance and Operating Fund will be held by the Bond Trustee, and the Capital Maintenance and Operating Fund Requirement will be $1,000,000, which shall be used for capital items not budgeted as ordinary maintenance and repair costs and may be used to make up any deficiency in the Revenue Fund after application of all monies in the Bond Reserve Account. The Revenue Fund will be held by the Bond Trustee, and the Revenue Fund Requirement will be $500,000, which will be funded initially from the proceeds of the Bonds. Only moneys remaining in the Revenue Fund that are in excess of the Revenue Fund Requirement ($500,000), and subject to other transfer restrictions of the Bond Indenture described herein (see APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - BOND INDENTURE - Revenues - Allocation of Revenues"), may be transferred out of the Bond Indenture on a monthly basis to the Gross Revenue Fund held under the Master Trust Indenture but subject to the following order of priority: (i) to the Gross Revenue Fund held by the Borrower the amount of the Borrower's expenses allocable to the Financed Charter Schools not to exceed $150,000 in each fiscal year ending June 30th; and (ii) to the bond redemption fund held by the Bond Trustee under the Bond Indenture (the "Redemption Fund") 50% of any amount remaining in the Revenue Fund in excess of the Revenue Fund Requirement after the transfers described in (i) above, and to the Borrower for deposit in the Gross Revenue Fund the other 50% of any amount remaining in the Revenue Fund in excess of the Revenue Fund Requirement after the transfers described in (i) above. However, if certain Specified Events (defined herein) occur after July 1, 2012, all monies in excess of the Revenue Fund Requirement will be transferred to the Redemption Fund to redeem Bonds. See "THE BONDS – Redemption" herein.

**The Borrower**

New Plan Learning, Inc., an Ohio nonprofit corporation (the "Borrower") is a 501(c)(3) organization established in 2005 as a supporting organization for certain designated charter schools, including the Financed Charter Schools. The Borrower and the other members of the Obligated Group hold title to real estate that is leased to charter school organizations, including the Financed Charter Schools, for which the Borrower is a supporting organization. The Borrower is the Obligated Group Representative under the Master Indenture. See APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" herein. For certain financial information concerning the Borrower, see APPENDIX B - "FINANCIAL STATEMENTS OF THE BORROWER AND THE FINANCED CHARTER SCHOOLS." Certain unaudited, internally prepared financial information for the Borrower for the fiscal year ended June 30, 2011 is included in APPENDIX B. That unaudited financial information was not reviewed by, nor subjected to any procedures of, the independent auditors for the Borrower.

**The Obligated Group**

The Obligated Group consists of the Borrower, 250 Shoup Mill LLC and OG-Ohio LLC, each an Ohio limited liability company, the sole member of each of which is the Borrower, which controls those limited liability companies. The revenues of each Member of the Obligated Group are pledged under the Master Indenture to secure obligations issued thereunder, including Obligation No. 1 securing the Bonds. The Members of the Obligated Group own the four Facilities being financed or refinanced with the proceeds of the Bonds. Members of the Obligated Group are generally liable for obligations issued under the Master Indenture.

2

**The Facilities**

The Borrower will use the proceeds of the Bonds (i) to refinance existing debt and provide funds for rehabilitation and/or construction of new structures for two (2) charter school facilities in Dayton, Ohio and Toledo, Ohio, and (ii) to acquire and provide funds for the rehabilitation and/or construction of new structures at two (2) charter school facilities in Chicago, Illinois and Toledo, Ohio. These four charter school facilities are referred to herein as the "Facilities" and these four schools are referred to herein as the Financed Charter Schools. See APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" herein.

**Financed Charter Schools**

The Financed Charter Schools operate four charter or community schools at the Facilities. For more information regarding each of the Financed Charter Schools' operations and certain information about other charter schools in other facilities owned by other limited liability companies wholly owned by the Borrower, see APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" herein. Audited financial statements for each of the Financed Charter Schools for the fiscal year ended June 30, 2010 are included within APPENDIX B - "FINANCIAL STATEMENTS OF THE BORROWER AND THE FINANCED CHARTER SCHOOLS." In addition, unaudited, internally prepared income statements and balance sheets for the fiscal year ended June 30, 2011 are also included for each Financed Charter School in APPENDIX B - "FINANCIAL STATEMENTS OF THE BORROWER AND THE FINANCED CHARTER SCHOOLS." Those unaudited, internally prepared financial statements were not reviewed by, nor subjected to any procedures of, the independent auditors for those Financed Charter Schools.

The Facilities will be leased to the Financed Charter Schools for the operation of the Financed Charter Schools pursuant to separate Leases, which will be assigned to the Bond Trustee. The Financed Charter Schools are not Members of the Obligated Group, and therefore, are not a party to the Loan Agreement. While each Financed Charter School will enter into a separate Lease with a Member of the Obligated Group, the individual Financed Charter Schools will be responsible solely for their own Lease obligations and shall never be responsible to make Lease payments for another Financed Charter School. All of the Leases will be assigned to the Bond Trustee to secure all of the Bonds.

Copies of the audited financial statements for each of the Financed Charter Schools for the fiscal years ending June 30, 2009 and June 30, 2008 (except for Horizon Science Academy - Dayton High insofar as its first year of operation was fiscal year ending June 30, 2010)  may be obtained from the Underwriter during the underwriting period at: RBC Capital Markets, LLC, 2398 E. Camelback Road, Suite 700, Phoenix, Arizona 85016

**Security for the Bonds: the Bond Indenture and the Master Trust Indenture**

***The Bond Indenture***

Lease Payments.  The Base Rent and Additional Rent (each as defined in the Leases) payable under the Leases will be paid directly to the Bond Trustee for deposit in the Revenue Fund established under the Bond Indenture. See "SECURITY AND SOURCE OF PAYMENT FOR THE BONDS - Flow of Funds" herein. The terms of each Lease are substantially similar except for the amount of Base Rent payable and the Facility subject to each Lease. The terms of each of the Leases shall be 30 years for the Ohio Financed Charter Schools and 35 years for the Facility in Illinois that is leased to Chicago Math & Science Academy, however the Borrower expects to amend the Lease for the Facility in Illinois to a 30-

year term with a higher annual rent, and Borrower expects this amendment to occur after delivery of the Bonds.  The amount of annual Base Rent payable pursuant to all of the Leases will be, for the fiscal year starting July 1, 2014, approximately 120% of the annual debt service applicable to that portion of the Bonds allocable to the related Financed Charter School and escalating at 1% per year during the Lease term until annual Base Rent payments equal approximately 130% of the annual debt service on the portion of the Bonds allocable to the related Financed Charter School.  Such allocations have been established for the limited purpose of setting Base Rent payments on the Leases.  Initially, for the first year of the Lease term, the amount of annual Base Rent payable on the Facilities in Ohio will be less than the debt service applicable to that portion of the Bonds allocable to the related Ohio Facilities.  Capitalized interest funded with proceeds of the Bonds will be used to make up the deficiency between those Base Rent payments and debt service on the Bonds.  For the Facility in Illinois, the Base Rent payments will be in excess of debt service on the Bonds allocated to that Facility beginning with the very first year of its Lease term.  See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS - The Leases" and "– Certain Financial Covenants of Financed Charter Schools Under the Leases" and "APPENDIX A - INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS - DEBT SERVICE COVERAGES FOR THE BONDS AND LEASES" herein.

The Base Rent and Additional Rent payable under the Leases will be paid directly to the Bond Trustee under the Bond Indenture to make debt service payments on the Bonds and to replenish any special funds and accounts created under the Bond Indenture to the extent necessary to maintain the required levels of funding required by the Bond Indenture.  See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - BOND INDENTURE - Revenues - Allocation of Revenues."  Thereafter, any remaining monies may be transferred to the Gross Revenue Fund.  Lease payments will not be available to pay any other debt issued under the Master Indenture except to the extent they result in transfers from the Revenue Fund under the Bond Indenture to the Gross Revenue Fund under the Master Indenture after payment of debt service on the Bonds and meeting other requirements for transfers under the Bond Indenture.

The Bond Reserve Account and the IFF Debt Service Reserve Account.  The Bonds also will be secured by a Bond Reserve Account established under the Bond Indenture and held by the Bond Trustee.  The Bond Reserve Account will be funded in an amount equal to the Bond Reserve Account Requirement, which will be maximum annual debt service on the Bonds ($3,173,568.78).  $3,000,000 of the Bond Reserve Requirement will be funded by a credit enhancement from NCB Capital Impact ("NCBCI"), which will use funds from a federal credit enhancement program to provide the initial deposit to the Bond Reserve Account.  $173,568.78 of the Bond Reserve Requirement will be funded with proceeds of the Bonds.  In addition, under the Bond Indenture, the Bond Trustee will establish and maintain a reserve account (the "IFF Debt Service Reserve Account") in an initial amount equal to $1,000,000 that will be funded by IFF, an Illinois not-for-profit corporation ("IFF").  Monies in the IFF Debt Service Reserve Account may be used and withdrawn by the Bond Trustee to make-up any deficiency in the Bond Trustee-held accounts for the payment of principal and interest on the Bonds that results from a Base Rent payment default by the Chicago Math & Science Academy, one of the Financed Charter Schools, under its Lease.  THE IFF DEBT SERVICE RESERVE ACCOUNT IS NOT AVAILABLE TO FUND LEASE DEFICIENCIES OF THE OHIO CHARTER SCHOOLS.  Those funds from NCBCI and IFF had previously secured debts being refinanced with the proceeds of the Bonds.  See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS - The Master Indenture" and "– The Bond Indenture - Reserve Accounts under Bond Indenture" herein.

Most of the assets securing the Bonds will be held by the Bond Trustee under the Bond Indenture, including (i) an assignment of the Leases and Base Rent and Additional Rent payments thereunder,

(ii) the Bond Reserve Account and the IFF Debt Service Reserve Account, (iii) the Revenue Fund, and (iv) the Capital Maintenance and Operating Fund.

The Capital Maintenance and Operating Fund. $1,000,000 of the proceeds of the Bonds will be deposited in the Capital Maintenance and Operating Fund and will be available for capital and operating expenses, and if necessary, debt service on the Bonds. Each withdrawal from this Capital Maintenance and Operating Fund is required to be replenished over a 36 month period.

The Revenue Fund. $500,000 of proceeds of the Bonds will be deposited in the Revenue Fund, which shall be the minimum balance required to be maintained therein (the "Revenue Fund Requirement"). If at any time the amount in the Revenue Fund is less than the Revenue Fund Requirement, the Trustee will suspend payments from the Revenue Fund to the Gross Revenue Fund of the Master Indenture until such time as the amounts in the Revenue Fund equal or are greater than the Revenue Fund Requirement. In addition, after the Bond Trustee has applied the Revenues pursuant to the provisions of the Bond Indenture that direct the allocation of Revenues, if the Revenue Fund Requirement is then met after making all of those transfers, the Trustee will make monthly transfers of any amounts remaining in the Revenue Fund in excess of the Revenue Fund Requirement in the following amounts in the following order of priority: (i) to the Gross Revenue Fund held by the Borrower the amount of the Borrower's expenses allocable to the Financed Charter Schools not to exceed $150,000 in each fiscal year ending June 30th; and (ii) to the Redemption Fund 50% of any amount remaining in the Revenue Fund in excess of the Revenue Fund Requirement after the transfers described in (i) above, and to the Borrower for deposit in the Gross Revenue Fund the other 50% of any amount remaining in the Revenue Fund in excess of the Revenue Fund Requirement after the transfers described in (i) above. However, if certain Specified Events (defined herein) occur after July 1, 2012, all monies in excess of the Revenue Fund Requirement will be transferred to the Redemption Fund to redeem Bonds. See "THE BONDS – Redemption" herein.

**The Master Trust Indenture**

The Borrower will act as the "Obligated Group Representative" pursuant to a Master Indenture of Trust, dated as of September 1, 2011 (the "Master Indenture"), between Wells Fargo Bank, National Association, as master trustee (the "Master Trustee") and the Obligated Group. The obligations of the Borrower under the Loan Agreement will be secured by a master note designated as "New Plan Learning, Inc. Obligation No. 1" ("Obligation No. 1") issued under and pursuant to the Master Indenture and the related Supplemental Master Indenture for Obligation No. 1 dated as of September 1, 2011 ("Related Supplement No. 1" and together with indentures supplemental to, and authorized and executed pursuant to the terms of, the Master Indenture, the "Related Supplements") by the Borrower to the Master Trustee for the benefit of owners of the Bonds. Under the Master Indenture, the Bond Trustee, as holder of Obligation No. 1 for the benefit of owners of the Bonds, shall be entitled to any and all amounts available under the Master Indenture and Related Supplements, which consists primarily of a pledge of Gross Revenues (as defined herein) of the Obligated Group and Mortgages (as defined herein) on the Facilities that are granted by the applicable Member of the Obligated Group to the Master Trustee. The Gross Revenues of the Obligated Group are expected to consist primarily of (i) portions of the excess Lease payments transferred by the Bond Trustee to the Gross Revenue Fund under the Master Indenture after the Bond Trustee has paid debt service on the Bonds and the other special funds and accounts are funded at the levels required by the Bond Indenture, and (ii) distributions from other limited liability companies wholly owned by the Borrower, which lease property under leases to other charter schools that are not Financed Charter Schools. See "Other NPL Owned Facilities" below and APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" and "– OTHER NPL OWNED FACILITIES" herein.

**Purpose of the Master Indenture Structure; Limited Applicability to the Bonds**

The Bonds are the first debt to be issued under the Master Indenture and the Borrower intends to issue other debt thereunder, including bonds to refinance the other eight charter school facilities it owns in Ohio. All debt issued under the Master Indenture will be secured by the Gross Revenue Fund which is controlled by the Borrower and pledged to the Master Trustee. For the Bonds, however, the Borrower determined that it should provide enhanced security by assigning the primary security through the Leases, the Reserve Account, the Capital Maintenance and Improvement Fund and the Revenue Fund directly to the Bond Trustee so that future creditors will not have an interest in such collateral until after the Bonds are paid in full, except to the extent moneys are released from the Revenue Fund under the Bond Indenture. Furthermore, cash retained in the Revenue Fund and other accounts under the Bond Indenture will be held and controlled by the Bond Trustee as security only for the Bonds and not for any other debt that may be issued under the Master Indenture in the future. However, the Gross Revenue Fund also will secure the Bonds. It is the expectation of the Borrower that, over time, transfers from the Revenue Fund to the Gross Revenue Fund under the Master Indenture will become significant and permit the Borrower to issue future debt under the Master Indenture with fewer encumbrances on its revenues.

**Other NPL Owned Facilities**

Other limited liability companies having the Borrower as their sole member, which are not Members of the Obligated Group, own eight other charter school facilities in Cincinnati, Cleveland, Columbus, Lorain and Youngstown, Ohio, each of which is leased to a nonprofit charter school managed by Concept. Those limited liability companies are not members of the Obligated Group, and the Master Trustee does not have a mortgage on those properties or any interest in those leases except to the extent payments thereon are transferred to the Borrower and become part of the Gross Revenue Fund. See APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS - Other NPL Owned Facilities" herein.

**The Manager**

The manager for each of the Financed Charter Schools in the Facilities owned by members of the Obligated Group is Concept Schools NFP ("Concept" or the "Manager"), an Illinois nonprofit corporation formed in 2002 to operate charter schools in the Midwest. As of the end of the 2011 school year, the Manager managed 25 charter schools in five states, including the four Financed Charter Schools and eight other charter schools in Ohio whose facilities are owned by limited liability companies wholly owned by the Borrower. See APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" herein. The Financed Charter Schools rely on Concept for many aspects of their operations. The obligations of the Financed Charter Schools to pay management fees to Concept are expressly subordinate in the Management Agreements (defined herein) to Lease payments and expenses of the Financed Schools. In the event a Financed Charter School defaults under its Lease by failing to pay rent, the obligation of the Financed Charter School to pay Concept's management fee shall be temporarily suspended until such default has been cured and the Financed Charter School shall receive a temporary refund from Concept within ten (10) days of written notice from the Financed Charter School to Concept. The temporary refund will be in an amount necessary to cure such Lease payment default, provided such refund amount shall not exceed the total fees received by Concept from such Financed Charter School during the then current fiscal year of such Financed Charter School. The temporary refund shall be made by Concept to the Bond Trustee to the extent permitted by law, and if not permitted by law, then made by Concept to such Financed Charter School and then immediately delivered to the Bond Trustee by the Financed Charter School. Any management fees temporarily suspended or refunded will remain due and payable

by the Financed Charter School to Concept, but shall only be payable upon and after the cure of the Lease default. So long as such amounts remain unpaid, any unpaid balance shall accrue interest daily at a rate of 5.00% per annum. See APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS – The Management Agreements."

## THE AUTHORITY

The Authority is a nonprofit corporation designated a political subdivision of the State of Arizona (the "State") incorporated with the approval of Pima County, Arizona (the "County"), pursuant to the provisions of the Constitution of the State of Arizona and the Act. The Authority has no taxing power. The Authority is empowered to issue bonds to provide funds for the financing or refinancing of the costs of the acquisition, construction, improvement, rehabilitation and equipping of a "project", as defined in the Act, including education facilities for community and charter schools, such as the Financed Charter Schools.

The Authority does not have the power to pledge its general credit. The Authority does not have the power to pledge the general credit or taxing power of the State of Arizona or of any political subdivision thereof, including, but not limited to, the County.

The Authority is governed by a Board of Directors selected by the Board of Supervisors of the County. The Authority does not employ any staff to carry out its limited functions, and it contracts with independent third parties to do so. The Authority does not, and will not in the future, monitor the financial condition of the Borrower, the Financed Charter Schools or the Obligated Group, the operation of the Facilities or rent payments under the Leases or otherwise monitor payment of the Bonds or compliance with the documents relating thereto. The responsibility for the operation of the Facilities and payment of debt service on the Bonds will rest entirely with the Obligated Group.

The Bonds are special limited obligations of the Authority. No recourse by any Holder of the Bonds will be had for the payment of the principal, premium, if any, or interest on any of the Bonds or for any claim based thereon or upon any obligation, covenant, or agreement in the Bond Indenture and the Loan Agreement or against any past, present, or future officer, director, counsel, advisor or agent of the Authority or any successor thereto, as such, directly or through the Authority or any successor thereto, under any rule of law or equity, statute or constitution, or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officer, director, counsel, advisor or agent as such has been expressly waived as a condition of and in consideration of the execution of the Bond Indenture, the Loan Agreement and the issuance of the Bonds.

Under the financing contemplated hereby, the Authority has no obligations with respect to the Bonds, the Facilities or the Project after the issuance of the Bonds, as the Bond Trustee will have primary responsibility to enforce compliance with the Bond Indenture and the Loan Agreement. The Master Trustee will have primary responsibility to enforce compliance with the Master Indenture and the Mortgages. All payments made pursuant to the Loan Agreement will be made directly to the Bond Trustee for disbursement to the Bondholders. The Authority neither has nor assumes responsibility for any information in this Official Statement, except for the information under this caption and the caption "ABSENCE OF MATERIAL LITIGATION - The Authority."

## PROGRAM ADMINISTRATION

### General

The Borrower will enter into a Program Administration and Disbursement Agreement dated as of September 1, 2011 (the "Program Administration Agreement") with Community Investment Corporation (the "Program Administrator"). The Program Administrator is an Arizona nonprofit corporation with a governing board composed of three members, two of who must be members of the board of directors of the Authority.

### Program Administration Agreement

Under the Program Administration Agreement, the Borrower will pay the Program Administrator an initial fee of $1,500 and an annual fee of $18,000 and in exchange therefor the Program Administrator shall provide services to the Borrower, which include, among other services, acting as the dissemination agent for Borrower and the other "Obligated Persons" pursuant to their continuing disclosure obligations respecting the Bonds, inspection of the Facilities, and review of construction and renovations disbursement requests from the Project Fund for improvements to the Facilities pursuant to the disbursing procedures of the Loan Agreement.

### Assignment of Administration Obligations

The Program Administrator may, with the prior written consent of the Borrower, assign all of its administration rights and obligations to another qualified program administrator who must assume the administration obligations set forth in the Program Administration Agreement for the same administration fee. The Program Administrator will be responsible for (i) reviewing the Facilities documentation for compliance with the requirements and conditions precedent set forth in the Bond Indenture and Loan Agreement prior to approving the Borrower's draw request for funds and (ii) assisting the Borrower, Members of the Obligated Group, and the Financed Charter Schools with the disclosure and information reporting requirements as set forth in the Bond Indenture, the Loan Agreement, the Leases and the Continuing Disclosure Agreement.

### Continuous Service

The Program Administrator shall perform its duties until the principal of, premium, if any, and interest on the Series 2011 Bonds have been paid in full or such administration duties are terminated.

## THE PROJECTS

The Projects are comprised of the refinancing and financing of the acquisition, construction, improvement and equipping of the Facilities. When complete, the Facilities will provide capacity to serve a total of approximately 2,060 students. See APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" herein for certain information about each of the Facilities not set forth below.

### Use of Funds

Of the four Facilities or "campuses" being financed with the proceeds of the Bonds,

- one, the Chicago Math & Science Academy, will be acquired by the Borrower with proceeds of the Bonds and thereafter Bond proceeds will be used to construct a new gymnasium addition to that Financed Charter School,

- one, the Horizon Science Academy - Toledo High, will be acquired by OG-Ohio LLC, a Member of the Obligated Group, with proceeds of the Bonds and thereafter Bond proceeds will be used to make renovations, and

- two others, Horizon Science Academy - Dayton High and Horizon Science Academy - Springfield will be refinanced with proceeds of the Bonds and thereafter proceeds will be used to make renovations.

<u>Computation of Lease Payments</u>

In establishing Lease payments for each of the Financed Charter Schools, Base Rent payable under each Lease will be established as a portion of the annual debt service on the Bonds, increasing annually after fiscal year 2013.  The principal amounts of Bonds used to set Base Rent payments for the Lease for each Facility are set forth below:

| Name | Location | Type | Bond Amount |
|------|----------|------|-------------|
| Chicago Math & Science Academy | Chicago, IL | Finance acquisition and new money | $12,810,000 |
| Horizon Science Academy - Springfield | Toledo, OH | Refinance and new money | 6,110,000 |
| Horizon Science Academy - Toledo High | Toledo, OH | Finance acquisition and new money | 6,850,000 |
| Horizon Science Academy - Dayton High | Dayton, OH | Refinance and new money | 7,350,000 |
| | | Total | $33,120,000 |

Notwithstanding the foregoing allocations, the Bonds are equally secured by the trust estate, including the Leases.  Once Lease payments are received by the Bond Trustee into the Revenue Fund, those Lease payments will be applied in accordance with the Bond Indenture, including to make debt service payments on the Bonds without regard to the Financed Charter School from whom those Lease payments were received.

<u>Renovations and Additions</u>

*The Architect and Construction Manager for Ohio Financed Charter Schools.*  It is expected that rehabilitation of the Facilities in Ohio will commence at various times within four (4) months following the date of issuance of the Bonds and will be managed by the Borrower and the design builder, Star Consultants, Columbus, Ohio (the "Design-Builder").

Established in July 1997, the Design-Builder is a multi-disciplinary professional Architectural/Engineering design-build group offering a broad variety of professional architectural and engineering and construction services.  The Design-Builder has extensive experience (an average of 24 years per person on the professional staff) in working with phased construction on occupied facilities and on new facilities.  Its team of 20 professionals includes architects and structural, civil, mechanical, and electrical engineers and construction management professionals.  The Design-Builder has had extensive experience with institutions, colleges, schools, office buildings, retail, and industrial facilities from simple remodeling to complex renovations.

9

The Design-Builder will competitively bid the major subcontracts using a process similar to typical public construction projects whereby it will advertise for bids in the local newspapers and construction trade publications, hold a pre-bid conference, accept pre-bid requests for clarification and then open sealed bids at the time and date set for bid opening. The Design-Builder expects to award those major subcontracts to the lowest bidder who is also a responsible bidder capable of completing its subcontract work on time and within budget.

*Horizon Science Academy - Springfield.*   The campus for the Horizon Science Academy - Springfield is located on a 1.87 acre site and includes 33,149 square feet of building space. The building was originally a social club and the school is currently utilizing 22,000 square feet of total building space. The renovations to be financed with the proceeds of the Bonds will add 6 more classrooms on the second floor and will also construct a new gymnasium. The building space at full capacity will include 18 classrooms, art room, labs, offices, a cafeteria and a gymnasium. The total cost of the project is approximately $5,238,791, including the refinancing of the current mortgage of approximately $2,497,000.

*Horizon Science Academy - Toledo High.*   The campus for Horizon Science Academy - Toledo High will be relocating to a new building on a 5.20 acre site that will include 58,167 square feet of closed building space. The building space at full capacity will include 28 classrooms, an art room, labs, offices, a cafeteria and a standard size gymnasium. The total cost of the project for this phase is approximately $5,650,073, which includes approximately $1,485,000 in acquisition costs.

*Horizon Science Academy - Dayton High.*   The campus for Horizon Science Academy - Dayton High is located on a 3.77 acre site and includes 41,050 square feet of building space. The building was originally a retail store and 29,600 square feet of total building space was converted to school use in the first phase of the project in summer 2009. The proceeds of the Bonds will be used to fund renovation of the remaining 11,450 square feet of building space along with an 8,800 square foot ground-up gymnasium addition and purchase of 3.26 acres of adjacent green space will complete the project in the second phase. The building space at full capacity will be 49,850 square feet on a 7.03 acre site and will include 28 classrooms, an art room, labs, offices, a cafeteria, a standard size gymnasium, and outdoor athletic fields. The total cost of the project is approximately $6,301,647, including the refinancing of the current mortgage of approximately $3,343,070.

*Chicago Math & Science Academy.* The campus for the Chicago Math & Science Academy is located on an approximate 2 acre site and includes 41,779 square feet of building space. The property is currently owned by the Chicago Math & Science Academy. It is expected that Bond proceeds will be used to acquire the building from the Chicago Math & Science Academy and to finance the construction of a new 9,775 square feet gymnasium. There will be no other improvements to the property and building capacity will remain the same at 599 students. The total cost of the project is approximately $11,760,107, which includes approximately $10,201,116 in the acquisition costs. The Borrower engaged CR/Daccord, Inc., Chicago, Illinois, to provide preconstruction services including a conceptual design budget for the new gymnasium, which includes hard costs, soft costs, FFE, financing costs and contingency. CR/Daccord, Inc. served as project coordinator on the prior renovations of the Chicago Math & Science Academy, and is familiar with that campus and the requirements of the Chicago Math & Science Academy. CR/Daccord, Inc. has 30 years of public and private sector construction experience and has worked on approximately 17 new school projects and 135 renovation projects since 1993. The Borrower expects to hire a design-builder to construct the new gymnasium and will require that design-builder to bid the major subcontracts pursuant to the process described above for the Financed Charter Schools in Ohio.

**Appraisals**

Upon the closing of the Bonds, the Members of the Obligated Group will own the following Facilities with the following "completed" appraised values:

| Facility | Date of Appraisal | Appraiser | Value as Completed |
|---|---|---|---|
| Chicago Math & Science Academy | August 9, 2010 | Cornerstone Realty Advisors, Inc., Chicago, Illinois | $11,000,000 |
| Horizon Science Academy - Springfield | June 25, 2010 | Integra Realty Resources, Cincinnati, Ohio | $2,800,000 |
| Horizon Science Academy - Toledo High | June 24, 2010 | Integra Realty Resources, Cincinnati, Ohio | $5,300,000 |
| Horizon Science Academy - Dayton High | June 28, 2010 | Integra Realty Resources, Cincinnati, Ohio | $4,800,000 |
| | | Total Appraised Value: | $23,900,000 |

*The total "completed" appraised value of the Facilities to be financed with the Bonds is significantly less than the principal amount of the Bonds, so that, if liquidated, their sale values are not expected to be sufficient to pay the Bonds in full.*

Limitations on Appraisals. Real estate appraisals estimate the fair market value of property at one point in time based on a number of assumptions and limiting conditions described therein. There can be no assurance, however, that the Master Trustee could realize the estimated values set forth above upon the sale of any of the Facilities following an event of default. Copies of the Appraisals may be obtained from the Underwriter during the underwriting period from RBC Capital Markets, LLC, 2398 E. Camelback Road, Suite 700, Phoenix, Arizona 85016.

**Environmental Reports and Status**

The Borrower has commissioned Phase I environmental site assessments (the "Phase I Reports") on each of the Facilities prior to construction to ascertain the risks of environmental contamination. Below is a listing of the dates of the environmental reports and the name of the provider thereof for each Facility:

| Facility | Date of Report | Type of Report | Firm |
|---|---|---|---|
| Chicago Math & Science | April 1, 2005 | Phase I | Gabriel Environmental Services Chicago, Illinois |
| Horizon Science Academy - Springfield | May 18, 2010 | Phase I | Partner Engineering and Science, Inc. El Segundo, California |
| Horizon Science Academy - Toledo High | May 20, 2010 | Phase I | Partner Engineering and Science, Inc. El Segundo, California |
| Horizon Science Academy - Dayton High | June 21, 2010 | Phase I | Peak Environmental Consulting Inc. Fort Collins, Colorado |

For the Horizon Science Academy - Springfield, Horizon Science Academy - Toledo High, and Horizon Science Academy - Dayton High, no recognized environmental conditions ("RECs") were reported in the Phase I reports. Some of these reports identified "environmental issues" related to the age

11

of the building and the possibility of the buildings containing "asbestos containing materials" or "ACMs", but did not identify ACMs as a REC.

With respect to the Chicago Math & Science Academy, during the on-site inspection, the environmental consultant noted RECs that included: (i) ACMs containing materials in painted plasters, insulated piping in the boiler room, vinyl tiles and the mastics underneath tiles, and suspended ceiling tiles; (ii) evidence of a permit dating back to the 1930s indicating there was a 750 gallon "paint vault" on the west wall of the building (although there was no physical evidence of any such "paint vault"); (iii) evidence of a fill port for a single fuel oil UST and an insurance map dating back to the 1930s indicating the possible presence of 3 gasoline USTs; and (iv) the possible presence of 4 solvent USTs and a solvent storage room on the property immediately north and adjacent to the Chicago Math & Science Academy.  Pursuant to Gabriel Environmental Science's Phase II report dated April 1, 2005, that environmental consultant conducted further testing and determined that the paint vault and offsite USTs were no longer of a concern. Pioneer Engineering & Environmental Services, Inc., Chicago, Illinois provided follow-up work on 3 different occasions relative to the initial Phase 1 dating back to 2005. First, it provided a demolition/renovations asbestos inspection and report dated November 18, 2008 to assist in identifying the removal and/or remediation in place of the asbestos containing materials.  Those recommendations were followed in connection with the renovation of the building.  Next, Pioneer provided a soils & asbestos summary report dated April 7, 2009.  In that report, it determined that based upon its testing, no gasoline USTs were found but 1 fuel oil UST was found, and it recommended removal of that fuel oil UST.  Further, it identified some areas with ACMs, including insulation in the boiler room, some tiles in various closets of the building and within some roof materials.   The recommendations to remove those ACMs were followed.  Finally, Pioneer issued a report dated June 19, 2009 relating to the removal of the 1 fuel oil UST wherein it reported that it provided oversight of the removal of that UST and subsequent soils testing around that UST.  Based upon the relatively good condition of the tank and the effective removal, Pioneer determined that it was a "No Release" and no further regulatory requirements applied.

With respect to the Horizon Science Academy - Toledo High Facility, during the on-site inspection, the environmental consultant noted mold growth on the walls and ceilings throughout the subject property building. The environmental consultant did not identify such mold growth as a REC. Based on the presence of mold in the subject property buildings, the environmental consultant recommended a mold survey be conducted in order to determine the quantity and species of mold present. OG-Ohio LLC, the owner of that Facility and a Member of the Obligated Group, intends to accept the recommendation of the environmental consultant and intends to address any and all mold related matters during renovations.

In each instance, each site with an older structure located on it that will be demolished and renovated gives rise to potential ACMs and lead-based paint issues.  The Member of the Obligated Group that owns the particular Facility will adopt an O&M plan for handling asbestos and lead-based paint issues with respect to that demolition and/or renovation.

*Copies of the environmental assessment reports may be obtained from the Underwriter during the underwriting period at: RBC Capital Markets, LLC, 2398 E. Camelback Road, Suite 700, Phoenix, Arizona 85016.*

## ESTIMATED SOURCES AND USES OF FUNDS

The following table sets forth the estimated sources and uses of funds related to the Bonds.

**Sources of Funds**

| | |
|---|---|
| Series 2011A Bond Principal | $32,575,000 |
| Series 2011B Bond Principal | 545,000 |
| Net Original Issue Discount for the Bonds | (204,044) |
| NCBCI Contribution | 3,000,000 |
| IFF Contribution | 1,000,000 |
| **Total** | **$36,915,956** |

**Uses of Funds**

| | |
|---|---|
| Project Fund | $28,950,618 |
| Revenue Fund | 500,000 |
| Capital Maintenance and Operating Fund | 1,000,000 |
| Bond Reserve Account | |
|     Bond Reserve Subaccount | 173,569 |
|     NCBCI Reserve Subaccount | 3,000,000 |
| IFF Debt Service Reserve Account | 1,000,000 |
| Capitalized Interest Account | 1,105,079 |
| Costs of Issuance[1] | 1,186,690 |
| **Total** | **$36,915,956** |

[REMAINDER OF THIS PAGE IS BLANK]

---

[1] Includes legal, printing, rating, underwriting discount and other miscellaneous costs of issuance.

## DEBT SERVICE SCHEDULE

The annual debt service payment requirements of the Bonds are set forth in the table below.

| Year Ending July 1 | Principal | Interest | Total |
|---|---|---|---|
| 2012 | $    -0- | $2,132,912.83 | $2,132,912.83 |
| 2013 | -0- | 2,620,643.78 | 2,620,643.78 |
| 2014 | -0- | 2,620,643.78 | 2,620,643.78 |
| 2015 | 215,000 | 2,620,643.78 | 2,835,643.78 |
| 2016 | 235,000 | 2,600,218.78 | 2,835,218.78 |
| 2017 | 255,000 | 2,577,893.78 | 2,832,893.78 |
| 2018 | 275,000 | 2,557,668.78 | 2,832,668.78 |
| 2019 | 295,000 | 2,538,418.78 | 2,833,418.78 |
| 2020 | 315,000 | 2,517,768.78 | 2,832,768.78 |
| 2021 | 340,000 | 2,495,718.78 | 2,835,718.78 |
| 2022 | 700,000 | 2,471,918.78 | 3,171,918.78 |
| 2023 | 755,000 | 2,417,668.78 | 3,172,668.78 |
| 2024 | 810,000 | 2,359,156.28 | 3,169,156.28 |
| 2025 | 875,000 | 2,296,381.28 | 3,171,381.28 |
| 2026 | 945,000 | 2,228,568.78 | 3,173,568.78 |
| 2027 | 1,015,000 | 2,155,331.28 | 3,170,331.28 |
| 2028 | 1,095,000 | 2,076,668.78 | 3,171,668.78 |
| 2029 | 1,175,000 | 1,991,806.28 | 3,166,806.28 |
| 2030 | 1,265,000 | 1,900,743.78 | 3,165,743.78 |
| 2031 | 1,365,000 | 1,802,706.28 | 3,167,706.28 |
| 2032 | 1,470,000 | 1,696,918.78 | 3,166,918.78 |
| 2033 | 1,590,000 | 1,582,993.78 | 3,172,993.78 |
| 2034 | 1,705,000 | 1,459,768.78 | 3,164,768.78 |
| 2035 | 1,840,000 | 1,327,631.28 | 3,167,631.28 |
| 2036 | 1,980,000 | 1,185,031.28 | 3,165,031.28 |
| 2037 | 2,145,000 | 1,024,156.26 | 3,169,156.26 |
| 2038 | 2,315,000 | 849,875.02 | 3,164,875.02 |
| 2039 | 2,505,000 | 661,781.26 | 3,166,781.26 |
| 2040 | 2,710,000 | 458,250.02 | 3,168,250.02 |
| 2041 | 2,930,000 | 238,062.52 | 3,168,062.52 |
| Total | $33,120,000 | $57,467,951.13 | $90,587,951.13 |

## THE BONDS

The following is a summary of certain provisions of the Bonds.  Reference is made to the Bonds for the complete text thereof and to the Bond Indenture for all of the provisions relating to the Bonds. The discussion herein is qualified by such reference.

**General**

The Bonds are being issued pursuant to the Bond Indenture securing the Bonds in the aggregate principal amount set forth on the cover of this Official Statement.  The Bonds will be delivered as registered Bonds in denominations of $5,000 and any amounts in excess thereof in even $5,000 increments.  The Bonds will be dated the date of issuance and will bear interest at the rate set forth on the

14

inside cover page hereof from their dated date. Interest on the Bonds will be calculated on the basis of a 360-day year of twelve 30-day months and will be payable in arrears on each January 1 and July 1, commencing January 1, 2012 (each an "Interest Payment Date"). The Bonds will mature in the amounts and in each of the years as set forth on the inside cover page hereof.

The Bonds, when issued, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), and will be evidenced by one Bond for each maturity in the total aggregate principal amount of the Bonds of such maturity. Registered ownership of the Bonds, or any portion thereof, may not thereafter be transferred except as set forth in the Bond Indenture. So long as Cede & Co. is the registered owner of the Bonds, as nominee of DTC, references herein to the bondholders, holders or registered owners will mean Cede & Co. as aforesaid and will not mean the "beneficial owners" of the Bonds.

The principal of and interest on the Bonds will be payable in lawful money of the United States of America upon surrender at the principal corporate trust office of the Bond Trustee. The interest on any Bond will be payable to the person whose name appears on the registration books of the Bond Trustee as the registered owner thereof as of the close of business on the fifteenth day of the calendar month prior to each month in which an Interest Payment Date occurs, whether or not a Business Day (the "Record Date"), such interest to be paid by check mailed by first class mail, postage prepaid, on the Interest Payment Date, to the registered owner at his or her address as it appears on such registration books. Notwithstanding the foregoing, however, any holder of all the Bonds and any holder of $1,000,000 or more in an aggregate principal amount of the Bonds will be entitled to receive payments of interest on the Bonds held by it by wire transfer of immediately available funds to such bank or trust company located within the United States of America as such other holder will designate in writing to the Bond Trustee by the first Record Date for such payment. So long as Cede & Co. is the registered owner of the Bonds, principal of and interest on the Bonds are payable in same day funds by the Bond Trustee to Cede & Co., as nominee for the Depository.

Any interest not punctually paid or duly provided for will thereafter cease to be payable to the bondholder on such Record Date and will be paid to the person in whose name the Bond is registered at the close of business on the date established by the Bond Trustee pursuant to the Bond Indenture as a record date for the payment of defaulted interest on the Bonds (the "Special Record Date"). The Special Record Date will be fixed by the Bond Trustee, notice thereof being given to the bondholders not less than 10 days prior to such Special Record Date.

**Book-Entry Only System**

The DTC will act as securities depository for the Bonds. The Bonds will be issued as fully registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully registered certificate will be issued for the Bonds set forth on the inside cover of this Official Statement, and will be deposited with DTC. For additional information regarding DTC and its book-entry only system, see APPENDIX E - "BOOK-ENTRY SYSTEM" herein.

**Transfer and Exchange of Bonds**

The registration of any Bond may, in accordance with its terms, be transferred, upon the books required to be kept pursuant to the provisions of the Bond Indenture, by the person in whose name it is registered, in person or by his or her duly authorized attorney, upon surrender of such Bond for cancellation, accompanied by delivery of a written instrument of transfer in a form acceptable to the Bond Trustee, duly executed. The Bond Trustee will require the payment by the holder requesting such transfer

of any tax or other governmental charge required to be paid with respect to such transfer, and there will be no other charge to any holder for any such transfer.

Bonds may be exchanged at the principal corporate trust office of the Bond Trustee for a like aggregate principal amount of the Bonds of the same maturity of other authorized denominations.  The Bond Trustee will require the payment by the holder requesting such exchange of any tax or other governmental charge required to be paid with respect to such exchange, and there will be no other charge to any holder for any such exchange.

## Redemption

The Bonds are subject to redemption prior to stated maturity as noted below.

*Optional Redemption.*  The Bonds maturing after July 1, 2021 are subject to redemption prior to their respective stated maturities, at the option of the Authority (which option will be exercised upon request of the Borrower), from any source of available funds, in whole or in part (in such maturities as may be specified by the Borrower or, if the Borrower fails to specify such maturities, in inverse order of maturity, and by lot within a maturity) on any date on or after July 1, 2021, at 100% of the principal amount of the Bonds to be redeemed, together with accrued interest to the date fixed for redemption.

*Mandatory Sinking Fund Redemption.*  The Bonds are "term bonds" (shown below) and are also subject to redemption prior to their stated maturity in part, by lot, from Mandatory Sinking Account Payments established pursuant to the Bond Indenture on each July 1 at the principal amount thereof together with interest accrued thereon to the date fixed for redemption set forth below, without premium. The term Bonds will be redeemed (or paid at maturity, as the case may be) by application of Mandatory Sinking Account Payments in the following amounts and on the following dates:

| $1,385,000 Series 2011A Term Bonds Maturing July 1, 2021 | | $16,605,000 2011A Term Bonds Maturing July 1, 2035 | |
| --- | --- | --- | --- |
| Mandatory Sinking Account Payment Date | Principal Amount | Mandatory Sinking Account Payment Date | Principal Amount |
| July 1, 2017 | $160,000 | July 1, 2022 | $700,000 |
| July 1, 2018 | 275,000 | July 1, 2023 | 755,000 |
| July 1, 2019 | 295,000 | July 1, 2024 | 810,000 |
| July 1, 2020 | 315,000 | July 1, 2025 | 875,000 |
| July 1, 2021[†] | 340,000 | July 1, 2026 | 945,000 |
| | | July 1, 2027 | 1,015,000 |
| | | July 1, 2028 | 1,095,000 |
| | | July 1, 2029 | 1,175,000 |
| | | July 1, 2030 | 1,265,000 |
| | | July 1, 2031 | 1,365,000 |
| | | July 1, 2032 | 1,470,000 |
| | | July 1, 2033 | 1,590,000 |
| | | July 1, 2034 | 1,705,000 |
| | | July 1, 2035[†] | 1,840,000 |

[†] Maturity Date

| $14,585,000 Series 2011A Term Bonds Maturing July 1, 2041 | | $545,000 Series 2011B Term Bonds Maturing July 1, 2017 | |
|---|---|---|---|
| Mandatory Sinking Account Payment Date | Principal Amount | Mandatory Sinking Account Payment Date | Principal Amount |
| July 1, 2036 | $1,980,000 | July 1, 2015 | $215,000 |
| July 1, 2037 | 2,145,000 | July 1, 2016 | 235,000 |
| July 1, 2038 | 2,315,000 | July 1, 2017[†] | 95,000 |
| July 1, 2039 | 2,505,000 | | |
| July 1, 2040 | 2,710,000 | | |
| July 1, 2041[†] | 2,930,000 | | |

[†] Maturity Date

*Extraordinary Optional Redemption from Insurance and Condemnation Proceeds or Following the Sale of a Facility following Termination or Default under a Lease.* The Bonds are subject to redemption prior to their respective stated maturities, at the option of the Authority (which option shall be exercised as directed by the Borrower) as a whole or in part (in such maturities as may be specified by the Borrower or, if the Borrower fails to specify such maturities, in inverse order of maturity, and by lot within a maturity) on any date, from insurance proceeds with respect to, or from condemnation awards from the taking of, or sale proceeds from sales consummated under threat of condemnation of, property of any Member of the Obligated Group, or following the termination or default under any Lease, at the principal amount thereof and interest accrued thereon to the date fixed for redemption, without premium.

*Extraordinary Construction-Related Optional Redemption.* The Bonds are subject to redemption in part prior to their stated maturity, at the option of the Borrower, on any date from amounts transferred from the Project Fund (i) following Completion (which means satisfaction of all of the conditions to completion of the new construction or rehabilitation projects as described in the Loan Agreement including delivery of the Completion Certificate) of one or more Facilities, or (ii) if there is a failure to complete a portion of the Project on or prior to its scheduled completion date.

*Extraordinary Optional Redemption Because of Charter Termination or Otherwise.* The Bonds are subject to redemption prior to their stated maturity, at the option of the Authority (which option shall be exercised as directed by the Borrower) as a whole or in part at a redemption price equal to the principal amount thereof together with interest accrued thereon to the date fixed for redemption, without premium (i) if the Borrower delivers a certificate to the Bond Trustee to the effect that a Financed Charter School has ceased to operate as a charter or community school under the applicable state charter school law, or otherwise, and (ii) by delivery to the Bond Trustee for deposit in the Redemption Fund of amounts sufficient to defease a principal amount of the Bonds (selected among all the Bond maturities on a pro rata basis and by lottery within a maturity) equal to the amount of Bond proceeds allocated to that Financed Charter School less a prorata portion (based upon the allocation to the initial par amount of the Bonds) of the principal of the Bonds previously redeemed or paid prior to the date set for redemption.

*Extraordinary Optional Redemption Because of Permitted Lease Amendments.* In the Loan Agreement, the Borrower covenants and agrees that the Members of the Obligated Group and the Financed Charter Schools will not amend any of the Leases unless (1) in the opinion of nationally recognized bond counsel, such amendment is necessary to preserve the exclusion of interest on the Series 2011A Bonds from gross income for purposes of federal income taxation or the exemption of interest on the Series 2011A Bonds from State of Arizona income taxation or the ability of the Borrower to issue other obligations the interest income on which is likewise exempt from federal or State of Arizona income taxation; (2) in the opinion of counsel, such amendment, modification or termination will not materially

17

adversely affect the interests of the Bondholders or result in any material impairment of the security hereby given for the payment of the Bonds; or (3) the Holders of a majority in principal amount of the Bonds then outstanding consent in writing to such amendment, modification or termination.  Under the Loan Agreement, no amendment, modification or termination of the Leases may reduce the amount of loan repayments to be made to the Authority or the Bond Trustee by the Borrower pursuant to the Loan Agreement, or extend the time for making such payments, without the written consent of all of the Holders of Bonds then outstanding.  The Bonds are subject to redemption prior to their stated maturity, at the option of the Authority (which option shall be exercised as directed by the Borrower) as a whole or in part at a redemption price equal to the allocable amount of principal redeemed corresponding to any reduction in base rent on the related Lease because of a permitted amendment to such Lease.

*Extraordinary Mandatory Redemption Because of Default on Lease.*  The Bonds are subject to mandatory redemption prior to their stated maturity following an event of default under any Lease in an amount equal to the principal amount of the Bonds allocated to that Lease outstanding on the redemption date thereof related to such Financed Charter School plus accrued interest thereon.  The par amount of Bonds to be redeemed will be that initial principal amount of the Bonds allocated to that Financed Charter School less a prorata portion of the principal amount of Bonds previously redeemed by mandatory sinking fund redemption prior to the redemption date; provided, however, that such prepayment may, at the option of the Borrower, be affected from time to time from excess amounts in the Revenue Fund pursuant to the Bond Indenture.  Upon the default by any Financed Charter School in the due and punctual payment of base rents under the related Lease, the Bond Trustee will not transfer any amounts from the Revenue Fund to the Gross Revenue Fund established by the Master Indenture but held by the Borrower until (a) such Financed Charter School cures the default or (b) the allocable amount of outstanding Bonds related to such Lease is redeemed.

*Cash Flow and Specified Event Redemptions.*  The Bonds are subject to redemption prior to their stated maturity, in whole or in part, on July 1 of each year from amounts transferred from the Revenue Fund in the form of cash flow redemptions or specified event redemptions pursuant to the Bond Indenture at a redemption price equal to the principal amount thereof together with interest accrued thereon to the date fixed for redemption, without premium.

After the Bond Trustee has applied the Revenues pursuant to the provisions of the Bond Indenture that direct the allocation of Revenues, if the Revenue Fund Requirement is then met after making all of those transfers, and after first making distributions to the Gross Revenue Fund of the Borrower's allocated expenses associated with the Financed Charter Schools, not to exceed $150,000 during any fiscal year ending June 30th, the Trustee will make monthly transfers of 50% of any amounts remaining in the Revenue Fund in excess of the Revenue Fund Requirement to the bond redemption fund (the "Redemption Fund") held by the Bond Trustee under the Bond Indenture (each a "Cash Flow Redemption").

The foregoing notwithstanding, after July 1, 2012 upon the occurrence and continuation of any of the events set forth below ("Specified Events"), after the Bond Trustee has applied the Revenues pursuant to the provisions of the Bond Indenture that direct the allocation of Revenues each month, the Trustee shall not transfer any amounts to the Borrower as described in the immediately prior paragraph but shall transfer all amounts remaining in the Revenue Fund in excess of the Revenue Fund Requirement to the Redemption Fund to be applied as set forth below:

(1)   immediately upon the failure of the Obligated Group Representative to achieve the required Aggregate Corporate Debt Service Coverage Ratio (defined herein) (i.e. 1.20:1.0), to the Redemption Fund to redeem Bonds;

(2)      60 days following the failure of the Obligated Group Representative to achieve the required operating reserve level (i.e. 12% of Aggregate Corporate Revenues based upon the immediately succeeding fiscal year for which audited financial statements are available) as reported in an Officer's Certificate to be provided on substantially the same day of each calendar quarter, unless the Borrower delivers to the Bond Trustee an Officer's Certificate stating that such deficiency has been cured, to the Redemption Fund to redeem Bonds;

(3)      (a) 60 days following a School's failure to achieve an operating reserve of at least 12% of Operating Expenses (based upon the immediately succeeding fiscal year for which audited financial statements are available) as reported in a certificate to be provided by the School on substantially the same day each calendar quarter, unless such School delivers to the Bond Trustee a certificate that such deficiency has been cured, or (b) immediately upon a School's failure to achieve an operating reserve level of at least 8.3% of Operating Expenses (based upon the immediately succeeding fiscal year for which audited financial statements are available) as reported in a certificate to be provided by the School on substantially the same day each calendar quarter, to the Redemption Fund to redeem Bonds;

(4)      60 days after a payment default by a School under a Lease which has not been cured, to the Redemption Fund to redeem Bonds until an Allocable Amount of Bonds for the Facilities related to such Lease default has been redeemed from such funds or other funds paid by the Borrower pursuant to the Loan Agreement.

Upon the cure or resolution of each of the Specified Events, the Trustee shall continue making the transfers set forth in the Bond Indenture to cause Cash Flow Redemptions.

*Selection of Bonds for Redemption.*  When any redemption is made pursuant to any of the provisions of the Bond Indenture (except for mandatory sinking fund redemptions and redemptions from insurance and condemnation proceeds or following the termination or default under any Leases) and less than all of the outstanding Bonds are to be redeemed, the Bond Trustee shall select the Bonds to be redeemed pro-rata among maturities and by lottery within a maturity; provided that, for any redemption made as a Cash Flow Redemption or because of a Specified Event, if less than all of the outstanding Bonds are to be redeemed, the Bond Trustee will select the Bonds to be redeemed in inverse order of maturities and by lottery within a maturity.

*Notice of Redemption.*  Notice of any redemption of Bonds will be mailed postage prepaid, not less than thirty (30) nor more than sixty (60) days prior to the redemption date (i) by first class mail to the respective holders thereof at the addresses appearing on the Bond registration books described in the Bond Indenture, and (ii) as may be further required in accordance with the applicable disclosure certificate.  Each notice of redemption will contain all of the following information: (a) the date of such notice; (b) the Series; (c) the date of issue of the Bonds of such Series, (d) the redemption date; (e) the redemption price; (f) the place or places of redemption (including the name and appropriate address or addresses of the Bond Trustee), (g) the CUSIP number, if any, of each maturity of Bonds; (h) (if less than all of the Bonds of any maturity are to be redeemed) the distinctive numbers of the Bonds of each maturity to be redeemed; (i) (in the case of Bonds redeemed in part only) the respective portions of the principal amount of the Bonds of each maturity to be redeemed; (j) a statement that such Bonds must be surrendered by the holders at the principal corporate trust office of the Bond Trustee, or at such other place or places designated by the Bond Trustee; and (k) notice that further interest on such Bonds, if any, will not accrue from and after the designated redemption date.

*Conditional Notice of Redemption.*  Any notice of optional redemption of Bonds may be conditioned on any fact or circumstance specified in the notice, and if such condition shall not have been

satisfied on or prior to the scheduled redemption date stated in such notice, that notice shall be of no force and effect on and as of the stated redemption date, the redemption shall be cancelled, and the Authority shall not be required to prepay the Bonds that were the subject of the notice.  The Bond Trustee shall give notice of such cancellation and the reason therefor in the same manner in which notice of prepayment was originally given.  The actual receipt by the owner of any Bond of notice of such cancellation shall not be a condition precedent to cancellation, and failure to receive such notice or any defect in such notice shall not affect the validity of the cancellation.

*Rescission of Notice of Redemption.*  The Authority may rescind any notice of optional redemption for any reason on any date prior to the date fixed for redemption by causing written notice of the rescission to be given to the owners of the Bonds so called for redemption.  Any redemption and notice thereof shall be rescinded if for any reason on the date fixed for redemption funds are not available for such purpose in an amount sufficient to pay in full on said date the principal of, interest on, and any premium due on the Bonds called for redemption.  Notice of rescission of redemption shall be given in the same manner in which notice of redemption was originally given.  The actual receipt by the owner of any Bond of notice of such rescission shall not be a condition precedent to rescission, and failure to receive such notice or any defect in such notice shall not affect the validity of the rescission.

*Effect of Redemption.*  When notice of redemption has been given substantially as provided for herein, and when the redemption price of the Bonds called for redemption is set aside for the purpose as described in the Bond Indenture, the Bonds designated for redemption will become due and payable on the specified redemption date and interest, if any, will cease to accrue thereon as of the redemption date, and upon presentation and surrender of such Bonds at the place specified in the notice of redemption, such Bonds will be redeemed and paid at the redemption price thereof out of the money provided therefor.  The holders of such Bonds so called for redemption after such redemption date will look for the payment of such Bonds and the redemption premium thereon, if any, only to the escrow fund established for such purpose.  All Bonds redeemed will be cancelled therewith by the Bond Trustee and will not be redelivered.

**Defeasance**

*Discharge of Bond Indenture.*  Bonds may be paid by the Authority in any of the following ways, provided that the Authority also pays or causes to be paid any other sums payable under the Bond Indenture by the Authority: (a) by paying or causing to be paid the principal of and interest on the Bonds Outstanding as and when the same become due and payable; (b) by depositing with the Bond Trustee, in trust, at or before maturity, money or securities in the necessary amount to pay or redeem Bonds Outstanding; or (c) by delivering to the Bond Trustee, for cancellation by it, all Bonds Outstanding.

If the Authority will pay all Bonds then Outstanding as provided above and will also pay or cause to be paid all other sums payable under the Bond Indenture by the Authority, then and in that case, at the election of the Authority, and notwithstanding that any Bonds will not have been surrendered for payment, the Bond Indenture and the pledge of Payments made under the Bond Indenture and all covenants, agreements and other obligations of the Authority under the Bond Indenture will cease, terminate, become void and be completely discharged and satisfied, except as provided in the Bond Indenture.  In such event, upon request of the Authority, the Bond Trustee will cause an accounting for such period or periods as may be requested by the Authority to be prepared and filed with the Authority and will execute and deliver to the Authority all such instruments as may be necessary or desirable to evidence such discharge and satisfaction, and the Bond Trustee will pay over, transfer, assign or deliver to the Authority all moneys or securities or other property held by it pursuant to the Bond Indenture which are not required for the payment of Bonds not theretofore surrendered for such payment and which are not required for the payment of fees and expenses of the Bond Trustee.

20

*Discharge of Liability on Bonds.* Upon the deposit with the Bond Trustee, in trust, at or before maturity, of money or securities in the necessary amount to pay or redeem any Outstanding Bond, whether upon or prior to its maturity or the redemption date of such Outstanding Bond, then all liability of the Authority in respect of such Bond will cease, terminate and be completely discharged, except only that thereafter the holder thereof will be entitled to payment of the principal of and interest on such Bond by the Authority, and the Authority will remain liable for such payment but only out of the money or securities deposited with the Bond Trustee as aforesaid for its payment; provided further, however, that the provisions of "Payments of Bonds after Discharge of Bond Indenture" hereof will apply in all events.

The Authority may at any time surrender to the Bond Trustee for cancellation by it any Bonds previously issued and delivered, which the Authority may have acquired in any manner whatsoever, and such Bonds, upon such surrender and cancellation, will be deemed to be paid and retired.

*Deposit of Money or Securities with Bond Trustee.* Whenever in the Bond Indenture it is provided or permitted that there be deposited with or held in trust by the Bond Trustee money or securities in the necessary amount to pay or redeem any Bonds, the money or securities so to be deposited or held may include money or securities held by the Bond Trustee in the funds and accounts established pursuant to this Bond Indenture (except for monies or securities held by the Bond Trustee in the NCBCI Reserve Subaccount of the Bond Reserve Account, unless the principal of all of the Bonds then Outstanding and the interest accrued thereon, shall have been declared to be due and payable immediately pursuant to an acceleration under the Bond Indenture) and shall be equal to:

(a)     lawful money of the United States of America in an amount equal to the principal amount of such Bonds and all unpaid interest thereon to maturity, except that, in the case of Bonds which are to be redeemed prior to maturity and in respect of which notice of such redemption shall have been given pursuant to the Bond Indenture or provision satisfactory to the Bond Trustee shall have been made for the giving of such notice, the amount to be deposited or held shall be the principal amount or redemption price of such Bonds and all unpaid interest thereon to the redemption date; or

(b)     direct and general obligations of the United States of America, or obligations which are unconditionally guaranteed as to principal and interest by the United States of America, or (ii) obligations exempt from federal income taxation pursuant to Section 103(a) of the Code, for which the Bond Trustee has received written evidence satisfactory to the Bond Trustee to the effect that obligations described in (ii) above have been irrevocably deposited in trust in an amount sufficient, together with earnings thereon without regard to reinvestment, to pay the principal of and premium, if any, and interest on such obligations as they become due, or (iii) investment and annuity contracts with financial institutions rated in one of the top two rating categories of each rating agency then rating the Bonds or insurance companies rated at least A in Best's Insurance Reports

provided, in each case, that the Bond Trustee shall have been irrevocably instructed (by the terms of this Bond Indenture or by Request of the Authority) to apply such money to the payment of such principal or redemption price and interest with respect to such Bonds.

*Payment of Bonds after Discharge of Bond Indenture.* Notwithstanding any provision of the Bond Indenture, and subject to applicable escheat laws, any moneys held by the Bond Trustee in trust for the payment of the principal of or interest on any Bonds and remaining unclaimed for six years after the principal of all the Outstanding Bonds has become due and payable (whether at maturity or by declaration as provided in the Bond Indenture), if such moneys were so held at such date, or six years after the date of deposit of such moneys if deposited after said date when all of the Bonds became due and payable, will be repaid to the Authority free from the trusts created by the Bond Indenture, and all liability of the Bond Trustee with respect to such moneys will thereupon cease; provided, however, that before the repayment

21

of such moneys to the Borrower as aforesaid, the Bond Trustee may (at the cost of the Authority) first mail to the holders of Bonds which have not yet been paid, at the addresses shown on the registration books maintained by the Bond Trustee, a notice, in such form as may be deemed appropriate by the Bond Trustee, with respect to the Bonds so payable and not presented and with respect to the provisions relating to the repayment to the Borrower of the moneys held for the payment thereof.

## SECURITY AND SOURCES OF PAYMENT FOR THE BONDS

**General**

The Bonds are limited obligations of the Authority, payable solely from the Revenues pledged under the Bond Indenture.  Revenues consist primarily of loan repayments required to be made by the Borrower pursuant to the Loan Agreement in amounts sufficient to pay the principal of and premium, if any, and interest on the Bonds when due.  The Authority will assign its right, title and interest in the Loan Agreement (except for any deposits to the Rebate Fund, the right of the Authority to receive certain administrative fees and expenses to the extent payable to the Authority and the right of the Authority to be indemnified) and its rights in Obligation No. 1, as described below,  which shall require the Borrower under the Loan Agreement and the other Members of Obligated Group to make payments to the Bond Trustee in amounts sufficient to pay when due the principal of and premium, if any, and interest on the Bonds.

THE BONDS, THE PREMIUM, IF ANY, AND THE INTEREST THEREON ARE SPECIAL LIMITED OBLIGATIONS OF THE AUTHORITY, PAYABLE EXCLUSIVELY FROM THE TRUST ESTATE.

THE BONDS DO NOT CONSTITUTE A DEBT OR A LOAN OF CREDIT OR A PLEDGE OF THE FULL FAITH AND CREDIT OR TAXING POWER OF THE AUTHORITY, OR PIMA COUNTY, ARIZONA, THE STATE OF ARIZONA OR OF ANY POLITICAL SUBDIVISION THEREOF, WITHIN THE MEANING OF ANY ARIZONA CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION AND SHALL NEVER CONSTITUTE NOR GIVE RISE TO A PECUNIARY LIABILITY OF THE STATE OF ARIZONA OR PIMA COUNTY, ARIZONA.  THE BONDS SHALL NOT CONSTITUTE, DIRECTLY OR INDIRECTLY, OR CONTINGENTLY OBLIGATE OR OTHERWISE CONSTITUTE, A GENERAL OBLIGATION OF OR A CHARGE AGAINST THE GENERAL CREDIT OF THE AUTHORITY, BUT SHALL BE SPECIAL LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE SOLELY FROM THE SOURCES DESCRIBED IN THE BOND INDENTURE AND MASTER INDENTURE.  THE AUTHORITY HAS NO TAXING POWER.

NO RECOURSE SHALL BE HAD FOR THE PAYMENT OF THE PRINCIPAL OF OR PREMIUM, IF ANY, OR INTEREST ON THE BONDS AGAINST ANY PAST, PRESENT, OR FUTURE OFFICER, DIRECTOR, COUNSEL, ADVISOR, OR AGENT OF THE AUTHORITY, OR ANY SUCCESSOR TO THE AUTHORITY, AS SUCH, EITHER DIRECTLY OR THROUGH THE AUTHORITY OR ANY SUCCESSOR TO THE AUTHORITY UNDER ANY RULE OF LAW OR EQUITY, STATUTE, OR CONSTITUTION OR BY THE ENFORCEMENT OF ANY ASSESSMENT OR PENALTY OR OTHERWISE, AND ALL SUCH LIABILITY OF ANY SUCH OFFICERS, DIRECTORS, COUNSEL, ADVISORS, OR AGENTS, AS SUCH, IS EXPRESSLY WAIVED AND RELEASED AS A CONDITION OF AND CONSIDERATION FOR THE EXECUTION AND ISSUANCE OF THE BONDS.

**The Bond Indenture**

The Authority will execute and deliver the Bond Indenture and absolutely assign to the Bond Trustee all of its rights, title and interest in and to the loan repayments, the Loan Agreement, Obligation No. 1, the Leases, and all moneys and investments in the funds established under the Bond Indenture (except the Rebate Fund and except for certain administrative expenses payable to the Authority) for the equal and proportionate benefit, security and protection of all present and future registered owners of the Bonds. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - BOND INDENTURE" herein. No additional bonds are permitted to be issued under the Bond Indenture. Certain reserves have been established as described under the heading "Reserve Accounts Under Bond Indenture" below.

*Reserve Accounts Under Bond Indenture.*

The Bond Reserve Account. The Bond Trustee will establish, hold and maintain the Bond Reserve Account at the Bond Reserve Account Requirement, which will be funded at maximum annual debt service on the Bonds ($3,173,568.78). Within the Bond Reserve Account, the Bond Trustee will establish, hold and maintain the Bond Reserve Subaccount and the NCBCI Reserve Subaccount, and within the NCBCI Reserve Subaccount, the Bond Trustee will establish, hold and maintain the NCBCI Reserve Earnings Subaccount. $3,000,000 of the monies deposited to the Bond Reserve Account will be provided by NCB Capital Impact, a District of Columbia not-for-profit corporation ("NCBCI"), pursuant to a credit enhancement repayment agreement executed by the Borrower in favor of NCBCI on the Closing Date (the "NCBCI Credit Enhancement"), and that initial amount ($3,000,000) will be deposited into the NCBCI Reserve Subaccount of the Bond Reserve Account. The obligations of Borrower to make repayments of principal and payments of interest, if any, under the NCBCI Credit Enhancement are subordinate to the amounts then currently due and payable under the Master Indenture. The Borrower is obligated to make an annual credit enhancement fee payment to NCBCI equal to 1% of the amount in the Bond Reserve Account on the first day of each Fiscal Year. Those annual credit enhancement fees are not subordinated to the amounts due and payable under the Master Indenture. The Trustee will establish within the NCBCI Reserve Subaccount the NCBCI Reserve Earnings Subaccount into which all interest, profits and other income received from investment of amounts in the Bond Reserve Account shall be deposited for the purposes of separately identifying and tracking such interest, profits and other income. $173,568.78 of the monies deposited in the Bond Reserve Account will be from proceeds of the Bonds and that amount will be deposited in the Bond Reserve Subaccount of the Bond Reserve Account. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - BOND INDENTURE - Revenues - Application of Bond Reserve Account" herein. Upon each repayment by the Borrower to NCBCI under the NCBCI Credit Enhancement, an equal amount will be thereafter transferred from the NCBCI Reserve Subaccount to the Bond Reserve Subaccount.

All amounts in the Bond Reserve Account will be used and withdrawn by the Bond Trustee solely for the purpose of making up any deficiency in the Interest Account or Principal Account, or (together with any other moneys available therefor) for the payment or redemption of all Bonds then Outstanding; provided that monies and securities held by the Bond Trustee in the NCBCI Reserve Subaccount will not be used for the payment or redemption of all Bonds then Outstanding unless the principal of all Bonds then Outstanding, and the interest accrued thereon, shall have been accelerated by the Bond Trustee pursuant to the Bond Indenture. The Bond Trustee will draw from the Bond Reserve Subaccount prior to drawing from the NCBCI Reserve Subaccount. Amounts withdrawn from the Bond Reserve Subaccount and the NCBCI Reserve Subaccount will be replenished by the Borrower on a pro-rata basis. Any amount in the Bond Reserve Account, excluding all interest, profits and other income received from the investment of amounts in the NCBCI Reserve Subaccount, in excess of the Bond Reserve Account Requirement ($3,173,568.78) will be transferred on or before the first (1st) day of each January, April, July and October to the Revenue Fund. All interest, profits and other income received from investment of

amounts in the NCBCI Reserve Subaccount will be deposited in the NCBCI Reserve Earnings Subaccount for the sole purpose of separately identifying and tracking such interest, profits and other income. The Bond Trustee will notify the Authority, NCBCI and the Borrower immediately of any withdrawal from the Bond Reserve Account for the purpose of making up a deficiency in the Interest Account or Principal Account, which notice will specify the amount of such withdrawal from each of the Bond Reserve Subaccount and NCBCI Reserve Subaccount, if any. That notice will also contain other information concerning the amounts withdrawn from the specific subaccount. Upon redemption or maturity of the Bonds, the Bond Trustee will transfer (a) to NCBCI (i) any amounts remaining in the NCBCI Reserve Earnings Subaccount and (ii) the lesser of (A) any other amounts remaining on deposit in the NCBCI Reserve Subaccount, or (B) such amount as may be certified by NCBCI to the Bond Trustee as being due and payable under the NCBCI Enhancement Agreement, and (b) to the Borrower any amounts remaining on deposit in the Bond Reserve Account following the above described transfers. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - BOND INDENTURE - Revenues - Application of Bond Reserve Account" herein.

IFF Debt Service Reserve Account. Pursuant to the Bond Indenture, an IFF Debt Service Reserve Account will be established and maintained by the Bond Trustee in the amount of $1,000,000, which may thereafter be proportionately reduced by partial prepayments of the principal balance of the Bond allocable to Chicago Math & Science Academy, a Financed Charter School ("IFF Reserve Required Amount"). The Bond Trustee will draw monies from the IFF Debt Service Reserve Account to make-up any deficiency in the Bond Trustee-held Principal Account and Interest Account, but only to the extent such deficiency results from a base rental payment default by the Chicago Math & Science Academy on its Lease. After a draw on the IFF Debt Service Reserve Account, the Chicago Math & Science Academy will be required to pay into the IFF Debt Service Reserve Account to restore it to the IFF Reserve Required Amount. Earnings on the IFF Debt Service Reserve Account will be paid to IFF only to the extent that the amounts in the IFF Debt Service Reserve Account exceed the IFF Reserve Required Amount. The agreement by IFF to initially fund the IFF Debt Service Reserve Account at the IFF Reserve Required Amount and the other terms and conditions relating thereto is subject to an agreement between the Borrower, the Chicago Math & Science Academy, IFF, the Master Trustee and the Bond Trustee ("IFF Reserve Agreement"). Under the IFF Reserve Agreement and its Lease, the Chicago Math & Science Academy is responsible to restore the IFF Debt Service Reserve Account in an amount equal to the withdrawn amount and to pay directly to IFF interest on such amount from the date it was withdrawn until the date it was reimbursed. Upon defeasance or full payment of Obligation No. 1, the amounts in the IFF Debt Service Reserve Account will be transferred to IFF. THE IFF DEBT SERVICE RESERVE ACCOUNT WILL ONLY BE DRAWN UPON IN THE EVENT THE CHICAGO MATH & SCIENCE ACADEMY FAILS TO MAKE A REQUIRED LEASE PAYMENT UNDER ITS LEASE. SO LONG AS THE CHICAGO MATH & SCIENCE ACADEMY MAKES LEASE PAYMENTS AS AND WHEN REQUIRED, THE IFF DEBT SERVICE RESERVE ACCOUNT WILL NOT BE AVAILABLE TO THE BOND TRUSTEE TO FUND ANY LEASE PAYMENT DEFICIENCY BY ANY OTHER FINANCED CHARTER SCHOOL. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - BOND INDENTURE - Revenues - IFF Debt Service Reserve Account; IFF Subaccount; IFF Consent Rights" herein.

Capital Maintenance and Operating Fund Reserve. The Borrower will be required to maintain $1,000,000 in the Capital Maintenance and Operating Fund (the "Capital Maintenance and Operating Fund Requirement"), initially funded with Bond proceeds, and will be available for capital and operating expenses, and if necessary, debt service on the Bonds. Each withdrawal from this Capital Maintenance and Operating Fund is required to be replenished over a 36 month period.

Revenue Fund Requirement. The Borrower will be required to maintain $500,000 in the Revenue Fund (the "Revenue Fund Requirement"), initially funded with Bond proceeds, and will be available for

distributions therefrom pursuant to the Bond Indenture to the various accounts and funds created and established under the Bond Indenture.  If at any time the amount in the Revenue Fund is less than the Revenue Fund Requirement, the Bond Trustee will suspend transfers from the Revenue Fund to the Gross Revenue Fund of the Master Indenture until such time as the amounts in the Revenue Fund are at least equal to the Revenue Fund Requirement.  Transfers by the Bond Trustee to the Borrower for deposit in the Gross Revenue Fund will be made monthly as follows in the following order of priority if there are amounts in the Revenue Fund in excess of the Revenue Fund Requirement ($500,000):  (i) to the Gross Revenue Fund held by the Borrower the amount of the Borrower's expenses allocable to the Financed Charter Schools not to exceed $150,000 in each fiscal year ending June 30th; and (ii) to the Redemption Fund 50% of any amount remaining in the Revenue Fund in excess of the Revenue Fund Requirement after the transfers described in (i) above, and to the Borrower for deposit in the Gross Revenue Fund the other 50% of any amount remaining in the Revenue Fund in excess of the Revenue Fund Requirement after the transfers described in (i) above.  However, upon the occurrence and continuation of certain Specified Events (see "THE BONDS - Redemption - *Cash Flow and Specified Event Redemptions* herein) after July 1, 2012, after the Bond Trustee has applied the Revenues pursuant to the provisions of the Bond Indenture that direct the allocation of Revenues each month, the Trustee will <u>not</u> transfer any amounts to the Borrower as described in this paragraph but shall use all amounts in excess of the Revenue Fund Requirement to redeem Bonds.

[REMAINDER OF THIS PAGE IS BLANK]

The following is a summary chart of the allocation of Revenues under the Bond Indenture.  For more detailed allocation information, see APPENDIX C – "SUMMARY OF PRINCIPAL DOCUMENTS – BOND INDENTURE – Revenues - Allocation of Revenues".  Revenues, consisting primarily of Lease payments from Financed Charter Schools to be made monthly under the Leases directly to the Bond Trustee, will be transferred by the Bond Trustee on or before the 20th day of each month, as follows:



1st — **INTEREST ACCOUNT**
(1/6th of amount due on the next interest payment date)

2nd — **PRINCIPAL ACCOUNT**
(1/12th of amount due on the next interest payment date)

3rd — **BOND RESERVE ACCOUNT**
(1/12th of amount of any prior withdrawal capped at the Bond Reserve Account Requirement)

4th — **CAPITAL MAINTENANCE AND OPERATING FUND**
(1/36th of amount of any prior withdrawal capped at the Capital Maintenance and Operating Fund Requirement ($1,000,000))

5th — **ADMINISTRATIVE FEES AND EXPENSES FUND**
(1/12th of amount due in next ensuing 12 months)

6th — **REVENUE FUND**
(Amount, if any, necessary to reinstate the Revenue Fund to the Revenue Fund Requirement ($500,000))

7th — **GROSS REVENUE FUND²** — **REDEMPTION FUND³**

---

² This allocation represents monthly transfers such that after the transfers to the Borrower for deposit to the Gross Revenue Fund of the Borrower's expenses allocable to the Financed Charter Schools (not to exceed $150,000 in a fiscal year), then 50% of the remaining amounts are transferred to the Gross Revenue Fund and the other 50% is transferred to the Redemption Fund.  However, after July 1, 2012 upon the occurrence and continuation of certain Specified Events (see "THE BONDS – Redemption – *Cash Flow and Specified Event Redemptions* herein), after the Bond Trustee has applied the Revenues pursuant to the provisions of the Bond Indenture that direct the allocation of Revenues each month (1st through 6th), the Trustee will not transfer any amounts to the Gross Revenue Fund but shall use all amounts in excess of the Revenue Fund Requirement to redeem Bonds by transfers to the Redemption Fund.

³ This allocation represents the other 50% of the amount in excess of the Revenue Fund Requirement after monthly transfers to the Borrower of the Borrower's expenses allocable to the Financed Charter Schools (not to exceed $150,000 in a fiscal year), which will be used to redeem Bonds; provided that after July 1, 2012 upon the occurrence and continuation of certain Specified Events (see "THE BONDS – Redemption – *Cash Flow and Specified Event Redemptions* herein), after the Bond Trustee has applied the Revenues pursuant to the provisions of the Bond Indenture that direct the allocation of Revenues each month (1st through 6th),  the Trustee will not transfer any amounts to the Gross Revenue Fund but shall use all amounts in excess of the Revenue Fund Requirement to redeem Bonds by transfers to the Redemption Fund.

**The Loan Agreement**

The Authority and the Borrower will execute the Loan Agreement to provide for the loan by the Authority to the Borrower of proceeds from the sale of the Bonds. The Authority will assign its rights in the Loan Agreement (except for certain unassigned rights to certain indemnification rights and administrative expenses of the Authority) to the Bond Trustee and will assign Obligation No. 1 to the Bond Trustee. Pursuant to the Loan Agreement, the Borrower will be required to make loan repayments sufficient to pay the principal, premium, if any, and interest on the Bonds when due. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - LOAN AGREEMENT" herein. The Loan Agreement contains, among other covenants and agreements of the Borrower, a covenant by the Borrower to provide a property condition assessment ("PCA") respecting each of the Facilities to the Bond Trustee and the Program Administrator. The Borrower must provide a copy of that PCA on September 1 of every fifth (5th) year while the Bonds are outstanding, commencing September 1, 2016. The PCA shall be conducted in accordance with ASTM E2018 Standard Guide for Property Condition Assessments: Baseline Property Condition Assessment Process or other similar and customary standard. The Financed Charter Schools are not a party to, and are not liable under, the Loan Agreement. In addition to other rights of prepayment contained in the Loan Agreement, the Borrower will also prepay the loan in part on each July 1 from amounts transferred to the Redemption Fund for Cash Flow Redemptions and redemptions occurring because of Specified Events. Subject to the limitations of the Bond Indenture regarding Loan Agreement amendments, the Borrower may amend Exhibit A of the Loan Agreement, which is the list of Financed Charter School Facility and Bond principal amount allocable to each, from time to time in connection with the prepayment of a portion of the loan pursuant to the loan prepayment provisions; provided that (x) the sum total of allocable amounts in Exhibit A to the Loan Agreement shall not be less than the principal amount of Bonds Outstanding at any time and (y) such amendment shall not provide an allocable amount for any Financed Charter School greater than the allocable amount stated on Exhibit A on the date of delivery of the Bonds. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - LOAN AGREEMENT" herein.

**Mortgages**

Pursuant to the Master Indenture, the Members of the Obligated Group will each execute and deliver a Mortgage, Assignment of Leases and Rents, Fixture Filing and Security Agreement (each a "Mortgage" and collectively, the "Mortgages"), under which each of the Members will grant to the Master Trustee a first lien on and security interest in the Mortgaged Property (as defined in the Mortgage), subject to certain permitted liens, as security for the payment of all Obligations issued under the Master Indenture and the performance by the Members of the Obligated Group of their other obligations under the Master Indenture. However, under Related Supplement No. 1, the Master Trustee has agreed to exercise remedies under the Mortgages, including, without limitation, foreclosure, only for the benefit of holders of Obligation No. 1, and therefore the Mortgages will secure only the Bonds while there are Bonds Outstanding. The Mortgages also create a current and absolute assignment of the rents under the Leases in favor of the Master Trustee; provided that the Borrower and the Master Trustee have agreed that the Borrower will cause base rents to be paid by the Financed Charter Schools directly to the Bond Trustee to deposit into the Revenue Fund. See "The Leases" below. The Mortgaged Property generally consists of all real property and personal property that constitute the "Facilities" at which the Financed Charter Schools operate. In connection with the execution and delivery of the Mortgages, the Borrower will obtain, in favor of the Master Trustee, ALTA title insurance policies aggregating in the amount of $33,120,000 issued by First American Title Insurance Company. See APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" and APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - THE MORTGAGES" herein.

27

**The Leases**

The primary source of Gross Revenues for the Members of the Obligated Group are the Base Rent payments under the Leases with each of the Financed Charter Schools and other lease payments for facilities leased to other charter schools. Under the Leases, each of the Members of the Obligated Group will lease to one or more of the Financed Charter Schools, and the Financed Charter Schools will lease from the applicable Member of the Obligated Group, the Facilities, until July 1, 2041 for the Financed Charter Schools in Ohio and until July 1, 2046 for Chicago Math & Science Academy ("Initial Term") (or such other later date if extended pursuant to the Leases) (such date, as it may be extended, "Expiration Date"), at the rentals and upon and subject to all of the terms, covenants and conditions set forth in the Leases. The terms of each Lease are substantially similar except for the amount of rent payable and the Facility subject to each Lease. The amount of annual Base Rent payable on the Leases will be, as of July 1, 2014, approximately 120% of the annual Bond debt service applicable to that portion of the Bonds allocable to the related Financed Charter School and escalating at 1% per year during the Lease term but never to exceed 130% of the annual debt service applicable to that portion of the Bonds allocable to the related Financed Charter School. Initially for the first year of the Lease term, the amount of annual Base Rent payable on the Facilities in Ohio will be less than the Bond debt service allocable to the Ohio Facilities. Capitalized interest funded with proceeds of the Bonds will be used to make up the deficiency between those base rent payments and debt service on the Bonds allocated to the Ohio Facilities. For the Facility in Illinois, the base rent payments shall be greater than debt service on the Bonds allocated to that Facility beginning with the first year of its Lease term. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - THE LEASES" herein.

Pursuant to the Leases, which will be assigned to the Master Trustee, the Financed Charter Schools will cause all rent payments payable to the Members of the Obligated Group under the Leases to be received by the Bond Trustee on behalf of the Members of the Obligated Group in lawful money of the United States on or before the day on which it is due, without offset or deduction. The Master Trustee will agree to this direct transfer of base rents directly to the Bond Trustee. The Financed Charter Schools have agreed to take such action as may be necessary to include all such payments of rent due under the Leases in its annual budgets, to make, as necessary, annual appropriations for all such payments and to take such action annually as will be required to provide funds in such year for such payments of rent. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - THE LEASES" herein.

In the Leases, each Financed Charter School has agreed that the payment of management fees under its Management Agreement, or any replacement, are subordinated to the operating expenses and lease payments under the Leases. Concept Schools has agreed to the subordination of its Management Fees. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - THE LEASES" herein.

The obligations of the Financed Charter Schools under the Leases are several, not joint, obligations of the Financed Charter Schools and a default on one Lease does not constitute an event of default under any other Lease or increase the payment obligations thereunder. Thus, if one Financed Charter School were to default on its Lease, the Master Trustee would not be able to increase the obligations of the other Financed Charter Schools and would initially rely upon NPL to resolve or cure the Lease default or sell the Facility used by such Financed Charter School and apply the proceeds to redeem Bonds. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - THE LEASES" herein.

**Certain Financial Covenants of the Financed Charter Schools under the Leases**

Each Financed Charter School has made covenants and representations in its respective Leases. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - THE LEASES" herein. Two

financial covenants included in the Leases are a "Net Current Assets" test and a "Cash on Hand" test. With respect to the "Net Current Assets" test, each Financed Charter School covenants and agrees in the Lease that it will at all times maintain a ratio of current assets to current liabilities of not less than 1.1 to 1.0 based upon the audited financial statements dated as of the end of each twelve-month period beginning July 1 and ending June 30, or such other twelve month period as may be designated by the Financed Charter School.   See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - THE LEASES" herein.

With respect to the "Cash on Hand" covenant, each Financed Charter School, in its Lease, covenants and agrees to maintain Cash on Hand in the amount of twelve percent (12%) of the operating expenses of the Financed Charter School on each calculation date.  "Cash on Hand" means the sum of cash, cash equivalents, liquid investments and unrestricted marketable securities (valued at the lower of cost or market) of the Financed Charter School.  This covenant will be tested annually at the end of each Fiscal Year, and if as of any June 30 calculation date the Cash On Hand is less than twelve percent (12%) of the gross revenues of the Financed Charter School, but greater than or equal to one percent (1%), the Financed Charter School shall retain a consultant within thirty (30) days, but in no event less than one hundred eighty (180) days after the applicable calculation date. The consultant will be experienced in working with or familiar with charter schools in the State of Ohio or State of Illinois, as applicable, that is independent of the Financed Charter School or any entity controlling the Financed Charter School, directly or indirectly. The consultant shall prepare and deliver a report of its conclusions and recommendations to the Bond Trustee within no less than forty-five (45) days after its retention and the action plan recommended by the consultant.  The Financed Charter School shall to the extent feasible, promptly upon its receipt of such recommendations, subject to applicable requirements or restrictions imposed by law or by the terms of the Loan Agreement, revise its methods of operation and shall take such other action as shall be in conformity with such recommendations; provided, however, that the Financed Charter School need not make such revisions or take such actions in conformity with such recommendations if the governing body of the Financed Charter School makes a good faith determination that such recommendations, in whole or in part, are not in the best interest of the Financed Charter School. The Financed Charter School shall provide reports to respective Obligated Group Member and the Bond Trustee no less frequently than quarterly regarding the progress of the Financed Charter School and its compliance with the recommendations of the consultant.   If the Financed Charter School complies in all material respects with the reasonable recommendations of the consultant, the Financed Charter School will be deemed to have complied with this covenant of the Lease for such Fiscal Year notwithstanding that Cash on Hand shall be less than the amount required; provided, that (1) this sentence shall not be construed as in any way excusing the Financed Charter School from taking any action or performing any duty required under this Lease, and (2) on any calculation date, the Cash On Hand is at least equal to one percent (1%) of the operating expenses of the Financed Charter School.   See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - THE LEASES" herein.

**The Master Indenture**

**Joint and Several Obligations of the Obligated Group but not the Financed Charter Schools.** Under the Master Indenture, the Borrower is authorized to issue, for itself and on behalf of the other Members of the Obligated Group, Obligations to evidence or secure Indebtedness or other obligations.  All Members of the Obligated Group are jointly and severally liable with respect to the payment of each Obligation issued under the Master Indenture, including Obligation No. 1.   The Members of the Obligated Group are required to make payment on Obligation No. 1 in amounts sufficient to pay when due the principal of and premium, if any, and interest on the Bonds.  For a more detailed discussion of entry to or withdrawal from the Obligated Group, see APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - MASTER INDENTURE - Withdrawal from Obligated Group."   All capitalized terms used and not defined in this section have the meanings listed in APPENDIX C -

29

"SUMMARY OF PRINCIPAL DOCUMENTS - Definitions." However, each of the Financed Charter Schools is liable only on its Lease and they are not responsible or otherwise obligated under the Loan Agreement, the Bond Indenture or the Master Indenture to make payments on Obligation No. 1 or the Bonds.

**Pledge of Gross Revenues.** The Members of the Obligated Group agree in the Master Indenture that, so long as any of the Obligations remain Outstanding, all of the Gross Revenues of the Members of the Obligated Group shall be deposited as soon as practicable upon receipt in a fund designated as the "Gross Revenue Fund" which the Members of the Obligated Group agree to establish and maintain, subject to the exceptions described below, in one or more accounts at such banking institution or institutions as the Borrower, as Obligated Group Representative, shall from time to time designate in writing to the Master Trustee for such purpose (the "Depository Bank(s)"). Subject only to the provisions of the Master Indenture permitting the application thereof for the purposes and on the terms and conditions set forth therein, each Member of the Obligated Group, to the extent permitted by law, has pledged and granted a security interest to the Master Trustee in the Gross Revenue Fund and all of the Gross Revenues of the Obligated Group to secure the payments on the Obligations and the performance by the Members of the Obligated Group of their other obligations under the Master Indenture. The Borrower has agreed to deliver to the Master Trustee on or before the date of issuance of the Bonds a fully executed deposit account control agreement or such other document or agreement necessary under applicable law to perfect or maintain as perfected the Master Trustee's security interest in the Gross Revenues and the Gross Revenue Fund. Each Member of the Obligated Group has covenanted that it will file such financing statements or amendments to or terminations of existing financing statements, or execute deposit account control agreements or amendments to or termination of existing deposit account control agreements, which shall be necessary to comply with applicable law or as required due to changes in the Obligated Group. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - MASTER INDENTURE" herein.

While the Members of the Obligated Group have agreed to deposit all Gross Revenues into the Gross Revenue Fund as described in the prior paragraph, pursuant to the Loan Agreement, the Borrower has assigned the Leases to the Master Trustee but the Master Trustee and the Borrower have agreed that the Borrower will cause the Financed Charter Schools to deposit their base rent under the Leases directly into the Revenue Fund held by the Bond Trustee under the Bond Indenture. Following the monthly allocation of Revenues to the various accounts under the Bond Indenture (see APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - BOND INDENTURE - Revenues - Allocation of Revenues" for a description on the allocation of Revenues under the Bond Indenture), the Bond Trustee will transfer to the Borrower any remaining amounts in the Revenue Fund for deposit into the Gross Revenue Fund established under the Master Indenture; provided, upon a default by any Financed Charter School related to the payment of its base rent under its Lease that is not cured within 180 days, the Bond Trustee will not transfer any amounts from the Revenue Fund to the Borrower until (a) such Financed Charter School(s) cures the default or (b) the allocable portion of the Bonds related to such Lease is redeemed. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - MASTER INDENTURE" herein.

Amounts in the Gross Revenue Fund may be used and withdrawn by any Member of the Obligated Group at any time for any lawful purpose, except as summarized below in the remainder of this paragraph. If any Required Payment with respect to any Obligation or other amount as is so required to be paid shall not be paid when due and payable or certain other Events of Default or the acceleration of the Obligations occur under the Master Indenture, the Master Trustee shall notify the Obligated Group Representative of such delinquency, and, unless such delinquent Required Payment is paid, or provision for payment is duly made, or then existing Events of Default known to the Master Trustee shall have been cured in a manner satisfactory to the Master Trustee, then the Master Trustee shall give written notice

30

thereof to the Depository Bank(s) to transfer the Gross Revenue Fund to the name and credit of the Master Trustee. The Gross Revenue Fund will continue to be held in the name and to the credit of the Master Trustee until six months after the amounts on deposit in said Gross Revenue Fund are sufficient to pay in full, or have been used to pay in full, all such delinquent installments in default and all other Events of Default known to the Master Trustee shall have been made good or cured to the satisfaction of the Master Trustee or provision deemed by the Master Trustee to be adequate shall have been made therefor, the Master Trustee shall transfer the Gross Revenue Fund (except for the Gross Revenues required to make such delinquent installments or cure such defaults) to the name and credit of the appropriate Members of the Obligated Group. During any period that the Gross Revenue Fund is held in the name and to the credit of the Master Trustee, the Master Trustee shall use and withdraw amounts in said fund from time to time first to make such installments as such installments become due (whether by maturity, redemption, acceleration or otherwise), and, if such amounts shall not be sufficient to pay in full all such installments due on any date, then to the payment of debt service on Obligations ratably, without any discrimination or preference, and second to such other payments in the order which the Master Trustee, in its discretion, shall determine to be in the best interest of the Holders without discrimination or preference. During any period that the Gross Revenue Fund is held in the name and to the credit of the Master Trustee, the Members of the Obligated Group shall not be entitled to use or withdraw any of the Gross Revenues of the Obligated Group unless and to the extent that the Master Trustee at its sole discretion so directs for the payment of current or past due operating expenses of the Members of the Obligated Group. Each Member of the Obligated Group has further agreed that the failure to comply with the terms of the foregoing provisions shall cause irreparable harm to the Holders and shall entitle the Master Trustee, with or without notice, to take immediate action to compel specific performance of the obligations of the Members of the Obligated Group as provided in the foregoing provisions. For more information concerning the pledge of Gross Revenues, see APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - MASTER INDENTURE - Gross Revenue Fund."

**Debt Service Coverage Ratio.** The Members of the Obligated Group have each agreed under the Master Indenture, as supplemented by Supplemental Master Indenture For Obligation No. 1, that so long as the Bonds are outstanding, the Obligated Group Representative will fix, charge and collect, or cause to be fixed, charged and collected, rental rates, fees and charges for the use of its Facilities and for the services furnished or to be furnished by the entities owned or controlled by the Obligated Group Representative so that the Aggregate Corporate Debt Service Coverage Ratio of the Obligated Group Representative and the entities owned or controlled by the Obligated Group Representative as a whole at the end of each Fiscal Year is not less than 1.20:1.0. The Obligated Group Representative's failure to achieve the required Aggregate Corporate Debt Service Coverage Ratio does not constitute an Event of Default if the Obligated Group Representative promptly engages an Independent Consultant to prepare a report, to be delivered to the Obligated Group Representative and the Master Trustee within forty-five (45) days of engagement, with recommendations for meeting the required Aggregate Corporate Debt Service Coverage Ratio, and the Obligated Group Representative, to the extent permissible, implements or causes to be implemented, within thirty (30) days of receipt of such recommendation, the Independent Consultant's recommendations. Notwithstanding the preceding sentence, if the Aggregate Corporate Debt Service Coverage Ratio of the Obligated Group Representative and the entities owned or controlled by the Obligated Group Representative as a whole falls below 1.0:1.0, it shall constitute an Event of Default. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - SUPPLEMENTAL MASTER INDENTURE – Additional Covenants " and related definitions.

**Operating Reserve.** The Members of the Obligated Group have each agreed under the Master Indenture, as supplemented by Supplemental Master Indenture For Obligation No. 1, that so long as the Bonds are outstanding, the Obligated Group Representative will maintain or cause to be maintained among itself and each of the entities it owns or controls an amount of money equal to 12% of Aggregate Corporate Revenues (as those Aggregate Corporate Revenues are shown in the immediately succeeding

fiscal year for which audited financial statements are available), tested as of the end of each calendar quarter, commencing the second calendar quarter after the date of issuance of the Series 2011 Bonds and thereafter each calendar quarter until all of the Series 2011 Bonds have been paid in full.  The failure to achieve the required operating reserve level does not constitute an Event of Default if the Obligated Group Representative promptly engages an Independent Consultant to prepare a report, to be delivered to the Obligated Group Representative and the Master Trustee within forty-five (45) days of engagement, with recommendations for meeting the required operating reserve level, and the Obligated Group Representative and all other entities owned or controlled by the Obligated Group Representative, to the extent permissible, implements, within thirty (30) days of receipt of such recommendation, the Independent Consultant's recommendations.  The operating reserves shall not be funded with proceeds of the Series 2011 Bonds.  See APPENDIX C – "SUMMARY OF PRINCIPAL DOCUMENTS – SUPPLEMENTAL MASTER INDENTURE – Additional Covenants" and related definitions.

**Limitations on Liens.**  Each Member of the Obligated Group has agreed in the Master Indenture that it will not create, assume or suffer to be created or permit the existence of any Lien upon any of its Property or Gross Revenues except for the Mortgages (as defined herein).  See APPENDIX C — "SUMMARY OF PRINCIPAL DOCUMENTS —MASTER INDENTURE — Mortgages; Against Encumbrances."

**Limitations on Additional Indebtedness.**  Each Member of the Obligated Group has agreed in the Master Indenture that it will not incur any Additional Indebtedness (whether through the issuance of Obligations or otherwise) other than Additional Indebtedness permitted by the Master Indenture, which Additional Indebtedness may be incurred only in the manner and pursuant to the terms set forth in Master Indenture.  The Borrower currently intends to finance other charter schools located in facilities it either owns or will own, including charter schools in Columbus, Cleveland, Lorain and Youngstown, among others.  The Borrower anticipates issuing an Obligation under the Master Indenture to provide security for those financings but only within and in accordance with the parameters and limitations for additional long-term indebtedness that is set forth in the Master Indenture.  The Master Indenture limits the incurrence of Long-Term Indebtedness by any Member of the Obligated Group except if one of two tests are met: (1) the Master Trustee receives an officer's certificate that the Debt Service Coverage Ratio taking into account existing Long-Term Indebtedness and the Long-Term Indebtedness proposed to be incurred, is not less than 1.20 based upon the most recent fiscal year for which audited financial statements are available; or (2) the Master Trustee receives *both* (i) an Accountant's certificate that the Debt Service Coverage Ratio for existing Long-Term Indebtedness is not less than 1.20 based upon the most recent fiscal year for which audited financial statements are available and (ii) an Independent Consultant's report indicating that the Debt Service Coverage Ratio  will be at least 1.25 in the fiscal year immediately following the date that the proposed capital improvement is expected to be in operation (for more detailed summary of the limitations on Long-Term Indebtedness and other types of Indebtedness, see APPENDIX C— "SUMMARY OF PRINCIPAL DOCUMENTS— MASTER INDENTURE - Limitations on Additional Indebtedness.")

**Other Covenants.**  The Members of the Obligated Group have agreed to other covenants in the Master Indenture, including without limitation, limitations on guaranties; limitations on consolidation, merger, sale or conveyance; and limitations on sale, lease or other disposition of assets.  For a description of these covenants see APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - SUMMARY OF CERTAIN PROVISIONS OF THE MASTER INDENTURE - MASTER INDENTURE - Particular Covenants of the Corporation and Each Member."

**Security and Enforceability**

**Bankruptcy.** In the event of the bankruptcy of a Member of the Obligated Group, the rights and remedies of the Bondholders are subject to various provisions of the federal Bankruptcy Code. If a Member of the Obligated Group were to file a petition in bankruptcy, payments made by that Member of the Obligated Group during the 90-day (or perhaps one year) period immediately preceding the filing of such petition may be avoidable as preferential transfers to the extent such payments allow the recipients thereof to receive more than they would have received in the event of the liquidation of the Member of the Obligated Group. Security interests and other liens granted to the Bond Trustee or the Master Trustee and perfected during such preference period also may be avoided as preferential transfers to the extent such security interest or other lien secures obligations that arose prior to the date of such perfection. A bankruptcy filing would operate as an automatic stay of the commencement or continuation of any judicial or other proceeding against the Member of the Obligated Group and its property and as an automatic stay of any act or proceeding to enforce a lien upon or to otherwise exercise control over such property, as well as various other actions to enforce, maintain or enhance the rights of the Bond Trustee and the Master Trustee. If the bankruptcy court so ordered, the property of the Member of the Obligated Group, including the Member's Gross Revenues and the Member's Mortgaged Property, could be used for the financial rehabilitation of the Member of the Obligated Group despite any security interest of the Bond Trustee or the Master Trustee in the property. The rights of the Bond Trustee and the Master Trustee to enforce their respective security interests and other liens could be delayed during the pendency of the rehabilitation proceeding.

A Member of the Obligated Group could file a plan for the adjustment of its debts in any bankruptcy proceeding, which could include provisions modifying or altering the rights of creditors generally or any class of them, secured or unsecured. The plan, when confirmed by a court, binds all creditors who had notice or knowledge of the plan and, with certain exceptions, discharges all claims against the debtor to the extent provided for in the plan. No plan may be confirmed unless certain conditions are met, among which are conditions that the plan be feasible and that it shall have been accepted by each class of claims impaired thereunder. The plan will be accepted if at least two-thirds in dollar amount and more than one-half in number of the class cast votes in its favor. Even if the plan is not so accepted, it may be confirmed if the court finds that the plan is fair and equitable with respect to each class of non-accepting creditors impaired thereunder and does not discriminate among creditors unfairly.

In addition, the obligations of the Borrower under the Loan Agreement and the Members of the Obligated Group under the Master Indenture are not secured by a lien on or security interest in any assets or revenues of any Member of the Obligated Group, other than the lien on Gross Revenues described under the caption "SECURITY FOR THE BONDS — The Master Indenture — Pledge of Gross Revenues" and the lien created by the Mortgage described under the caption "SECURITY FOR THE BONDS - The Master Indenture - Mortgage." Except with respect to the lien on Gross Revenues and the Mortgage, in the event of a bankruptcy of any Member of the Obligated Group, Bondholders would be unsecured creditors and would be in an inferior position to any secured creditors and, generally speaking, on parity with all other unsecured creditors.

In the event of the bankruptcy of a Member of the Obligated Group, there is no assurance that certain covenants, including tax covenants, contained in the Loan Agreement or certain other documents would survive. Accordingly, a bankruptcy trustee could take action that would adversely affect the exclusion of interest on the Bonds from gross income of the Bondholders for federal income tax purposes.

**Enforceability of the Master Indenture, the Loan Agreement, Obligation No. 1 and the Mortgage.** The legal right and practical ability of the Bond Trustee to enforce rights and remedies under the Loan Agreement, of the Master Trustee to enforce its rights and remedies under the Master Indenture,

Obligation No. 1, and the Mortgage, and of the Borrower and other Members of the Obligated Group to enforce rights and remedies under the Leases, may be limited by laws relating to bankruptcy, insolvency, reorganization, fraudulent conveyance or moratorium and by other similar laws affecting creditors' rights. The state of insolvency, fraudulent conveyance and bankruptcy laws relating to the enforceability of guaranties or obligations issued by one corporation in favor of another corporation's creditors or of an obligation of a Member of the Obligated Group to make debt service payments on behalf of another Member of the Obligated Group is unsettled. In particular, such obligations may be voidable under the Federal Bankruptcy Code or applicable state fraudulent conveyance laws if the obligation is incurred without "fair" and/or "fairly equivalent" consideration to the obligor and the incurrence of the obligation renders the Member of the Obligated Group insolvent. The standards for determining the fairness of consideration and the manner of determining insolvency are not clear and may vary under the Federal Bankruptcy Code, state fraudulent conveyance statutes and applicable cases. Consequently, the Bond Trustee's and the Master Trustee's ability to enforce the rights and remedies under the Loan Agreement, the Master Indenture, Obligation No. 1 and the Mortgage against any Member of the Obligated Group that would be rendered insolvent thereby could be subject to challenge. Similarly, the Borrower's and other Members of the Obligated Group's ability to enforce rights and remedies under the Leases. In addition, enforcement of such rights and remedies will depend upon the exercise of various remedies specified by such documents, which, in many instances, may require judicial actions that are subject to discretion and delay, that otherwise may not be readily available or that may be limited by certain legal principles, including fraudulent conveyance or moratorium and other similar laws.

The joint and several obligation described herein of each Member of the Obligated Group to make payments on Obligation No. 1 may not be enforceable against a Member of the Obligated Group under any of the following circumstances:

- to the extent payments on Obligation No. 1 are requested to be made from assets of such Member of the Obligated Group that are donor-restricted or that are subject to a direct, express or charitable trust that does not permit the use of such assets for such payments;

- if the purpose of the debt created and evidenced by Obligation No. 1 is not consistent with the charitable purposes of such Member of the Obligated Group, or if the debt was incurred or issued for the benefit of an entity other than a nonprofit corporation that is exempt from federal income taxes under sections 501(a) and 501(c)(3) of the Code and is not a "private foundation" as defined in section 509(a) of the Code;

- if and to the extent payments are requested to be made pursuant to any loan violating applicable usury laws.

These limitations on the enforceability of the joint and several obligations of the Members of the Obligated Group on Obligation No. 1 also apply to their obligations on all Obligations. If the obligation of a particular Member of the Obligated Group to make payment on an Obligation is not enforceable and payment is not made on such Obligation when due in full, then Events of Default will arise under the Master Indenture.

There exists common law authority and authority under certain statutes for the ability of the courts to terminate the existence of a nonprofit corporation or undertake supervision of its affairs on various grounds, including a finding that such corporation has insufficient assets to carry out its stated charitable purposes. Such court action may arise on the court's own motion or pursuant to a petition of the state Attorney General or such other persons who have interests different from those of the general public, pursuant to the common law and statutory power to enforce charitable trusts and to see to the application of their funds to their intended charitable uses.

34

The various legal opinions delivered concurrently with the issuance of the Bonds are qualified as to the enforceability of the various legal instruments by limitations imposed by state and federal laws, rulings, policy and decisions affecting remedies and by bankruptcy, reorganization or other laws of general application affecting the enforcement of creditors' rights or the enforceability of certain remedies or document provisions.

**Perfection of a Security Interest.**  Each Member of the Obligated Group will grant a security interest in the Gross Revenue Fund and all of the Gross Revenues of the Obligated Group (to the extent permitted by law) and will agree to perfect the grant of a security interest in the Gross Revenue Fund to the extent, and only to the extent, that such security interest may be perfected under the Uniform Commercial Code.  The grant of a security interest in Gross Revenues may be subordinated to the interest and claims of others in several instances.  Some examples of cases of subordination of prior interests and claims are (i) statutory liens, (ii) rights arising in favor of the United States of America or any agency thereof, (iii) present or future prohibitions against assignment in any federal statutes or regulations, (iv) constructive trusts, equitable liens or other rights impressed or conferred by any state or federal court in the exercise of its equitable jurisdiction, and (v) federal or state bankruptcy laws that may affect the enforceability of the Master Indenture or grant of a security interest in Gross Revenues.  In addition, it may not be possible to perfect a security interest in any manner whatsoever in certain types of Gross Revenues (e.g., gifts, donations, certain insurance proceeds and payments under state funding programs) prior to actual receipt by any Member of the Obligated Group.

[REMAINDER OF THIS PAGE IS BLANK]

**Flow of Funds**

The following is a summary pictorial of the flow of funds. It is meant as a summary and reference is made to APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS" for a more complete description of the flow of funds.



## RISK FACTORS

*Investment in the Bonds involves substantial risks. The following information should be considered by prospective investors in evaluating the Bonds. However, the following does not purport to be an exclusive listing of risks and other considerations which may be relevant to investing in the Bonds, and the order in which the following information is presented is not intended to reflect the relative importance of any such risks. Certain factors which could result in a reduction of revenues available to the Financed Charter Schools and a corresponding reduction in payments made to the Authority by the Borrower are discussed herein.*

A number of factors could have an adverse impact on the ability of the Financed Charter Schools to generate sufficient revenues to meet their respective obligations under the Leases, which could, in turn, have an effect on the Borrower's ability to make loan repayments. The ability of the Financed Charter Schools to generate sufficient revenues is dependent upon a number of elements, including the Ohio state budget pressures relating to the Financed Charter Schools in Ohio and the Illinois state budget pressures relating to the Chicago Math & Science Academy, demand for charter schools, the ability of the Financed Charter Schools to provide the educational services and classes demanded by parents or to attract students generally, changes in the level of confidence in the public school system in general or public charter

36

schools in particular, competition, faculty recruitment, demographic changes, legislation, governmental regulations, changes in immigration policy, litigation and the Financed Charter Schools' ability to achieve enrollment and fundraising levels. This, in turn, is affected by numerous circumstances both within and outside the control of the Financed Charter Schools, including a continuation of favorable governmental policies and programs with respect to public charter schools (see APPENDIX G - "COMMUNITY SCHOOL/CHARTER SCHOOL STATUTES IN OHIO AND ILLINOIS" attached hereto); the competitive appeal and perceived quality of the Financed Charter Schools' curriculum; the ability and energy of its faculty and administration; and the benevolence of its supporters. **The adequacy of the Borrower's pledged Revenues depends primarily on the ability of the Financed Charter Schools to pay Rent under their respective Leases. There can be no assurance given that revenues of the Borrower, the Obligated Group or the Financed Charter Schools will not decrease.**

**Any and all financial projections are only good faith estimates and are not intended as a representation or warranty as to the future financial condition of the Financed Charter Schools, the Obligated Group or the Borrower.**

See APPENDIX A "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" hereto for more detailed information regarding the Financed Charter Schools, the Obligated Group and the Borrower. See APPENDIX G hereto for more detailed information on the laws of the State of Ohio and State of Illinois relating to the Financed Charter Schools and the funding therefor.

**General**

Base Rent payments made under the Leases by the Financed Charter Schools will be the primary source for funds to make debt service payments on the Bonds. A Lease termination or default would likely have a material adverse effect on the Borrower's ability to make debt service payments; provided, however, the Borrower will have the ability to redeem Bonds in part following a Lease termination or default or to restructure a Lease. See "THE BONDS - Redemption" herein. The Members of the Obligated Group have also encumbered the Facilities with the Mortgages as security for their obligations under the Master Indenture. No representation or assurance can be made that base rent payments under the Leases will be realized in amounts sufficient to make the payments under the Loan Agreement and no representation or assurance can be made that upon foreclosure of a Mortgage the sale price of the related Facility would be equal to the principal amount of Bonds allocable to that Facility. **Revenues available to the Bond Trustee to pay debt service on the Bonds are primarily dependent on the ability of the respective Financed Charter Schools to make payments of rent under the Leases.**

THE BONDS, THE PREMIUM, IF ANY, AND THE INTEREST THEREON ARE SPECIAL LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE EXCLUSIVELY FROM THE TRUST ESTATE. THE BONDS DO NOT CONSTITUTE A DEBT OR A LOAN OF CREDIT OR A PLEDGE OF THE FULL FAITH AND CREDIT OR TAXING POWER OF THE AUTHORITY, OF PIMA COUNTY, ARIZONA, THE STATE OF ARIZONA, OR OF ANY POLITICAL SUBDIVISIONS THEREOF, WITHIN THE MEANING OF ANY ARIZONA CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION AND SHALL NEVER CONSTITUTE NOR GIVE RISE TO A PECUNIARY LIABILITY OF THE STATE OF ARIZONA OR PIMA COUNTY, ARIZONA. THE BONDS SHALL NOT CONSTITUTE, DIRECTLY OR INDIRECTLY, OR CONTINGENTLY OBLIGATE OR OTHERWISE CONSTITUTE, A GENERAL OBLIGATION OF OR A CHARGE AGAINST THE GENERAL CREDIT OF THE AUTHORITY, BUT SHALL BE SPECIAL LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE SOLELY FROM THE SOURCES DESCRIBED IN THE BOND INDENTURE. THE AUTHORITY HAS NO TAXING POWER.

**Obligation of Financed Charter Schools is Several, not Joint; No Cross Collateralization of Lease Obligations**

The obligations of each Financed Charter School under its Lease will be an obligation of only that particular Financed Charter School and no other Financed Charter School is jointly liable thereon.  Thus, a default by one Financed Charter School under its Lease will not increase the obligation of any other Financed Charter School and will not be an event of default under any other Lease or under the Loan Agreement, the Bond Indenture or the Master Indenture.  However, once Lease payments are made to the Bond Trustee, the Bond Trustee is required to deposit the payments in the Revenue Fund and apply them in accordance with the Bond Indenture, including to make debt service payments on the Bonds, without regard to the source of any Lease payments.  Thus, Lease payments are not designated for payment of any particular Bonds or limited to the amount of Bonds used to compute the Lease Base Rent payments.

If a Financed Charter School were to default under its Lease, such default would not constitute an event of default under any other Lease or increase the obligations of any other Financed Charter School, under its Lease or otherwise.  After a default under a Lease, the applicable fee owner of the Facility that is a Member of the Obligated Group may cure such event of default and the Borrower may, among other things, prepay the Loan in part to reduce the Lease obligation of a Financed Charter School.  If the default is not cured, the Borrower, or the Bond Trustee, may sell the related Facility and apply the proceeds thereof to a partial redemption of Bonds.  Since the appraised values of the Facilities are significantly below the principal amount of the Bonds, it is not expected that such sale proceeds would be sufficient to redeem an Allocable Amount of Bonds and that Bondholders would have to rely on the Borrower or excess revenues, if any, in the Revenue Fund, to redeem the remaining portion of Bonds allocable to such Facility.  See "THE PROJECTS - Computation of Lease Payments" and "THE PROJECTS - Appraisals" herein.  However, the Loan Agreement and Bond Indenture provide that the Borrower may cause excess funds in the Revenue Fund under the Bond Indenture to be used to make further partial redemptions towards the allocable amount of Bonds to be redeemed resulting from a default under a Lease.

**Tax Related Issues**

*Tax-Exempt Status of Interest on the Bonds.*  The Code imposes a number of requirements that must be satisfied for interest on state and local obligations, such as the Bonds, to be excludable from gross income for federal income tax purposes.  These requirements include limitations on the use of Bond proceeds, limitations on the investment earnings of Bond proceeds prior to expenditure, a requirement that certain investment earnings on Bond proceeds be paid periodically to the United States and a requirement that the issuers file an information report with the Internal Revenue Service (the "IRS").  The Authority, the Members of the Obligated Group and the Financed Charter Schools have covenanted in certain of the documents referred to herein that they will comply with such requirements.  Failure by any of the foregoing to comply with the requirements stated in the Code and related regulations, rulings and policies may result in the treatment of interest on the Bonds as taxable, retroactively to the date of issuance of the Bonds.

*Maintenance of the Tax-Exempt Status.*  The tax exempt status of the Bonds depends upon the maintenance by Financed Charter Schools and the Borrower of each of their status as an organization described in section 501(c)(3) of the Code.  The maintenance of such status is contingent on compliance with general rules promulgated in the Code and related regulations regarding the organization and operation of tax-exempt entities, including the operation for charitable and educational purposes and avoidance of transactions which may cause the assets of either to inure to the benefit of private individuals.

38

In recent years, the IRS has increased the frequency and scope of its audit and other enforcement activity regarding tax-exempt organizations and, in particular, charter schools. As a result, tax-exempt organizations are increasingly subject to a greater degree of scrutiny. The primary penalty available to the IRS under the Code with respect to a tax-exempt entity engaged in unlawful private benefit is the revocation of tax-exempt status. Although the IRS has not frequently revoked the 501(c)(3) tax-exempt status of nonprofit corporations, it could do so in the future. Loss of tax-exempt status by the Financed Charter Schools or the Borrower could potentially result in loss of tax exemption of interest on the Bonds and of other existing and future tax-exempt debt of the Borrower, if any, and defaults in covenants regarding the Bonds and other existing and future tax-exempt debt, if any, would likely be triggered.

Less onerous sanctions have been enacted which focus enforcement on private persons who transact business with a tax-exempt organization rather than the tax-exempt organization, but these sanctions do not replace the other remedies available to the IRS as mentioned above.

*State Income Tax Exemption.* The loss by the Members of the Obligated Group or the Financed Charter Schools of federal tax exemption might trigger a challenge to its State income tax exemption. Such event could be adverse and material.

*Unrelated Business Income.* In recent years, the IRS and state, county and local taxing authorities have been undertaking audits and reviews of the operations of tax-exempt organizations with respect to their exempt activities and the generation of unrelated business taxable income ("UBTI"). The Financed Charter Schools, the Borrower and the other Members of the Obligated Group currently report no UBTI, except for an immaterial amount associated with a cell tower license on a charter school in Cleveland, Ohio owned by a limited liability company of which the Borrower is the sole member. The Financed Charter Schools and Members of the Obligated Group may participate in activities which generate UBTI in the future. If so, the Financed Charter Schools and Members of the Obligated Group believe they would properly account for and report all UBTI; nevertheless, an investigation or audit could lead to a challenge which could result in taxes, interest and penalties with respect to unreported UBTI and in some cases could ultimately affect their tax-exempt status, as well as the exclusion from gross income for federal income tax purposes of the interest on the Bonds.

*Exemption from Property Taxes.* In recent years, state, county and local taxing authorities have been undertaking audits and reviews of the operations of tax-exempt corporations with respect to their real property tax exemptions. Currently, applications for real property taxation are pending for previous years with respect to some of the properties that encompass the campuses. For other schools, initial rulings as to those applications for previous years have been adverse, and the Borrower will file appeals of those initial determinations. Although some real property taxes have been paid as to such properties while the applications have been pending, the Borrower had for the most part not paid such property taxes as to such properties while the applications are pending with the understanding that the assessed taxes will be waived once the tax-exemption is granted. However, all property taxes that are due and payable for any prior years as to any Facilities will be fully paid upon issuance of the Bonds. With respect to those properties for which adverse real property tax determinations were received, it is not certain whether those appeals as to prior years will ultimately be successful. However, significant legislation was recently adopted in Ohio (H.B. 153) that amended Ohio's property tax exemption law by adding an exemption for "real property used by a school for primary or secondary educational purposes," effective for taxes for the 2011 tax year. "School" includes community schools, therefore the Borrower expects that all of the Facilities located in Ohio will be able to obtain exemption from property taxes for future years. Under that legislation, it appears that property used as a charter school is entitled to exemption from property taxes, without regard to the ownership of the property and without regard to either (1) whether the school

uses the property under a lease or (2) the terms of any such lease[4].  However, it is possible that the statutes regarding real property tax exemption could be further changed or that the interpretation of existing statutory law could be changed to deny property tax exemption to the facilities.

Also, there is a possibility that real property tax exemption could be denied for the campus used by Chicago Math & Science Academy.  It is not clear whether under Illinois law a property owned by a supporting organization of a 501(c)(3) organization such as Chicago Math & Science Academy and leased in its entirety to the supported organization will qualify for property tax exemption.  Although some statutes appear to suggest that the property could qualify for property tax exemption, there are cases, arguably distinguishable, that suggest otherwise.

**Factors That Could Affect the Security Interest in the Pledged Revenues**

The Master Trustee's security interest in the Facilities may be subordinated to the interest and claims of others in several instances.  Some examples of cases of subordination of prior claims are (i) statutory liens, (ii) rights arising in favor of the United States of America or any agency thereof, (iii) present or future prohibitions against assignment in any statutes or regulations, (iv) constructive trusts, equitable liens or other rights impressed or conferred by any state or federal court in the exercise of its equitable jurisdiction, (v) federal or state bankruptcy or insolvency laws that may affect the enforceability of the Loan Agreement or the Leases, (vi) rights of third parties in amounts not in the possession of the Master Trustee, and (vii) claims that might arise if appropriate financing or continuation statements are not filed in accordance with the Ohio or Illinois Uniform Commercial Code as from time to time in effect.

**Limitations on Value of the Facilities and to Remedies Under the Mortgages**

*Maintenance of Value.*  The Facilities are located in regions that have experienced significant real property market volatility over the past several years.  The Facilities are used for the special purpose of educating school children.  Due to the special use nature of the Facilities, the prospective pool of purchasers at resale may be limited.  There can be no assurance that should a Financed Charter School default on its Lease and thereby cause the Borrower to default in making the payments due under the Loan Agreement, the particular Facilities could be foreclosed upon and sold for the amounts owed with respect to the Bonds.

*Appraised Value is Substantially Less than the Principal Amount of the Bonds.*  The appraisal reports (the "Appraisals") for the Facilities estimate the market value "as completed" of the Facilities.  See "THE PROJECTS - Appraisals" herein.  Thus, on liquidation, it is not expected that amounts received upon sale of a particular Facility would be sufficient to pay allocable portion (allocable to that Facility) of the Bonds in full.  Moreover, no assurance can be given that the Facilities could be sold for the amount of estimated market value thereof contained in the Appraisals.  Appraisals, including the Appraisals, are subject to numerous limitations.  See "THE PROJECTS - Appraisals" herein.

*Hazardous Substances.*  While governmental taxes, assessments and charges are common claims against the value of property, other less common claims may be relevant.  One of the most serious in terms of the potential reduction in the value that may be realized is a claim with regard to hazardous substances.  In general, the Borrower may be required by law to remedy conditions of the Facilities relating to release of hazardous substances.  The federal Comprehensive Environmental Response,

---

[4] A recent Ohio Supreme Court case determined that a real property tax exemption is not available to property when that property is privately owned and is leased to a charter school under a for-profit lease.  Legislation that was recently enacted in Ohio appears to change Ohio law to render the outcome of that case irrelevant to tax years after the 2011 tax year.

Compensation and Liability Act of 1980, sometimes referred to as "CERCLA" or the "Superfund Act," is the most well-known and widely applicable of these laws. Ohio and Illinois law with regard to hazardous substances are stringent and similar to certain federal acts. Under many of these laws, the owner (or operator) is obligated to remedy a hazardous substance condition of property whether or not the owner (or operator) had or has anything to do with the creation or handling of the hazardous substance. The effect, therefore, should the Facilities be affected by a hazardous substance, is generally to reduce the marketability and value of the parcel by the cost of remedying the condition. Further, such liabilities may arise not simply from the existence of a hazardous substance but from the method of handling the hazardous substance. Any of these potentialities could significantly affect the value of the Project that would be realized upon a default and foreclosure. See "THE PROJECTS - Environmental Reports and Status" herein.

*Foreclosure.* Should foreclosure under any of the Mortgages be sought, it is generally subject to most of the delays and expenses of other lawsuits, and may require several years to complete.

*Construction Risk.* The new construction component (i.e. the rehabilitation of most of the Facilities in some fashion or another) is subject to the risk of delays due to a variety of factors including, among others, delays in obtaining the necessary permits, licenses and other governmental approvals, site difficulties, labor disputes, delays in delivery and shortage of materials, weather conditions, fire and other casualties and default by the applicable Member of the Obligated Group, a contractor or subcontractors. If completion of a Facility is delayed beyond the estimated construction period, projected Revenues from increased enrollment or initial start-up enrollment may be delayed. Such a delay could adversely affect the financial condition of the Financed Charter Schools.

The Borrower believes that the proceeds of the Bonds will be sufficient to finance the costs of the Facilities. The costs of construction may be increased, however, if there are change orders. Furthermore, the cost of construction of any campus may be affected by other factors beyond the control of the applicable Member of the Obligated Group or any contractor constructing any portion of the Project, including, but not limited to, labor disputes, delays in delivery and shortage of materials, site difficulties, adverse weather conditions, subcontractor defaults, fire and casualty and unknown contingencies.

The construction contracts will require that the applicable contractor provide payment and performance bonds. However, there can be no assurance that the obligation of the surety under such bonds can be enforced without costly and time-consuming litigation.

*Environmental Risks.* There are potential risks relating to liabilities for environmental hazards with respect to the ownership of any real property. If hazardous substances are found to be located on a property, owners of such property may be held liable for costs and other liabilities related to the removal of such substances which costs and liabilities could exceed the value of the Facilities or any portion thereof. See "THE PROJECTS - Environmental Report and Status" herein.

**Bankruptcy**

The rights and remedies of the owners of the Bonds are subject to various provisions of the Federal Bankruptcy Code (the "Bankruptcy Code"). If any Member of the Obligated Group were to become a debtor in a bankruptcy case, its revenues and certain of its accounts receivable and other property created or otherwise acquired after the filing of such petition and for up to 90 days prior to the filing of such petition may not be subject to the security interest created under the Mortgages for the benefit of the owners of the Bonds. The filing would operate as an automatic stay of the commencement or continuation of any judicial or other proceeding against any Member of the Obligated Group, and its property, and as an automatic stay of any act or proceeding to enforce a lien upon or to otherwise exercise

41

control over its property.  If the bankruptcy court so ordered, the property of any Member of the Obligated Group, including accounts receivable and proceeds thereof, could be used for the financial rehabilitation of such Member despite the security interest of the Master Trustee therein.  While the Bankruptcy Code requires that the interest of the Master Trustee as lien owner be adequately protected before the collateral may be used by the Member, such protection could take the form of a replacement lien on assets of the Borrower acquired or created after the bankruptcy petition is instituted.  The rights of the Master Trustee to enforce liens and security interests against the Obligated Group's assets could be delayed during the pendency of the rehabilitation proceedings.

A Member could file a plan for the reorganization of its debts in any such proceeding which could include provisions modifying or altering the rights of creditors generally, or any class of them, secured or unsecured.  The plan, when confirmed by a court, binds all creditors who had notice or knowledge of the plan and discharges all claims against the debtor provided for in the plan.  No plan may be confirmed unless certain conditions are met, among which are that the plan is in the best interests of creditors, is feasible and has been accepted by each class of claims impaired thereunder.  Each class of claims has accepted the plan if at least two thirds in dollar amount and more than one half in number of the class cast votes in its favor.  Even if the plan is not so accepted, it may be confirmed if the court finds that the plan is fair and equitable with respect to each class of non-accepting creditors impaired thereunder and does not discriminate unfairly.

**Factors Associated with Financed Charter Schools' Operations**

There are a number of factors affecting schools generally that could have an adverse effect on the Financed Charter Schools' financial position and ability to make rent payments necessary to make debt service payments on the Bonds.  These factors include, but are not limited to, failure to qualify for statutory reimbursement under state programs; increasing costs of compliance with federal, state or local laws or regulations, including, but not limited to, laws or regulations concerning environmental quality, work safety and accommodation of persons with disabilities; taxes or other charges imposed by federal, state or local governments; the ability to attract a sufficient number of students; changes in existing statutes pertaining to the powers of the Financed Charter Schools and disruption of the Financed Charter Schools' operations by real or perceived threats against the Financed Charter Schools, its staff members or students.  The Financed Charter Schools cannot assess or predict the ultimate effect of such factors on its operations or financial results of its operations or on its ability to make rent payments.

**Other Limitations on Enforceability of Remedies**

There exists common law authority and authority under various state statutes pursuant to which courts may terminate the existence of a nonprofit corporation or undertake supervision of its affairs on various grounds, including a finding that the corporation has insufficient assets to carry out its stated charitable purposes or has taken some action which renders it unable to carry out such purposes.  Such court action may arise on the court's own motion or pursuant to a petition of a state attorney general or other persons who have interests different from those of the general public, pursuant to the common law and statutory power to enforce charitable trusts and to see to the application of their funds to their intended charitable uses.

In addition to the foregoing, the realization of any rights under the Loan Agreement, the Bond Indenture, the Leases, the Master Indenture and the Mortgages upon a default depends upon the exercise of various remedies specified in the Loan Agreement, the Bond Indenture, the Leases, the Master Indenture and the Mortgages.  These remedies may require judicial action which is often subject to discretion and delay.  Under existing law, certain of the remedies specified in the Loan Agreement, the Bond Indenture, the Leases, the Master Indenture and the Mortgages may not be readily available or may

be limited. For example, a court may decide not to order the specific performance of the covenants contained in the Loan Agreement, the Bond Indenture, the Leases, the Master Indenture and the Mortgages. Accordingly, the ability of the Authority or the Bond Trustee/Master Trustee to exercise remedies under the Loan Agreement, the Bond Indenture, the Leases, the Master Indenture and the Mortgages upon an Event of Default could be impaired by the need for judicial or regulatory approval.

**Specific Risks of Charter Schools**

*Charter School Laws.* The charter school laws in Ohio and Illinois are evolving. Amendments are made relatively frequently and legislative and public attitudes are still forming. Significant legislation was recently adopted in Ohio (H.B. 153) that significantly altered the Ohio charter school statute, which is further described in APPENDIX G - "COMMUNITY SCHOOL/CHARTER STATUTES IN OHIO AND ILLINOIS" hereto. It is likely that additional changes will be made in the future, some of which may be adverse to charter schools in general and to the Financed Charter Schools in particular.

*Non-Renewal or Revocation of Charters.* In Illinois, a charter may be granted for five to ten years, and may be renewed in increments not to exceed five years. The Illinois charter school law allows for nonrenewal and revocation of a charter. See APPENDIX G - "COMMUNITY SCHOOL/CHARTER SCHOOL STATUTES IN OHIO AND ILLINOIS" attached hereto. In Ohio, the charter schools (referred to as "community schools") have "sponsor" contracts that are, in some cases, on a year-to-year basis. However, none of the Financed Charter Schools in Ohio are currently on a year-to-year basis. The Ohio charter school law allows for nonrenewal and revocation. The Financed Charter Schools believe that they have stable relationships with their sponsors and charter authorizer, as applicable. See APPENDIX A - "INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" herein.

*Budgetary Constraints.* The Financed Charter Schools are funded primarily from State and local tax revenues and budgetary pressures at the state or local level may jeopardize future funding levels, which may adversely affect the ability of the Financed Charter Schools to make their respective payments under the Leases. See APPENDIX G - "COMMUNITY SCHOOL/CHARTER SCHOOL STATUTES IN OHIO AND ILLINOIS".

*Enrollment Levels.* The Financed Charter Schools' revenues and financial strength will depend in part upon maintaining certain enrollment levels at the Financed Charter Schools. A reduction in enrollment will have a direct result of reducing attendance-based state payments or, for the Chicago Math & Science Academy, per capital student tuition payments, payable with respect to the affected Financed Charter School. A reduction in revenues of a Financed Charter School could materially affect its ability to make Lease payments under its Lease.

*Risk of Reduction in Funding.* Since the vast majority of funds for the Financed Charter Schools' operations come from the State on the basis of attendance, each Financed Charter School is subject to State funding reductions or restrictions that might affect all public school districts and charter schools. Among other such risks, over time the State may not increase attendance based funding commensurate with increases in the cost of school operations, or the State may even decrease attendance based funding. See APPENDIX G - "COMMUNITY SCHOOL/CHARTER SCHOOL STATUTES IN OHIO AND ILLINOIS".

Attendance-based funding is determined by actual attendance, and not by student enrollment data. Regardless of the statewide level of attendance based funding, the Financed Charter Schools are subject to loss of revenue if attendance should decrease, or if attendance should decrease even if enrollment remains

steady, whether due to student illness, truancy or other factors.  Such a loss of revenues could adversely affect the ability of the Financed Charter Schools to make their respective payments under the Leases.

In addition, the charter school laws prohibit a charter school from imposing fees or charges for its educational services.  Therefore, the Financed Charter Schools are dependent upon receipt of primarily state funding as well as philanthropic support.  There is little any charter school can do to increase revenues, other than to admit a larger number of students.  Each of the Financed Charter Schools competes for students with public district schools, other community schools and private schools.

***Labor Relations.***  Unionization of employees, or a shortage of qualified teachers, could cause a larger than expected increase in payroll costs, which could have a material adverse effect on the ability of the Financed Charter Schools to make their base rental payments, which is the primary source of revenues to Members of the Obligated Group for use to make debt service payments on the Bonds.  Currently, none of the employees of the Financed Charter Schools belong to unions.  However, more than half of the teacher employees of the Chicago Math & Science Academy voted approximately one year ago to unionize, although their organization has not been recognized.

On July 29, 2010, CMSA filed a petition with Region 13 of the National Labor Relations Board ("NLRB").  The petition asserted that a labor organization had presented a claim to be recognized as the representative of a group of CMSA employees.  As such, CMSA requested that the NLRB schedule a secret ballot election among its employees, in order to resolve an ongoing dispute as to whether the union represents a majority of CMSA faculty for collective bargaining purposes.

The union in question opposed CMSA's petition, however, arguing that the NLRB has no jurisdiction over CMSA because it is a "political subdivision" within the meaning of the National Labor Relations Act.  As such, the union alleged that CMSA is properly subject to the jurisdiction of the Illinois Educational Labor Relations Act, a state statute that regulates labor relations between state educational employers and unions.  After a fact-finding hearing, the Acting Regional Director of NLRB Region 13 issued a Decision and Order, finding that CMSA was a "political subdivision" within the meaning of Section 2(2) of the Act.  By extension, the Acting Regional Director concluded that the Board did not have jurisdiction to process CMSA's representation petition, and dismissed it in its entirety.

CMSA filed a Request for Review on October 18, 2010 with the full NLRB in Washington, D.C.  The NLRB granted CMSA's Request for Review on January 10, 2011, and gave the parties and interested *amici* an opportunity to file legal briefs on the matter.  Briefing was completed in March 2011.  The NLRB has not issued a final decision in the matter.  CMSA expects that the ruling will be issued sometime before the end of the calendar year 2011.

***Reliance on Concept Schools for Management.***  Each Financed Charter School is managed by Concept Schools, NFP, an Illinois nonprofit corporation ("Concept").  Each Financed Charter School relies upon Concept for its curriculum, management capabilities and resources in managing and operating the Financed Charter School.  The loss of those management services from Concept could have a material adverse impact on the Financed Charter Schools' ability to maintain and increase attendance levels.  Attendance levels drive revenues and if attendance drops, revenues could be affected in a negative fashion, which would impact the Financed Charter Schools' ability to make timely payments of base rent under their respective Leases.

**Claims and Insurance Coverage**

Litigation could arise from the corporate and business activities of the Borrower and of the Financed Charter Schools, including from their status as employers.  See APPENDIX A -

"INFORMATION REGARDING NEW PLAN LEARNING, INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS" - "CONCEPT SCHOOLS - Investigations". Many of these risks are covered by insurance, but some are not. For example, claims arising from wrongful termination or sexual molestation claims and business disputes may not be covered by insurance or other sources and may, in whole or in part, be a liability of the affected school if determined or settled adversely.

The Members of the Obligated Group have covenanted and agreed in the Master Indenture that they will keep maintain, or caused to be maintained, property, general liability and business interruption insurance with respect to the Facilities at levels set forth in the Master Indenture. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS — LOAN AGREEMENT" herein.

## ABSENCE OF MATERIAL LITIGATION

### The Authority

To the knowledge of the Authority, there is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, governmental agency, public board or body, pending against the Authority seeking to restrain or enjoin the sale or issuance of the Bonds, or in any way contesting or affecting any proceedings of the Authority taken concerning the sale thereof, the pledge or application of any moneys or security provided for the payment of the Bonds, the validity or enforceability of the documents executed by the Authority in connection with the Bonds, the completeness or accuracy of the Official Statement or the existence or powers of the Authority relating to the sale of the Bonds.

### The Borrower

There is no controversy or litigation of any nature now pending against the Borrower or, to the knowledge of the officers of the Borrower, threatened, which seeks to restrain or enjoin the sale or issuance of the Bonds or in any way contests or affects the validity of the Bonds, or any proceedings of the Borrower or any Member of the Obligated Group taken concerning the issuance or sale of the Bonds, or the pledge or application of any moneys or security provided for the payment of the Bonds, the use of the Bond proceeds or the existence or powers of the Borrower or any Member of the Obligated Group relating to the issuance of the Bonds.

### The Financed Charter Schools

There is no controversy or litigation of any nature now pending against any of the Financed Charter Schools or, to the knowledge of the officers of those respective Financed Charter Schools, threatened, which seeks to restrain or enjoin the sale or issuance of the Bonds or in any way contests or affects the validity of the Bonds, or any proceedings of the Financed Charter Schools taken concerning the issuance or sale of the Bonds, or the pledge or application of any moneys or security provided for the payment of the Bonds, the use of the Bond proceeds or the existence or powers of the Financed Charter Schools relating to the issuance of the Bonds or relating to the Leases.

## TAX MATTERS

### The Series 2011A Bonds

In the opinion of Orrick, Herrington & Sutcliffe LLP, Bond Counsel to the Authority ("Bond Counsel"), based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, the accuracy of certain representations and compliance with certain

covenants, interest on the Series 2011A Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Code and is exempt from State of Arizona taxation.  In the further opinion of Bond Counsel, interest on the Series 2011A Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although Bond Counsel observes that such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income.  A complete copy of the proposed form of opinion of Bond Counsel is set forth in Appendix F hereto.

To the extent the issue price of any maturity of the Series 2011A Bonds is less than the amount to be paid at maturity of such Series 2011A Bonds (excluding amounts stated to be interest and payable at least annually over the term of such Series 2011A Bonds), the difference constitutes "original issue discount," the accrual of which, to the extent properly allocable to each Beneficial Owner thereof, is treated as interest on the Series 2011A Bonds which is excluded from gross income for federal income tax purposes.  For this purpose, the issue price of a particular maturity of the Series 2011A Bonds is the first price at which a substantial amount of such maturity of the Series 2011A Bonds is sold to the public (excluding bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers).  The original issue discount with respect to any maturity of the Series 2011A Bonds accrues daily over the term to maturity of such Series 2011A Bonds on the basis of a constant interest rate compounded semiannually (with straight-line interpolations between compounding dates).  The accruing original issue discount is added to the adjusted basis of such Series 2011A Bonds to determine taxable gain or loss upon disposition (including sale, redemption, or payment on maturity) of such Series 2011A Bonds.  Beneficial Owners of the Series 2011A Bonds should consult their own tax advisors with respect to the tax consequences of ownership of Series 2011A Bonds with original issue discount, including the treatment of Beneficial Owners who do not purchase such Series 2011A Bonds in the original offering to the public at the first price at which a substantial amount of such Series 2011A Bonds is sold to the public.

Series 2011A Bonds purchased, whether at original issuance or otherwise, for an amount higher than their principal amount payable at maturity (or, in some cases, at their earlier call date) ("Premium Bonds") will be treated as having amortizable bond premium.  No deduction is allowable for the amortizable bond premium in the case of bonds, like the Premium Bonds, the interest on which is excluded from gross income for federal income tax purposes.  However, the amount of tax-exempt interest received, and a Beneficial Owner's basis in a Premium Bond, will be reduced by the amount of amortizable bond premium properly allocable to such Beneficial Owner.  Beneficial Owners of Premium Bonds should consult their own tax advisors with respect to the proper treatment of amortizable bond premium in their particular circumstances.

The Code imposes various restrictions, conditions and requirements relating to the exclusion from gross income for federal income tax purposes of interest on obligations such as the Series 2011A Bonds.  The Authority, the Borrower and the Financed Charter Schools have made certain representations and covenanted to comply with certain restrictions, conditions and requirements designed to ensure that interest on the Series 2011A Bonds will not be included in federal gross income.  Inaccuracy of these representations or failure to comply with these covenants may result in interest on the Series 2011A Bonds being included in gross income for federal income tax purposes, possibly from the date of original issuance of the Series 2011A Bonds.  The opinion of Bond Counsel assumes the accuracy of these representations and compliance with these covenants.  The opinion of Bond Counsel also assumes that actions of the Borrower, Financed Charter Schools, the Authority and other persons taken subsequent to the date of issuance of the Series 2011A Bonds will not cause any of the Series 2011A Bonds to exceed the $150,000,000 limitation on qualified 501(c)(3) bonds that do not finance hospital facilities, as set forth in Section 145(b) of the Code.  Bond Counsel has not undertaken to determine (or to inform any person) whether any actions taken (or not taken), or events occurring (or not occurring), or any other

46

matters coming to Bond Counsel's attention after the date of issuance of the Series 2011A Bonds may adversely affect the value of, or the tax status of interest on, the Series 2011A Bonds. Accordingly, the opinion of Bond Counsel is not intended to, and may not, be relied upon in connection with any such actions, events or matters.

In addition, Bond Counsel has relied, among other things, on the opinion of Jeff Stewart Legal Services, LLC, Counsel to the Members of the Obligated Group and the opinion of Nicola, Gudbranson & Cooper, LLC, and Chico & Nunes, P.C., Counsel to the Financed Charter Schools as the tenant of the Facilities regarding the current qualification of each of the Borrower and the Financed Charter Schools as an organization described in Section 501(c)(3) of the Code and the intended operation of the facilities to be financed or refinanced by the Series 2011A Bonds as substantially related to each of the Borrower's and Financed Charter Schools' charitable purposes under Section 513(a) of the Code. Such opinions are subject to a number of qualifications and limitations. Furthermore, Counsel to Financed Charter Schools and the Borrower cannot give and have not given any opinions or assurances about the future activities of Financed Charter Schools or the Borrower, or about the effect of future changes in the Code, the applicable regulations, the interpretation thereof or changes in enforcement thereof by the IRS. Failure of the Borrower or the Financed Charter Schools to be organized and operated in accordance with the IRS's requirements for the maintenance of their status as organizations described in Section 501(c)(3) of the Code, or to operate the facilities financed or refinanced by the Series 2011A Bonds in a manner that is substantially related to their charitable purposes under Section 513(a) of the Code, may result in interest payable with respect to the Series 2011A Bonds being included in federal gross income, possibly from the date of the original issuance of the Series 2011A Bonds.

Although Bond Counsel is of the opinion that interest on the Series 2011A Bonds is excluded from gross income for federal income tax purposes and is exempt from State of Arizona taxation, the ownership or disposition of, or the accrual or receipt of interest on, the Series 2011A Bonds may otherwise affect a Beneficial Owner's federal, state or local tax liability. The nature and extent of these other tax consequences depends upon the particular tax status of the Beneficial Owner or the Beneficial Owner's other items of income or deduction. Bond Counsel expresses no opinion regarding any such other tax consequences.

Future legislative proposals, if enacted into law, clarification of the Code or court decisions may cause interest on the Series 2011A Bonds to be subject, directly or indirectly, to federal income taxation or to be subject to or exempted from state income taxation, or otherwise prevent Beneficial Owners from realizing the full current benefit of the tax status of such interest. The introduction or enactment of any such future legislative proposals, clarification of the Code or court decisions may also affect the market price for, or marketability of, the Series 2011A Bonds. Prospective purchasers of the Series 2011A Bonds should consult their own tax advisors regarding any pending or proposed federal or state tax legislation, regulations or litigation, as to which Bond Counsel expresses no opinion.

The opinion of Bond Counsel is based on current legal authority, covers certain matters not directly addressed by such authorities, and represents Bond Counsel's judgment as to the proper treatment of the Series 2011A Bonds for federal income tax purposes. It is not binding on the IRS or the courts. Furthermore, Bond Counsel cannot give and has not given any opinion or assurance about the future activities of the Authority, the Borrower or Financed Charter Schools, or about the effect of future changes in the Code, the applicable regulations, the interpretation thereof or the enforcement thereof by the IRS. The Authority, the Borrower and Financed Charter Schools have covenanted, however, to comply with the requirements of the Code.

Bond Counsel's engagement with respect to the Bonds ends with the issuance of the Bonds, and, unless separately engaged, Bond Counsel is not obligated to defend the Authority, the Borrower,

Financed Charter Schools or the Beneficial Owners regarding the tax-exempt status of the Series 2011A Bonds in the event of an audit examination by the IRS. Under current procedures, parties other than the Authority, the Financed Charter Schools or the Borrower and their appointed counsel, including the Beneficial Owners, would have little, if any, right to participate in the audit examination process. Moreover, because achieving judicial review in connection with an audit examination of tax-exempt bonds is difficult, obtaining an independent review of IRS positions with which the Authority, the Borrower or Financed Charter Schools legitimately disagrees, may not be practicable. Any action of the IRS, including but not limited to selection of the Series 2011A Bonds for audit, or the course or result of such audit, or an audit of bonds presenting similar tax issues may affect the market price for, or the marketability of, the Series 2011A Bonds, and may cause the Authority, the Borrower, Financed Charter Schools or the Beneficial Owners to incur significant expense.

**The Series 2011B Bonds**

The following discussion summarizes certain U.S. federal tax considerations generally applicable to holders of the Series 2011B Bonds that acquire their 2011B Bonds in the initial offering. The discussion below is based upon laws, regulations, rulings, and decisions in effect and available on the date hereof, all of which are subject to change, possibly with retroactive effect. Prospective investors should note that no rulings have been or are expected to be sought from the IRS with respect to any of the U.S. federal income tax consequences discussed below, and no assurance can be given that the IRS will not take contrary positions. Further, the following discussion does not deal with all U.S. federal income tax consequences applicable to any given investor, nor does it address the U.S. federal income tax considerations applicable to categories of investors some of which may be subject to special taxing rules (regardless of whether or not such persons constitute U.S. Holders), such as certain U.S. expatriates, banks, REITs, RICs, insurance companies, tax-exempt organizations, dealers or traders in securities or currencies, partnerships, S corporations, estates and trusts, investors that hold their Series 2011B Bonds as part of a hedge, straddle or an integrated or conversion transaction, or investors whose "functional currency" is not the U.S. dollar. Furthermore, it does not address (i) alternative minimum tax consequences or (ii) the indirect effects on persons who hold equity interests in a holder. In addition, this summary generally is limited to investors that acquire their Series 2011B Bonds pursuant to this offering for the issue price that is applicable to such Series 2011B Bonds (i.e., the price at which a substantial amount of the Series 2011B Bonds are sold to the public) and who will hold their Series 2011B Bonds as "capital assets" within the meaning of Section 1221 of the Code.

As used herein, "U.S. Holder" means a beneficial owner of a Series 2011B Bond that for U.S. federal income tax purposes is an individual citizen or resident of the United States, a corporation or other entity taxable as a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia), an estate the income of which is subject to U.S. federal income taxation regardless of its source or a trust where a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons (as defined in the Code) have the authority to control all substantial decisions of the trust (or a trust that has made a valid election under U.S. Treasury Regulations to be treated as a domestic trust). As used herein, "Non-U.S. Holder" generally means a beneficial owner of a Series 2011B Bond (other than a partnership) that is not a U.S. Holder. If a partnership holds Series 2011B Bonds, the tax treatment of such partnership or a partner in such partnership generally will depend upon the status of the partner and upon the activities of the partnership. Partnerships holding Series 2011B Bonds, and partners in such partnerships, should consult their own tax advisors regarding the tax consequences of an investment in the Series 2011B Bonds (including their status as U.S. Holders or Non-U.S. Holders).

**For U.S. Holders**

In the opinion of Bond Counsel, based upon an analysis of existing laws, regulations, rulings and court decisions and assuming compliance with certain covenants, interest on the Series 2011B Bonds is exempt from State of Arizona taxation. Interest on the Series 2011B Bonds is not excluded from gross income for federal income tax purposes under Section 103 of the Code. Bond Counsel expresses no opinion regarding any other tax consequences related to the ownership or disposition of, or accrual or receipt of interest on, the Series 2011B Bonds.

The Series 2011B Bonds are not expected to be treated as issued with original issue discount ("OID") for U.S. federal income tax purposes because the stated redemption price at maturity of the Series 2011B Bonds is not expected to exceed their issue price, or because any such excess is expected to only be a de minimis amount (as determined for tax purposes).

Prospective investors that are not individuals or regular C corporations who are U.S. persons purchasing the Series 2011B Bonds for investment should consult their own tax advisors as to any tax consequences to them from the purchase, ownership and disposition of the Series 2011B Bonds.

Disposition of the Series 2011B Bonds. Unless a nonrecognition provision of the Code applies, the sale, exchange, redemption, retirement (including pursuant to an offer by the Authority), defeasance or other disposition of a Series 2011B Bond, will be a taxable event for U.S. federal income tax purposes. In such event, in general, a U.S. Holder of a Series 2011B Bond will recognize gain or loss equal to the difference between (i) the amount of cash plus the fair market value of property received (except to the extent attributable to accrued but unpaid interest on the Series 2011B Bond which will be taxed in the manner described above) and (ii) the U.S. Holder's adjusted tax basis in the Series 2011B Bond (generally, the purchase price paid by the U.S. Holder for the Series 2011B Bond, decreased by any amortized premium). Any such gain or loss generally will be capital gain or loss. In the case of a noncorporate U.S. Holder of the Series 2011B Bonds, the maximum marginal U.S. federal income tax rate applicable to any such gain will be lower than the maximum marginal U.S. federal income tax rate applicable to ordinary income if such U.S. holder's holding period for the Series 2011B Bonds exceeds one year. The deductibility of capital losses is subject to limitations.

**For Non-U.S. Holders**

Interest. Subject to the discussion below under the heading "Information Reporting and Backup Withholding," payments of principal of, and interest on, any Series 2011B Bond to a Non-U.S. Holder, other than (1) a controlled foreign corporation, as such term is defined in the Code, which is related to the Authority through stock ownership and (2) a bank which acquires such Series 2011B Bond in consideration of an extension of credit made pursuant to a loan agreement entered into in the ordinary course of business, will not be subject to any U.S. withholding tax provided that the beneficial owner of the Series 2011B Bond provides a certification completed in compliance with applicable statutory and regulatory requirements, which requirements are discussed below under the heading "Information Reporting and Backup Withholding," or an exemption is otherwise established.

Disposition of the Series 2011B Bonds. Subject to the discussion below under the heading "Information Reporting and Backup Withholding," any gain realized by a Non-U.S. Holder upon the sale, exchange, redemption, retirement (including pursuant to an offer by the Authority), defeasance or other disposition of a Series 2011B Bond generally will not be subject to U.S. federal income tax, unless (i) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business within the United States; or (ii) in the case of any gain realized by an individual Non-U.S. Holder, such holder is present in the United States for 183 days or more in the taxable year of such sale, exchange, redemption,

49

retirement (including pursuant to an offer by the Authority), defeasance or other disposition and certain other conditions are met.

U.S. Federal Estate Tax.  A Series 2011B Bond that is held by an individual who at the time of death is not a citizen or resident of the United States will not be subject to U.S. federal estate tax as a result of such individual's death, provided that at the time of such individual's death, payments of interest with respect to such Series 2011B Bond would not have been effectively connected with the conduct by such individual of a trade or business within the United States.

Information Reporting and Backup Withholding.  U.S. information reporting and "backup withholding" requirements apply to certain payments of principal of, and interest on the Series 2011B Bonds, and to proceeds of the sale, exchange, redemption, retirement (including pursuant to an offer by the Authority), defeasance or other disposition of a Series 2011B Bond, to certain noncorporate holders of Series 2011B Bonds that are United States persons.  Under current U.S. Treasury Regulations, payments of principal and interest on any Series 2011B Bond to a holder that is not a United States person will not be subject to any backup withholding tax requirements if the beneficial owner of the Series 2011B Bond or a financial institution holding the Series 2011B Bond on behalf of the beneficial owner in the ordinary course of its trade or business provides an appropriate certification to the payor and the payor does not have actual knowledge that the certification is false.  If a beneficial owner provides the certification, the certification must give the name and address of such owner, state that such owner is not a United States person, or, in the case of an individual, that such owner is neither a citizen nor a resident of the United States, and the owner must sign the certificate under penalties of perjury.  If a financial institution, other than a financial institution that is a qualified intermediary, provides the certification, the certification must state that the financial institution has received from the beneficial owner the certification set forth in the preceding sentence, set forth the information contained in such certification, and include a copy of such certification, and an authorized representative of the financial institution must sign the certificate under penalties of perjury.  A financial institution generally will not be required to furnish to the IRS the names of the beneficial owners of the Series 2011B Bonds that are not United States persons and copies of such owners' certifications where the financial institution is a qualified intermediary that has entered into a withholding agreement with the IRS pursuant to applicable U.S. Treasury Regulations.

In the case of payments to a foreign partnership, foreign simple trust or foreign grantor trust, other than payments to a foreign partnership, foreign simple trust or foreign grantor trust that qualifies as a withholding foreign partnership or a withholding foreign trust within the meaning of applicable U.S. Treasury Regulations and payments to a foreign partnership, foreign simple trust or foreign grantor trust that are effectively connected with the conduct of a trade or business within the United States, the partners of the foreign partnership, the beneficiaries of the foreign simple trust or the persons treated as the owners of the foreign grantor trust, as the case may be, will be required to provide the certification discussed above in order to establish an exemption from withholding and backup withholding tax requirements. The current backup withholding tax rate is 28% (subject to future adjustment).

In addition, if the foreign office of a foreign "broker," as defined in applicable U.S. Treasury Regulations pays the proceeds of the sale of a Series 2011B Bond to the seller of the Series 2011B Bond, backup withholding and information reporting requirements will not apply to such payment provided that such broker derives less than 50% of its gross income for certain specified periods from the conduct of a trade or business within the United States, is not a controlled foreign corporation, as such term is defined in the Code, and is not a foreign partnership (1) one or more of the partners of which, at any time during its tax year, are U.S. persons (as defined in U.S. Treasury Regulations Section 1.1441-1(c)(2)) who, in the aggregate hold more than 50% of the income or capital interest in the partnership or (2) which, at any time during its tax year, is engaged in the conduct of a trade or business within the United States. Moreover, the payment by a foreign office of other brokers of the proceeds of the sale of a Series 2011B

Bond, will not be subject to backup withholding unless the payer has actual knowledge that the payee is a U.S. person. Principal and interest so paid by the U.S. office of a custodian, nominee or agent, or the payment by the U.S. office of a broker of the proceeds of a sale of a Series 2011B Bond, is subject to backup withholding requirements unless the beneficial owner provides the nominee, custodian, agent or broker with an appropriate certification as to its non-U.S. status under penalties of perjury or otherwise establishes an exemption.

**Circular 230**

Under 31 C.F.R. part 10, the regulations governing practice before the IRS (Circular 230), the Authority and its tax advisors are (or may be) required to inform you that:

• Any advice contained herein, including any opinions of counsel referred to herein, is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer;

• Any such advice is written to support the promotion or marketing of the Bonds and the transactions described herein (or in such opinion or other advice); and

• Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

**APPROVAL OF LEGALITY**

Legal matters incident to the issuance or delivery of the Bonds are subject to the unqualified approving opinion of Orrick, Herrington & Sutcliffe LLP, San Francisco, California, Bond Counsel to the Authority. The approval of certain matters will be made for the Authority by its counsel, Russo, Russo & Slania, P.C., Tucson, Arizona, for the Borrower by its Counsel, Jeff Stewart Legal Services, LLC, Dayton, Ohio, and for the Financed Charter Schools by their Ohio Counsel, Nicola, Gudbranson & Cooper, LLC, Cleveland, Ohio, and by their Illinois counsel, Chico & Nunes, P.C., Chicago, Illinois. Certain legal matters will be passed upon for the Underwriter by Eichner & Norris PLLC, Washington, District of Columbia, Underwriter's Counsel and by Peck, Shaffer and Williams LLP, Columbus, Ohio, Disclosure Counsel to the Borrower.

**RATING**

The Borrower has applied for and expects to receive a rating for the Bonds of "BBB-" from Fitch, Inc., doing business as Fitch Ratings ("Fitch"). The Borrower has furnished to Fitch certain information and materials concerning the Bonds. No application was made to any other rating agency for the purpose of obtaining additional ratings on the Bonds. Once the rating is received, any explanation of the significance of such rating may only be obtained from the rating agency furnishing the same. Generally, rating agencies base their ratings on such information and materials and on investigations, studies and assumptions made by the rating agencies themselves. Even once a rating is provided, there is no assurance that the rating will remain in effect for any given period of time or that it might not be lowered or withdrawn entirely by the rating agency, if in its judgment circumstances so warrant. Any such downward change in or withdrawal of the rating might have an adverse effect on the market price or marketability of the Bonds.

## CONTINUING DISCLOSURE

The Members of the Obligated Group will execute and deliver a Continuing Disclosure Agreement pursuant to which each will, for the benefit of the Beneficial Owners of the Bonds, annually compile and deliver to the Program Administrator, as dissemination agent, certain financial information and operating data relating to the operations of the Financed Charter Schools, the Borrower and other Members of the Obligated Group, as appropriate (each an "Annual Report"), and provide notices of the occurrence of certain enumerated events. The Members of the Obligated Group and Financed Charter Schools will also provide quarterly, internally prepared and unaudited balance sheets and income statements. Each Lease obligates the Financed Charter School to provide the information required by the Continuing Disclosure Agreement respecting that Financed Charter School. See APPENDIX C - "SUMMARY OF PRINCIPAL DOCUMENTS - THE LEASES" herein. The Annual Report and unaudited financial information that will be provided quarterly will be provided by the dissemination agent to any person who requests it. A form of the Continuing Disclosure Agreement is attached hereto as Appendix D. These covenants have been made in order to assist the Underwriter in complying with Securities and Exchange Commission Rule 15c2-12(b)(5) (the "Rule"). The Borrower, Members of the Obligated Group and the Financed Charter Schools have never failed to comply in all material respects with any previous undertaking with regard to the Rule to provide annual reports or notices of material events.

## UNDERWRITING

The Bonds are being purchased by RBC Capital Markets, LLC (the "Underwriter"). The Underwriter has agreed to purchase the Bonds at a price of $32,435,715.85 (being the principal amount of the Bonds less original issue discount of $204,044.15, less an Underwriter's discount of $480,240.00). The Bond Purchase Agreement ("Bond Purchase Agreement") pursuant to which the Bonds are being purchased by the Underwriter provides that the Underwriter will purchase all of the Bonds if any are purchased. The obligation of the Underwriter to make such purchase is subject to certain terms and conditions set forth in the Bond Purchase Agreement. The Underwriter may offer and sell the Bonds to certain dealers and others at prices different from the prices stated on the inside cover page of this Official Statement. The offering prices may be changed from time to time by the Underwriter.

[REMAINDER OF THIS PAGE IS BLANK]

## MISCELLANEOUS

The foregoing and subsequent summaries and descriptions of provisions of the Bonds and the Bond Indenture and all references to other materials not purporting to be quoted in full are only brief outlines of some of the provisions thereof and do not purport to summarize or describe all of the provisions thereof, and reference is made to said documents for full and complete statements of their provisions.  The appendices attached hereto are a part of this Official Statement.  Copies, in reasonable quantity, of the Master Indenture, Bond Indenture and Loan Agreement may be obtained during the offering period upon request directed to the Underwriter.

NONE OF THE INFORMATION IN THIS OFFICIAL STATEMENT HAS BEEN SUPPLIED OR VERIFIED BY THE AUTHORITY OTHER THAN, THE INFORMATION UNDER THE CAPTIONS "THE AUTHORITY" AND "ABSENCE OF MATERIAL LITIGATION — THE AUTHORITY."  THE AUTHORITY MAKES NO REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, AS TO (1) THE ACCURACY OR COMPLETENESS OF INFORMATION IN THIS OFFICIAL STATEMENT OTHER THAN IN THE SECTIONS IDENTIFIED ABOVE; (2) THE VALIDITY OF THE BONDS; OR (3) THE TAX STATUS OF THE INTEREST ON THE BONDS.

The distribution and use of this Official Statement has been approved by the Borrower.

**NEW PLAN LEARNING, INC.**
As Representative of the Obligated Group


By:____*/s/ Murat Arabaci*_____
     Murat Arabaci, President

(THIS PAGE IS INTENTIONALLY LEFT BLANK)

# APPENDIX A

## TABLE OF CONTENTS

### INFORMATION REGARDING NEW PLAN LEARNING INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND FINANCED CHARTER SCHOOLS

INTRODUCTION ...................................................................................................................... 3

NEW PLAN LEARNING AND THE OBLIGATED GROUP ................................................. 3
    NPL .................................................................................................................................... 4
    Other NPL Owned Facilities; No Cross Default ............................................................ 5
    Future NPL Activities ...................................................................................................... 6
    NPL Management and Governance .................................................................................. 6
    Prior Financings By NPL and Controlled Entities .......................................................... 7

THE FINANCED CHARTER SCHOOLS ............................................................................... 8
    Financed Charter Schools Obligated Only on Leases; No Cross Collateralization of Lease Obligations; Parity Bonds .......................................................................................................... 8
    Horizon Science Academy – Springfield ........................................................................ 8
    Horizon Science Academy – Dayton High ................................................................... 11
    Horizon Science Academy – Toledo High .................................................................... 13
    Chicago Math and Science Academy ............................................................................ 15
    Other School Information .............................................................................................. 17

OTHER NPL OWNED FACILITIES ..................................................................................... 18
    No Direct Security Interest Held By Master Trustee in Other NPL Owned Facilities or Leases thereon; No Cross Default ................................................................................................... 18
    Net Revenues From Other NPL Owned Facilities as Additional Security for the Bonds ..................... 18
    *COLUMBUS SCHOOLS* ............................................................................................. 18
    Horizon Science Academy – Columbus High ............................................................... 18
    Horizon Science Academy – Columbus Middle ............................................................ 19
    *CLEVELAND SCHOOLS* ........................................................................................... 19
    Horizon Science Academy – Cleveland High ............................................................... 19
    Horizon Science Academy – Cleveland Middle ............................................................ 19
    Horizon Science Academy – Cleveland Elementary ..................................................... 19
    Horizon Science Academy – Denison ........................................................................... 20
    *CINCINNATI SCHOOL* .............................................................................................. 20
    Horizon Science Academy – Cincinnati ........................................................................ 20
    *YOUNGSTOWN SCHOOL* ......................................................................................... 21
    Horizon Science Academy – Youngstown .................................................................... 21

DEBT SERVICE COVERAGES FOR THE BONDS AND LEASES ................................... 21
    Bond Debt Service Coverage[1] for Fiscal Year Ended June 30 ................................... 22
    Projected Base Rent Lease Coverage For Each Financed Charter School[1] ................ 22

CONCEPT SCHOOLS ............................................................................................................. 23
    History of Concept Schools ........................................................................................... 23
    Educational Achievement .............................................................................................. 27
    Concept's Services ......................................................................................................... 31
    Academic Standards ...................................................................................................... 32
    Concept Schools Management and Governance ............................................................. 32
    Recent News Articles ..................................................................................................... 34

## APPENDIX A

## INFORMATION REGARDING NEW PLAN LEARNING INC. AND THE OBLIGATED GROUP, CONCEPT SCHOOLS AND THE SCHOOLS

## INTRODUCTION

The proceeds of the Bonds will be loaned to New Plan Learning, Inc. ("NPL"), which will use such proceeds to (i) renovate and refinance outstanding indebtedness with respect to two charter school facilities, (ii) acquire and renovate two charter school facilities, (iii) fund a portion of amounts deposited to a Bond Reserve Account, the Revenue Fund and the Capital Maintenance and Operating Fund under the Bond Indenture, (iv) pay a portion of the interest on the Bonds through July 1, 2013, and (v) pay costs of issuing the Bonds. Each of the four facilities (each a "Facility" and, collectively, the "Facilities") will be leased pursuant to substantially identical leases (collectively, the "Leases") between the Member of the Obligated Group that is the fee owner of the respective Facility and the charter school occupying such Facility (each a "Financed Charter School" and, collectively, the "Financed Charter Schools"). The Leases will be assigned to the Bond Trustee to secure the Bonds. The Financed Charter Schools will pay their Base Rent and Additional Rent under the Leases directly to the Bond Trustee for deposit to the Revenue Fund under the Bond Indenture. In addition, each Member of the Obligated Group will grant a mortgage on the Facility or Facilities owned by it to the Master Trustee as additional security for the Bonds. Each Financed Charter School will enter into a substantially identical management agreement (collectively, the "Management Agreements") with Concept Schools, NFP, an Illinois nonprofit corporation ("Concept"). Each Financed Charter School was organized with the assistance of Concept.

## NEW PLAN LEARNING AND THE OBLIGATED GROUP

NPL is the Borrower of the proceeds of the Bonds but the obligations issued under the Master Indenture are joint and several obligations of each member of the Obligated Group, which initially includes NPL, as well as 250 Shoup Mill LLC and OG-Ohio LLC, each of which is an Ohio limited liability company whose sole member is NPL. The initial Members of the Obligated Group are as follows:

| **New Plan Learning, Inc.** | **Facilities Owned by Members of the Obligated Group**[1] |
|---|---|
| New Plan Learning, Inc. | Chicago Math and Science Academy |
| 250 Shoup Mill LLC (NPL is the sole member) | HSA[2] Dayton High |
| OG-Ohio LLC (NPL is the sole member) | HSA Toledo High |
|  | HSA Springfield |

While the primary source of payment and security for the Bonds is the Base Rent and Additional Rent from the Leases and revenues held under the Bond Indenture, the Obligated Group is jointly and severally liable under the Master Indenture for obligations issued thereunder, including Obligation No. 1 securing the Bonds, and for future obligations issued under the Master Indenture. Upon the issuance of

---

[1] The "Financed Charter Schools" are the charter schools listed below.

[2] HSA stands for Horizon Science Academy.

the Bonds, the Bonds also will be secured by Mortgages on the Facilities. See "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS" in the Official Statement.

The Bonds are the first issuance of debt under the Master Indenture.

## NPL

NPL is an Ohio nonprofit corporation and organization described in Section 501(c)(3) of the Code pursuant to its determination letter from the Internal Revenue Service. NPL was established in 2005 and it provides facilities and support services to new and existing charter schools in the mid-west, each of which is managed by Concept. NPL is the predecessor of Breeze Inc. ("Breeze"), which is a for-profit entity originally established by Concept to provide real estate and facility services to Horizon Science Academy-Columbus High School in 2004. Shortly after that acquisition, Concept decided to organize NPL, to provide real estate and facility support for charter schools in general, and transferred the shares of the for-profit corporation to NPL for nominal consideration. While NPL was established by the founders of Concept, it operates with an independent Board of Directors, management and employees. There is no legal relationship between Concept and NPL that would result in Concept having legal control over, or the right to manage the affairs of, NPL.

NPL was organized as a supporting organization within the meaning of Section 509 of the Code. NPL has declared itself a supporting organization for all of the charter schools to which NPL currently leases facilities, either directly or through one of its wholly controlled entities. NPL's Board of Directors is elected by the charter schools for which it is a supporting organization. NPL has made, and intends to continue to make, cash contributions from time to time to those charter schools for which it is a supporting organization, giving priority to the schools that experience the greatest financial need.

Typically, one of the most challenging aspects of starting a charter school is acquiring the rights to a suitable facility. Often, a charter school has little expertise in selecting an appropriate location and preparing that location for use as a school serving the grades the charter school was organized to serve. In addition, new charter schools usually have little or no financial resources to acquire or prepare such a facility.

As a part of NPL's support function, it purchases, builds or renovates, and leases buildings for use as charter or community schools at what NPL believes are below market rates. NPL not only finds locations for charter schools, based on student population, safety and accessibility, but also provides layout designs and monitors renovations. Thus, the charter school is able to focus on providing the best education while receiving back office support from Concept and facilities planning from NPL. NPL or NPL affiliates currently own 10 facilities that are leased to charter schools.

Audited financial statements for the Borrower for the fiscal year ended June 30, 2010 are included in APPENDIX B. In addition, certain internally prepared, unaudited financial information for the Borrower for the fiscal year ended June 30, 2011 is included in APPENDIX B. That unaudited financial information was not reviewed by, nor subjected to any procedures of, the auditor for the Borrower. Upon the closing of the Bonds, approximately $800,000 of development expenses for the Facilities shown as "Total Other Current Assets" under the unaudited June 30, 2011 balance sheet of NPL will be reimbursed to NPL in cash from Bond proceeds deposited to the Project Fund under the Bond Indenture.

A-4

**Other NPL Owned Facilities; No Cross Default**

NPL also is the sole member of three Ohio limited liability companies that own eight other facilities in Cleveland, Columbus, Cincinnati and Youngstown, Ohio.  These facilities (the "Other NPL Owned Facilities") house eight other charter schools managed by Concept.  These limited liability companies are not members of the Obligated Group and the Master Trustee does not have a mortgage on any of the Other NPL Owned Facilities.  However, to the extent leases on these facilities exceed related debt service payments and other expenses of NPL, distributions to NPL that result from those operations will be deposited in the Gross Revenue Fund and potentially be available to meet NPL's obligations under the Master Indenture.  However, no default by a school on a lease in any Other NPL Owned Facility constitutes a default under the Master Indenture, the Bond Indenture, the Loan Agreement or the Bonds.

Below is a chart depicting the organizational structure of NPL and the ownership of the Facilities and the other NPL Owned Facilities.



In connection with the issuance of the Bonds, the Members of the Obligated Group will own the Facilities and lease them to the Financed Charter Schools. NPL will purchase the Facility hosting the Chicago Math and Science Academy from the Chicago Math & Science Academy. OG-Ohio LLC will purchase the Facility for HSA Toledo High from a third party. The Facility hosting the HSA Springfield school will be transferred to OG-Ohio LLC from Breeze following partial repayment of loans currently secured in part by that Facility.

**Future NPL Activities**

The acquisition process is an on-going activity for NPL. NPL continues to work with additional charter schools to identify facilities that are potential locations for those charter schools, gain site control of those facilities, and prepare those facilities for use. Prior to construction, NPL works with experienced professionals to prepare architectural and engineering drawings, surveys, appraisals and environmental reports and reviews applicable zoning and building codes. In addition, NPL performs an entitlement review. A building is selected based on the apparent need for an educational alternative in the particular neighborhood, the potential of the building for use as a school, and the extent to which the building can be renovated for suitable school use without incurring excessive cost.

A lease agreement is generally executed with the charter school at the same time an acquisition is made. Lease payments under a lease agreement are generally set above the debt service for a facility in order to provide for repair and replacement reserves, operating reserves, debt service reserves, and generally to satisfy debt service coverage ratio requirements from lenders.

For example, NPL has entered into a purchase agreement to acquire a facility in Lorain, Ohio which presently is leased to a community school managed by Concept.

**NPL Management and Governance**

In order to keep operating costs low, NPL has two full-time employees and engages contractors and advisors on a project by project basis. Mr. Murat Arabaci manages NPL's day-to-day operations and Mr. Kairat Mavlyankulov handles accounting. Mr. Edip Pektas and Mr. Chris Hill are non-employee advisors to NPL.

**Murat Arabaci**
*President*

Mr. Murat Arabaci is the President of NPL. Mr. Arabaci is responsible for implementing the strategic goals and objectives of NPL. Mr. Arabaci received a Master's Degree in Business Administration from Fatih University.

**Kairat Mavlyankulov**
*Accountant*

Mr. Mavlyankulov is an employee of NPL and manages NPL's accounting. He has a degree in Finance and Accounting from DePaul University.

**Edip Pektas**
*Financial Advisor*

Mr. Edip Pektas is an advisor to NPL, assisting the organization with its business development and financing needs. He received his Bachelor's Degree in Finance and Information Systems from DePaul University.

**Chris Hill**
*Project Management*

Mr. Hill serves as a Project Management Advisor to NPL. From 1997 to 2001, Mr. Hill served a central role with Chicago Mayor Richard M. Daley's cabinet as the Commissioner of the City's Department of Planning and Development. Prior to his appointment on the Planning Department, Mr.

Hill served as the Executive Director of the Public Building Commission (PBC) of Chicago, the municipal corporation responsible for the financing, construction and rehabilitation of public schools, police stations, libraries, park district buildings and city colleges. Mr. Hill earned a Bachelor's Degree in Architecture with honors and distinction from the University of Illinois at Chicago and Versailles, France. Mr. Hill serves as a member of the Urban Development Committee for the Metropolitan Planning Council and as a member of the US Green Building Council.

**NPL's Board of Directors**

NPL's Board of Directors is appointed by the charter schools' whose facilities NPL, or NPL affiliates, own.

**Savas Kaya, Ph.D.**
*Board Member*

Dr. Savas Kaya received a Master of Philosophy Degree in 1994 from the University of Cambridge, U.K., and a Doctorate of Philosophy Degree in 1998 from Imperial College of Science, Technology & Medicine, London, U.K., for his work on strained Si quantum wells on vicinal substrates. From 1998 to 2001, Dr. Kaya was a Postdoctoral Researcher at the University of Glasgow, Scotland, U.K., carrying out research in transport and scaling in Si/SiGeMOSFETs, and fluctuation phenomena in decanano MOSFETs. He is currently with the Russ College of Engineering, Ohio University, Athens, Ohio. Dr. Kaya served as Air Force Office of Scientific Research Summer Faculty Fellow from 2006 to 2008. He has over 34 journal papers and 45 conference proceedings. Dr. Kaya was a member of the organizing committee for IWCE'7, 2000, IEEE Nanotech'6, 2006 and Program Committee's for SISPAD 2009.

**Nuh Aydin, Ph.D.**
*Board Member*

Dr. Nuh Aydin has a Doctorate of Philosophy Degree in Mathematics and a Master's Degree in Mathematics Education and Computer Science, all from Ohio State University. Dr. Nuh Aydin is an associate professor of Mathematics at Kenyon College.

**Adem Cakmak, Ph.D.**
*Board Member*

Adem Cakmak earned his Master's Degree and Doctorate of Philosophy Degree in Mathematics at Georgia Tech University and Texas Tech University, respectively. He is involved in community education initiatives and interested in research in applied mathematics and mathematics education. Dr. Cakmak has been an assistant professor of Mathematics at Ohio University Lancaster since 2009.

**Prior Financings By NPL and Controlled Entities**

Prior to the issuance of the Bonds, NPL, CMSA and other limited liability companies controlled by NPL have financed the acquisition and rehabilitation of charter school facilities using bank loans, including loans from community development financial institutions. As of the date of this Official Statement, neither NPL nor any NPL controlled entity has had a payment default on any loan.

## THE FINANCED CHARTER SCHOOLS

*Below is a brief description of each of the Financed Charter Schools and the Facilities being financed or refinanced with the proceeds of the Bonds. Audited financial statements for each of the Financed Charter Schools for the fiscal year ended June 30, 2010 are included in APPENDIX B of the Official Statement. In addition, certain unaudited, internally prepared financial information relating to the Financed Charter Schools is also included in APPENDIX B. That internally prepared, unaudited financial information was not reviewed by, nor subjected to procedures of, the respective auditors for the Financed Charter Schools.*

**Financed Charter Schools Obligated Only on Leases;**
**No Cross Collateralization of Lease Obligations; Parity Bonds**

Each Financed Charter Schools is obligated on a Lease with the Member of the Obligated Group that owns the property and Facilities in which such Financed Charter School operates, but *no Financed Charter School is a Member of the Obligated Group and therefore no Financed Charter School is obligated under the Master Indenture or on the Loan Agreement or the Bonds.* In addition, each Lease for a Financed Charter School is an obligation only of the Financed Charter School that is a party to that Lease and no Financed Charter School is obligated on any Lease to which another Financed Charter School is a party nor will the Lease obligations of any Financed Charter School increase due to a default on a Lease with another Financed Charter School. Therefor financial information is presented for each Financed Charter School separately.

All Bonds are parity obligations equally secured and payable from Lease payments made by the Financed Charter Schools to the Bond Trustee, by other amounts held under the Bond Indenture and the Gross Revenue Fund pledged under the Master Indenture. While NPL, for its own purposes "allocated" a certain amount of Bonds and the related debt service to each Financed School for the sole purpose of establishing Base Rent amounts for each Lease, all of the Bonds are equally and ratable secured by all of the Leases on the Financed Schools.

**Horizon Science Academy – Springfield**

Horizon Science Academy – Springfield ("HSA Springfield") started operation in the fall of 2005 at a campus located at 630 S. Reynolds Rd., Toledo, Ohio, serving students in grades 3 through 8. Student enrollment at the campus is currently 250 and at full capacity following renovation of the Facility it is expected to be approximately 375 and the grade span is expected to expand to K through 8. For the 2010-11 school year, the student population is 65% African American, 26% Caucasian and 8% Hispanic, and 88% of students are eligible for free or reduced price lunches (all numbers are approximations). For the 2009-2010 and 2010-2011 school years, HSA Springfield the student body included 71% and 86%, respectively, of non-graduating students from the prior years. HSA Springfield currently has 117 students on the waiting list.

*The Springfield Facility.* The campus for HSA Springfield is located on a 1.87 acre site and includes 33,149 square feet of building space. The building was originally a social club and the school is currently utilizing approximately 22,000 square feet of total building space. Bond proceeds will add six more classrooms on the second floor and will also be used to construct a new gymnasium. The building space at full capacity will include 18 classrooms, an art room, labs, offices, cafeteria and a gymnasium.

*Staffing.* For the 2010-11 school year, HSA Springfield employed a staff of 19 teachers and nine office and administrative staff. 13 of the teachers at HSA Springfield in the 2010-11 school year also

A-8

were teachers at the school the prior year, a retention rate of 88%. HSA Springfield anticipates that staffing levels may increase in future years, commensurate with the level of students served.

Mr. Mustafa Arslan is the Principal of HSA Springfield. Mr. Arslan has 18 years of experience in education. He has taught at the elementary and secondary level and has been a lead teacher on both levels. Mr. Arslan was a math teacher for 15 years before becoming the Principal for HSA Springfield. Mr. Arslan has supervised school-wide student success and positive behavior support programs, as well as managed compliance issues for district program improvement legislation. He has a Bachelor's Degree in Mathematics Education and he is working on a Master's Degree in Educational Administration.

**Historical and Projected School Enrollment:**

The table below lists the historical and projected enrollment for HSA Springfield by grade:

| Fiscal Year (ended June 30) | Total | K | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 128 | | | | | | 22 | 35 | 48 | 23 |
| 2008 | 136 | | | | | | 30 | 39 | 44 | 23 |
| 2009 | 177 | | | | | 18 | 18 | 43 | 50 | 48 |
| 2010 | 228 | | | | | 21 | 39 | 49 | 65 | 53 |
| 2011 | 250 | | | | 20 | 23 | 34 | 65 | 52 | 56 |
| 2012 | 275 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 50 | 50 |
| 2013 | 325 | 50 | 50 | 25 | 25 | 25 | 25 | 25 | 50 | 50 |
| 2014 | 350 | 50 | 50 | 50 | 50 | 25 | 25 | 25 | 25 | 50 |
| 2015 | 375 | 50 | 50 | 50 | 50 | 50 | 50 | 25 | 25 | 25 |
| 2016 | 400 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 25 | 25 |

[REMAINDER OF THIS PAGE IS BLANK]

A-9

## Horizon Science Academy-Springfield

| | Actual | | | Forecasted | | | | |
|---|---|---|---|---|---|---|---|---|
| | Fiscal Year 2009 | Fiscal Year 2010 | Fiscal Year 2011 (unaudited) | Fiscal Year 2012 [9] | Fiscal Year 2013 | Fiscal Year 2014 | Fiscal Year 2015 | Fiscal Year 2016 |
| Full Time Equivalency (FTE) | 177 | 228 | 246 | 275 | 325 | 350 | 375 | 400 |
| **Operating Revenues** (7) | | | | | | | | |
| State Foundation Payments (1) | 1,334,533 | 1,606,980 | 1,775,851 | 2,137,278 | 2,576,391 | 2,792,728 | 3,052,053 | 3,320,633 |
| Charges for Services | 2,517 | 2,802 | 11,493 | 11,493 | 3,060 | 3,121 | 3,184 | 3,247 |
| Fees | 3,039 | 5,975 | 6,435 | 6,436 | 6,630 | 6,763 | 6,898 | 7,036 |
| Other | 13,746 | 7,731 | 7,962 | 7,962 | 5,406 | 5,514 | 5,624 | 5,737 |
| **Total Operating Receipts** | 1,353,835 | 1,623,489 | 1,801,741 | 2,163,170 | 2,591,487 | 2,808,126 | 3,067,759 | 3,336,653 |
| **Nonoperating Receipts** | | | | | | | | |
| Federal Grants (2) | 398,576 | 513,869 | 511,876 | 412,599 | 497,369 | 546,341 | 597,072 | 649,615 |
| Federal Fiscal Stabilization/Jobs Ed Grants | - | 109,116 | 151,428 | 107,470 | - | - | - | |
| State Grants | 5,000 | 7,175 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Donations | 135,563 | 45,810 | - | - | - | - | - | |
| Interest Income | (1,059) | (755) | - | - | - | - | - | |
| Total Nonoperating Revenues | 538,080 | 675,215 | 668,304 | 525,069 | 502,369 | 551,341 | 602,072 | 654,615 |
| **Total Revenue** | 1,891,915 | 2,298,703 | 2,470,046 | 2,688,239 | 3,093,856 | 3,359,467 | 3,669,831 | 3,991,268 |
| **Operating Expenses** (3) | | | | | | | | |
| Salaries and Wages (4) | 680,835 | 851,418 | 872,999 | 1,029,125 | 1,161,155 | 1,195,990 | 1,213,298 | 1,338,382 |
| Employee Retirement and Insurance Benefits | 160,974 | 235,442 | 263,408 | 277,864 | 313,512 | 322,917 | 327,590 | 361,363 |
| Purchased Services | | | | | | | | |
| *Management Fee (5)* | *133,453* | *198,583* | *210,000* | *106,864* | *128,820* | *139,636* | *152,603* | *166,032* |
| *Rent (6)* | - | - | - | - | - | - | - | |
| *Other Purchased Services* | *465,393* | *524,838* | *582,116* | *603,390* | *713,097* | *767,951* | *822,805* | *877,658* |
| Supplies and Materials | 67,410 | 79,806 | 136,229 | 136,246 | 107,617 | 108,799 | 109,673 | 116,559 |
| Capital Outlay -New | - | - | 32,073 | 30,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Depreciation | 15,622 | 55,702 | - | - | - | - | - | |
| Other | 32,356 | 41,632 | 42,040 | 47,552 | 54,024 | 55,263 | 56,532 | 60,945 |
| **Total Operating Expenses (Excluding Rent and Depreciation)** | 1,556,043 | 1,987,662 | 2,138,865 | 2,231,041 | 2,488,225 | 2,600,557 | 2,692,501 | 2,930,939 |
| **Net Operating Revenue (Excluding Rent and Depreciation)** | 335,872 | 311,281 | 331,181 | 457,198 | 605,632 | 758,910 | 977,330 | 1,060,329 |
| **Coverage** | | | | | | | | |
| Rent | | | | 175,200 | 494,961 | 591,230 | 644,465 | 651,163 |
| Rent Coverage Ratio | | | | 2.61 | 1.22 | 1.28 | 1.52 | 1.63 |

(1) Per pupil funding is assumed to increase 2% per annum.
(2) Federal grants include only Title I funding. It does not include ARRA, Ed Jobs, Dissemination or any other grants at federal or state levels.
(3) All expenditures are assumed to increase 3% per annum.
(4) Salaries are projected by Concept's academic team based on the enrollment projections. Benefits are estimated at 25% of salaries.
(5) Beginning in FY 2012, projected management fee for Concept is 5% of State foundation payments, and is subordinated to rent payments, but it may be up to 12% if the school can pay its Lease payments and operating expenses and meet its financial covenants.
(6) See Rental figures below in Coverage section.
(7) Does not include Concept's reduction ("donated") management fee in the School's audited financials in Appendix B.
(8) Fiscal year 2012 results are annualized.

**Horizon Science Academy – Dayton High**

Horizon Science Academy – Dayton High ("HSA Dayton High") started operation in the fall of 2009 at a campus located at 250 Shoup Mill Rd., Dayton, Ohio, serving students in grades 7 through 12. Student enrollment at the campus is currently approximately 278 and at full capacity following renovation of the Facility it is expected to be approximately 535. For the 2010-11 school year, the student population is 65% African American, 29% Caucasian and 1% Hispanic, and 94% of students are eligible for free or reduced price lunch (all numbers are approximations). For the 2010-2011 school year HSA Dayton High included 73% of non-graduating students from the prior year. HSA Dayton High currently has 50 students on the waiting list.

*The Dayton High Facility.* The campus for HSA Dayton High is located on a 3.77 acre site and includes 41,050 square feet of building space. The building was originally a retail store and 29,600 square feet of total building space was converted to school use in the first phase of the project in Summer 2009. Bonds proceeds will be used to fund renovation of the remaining 11,450 square feet of building space, construct an 8,800 square feet ground-up gymnasium and purchase a 3.26 acre adjacent green area. The building space at full capacity will be 49,850 square feet on a 7.03 acre site and will include 28 classrooms, an art room, labs, offices, a cafeteria, a standard size gymnasium, and an outdoor athletic field.

*Staffing.* For the 2010-11 school year, HSA Dayton High employed a staff of 26 teachers and five office and administrative staff. 10 of the teachers at HSA Dayton High in the 2010-11 school year also were teachers at the school in the prior year, a retention rate of 68%. HSA Dayton High anticipates that staffing levels may increase in future years, commensurate with the level of students served.

Mr. Ugur Zengince is the principal of HSA Dayton High. Mr. Zengince has 14 years of experience in education. He has taught at the elementary and secondary level and has been a lead teacher at both levels. Mr. Zengince had been working as a school principal at other Concept Schools-managed schools for five years before becoming the principal of HSA Dayton High. Mr. Zengince has supervised school-wide student success and positive behavior support programs, as well as managed compliance issues for district program improvement legislation. Mr. Zengince also worked as a start-up director of two charter schools in Ohio. He has Bachelor's Degree in Mathematics and is pursuing a Master's Degree in Educational Administration at the University of Cincinnati.

**Historical and Projected School Enrollment:**

The table below lists the historical and projected enrollment for HSA Dayton High by grade. Fiscal year 2010 was the first year of operations for HSA Dayton High:

| Fiscal Year (ended June 30) | Total | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|
| 2010 | 248 | 25 | 38 | 70 | 54 | 45 | 17 |
| 2011 | 278 | 39 | 19 | 69 | 57 | 53 | 41 |
| 2012 | 280 | 50 | 50 | 50 | 50 | 40 | 40 |
| 2013 | 325 | 50 | 50 | 75 | 60 | 50 | 40 |
| 2014 | 365 | 50 | 50 | 100 | 65 | 55 | 45 |
| 2015 | 400 | 50 | 50 | 100 | 90 | 60 | 50 |
| 2016 | 430 | 50 | 50 | 100 | 90 | 85 | 55 |

## Horizon Science Academy-Dayton High

| | Actual | | Forecasted | | | | |
|---|---|---|---|---|---|---|---|
| | Fiscal Year 2010 | Fiscal Year 2011 (unaudited) | Fiscal Year 2012 (8) | Fiscal Year 2013 | Fiscal Year 2014 | Fiscal Year 2015 | Fiscal Year 2016 |
| Full Time Equivalency (FTE) | 248 | 256 | 280 | 325 | 365 | 400 | 430 |
| **Operating Revenues** | | | | | | | |
| State Foundation Payments (1) | 1,658,621 | 1,693,289 | 1,991,360 | 2,357,628 | 2,700,754 | 3,018,925 | 3,310,251 |
| Charges for Services | - | 8,548 | 8,719 | 8,893 | 9,071 | 9,252 | 9,437 |
| Fees | - | 2,090 | 2,132 | 2,174 | 2,218 | 2,262 | 2,308 |
| Other | 16,917 | 10,819 | 11,036 | 11,256 | 11,482 | 11,711 | 11,945 |
| **Total Operating Receipts** | 1,675,538 | 1,714,747 | 2,013,246 | 2,379,952 | 2,723,524 | 3,042,150 | 3,333,941 |
| **Nonoperating Receipts** | | | | | | | |
| Federal Grants (2) | 431,689 | 573,723 | 363,625 | 430,506 | 493,161 | 551,260 | 604,456 |
| Federal Fiscal Stabilization/Jobs Ed Grants | - | 144,233 | 97,650 | - | - | - | - |
| State Grants | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Donations | 100,000 | 20,000 | - | - | - | - | - |
| Interest Income | (3,384) | - | - | - | - | - | - |
| Total Nonoperating Revenues | 533,305 | 742,957 | 466,275 | 435,506 | 498,161 | 556,260 | 609,456 |
| Rent Revenue (3) | | | | 180,000 | 183,600 | 187,272 | 191,017 |
| **Total Revenue** | 2,208,843 | 2,457,703 | 2,479,521 | 2,995,458 | 3,405,285 | 3,785,682 | 4,134,414 |
| **Operating Expenses (4)** | | | | | | | |
| Salaries and Wages (5) | 754,046 | 1,005,741 | 1,035,913 | 1,247,330 | 1,399,327 | 1,477,367 | 1,606,101 |
| Employee Retirement and Insurance Benefits | 190,063 | 322,785 | 290,056 | 349,252 | 391,812 | 413,663 | 449,708 |
| Purchased Services | | | | | | | |
| *Management Fee (6)* | *170,911* | *56,000* | *99,568* | *117,881* | *135,038* | *241,514* | *397,230* |
| *Rent (7)* | - | - | - | - | - | - | - |
| *Other Purchased Services* | *441,326* | *362,681* | *356,683* | *374,517* | *393,243* | *412,905* | *433,550* |
| Supplies and Materials | 117,010 | 204,814 | 140,000 | 177,886 | 139,856 | 154,685 | 168,980 |
| Capital Outlay -New | - | - | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Depreciation | 21,053 | - | - | - | - | - | - |
| Other | 65,225 | 56,649 | 60,000 | 102,085 | 115,388 | 127,737 | 139,208 |
| Total Operating Expenses (Excluding Rent and Depreciation) | 1,759,634 | 2,008,670 | 1,992,220 | 2,378,952 | 2,584,663 | 2,837,871 | 3,204,777 |
| Net Operating Revenue (Excluding Rent and Depreciation) | 449,209 | 449,033 | 487,302 | 616,506 | 820,622 | 947,811 | 929,637 |
| **Coverage** | | | | | | | |
| Rent | | | 428,291 | 531,324 | 711,134 | 777,448 | 777,968 |
| Rent Coverage Ratio | | | 1.14 | 1.16 | 1.15 | 1.22 | 1.19 |

(1) Per pupil Funding is assumed to increase 2% per annum.
(2) Federal grants include only Title I funding. It does not include ARRA, Ed Jobs, Dissemination or any other grants at federal or state levels.
(3) Dayton High will lease a part of the property to Dayton Elementary and will collect rent in the amount of $180,000 for 2011-2012 school year. Rent amount will increase at 2% per annum.
(4) Beginning in FY 2012 all expenditures are assumed to increase 3% per annum.
(5) Salaries are projected by Concept's academic team based on the enrollment projections. Benefits are estimated at 25% of salaries.
(6) Concept's management fee for FY 2012, 2013 AND 2014 is budgeted at 5% of state foundation payments, 8% for FY 2015 and 12% thereafter, but it may be up to 12% if the school can pay its Lease payments and operating expenses and meet its financial covenants.
(7) See Rental figures below in Coverage Section.
(8) Fiscal year 2012 results are annualized.

**Horizon Science Academy – Toledo High**

Horizon Science Academy – Toledo High ("HSA Toledo High") started operation in the fall of 2004 at a campus located at 425 Jefferson Avenue, Toledo, Ohio, serving students in grades 9 through 12. Current student enrollment at the campus is approximately 275. HSA Toledo High will move to a new campus at 2600 W. Sylvania Ave., Toledo, Ohio, and student enrollment at full capacity is expected to be 630. For the 2010-11 school year, the student population is 66% African American, 18% Caucasian and 6% Hispanic, and 82% of students are eligible for free or reduced price lunch (all numbers are approximations). For the 2009-2010 and 2010-2011 school years, the HSA Toledo High student body included 74% and 70%, respectively, of the non-graduating students from the prior years. HSA Toledo High currently has 15 students on the waiting list.

*The Toledo Facility.* The new campus to which HSA Toledo High will be relocated will include a 7.57 acre site with 58,167 square feet of building space. The building space at full capacity will include 28 classrooms, an art room, labs, offices, a cafeteria and a standard size gymnasium.

*Staffing.* For the 2010-11 school year, HSA Toledo High employed a staff of 29 teachers and five office and administrative staff. 18 teachers at HSA Toledo High in the 2010-11 school year also were teachers there the prior year, a retention rate of 88%. HSA Toledo High anticipates that staffing levels will increase in future years, commensurate with the level of students served.

Mr. Mustafa Adam Yazici is the principal of HSA Toledo High. Mr. Yazici has 16 years of experience in education. He has taught at the elementary and secondary levels and has been a lead teacher at both levels. Mr. Yazici was a math teacher for 10 years before becoming principal of HSA Toledo High. Mr. Yazici has supervised school-wide student success and positive behavior support programs as well as managed compliance issues for district program improvement legislation. He has a Bachelor's Degree in Math education and is pursuing a Master's Degree in Educational Administration.

**Historical and Projected School Enrollment:**

The table below lists the historical and projected enrollment for HSA Toledo High by grade:

| Fiscal Year (ended June 30) | Total | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|
| 2008 | 239 | | 69 | 80 | 41 | 35 | 14 | |
| 2009 | 249 | | | 99 | 69 | 37 | 31 | 14 |
| 2010 | 270 | | | | 105 | 71 | 62 | 32 |
| 2011 | 275 | | | | 63 | 95 | 67 | 50 |
| 2012 | 260 | | | | 100 | 70 | 60 | 50 |
| 2013 | 380 | | | | 150 | 100 | 70 | 60 |
| 2014 | 475 | | | | 175 | 140 | 95 | 65 |
| 2015 | 565 | | | | 175 | 165 | 135 | 90 |
| 2016 | 630 | | | | 175 | 165 | 160 | 130 |

## Horizon Science Academy-Toledo High

| | Actual | | | Forecasted | | | | |
|---|---|---|---|---|---|---|---|---|
| | Fiscal Year 2009 | Fiscal Year 2010 | Fiscal Year 2011 (unaudited) | Fiscal Year 2012 | Fiscal Year 2013 | Fiscal Year 2014 | Fiscal Year 2015 | Fiscal Year 2016 |
| Full Time Equivalency (FTE) | 249 | 270 | 256 | 260 | 380 | 475 | 565 | 630 |
| **Operating Revenues** | | | | | | | | |
| State Foundation Payments (1) | 1,737,737 | 1,823,132 | 1,709,535 | 1,864,881 | 2,780,108 | 3,544,637 | 4,300,578 | 4,891,241 |
| Charges for Services | 4,241 | 3,136 | 13,169 | 13,432 | 3,296 | 3,395 | 3,497 | 3,602 |
| Fees | 21,120 | 24,031 | 8,484 | 30,000 | 27,810 | 28,644 | 29,504 | 30,389 |
| Other | 10,910 | 27,439 | 9,841 | 17,000 | 16,480 | 16,974 | 17,484 | 18,008 |
| **Total Operating Receipts** | 1,774,008 | 1,877,738 | 1,741,029 | 1,925,313 | 2,827,694 | 3,593,651 | 4,351,062 | 4,943,239 |
| **Nonoperating Receipts** | | | | | | | | |
| Federal Grants (2) | 359,695 | 718,599 | 388,064 | 385,763 | 569,061 | 711,326 | 846,104 | 910,443 |
| Federal Fiscal Stabilization/Jobs Ed Grants | - | - | 144,084 | 104,434 | - | | | |
| State Grants | 6,000 | 6,848 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Other Grants | - | - | - | - | - | - | - | - |
| Donations | 161,344 | 19,772 | - | - | - | - | - | - |
| Interest Income/Expense | (9,637) | (3,291) | - | - | - | - | - | - |
| Total Nonoperating Revenues | 517,402 | 741,928 | 537,147 | 495,198 | 574,061 | 716,326 | 851,104 | 915,443 |
| **Total Revenue** | 2,291,410 | 2,619,666 | 2,278,176 | 2,420,511 | 3,401,754 | 4,309,977 | 5,202,165 | 5,858,682 |
| **Operating Expenses (3)** | | | | | | | | |
| Salaries and Wages (4) | 1,059,116 | 1,084,263 | 1,071,630 | 1,175,981 | 1,342,569 | 1,861,460 | 2,231,884 | 2,375,353 |
| Employee Retirement and Insurance Benefits | 228,441 | 259,537 | 300,030 | 305,755 | 335,642 | 465,365 | 557,971 | 593,838 |
| Purchased Services | | | | | | | | |
| *Management Fee (5)* | *161,344* | *233,581* | *144,000* | *167,839* | *333,613* | *425,356* | *516,069* | *586,949* |
| *Rent (6)* | *-* | *-* | *-* | *-* | *-* | *-* | *-* | *-* |
| *Other Purchased Services* | *226,287* | *314,959* | *283,945* | *273,052* | *414,576* | *438,583* | *462,183* | *482,739* |
| Supplies and Materials | 83,941 | 65,713 | 128,109 | 98,221 | 124,742 | 151,076 | 176,079 | 194,346 |
| Depreciation | 53,064 | 56,465 | - | 20,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Other | 48,544 | 37,112 | 37,213 | 52,125 | 76,007 | 88,297 | 100,489 | 110,263 |
| Total Operating Expenses (Excluding Rent and Depreciation) | 1,860,737 | 2,051,630 | 1,964,927 | 2,092,973 | 2,637,149 | 3,440,138 | 4,054,675 | 4,353,488 |
| **Net Operating Revenue (Excluding Rent and Depreciation)** | 430,673 | 568,036 | 313,249 | 327,538 | 764,605 | 869,839 | 1,147,490 | 1,505,194 |
| **Coverage** | | | | | | | | |
| Rent | | | | 276,000 | 503,477 | 662,562 | 716,380 | 735,861 |
| Rent Coverage Ratio | | | | 1.19 | 1.52 | 1.31 | 1.60 | 2.04 |

(1) Per pupil funding is assumed to increase 2% per annum.
(2) Federal grants include only Title I funding. It does not include ARRA, Ed Jobs, Dissemination or any other grants at federal or state levels.
(3) Beginning in FY 2012 all expenditures are assumed to increase 3% per annum.
(4) Salaries are projected by Concept's academic team based on the enrollment projections. Benefits are estimated at 25% of salaries.
(5) Projected management fee for Concept is 12% of State foundation payments, and is subordinated to rent payments.
(6) See Rental figures below in Coverage section.

**Chicago Math and Science Academy**

Chicago Math and Science Academy ("CMSA") started operation in the fall of 2005. It is currently at a campus located at 7212 N. Clark St Chicago, Illinois 60626, and serves students in grades 6 through 12. Student enrollment at the campus is currently at maximum capacity of 599. For the 2010-11 school year, the student population is 23.7% African American, 3.7% Caucasian and 61.3% Hispanic, and 81.7% of students are eligible for free or reduced price lunch (all numbers are approximations). For the 2009-2010 and 2010-2011 school years, CMSA's student body included 88% and 86%, respectively, of the non-graduating students from the prior years. CMSA currently has 763 students on the waiting list.

*The CMSA Facility*. The campus for CMSA's facility sits on 2 acres and has 41,799 square feet of building space. The property is currently owned by CMSA which it first occupied in the 2009-2010 school year. It is expected that Bond proceeds will be used to acquire the building from CMSA on a lease back term that will involve the ground up construction of a 9,775 square foot gymnasium.

*Staffing*. For the 2010-11 school year, CMSA employed a staff of 57 teachers and 13 office and administrative staff. CMSA anticipates that staffing levels are likely to remain the same in the future years. 32 of the teachers at CMSA in the 2010-11 school year were teachers at CMSA the prior year, a retention rate of 70%.

Mr. Aydin Kara became the principal of CMSA in 2011. Mr. Kara began teaching math and science at middle school and high school levels in 1997. In 2003, he was employed by Horizon Science Academy in Columbus, Ohio. After teaching for several years, he assumed the leadership position of the school. In 2008, he became the Director of Horizon Science Academy in Cleveland, Ohio managed by Concept Schools. During his employment in Concept network schools as a school leader, he assumed the responsibilities of instructional leadership, personnel management and fiscal/administrative/facility management. Mr. Kara has a Bachelor of Science degree in Physics Education from Middle East Technical University in Ankara, Turkey, and a Master of Science degree in Education and Allied Professions with a focus in Educational Leadership from the University of Dayton. In 2010, Mr. Kara enrolled in a PhD program in Urban Education at Cleveland State University.

**Historical and Projected School Enrollment:**

The table below lists the historical and projected enrollment for the CMSA by grade.

| Fiscal Year | Total | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|
| 2006 | 294 | 70 | 76 | 74 | 74 | | | |
| 2007 | 366 | 68 | 75 | 86 | 84 | 53 | | |
| 2008 | 400 | 59 | 72 | 88 | 80 | 66 | 35 | |
| 2009 | 483 | 71 | 79 | 79 | 93 | 69 | 61 | 31 |
| 2010 | 591 | 69 | 91 | 94 | 117 | 94 | 68 | 58 |
| 2011 | 599 | 88 | 77 | 93 | 90 | 110 | 76 | 65 |
| 2012 | 599 | 75 | 75 | 75 | 110 | 100 | 90 | 74 |
| 2013 | 599 | 75 | 75 | 75 | 110 | 100 | 90 | 74 |
| 2014 | 599 | 75 | 75 | 75 | 110 | 100 | 90 | 74 |
| 2015 | 599 | 75 | 75 | 75 | 110 | 100 | 90 | 74 |
| 2016 | 599 | 75 | 75 | 75 | 110 | 100 | 90 | 74 |

## Chicago Math and Science Academy

|  | Actual | | | Forecasted | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Fiscal Year | Fiscal Year | Fiscal Year 2011 (unaudited) | Fiscal Year 2012[4] | Fiscal Year | Fiscal Year | Fiscal Year | Fiscal Year |
|  | 2009 | 2010 | | | 2013 | 2014 | 2015 | 2016 |
| Full Time Equivalency (FTE) | 483 | 595 | 595 | 599 | 599 | 599 | 599 | 599 |
| **Operating Revenues** | | | | | | | | |
| CPS Per Capita[1] | 3,584,317 | 4,536,221 | 4,342,202 | 4,344,547 | 4,431,438 | 4,520,067 | 4,610,468 | 4,702,677 |
| Small School facility Supplement (CSI Grant)[1] | 144,900 | 178,500 | 177,450 | 177,450 | 177,450 | 177,450 | 177,450 | 177,450 |
| Non-CPS Facility Supplement[1] | 205,275 | 252,875 | 251,388 | 251,388 | 251,388 | 251,388 | 251,388 | 251,388 |
| SGSA | 274,159 | 304,141 | 328,307 | 334,873 | 341,571 | 348,402 | 355,370 | 362,477 |
| NCLB | 114,490 | 112,200 | 137,266 | 140,012 | 142,812 | 145,668 | 148,581 | 151,553 |
| Title II | - | 29,750 | 26,775 | 27,311 | 27,857 | 28,414 | 28,982 | 29,562 |
| ELL | 19,437 | 38,122 | 34,856 | 35,553 | 36,264 | 36,989 | 37,729 | 38,484 |
| **Total Operating Receipts** | 4,342,578 | 5,451,809 | 5,298,243 | 5,311,133 | 5,408,779 | 5,508,377 | 5,609,968 | 5,713,591 |
| **Nonoperating Receipts** | | | | | | | | |
| Grants | 182,910 | 160,250 | 77,812 | 79,368 | 80,956 | 82,575 | 84,226 | 85,911 |
| Contributed Good & Services | 320,989 | 241,705 | - | - | - | - | - | |
| Student Fees | 89,376 | 142,690 | 101,867 | 103,904 | 105,982 | 108,102 | 110,264 | 112,469 |
| Special Ed. Reimbursement | 174,623 | 253,693 | 353,414 | 360,482 | 367,692 | 375,046 | 382,547 | 390,198 |
| Other | (6,536) | 21,556 | 103,129 | 105,192 | 107,296 | 109,442 | 11,631 | 113,863 |
| Total Nonoperating Revenues | 761,362 | 819,894 | 636,223 | 648,947 | 661,926 | 675,165 | 688,668 | 702,441 |
| **Total Revenue** | 5,103,940 | 6,271,703 | 5,934,466 | 5,960,080 | 6,070,705 | 6,183,542 | 6,298,636 | 6,416,032 |
| **Operating Expenses**[2] | | | | | | | | |
| Direct Student Costs | 781,771 | 757,461 | 295,647 | 304,516 | 313,652 | 323,061 | 332,753 | 342,736 |
| Salaries & Benefits | 2,855,470 | 3,692,510 | 3,006,608 | 3,066,740 | 3,128,075 | 3,190,637 | 3,254,450 | 3,319,539 |
| Occupancy of Facilities | 49,682 | 148,376 | 150,157 | 154,662 | 159,302 | 164,081 | 169,003 | 174,074 |
| Office and Administration | 193,156 | 139,694 | 131,172 | 135,108 | 139,161 | 143,336 | 147,636 | 152,065 |
| Management Fee[3] | 391,488 | 525,863 | 521,064 | 521,346 | 531,773 | 542,408 | 553,256 | 564,321 |
| Other Expenses | 27,153 | 41,993 | 283,860 | 100,000 | 103,000 | 106,090 | 109,273 | 112,551 |
| Depreciation | 105,521 | 263,140 | | - | - | - | | |
| **Total Operating Expenses (Excluding Rent and Depreciation)** | 4,298,721 | 5,305,897 | 4,388,509 | 4,282,372 | 4,374,962 | 4,469,613 | 4,566,371 | 4,665,285 |
| **Net Operating Revenue (Excluding Rent and Depreciation)** | 805,219 | 965,806 | 1,545,956 | 1,677,708 | 1,695,742 | 1,713,929 | 1,732,265 | 1,750,747 |
| **Coverage** | | | | | | | | |
| Rent[5] | | | | 1,028,794 | 1,028,794 | 1,037,635 | 1,075,706 | 1,227,384 |
| Rent Coverage | | | | 1.63 | 1.65 | 1.65 | 1.61 | 1.43 |

[1] Per pupil funding is assumed to increase 2% per annum and no increase is assumed on Small School Facility Supplement and Non-CPS Facility Supplement.

[2] All operating expenses are projected to increase 3% where salaries and wages increase at 2% per annum.

[3] Projected management fee for Concept Schools is 12% of CPS per capital payments and management fee is subordinated to rent payments.

[4] Fiscal year 2012 results are annualized.

[5] Rent may be increased, and the term of the lease shortened to 30 years, in connection with an amendment to the CMSA lease after delivery of the Bonds.

**Other School Information**

During the underwriting period the Underwriter will make available upon written request with respect to each Financed Charter School the following:

        (1)     An Appraisal of the Facility;

        (2)     An Environmental Report related to the Facility;

        (3)     If available, audited financial statements for fiscal years ended June 30, 2008 and June 30, 2009; and

        (4)     Such other information as investors may reasonably request.

## OTHER NPL OWNED FACILITIES

*Below is a brief and limited description of other charter schools (charter schools that are not one of the Financed Charter Schools) that operate in facilities owned by an entity owned solely by NPL that is not part of the Obligated Group. These Other NPL Owned Facilities are expected to provide a portion of the Gross Revenue of the Members of the Obligated Group.* ***NPL, directly or through NPL Affiliates, expects to continue to acquire facilities to be leased to charter schools in the future.***

**No Direct Security Interest Held By Master Trustee**
**in Other NPL Owned Facilities or Leases thereon; No Cross Default**

The entities that own the Other NPL Owned Facilities are not members of the Obligated Group and, therefore, the Bond Trustee will not have a security interest in the leases with schools in the Other NPL Owned Facilities nor will the Master Trustee have a mortgage on or other security interest in the Other NPL Owned Facilities. Each of the Other NPL Owned Facilities (other than HSA Youngstown) was financed with debt other than the Bonds and is encumbered by a mortgage securing such debt. Similarly, no event of default under any loan document with respect to any of the Other NPL Owned Facilities is an event of default under the Master Indenture, the Bond Indenture, the Loan Agreement or the Bonds.

All of the debt secured by the Other NPL Owned Facilities is current as of the date hereof. The loan agreements between lenders and the NPL Affiliates that own those Other NPL Owned Facilities have various covenants and restrictions in them, including restrictions on distributions by Breeze to NPL.

**Net Revenues From Other NPL Owned Facilities**
**as Additional Security for the Bonds**

The lease revenues from the charter schools in the Other NPL Owned Facilities are the only other source of revenues for NPL other than the Leases on the Facilities housing the Financed Charter Schools. Revenues from leases on Other NPL Owned Facilities, after payment of debt service on loans secured by the Other NPL Owned Facilities and operating expenses of NPL, when distributed to NPL would constitute Gross Revenues under the Master Indenture and would be required to be deposited to the Gross Revenue Fund thereunder and provide additional security for the Bonds. See "APPENDIX C – DEFINITIONS AND SUMMARY OF PRINCIPAL DOCUMENTS – The Gross Revenue Fund" herein. See "APPENDIX B – Audited Financial Statements of NPL for the Fiscal Year End June 30, 2010" herein.

## *COLUMBUS SCHOOLS*

**Horizon Science Academy – Columbus High**

Horizon Science Academy – Columbus ("HSA Columbus High") started operation in the fall of 1999, and is currently serving approximately 380 students in grades 9-12 at 1070 Morse Rd., Columbus, Ohio. The HSA Columbus High facility currently has 38,560 square feet of school space on 1.87 acres of land. The site includes 18 classrooms, an art room, labs, offices, a cafeteria and a gymnasium.

The HSA Columbus High facility is owned by Breeze, a wholly-owned subsidiary of NPL, and is currently encumbered by approximately $2,055,832.60 principal amount of debt with payments of $230,857 per year. That facility is currently leased to HSA Columbus High under a lease that terminates on June 30, 2018. Annual lease payments are approximately $384,000.

**Horizon Science Academy – Columbus Middle**

Horizon Science Academy – Columbus Middle ("HSA Columbus Middle") started operation in the fall of 2007, and is currently serving 325 students in grades 6 through 8 at 2350 Morse Rd., Columbus, Ohio. The HSA Columbus Middle facility currently has 25,202 square feet of school space on 1.87 acres of land. This site includes 16 classrooms, an art room, labs, offices, a multipurpose area that serves as a cafeteria and a gym. The HSA Columbus Middle facility is owned by 2350 Morse LLC, a wholly-owned subsidiary of NPL, and is currently encumbered by approximately $3,405,954.94 principal amount of debt with payments of $312,026 per year. This Facility is currently leased to HSA Columbus Middle under a lease that terminates on June 30, 2035. Annual lease payments are approximately $369,000.

### *CLEVELAND SCHOOLS*

The following is a brief discussion of Other NPL Owned Facilities in the Cleveland, Ohio area, which include HSA – Cleveland High, HSA – Cleveland Middle, HSA – Cleveland Elementary and HSA – Denison. These charter schools were financed under one loan from NCBCI. These four facilities are currently encumbered by approximately $7,322,681 of debt with annual payments of approximately $672,855.

**Horizon Science Academy – Cleveland High**

Horizon Science Academy – Cleveland High ("HSA Cleveland High") started operation in the fall of 2005 at a campus located at 6000 South Marginal Rd. Cleveland, Ohio and is currently serving students in grades 9 through 12. Current enrollment is approximately 470 students. The HSA Cleveland High facility currently has 52,594 square feet of school space on 4.4 acres of land it shares with HSA Cleveland Middle and HSA Cleveland Elementary. This facility includes 25 classrooms, an art room, labs, offices, a music room, a cafeteria and a standard size gymnasium. The HSA Cleveland High facility is owned by Breeze. This Facility is currently leased to HSA Cleveland High under a lease that terminates on June 30, 2018. Annual lease payments are approximately $348,297.

**Horizon Science Academy – Cleveland Middle**

Horizon Science Academy – Cleveland Middle ("HSA Cleveland Middle") started operation in the fall of 2005 at a campus located at 6100 South Marginal Rd. Cleveland, Ohio and is currently serving students in grades 6 through 8. Current enrollment is approximately 160 students. The HSA Cleveland Middle facility currently has 10,620 square feet of school space. This site includes 6 classrooms, labs and offices. The HSA Cleveland Middle facility is owned by Breeze. This facility is currently leased to HSA Cleveland Middle School under a lease that terminates on August 31, 2017. Annual lease payments are approximately $138,000. However, the actual amount currently paid is $110,232 because the school is taking credit for tenant improvement made on the Cleveland Elementary building.

**Horizon Science Academy – Cleveland Elementary**

Horizon Science Academy – Cleveland Elementary ("HSA Cleveland Elementary") started operation in the fall of 2007 at a campus located at 6150 South Marginal Rd. Cleveland, Ohio and is currently serving students in grades K through 5. Current enrollment is approximately 150 students. The HSA Cleveland Elementary facility currently has 10,391 square feet of school space.

The HSA Cleveland Elementary facility is owned by Breeze.  This facility is currently subleased to HSA Cleveland Elementary by HSA Cleveland Middle under a sublease that terminates in August 31, 2011 with automatic yearly extensions.  Annual sublease payments are approximately $167,648 per year.

**Horizon Science Academy – Denison**

Horizon Science Academy – Denison ("HSA Denison") started operation in the fall of 2005 at a campus located at 1700 Denison Avenue, Cleveland, Ohio and is currently serving students in grades K through 8.  Current enrollment is approximately 320 students.  The HSA Denison facility currently has 40,964 square feet of school space on 1.61 acres of land.  This site currently includes 18 classrooms, an art room, labs, offices, a cafeteria and a standard size gymnasium after renovation is complete.  The HSA Denison facility is owned by Breeze.  This facility is currently leased to HSA Denison under a lease that terminates June 30, 2015.  Annual lease payments are $430,263.

*CINCINNATI SCHOOL*

**Horizon Science Academy – Cincinnati**

Horizon Science Academy – Cincinnati ("HSA Cincinnati") started operation in the fall of 2005 at a campus located at 1055 Laidlaw Ave., Cincinnati, Ohio, serving students in grades 5 through 9.  HSA Cincinnati now serves students in grades K through 12. Student enrollment at the campus is currently 360.  The HSA Cincinnati Facility is located on a 4.06 acre site and includes 43,116 square feet of building space.  The property is currently owned by Breeze and is leased to HSA Cincinnati under a lease that terminates on June 30, 2008.  Annual lease payments are approximately $258,000.

*YOUNGSTOWN SCHOOL*

**Horizon Science Academy – Youngstown**

Horizon Science Academy – Youngstown ("HSA Youngstown") started operation in the fall of 2010 at a campus located at 3403 Southern Boulevard, Youngstown, Ohio and is currently serving 200 students in grades K-7. The HSA Youngstown Facility currently has 52,294 square feet of school space on 1.4 acres of land. This site includes 22 classrooms, an art room, labs, offices, a cafeteria and a standard size gymnasium. The HSA Youngstown Facility is owned by NOG Ohio LLC and was acquired with the proceeds of a loan in the principal amount of $500,000 with payments of $31,250 per year and a balloon payment due on June 30, 2012. The note is not secured by a mortgage. This facility is currently leased to HSA Youngstown under a lease that terminates on July 31, 2015. Annual lease payments are approximately $180,000.

### Revenues and Obligations of Other NPL Owned Facilities in Fiscal 2011

| School | 2011 Annual Lease Payment | Annual Debt Service | Difference |
|---|---|---|---|
| Horizon Science Academy Cincinnati | $258,000 | $151,089 | $106,911 |
| Horizon Science Academy Columbus High | $384,000 | $230,857 | $153,143 |
| Horizon Science Academy Columbus Middle | 369,000 | 312,026 | 56,974 |
| Horizon Science Academy Youngstown | 165,000 | 31,250 | 133,750 |
| Horizon Science Academy Cleveland High [1] | 348,297 | | |
| Horizon Science Academy Cleveland Middle [1] | 110,232 | | |
| Horizon Science Academy Cleveland Elementary [1] | 167,648 | | |
| Horizon Science Academy Denison [1] | 430,263 | | |
| Subtotal for NCBCI Financed Charter Schools | 1,056,440 | 672,855 [2] | 383,723 [2] |
| Total | $2,232,440 | $1,398,077 | $834,363 |

[1] The three Cleveland Schools and HSA Denison were financed under the same loan documents.
[2] Collective Annual Debt Service and Difference for the three Cleveland Schools and HSA Denison.

The payments described above are estimates for the Other NPL Owned Facilities that NPL or NPL Affiliates own as of the date hereof. As set forth above, NPL expects to acquire new facilities for new charter schools in the future, the financial results of which cannot be predicted. In addition, NPL intends to refinance some or all of the Other NPL Owned Facilities in the future, possibly using bonds or other debt secured by Obligations issued pursuant to the Master Trust Indenture on a parity with the Bonds. In particular, NPL expects to purchase a facility in Lorain, Ohio before the end of 2011. Such facility currently houses a Concept Schools-managed community school.

### DEBT SERVICE COVERAGES FOR THE BONDS AND LEASES

In establishing Lease payments for each Financed Charter School, the principal amount of the Bonds was allocated among the Financed Charter Schools and Lease payments will be greater than their pro rata share of Bond debt service. Thus, the obligations of the Financed Charter Schools under the Leases have been established to provide the following projected debt service coverage for the Bonds:

**Bond Debt Service Coverage[1] for Fiscal Year Ended June 30**

|  | 2012[2] | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Total Base Rent Lease Payments | 2,024,491 | 2,674,762 | 3,108,825 | 3,363,192 | 3,399,891 |
| Capitalized Interest | 663,047 | 442,032 | - | - | - |
| Total Available to Pay Debt Service | 2,687,538 | 3,116,794 | 3,108,825 | 3,363,192 | 3,399,891 |
| Bond Debt Service | 2,132,913 | 2,620,644 | 2,620,644 | 2,835,644 | 2,835,219 |
| Debt Service Coverage | 1.26 | 1.19 | 1.19 | 1.19 | 1.20 |

(1)   Does not include cashflow from Other NPL Owned Facilities. See above.
(2)   Includes 10 months Lease Payments and Bond Debt Service

In addition to the Lease payments shown in the chart above, any other assets of Members of the Obligated Group, including NPL, are available to pay obligations under the Master Indenture, including Obligation No. 1 securing the Bonds. The projected operating cash flow of NPL is not included in the Bond debt service coverage ratios shown above.

The chart below summarizes the projected coverage of its annual Base Rent Lease obligations by each of the Financed Charter Schools. These are set forth separately for each Financed Charter School since each Financed Charter School is liable only on its Lease and not for other Leases or the Bonds. As noted above, the coverage numbers shown below do not reflect the subordination of Concept's management fee. See "THE MANAGEMENT AGREEMENTS – Fees: Subordination to Lease Payments, Operating Costs; Clawback of Concept Fee" in Appendix A.

**Projected Base Rent Lease Coverage For Each Financed Charter School[1]**

| Fiscal Year | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Springfield | 2.61 | 1.22 | 1.28 | 1.52 | 1.63 |
| Dayton | 1.14 | 1.16 | 1.15 | 1.22 | 1.19 |
| Toledo | 1.19 | 1.52 | 1.31 | 1.60 | 2.04 |
| CMSA | 1.63 | 1.65 | 1.65 | 1.61 | 1.43 |

[1] The CMSA Lease may be amended after delivery of the Bonds to shorten the term to 30 years and increase annual lease payments.

# CONCEPT SCHOOLS

## History of Concept Schools

Concept Schools, NFP, an Illinois nonprofit corporation ("Concept"), was established in 2002 with the mission of creating and managing high quality college preparatory charter schools focusing on math, science and technology in educationally and economically underserved communities.

The idea of a college preparatory charter school focusing on math, science, and technology, was developed by two Turkish educators ten years ago in Ohio. Taner Ertekin, an educator who started schools in Thailand and Japan, was visiting the United States to recruit American teachers for the schools he had started in these countries. The charter school concept was introduced to Taner, who was an entrepreneur, by his longtime friend, Ehat Ercanli, at that time a computer technology professor at Case Western University in Cleveland. (Dr. Ercanli currently teaches at Syracuse University in New York.)

The State of Ohio had just recently passed its charter schools law. Mr. Ertekin realized the opportunity for making a difference in education through his math, science and technology focused curriculum. Mr. Ertekin and Dr. Ercanli put together a team of scientists, business leaders, and educators, including Sedat Duman and Salim Ucan, who are now the President/CEO and the Vice President of Concept, respectively. They developed the program and wrote their proposal after extensive research on the American education system, visiting many schools, then using the best practices from the Turkish education system and the American education system. Their proposal was approved by the Ohio State Board of Education and they opened HSA Cleveland High. State officials asked them to open one more school in Columbus, Ohio that year, 1999 (HSA Columbus High).

For five years Mr. Ertekin and Dr. Ercanli operated only two schools in Columbus and Cleveland, Ohio. These two schools established a reputation of being effective learning environments through their state test scores, attendance rates, and graduation and college acceptance rates in a short time. At that point, sponsors approached Mr. Ertekin with the idea of replicating the model and Concept began to grow.

Mr. Ertekin envisioned a new organization to provide back office and management support to the schools once they grew. He also wanted to leverage the success of the current schools to open new ones. In 2002, Mr. Ertekin founded Concept as a management organization.

As the number of the schools started increasing in Ohio and other Midwest states, Concept faced a challenge of finding quality math and science teachers who wanted to work in urban schools. In response, the founders of Concept tapped into their resources abroad. They began bringing teachers from Turkey, Russia, and other European countries to teach math and science. These teachers brought content expertise and led to the significant presence of international staff within the Concept network. Currently, approximately 10% of the Concept's staff is comprised of international teachers. These teachers are selected carefully; their background checks are done and they file the proper paperwork to be able to teach in the United States, including their teaching certificates and legal working visas.

Since its inception, Concept has grown to manage 25 charter schools (each a "Concept School") in Ohio, Indiana, Illinois, Michigan and Missouri. Located in urban areas, the 25 Concept Schools at the beginning of the 2010-2011 school year served over 7,300 students.

TABLE 1 below shows the growth in the number of Concept Schools since 1999.

**TABLE 1**



Table 2 below shows the list of all Concept Schools in operation for the 2010-11 school year:

**TABLE 2**

**Charter Authorizer, Renewal History and Expiration Date**

| Concept Schools - Member Schools | Charter Authorizer [2] | Original Charter Award Date | Charter Renewal History, if any | Current Charter Expiration Date |
|---|---|---|---|---|
| **Illinois Schools** | | | | |
| Chicago Math and Science Academy (CMSA) [1] | Office of New Schools | 7/1/2004 | 2/25/2009 | 6/30/2014 |
| Quest Charter Academy | Peoria School District | 8/1/2010 | N.A. | 8/1/2015 |
| **Indiana Schools** | | | | |
| Indiana Math and Science Academy (IMSA) - North | Mayor's Office | 7/1/2010 | N.A. | 6/30/2017 |
| Indiana Math and Science Academy (IMSA) - West | Ball State University | 7/1/2007 | N.A. | 6/30/2014 |
| **Michigan Schools** | | | | |
| Michigan Math and Science Academy (MMSA) | Grand Valley State University | 7/1/2009 | N.A. | 6/30/2014 |
| **Missouri Schools** | | | | |
| Gateway Math & Science Academy (GMSA) | Lindenwood University | 06/04/10 | N.A. | 06/01/15 |
| **Ohio Schools** | | | | |
| Horizon Science Academy - Cincinnati | LCESC | 11/18/2004 | 6/30/2011 | 6/30/2016 |
| Horizon Science Academy - Cleveland Elementary School | BCHF | 3/24/2008 | 7/1/2010 | 6/30/2015 |
| Horizon Science Academy - Cleveland Middle School | LCESC | 1/10/2005 | 7/1/2009 | 6/30/2012 |
| Horizon Science Academy - Cleveland High School | LCESC | 05/1999 | 7/1/2007 | 5/30/2012 |
| Horizon Science Academy - Columbus Elementary School | BCHF | 3/24/2008 | 6/30/2010 | 6/30/2015 |
| Horizon Science Academy - Columbus Middle School | BCHF | 3/15/2007 | 6/30/2010 | 6/30/2015 |
| Horizon Science Academy - Columbus High School | LCESC | 05/1999 | 7/1/2009 | 5/30/2012 |
| Horizon Science Academy - Dayton Elementary School | LCESC | 11/18/2004 | 6/30/2011 | 6/30/2016 |
| Horizon Science Academy - Dayton High [1] | BCHF | 4/6/2009 | N.A. | 6/30/2015 |
| Horizon Science Academy - Dayton Downtown | BCHF | 7/12/2010 | N.A. | 6/30/2015 |
| Horizon Science Academy - Denison Elementary School | BCHF | 3/24/2008 | 7/1/2009 | 6/30/2015 |
| Horizon Science Academy - Denison K-8 School | LCESC | 11/19/2004 | 7/1/2009 | 5/30/2012 |
| Horizon Science Academy - Springfield [1] | LCESC | 6/21/2005 | 6/30/2011 | 6/30/2016 |

A-25

| Concept Schools - Member Schools | Charter Authorizer [2] | Original Charter Award Date | Charter Renewal History, if any | Current Charter Expiration Date |
|---|---|---|---|---|
| Horizon Science Academy - Toledo [1] | LCESC | 8/30/2004 | 7/1/2009 | 5/14/2012 |
| Horizon Science Academy - Toledo Downtown | BCHF | 7/12/2010 | N.A. | 6/30/2015 |
| Horizon Science Academy - Youngstown | BCHF | 7/12/2010 | N.A. | 6/30/2015 |
| Horizon Science Academy - Lorain | BCHF | 4/6/2009 | 7/1/2010 | 6/30/2015 |
| Noble Academy - Cleveland | BCHF | 3/15/2006 | 7/1/2010 | 6/30/2015 |
| Noble Academy - Columbus | BCHF | 05/2006 | 5/6/2010 | 6/30/2015 |

[1] Financed Charter Schools.
[2] Lucas County Educational Service Center ("LCESC") and Buckeye Community Hope Foundation ("BCHF").

Until 2006, Concept's school design was to serve grades 6-12. However, realizing the needs of the student population, Concept established Noble Academy Cleveland and Noble Academy - Columbus in 2006. The expansion was a result of the perceived need to enroll students earlier, beginning in kindergarten, to equip them with the necessary academic and social skills to excel in a rigorous college preparatory curriculum in middle school and high school. Concept believes results since 2006 have proven the value of starting with children in earlier grades.

The pillars of Concept's curriculum are:

- Rigorous college preparatory curriculum with an emphasis on Math, Science and Technology
- Personalized education
- Higher standards and expectations
- Knowledgeable and skilled staff
- Data-driven instruction through ongoing assessment of learning
- Increased student engagement and relationships
- Community partnership

Concept employs a standard-based, college-preparatory curriculum that focuses on Mathematics and English in kindergarten through 8th grade and then focuses on Math, Science and Technology through high school.

Concept attempts to find teachers who are committed to urban education and willing to go beyond the call of duty in order to meet the needs of students. Concept's staff selection process requires demonstration lessons, classroom visits, online screening tests, a comprehensive interview, review of transcripts, referrals and reference checks. Since finding high quality math and science teachers has been a challenge for urban schools, Concept also recruits some of the best and brightest math and science teachers from overseas and recommends them to the schools within their network.

Concept attempts to engage its students with many opportunities beyond academics. The staff sponsors after-school clubs, math olympiad teams, science project teams, debate teams, after-school tutoring and weekend classes for students who need extra help. They organize local, national and even international trips for students, parents and staff members. Students are able to participate in summer cultural exchange programs created by Concept. Through this program students are able to live with a

host family for three weeks and get a comprehensive exposure to another culture.  The impact of such programs on urban students is invaluable, considering the fact that most of them have not left their city or state, let alone their country.

Parents and teachers of students are expected to help students learn through extracurricular activities, science fair projects, Olympiad competitions, national trips, overseas summer programs, Saturday SAT and ACT educational camps and all other school related activities.  Through community partnerships, students participate in internships, providing them with applied opportunities to pursue research and gain technical experience.

In terms of pedagogy, the Concept design uses many proven teaching methods to maximize classroom learning, rather than subscribing to a single method.  Concept allows teachers to teach in an environment that permits teachers to customize their teaching materials and strategies according to their particular group of students' needs.  Teachers at Concept Schools use a combination of instructional techniques such as direct teaching, problem based learning, project based learning and collaborative learning.

Clearly defined high expectations for academic achievement and conduct do not include exceptions based on the background of students.  Through an extended school day, week and year, Concept Schools provide students more time in the classroom to acquire the academic knowledge and skills to prepare them for the nation's best colleges and the world beyond.  Through small class sizes, Concept Schools attempt to personalize relationships between teachers and students.

Higher standards and expectations are reflected through grade-promotion standards, school-wide discipline policies and graduation requirements.  Students' participation in after-school activities, extracurricular activities, school-wide events and showcases are not only expected but are mandatory in some cases.  Such high expectations and standards are clearly communicated to students, parents and the larger community on an ongoing basis.

**Educational Achievement**

The schools that Concept has established to date have been successful in many ways:

o      Over 95% college acceptance rate for all Concept managed high schools.

o      Noble Academy Cleveland was the only charter school in Ohio to receive "Excellent with Distinction" rating in the 2009-2010 school year.

o      In 2009-2010 school year, two Ohio Concept Schools received "Excellent" ratings, two schools received "Effective" ratings and five schools received "Continuous Improvement" ratings.

o      HSA Toledo and HSA Columbus High were designated as Excellent Schools by Ohio Department of Education in the 2008 and 2009 school years.

o      HSA Cleveland High School was designated as a 2009 National Blue Ribbon School by the U.S. Secretary of Education. It also received Bronze medal for outstanding achievement by US NEWS AND WORLD REPORT news magazine – best Charter School for 2008 and 2010.

o      HSA Columbus High, HSA Toledo High and HSA Cleveland High were amongst the Schools of Promise designated by the Ohio Department of Education in the 2008, 2009 and 2010 school years.

o      HSA Cleveland was awarded National Title I Distinguished School Award for Closing the Achievement Gap in the 2009 school year.

o      Nine charter public schools made the Illinois State Board of Education's (ISBE) 2008 Illinois Honor Roll. Chicago Math and Science Academy is one of those schools.

o      Chicago Math & Science Academy was the highest performing public school out of 97 public high-schools within the Chicago Public Schools district based on State testing.

o      Indiana Math & Science Academy in Indianapolis was rated "Exemplary" in 2009 and 2010.

o      Students graduated from Concept School's member schools have been accepted to top tier schools such as MIT and West Point.

[REMAINDER OF THIS PAGE IS BLANK]

The following chart shows the ratings for Concept Schools that were open for that academic year.

**TABLE 3**

**Concept Schools' Academic Results**

| School | Year Est. | Grades Served | State Rating 2009 | State Rating 2010 | State Rating 2011 | District Rating [2] | AYP 2009 | AYP 2010 | AYP 2011 | District AYP Rating |
|---|---|---|---|---|---|---|---|---|---|---|
| **Illinois Schools** | | | | | | | | | | |
| Chicago MSA [1][3] | 2005 | 6-12 | N.A. | N.A. | N.A. | N.A. | NOT MET | NOT MET | | NOT MET |
| Quest Charter Academy | 2010 | 6-12 | N.A. | N.A. | NR | N.A. | N.A. | NR | NR | NOT MET |
| **Indiana Schools** | | | | | | | | | | |
| Indiana MSA - North | 2010 | K-7 | NR | NR | Exemplary | N.A. | NR | | MET | NOT MET |
| Indiana MSA - West | 2007 | K-12 | NR | Exemplary | Exemplary | N.A. | NOT MET | MET | NOT MET | NOT MET |
| **Michigan Schools** | | | | | | | | | | |
| Michigan MSA | 2009 | 5-8 | NR | NR | A | N.A. | NR | NR | MET | NOT MET |
| **Missouri Schools** | | | | | | | | | | |
| Gateway MSA | 2010 | K-7 | N.A. | N.A. | NR | N.A. | NR | NR | NR | NOT MET |
| **Ohio Schools** | | | | | | | | | | |
| HSA - Cincinnati [1][4] | 2005 | K-12 | Continuous Improvement | Academic Watch | Effective | Effective | MET | NOT MET | MET | NOT MET |
| HSA - Cleveland Elementary School | 2008 | K-5 | NR | Continuous Improvement | Continuous Improvement | Continuous Improvement | MET | MET | MET | NOT MET |
| HSA - Cleveland Middle School | 2005 | 6-8 | Continuous Improvement | Effective | Excellent | Continuous Improvement | MET | MET | MET | NOT MET |
| HSA - Cleveland High School | 1999 | 9-12 | Effective | Effective | Excellent | Continuous Improvement | MET | MET | MET | NOT MET |
| HSA - Columbus Elementary School | 2008 | K-5 | NR | Academic Watch | Effective | Continuous Improvement | NOT MET | MET | MET | NOT MET |
| HSA - Columbus Middle School | 2007 | 6-8 | Continuous Improvement | Continuous Improvement | Effective | Continuous Improvement | MET | MET | MET | NOT MET |
| HSA - Columbus High School | 1999 | 9-12 | Excellent | Excellent | Excellent | Continuous Improvement | MET | MET | MET | NOT MET |
| HSA - Dayton Elementary School | 2005 | K-6 | Continuous Improvement | Academic Watch | Continuous Improvement | Academic Watch | MET | NOT MET | NOT MET | NOT MET |
| HSA - Dayton High School [1][4] | 2009 | 7-12 | NR | Academic Watch | Continuous Improvement | Academic Watch | NR | NOT MET | NOT MET | NOT MET |
| HSA - Dayton Downtown | 2010 | K-6 | NR | NR | Academic Watch | Academic Watch | NR | NR | NOT MET | NOT MET |

A-29

| School | Year Est. | Grades Served | State Rating 2009 | State Rating 2010 | State Rating 2011 | District Rating [2] | AYP 2009 | AYP 2010 | AYP 2011 | District AYP Rating |
|---|---|---|---|---|---|---|---|---|---|---|
| HSA - Denison Elementary School | 2008 | K-5 | NR | Academic Watch | Academic Emergency | Continuous Improvement | NR | NOT MET | NOT MET | NOT MET |
| HSA - Denison K-8 School | 2005 | K-8 | Continuous Improvement | Continuous Improvement | Continuous Improvement | Continuous Improvement | MET | MET | MET | NOT MET |
| HSA - Springfield [1] | 2005 | 4-8 | Continuous Improvement | Continuous Improvement | Effective | Continuous Improvement | MET | MET | MET | NOT MET |
| HSA - Toledo [1] | 2004 | 9-12 | Excellent | Continuous Improvement | Continuous Improvement | Continuous Improvement | MET | NOT MET | NOT MET | NOT MET |
| HSA - Toledo Downtown | 2010 | 3-8 | NR | NR | Academic Watch | Continuous Improvement | NR | NR | NOT MET | NOT MET |
| HSA - Youngstown | 2010 | K-7 | NR | NR | Continuous Improvement | Academic Emergency | NR | NR | MET | NOT MET |
| HSA - Lorain [4] | 2009 | K-5 | NR | Academic Emergency | Effective | Academic Watch | NR | NOT MET | MET | NOT MET |
| Noble Academy - Cleveland | 2006 | K-8 | Excellent | Excellent w/ Distinction | Excellent | Continuous Improvement | MET | MET | MET | NOT MET |
| Noble Academy - Columbus | 2006 | K-8 | Effective | Excellent | Effective | Continuous Improvement | MET | NOT MET | MET | NOT MET |

[1] Schools financed as part of the Project.

[2] See Appendix G in the Official Statement for a discussion of the ranking system in Ohio.

[3] In connection with the renewal of the charter for the Chicago Math & Science Academy, the Chicago Board of Education report noted that:

"In the middle school, the charter schools average attendance rate for the past four years was 96.1%.  From 2004-2005 to 2007-2008, CMSA has shown four years of consistent gains in the percentage of students in grades 6 through 8 meeting/exceeding state standards on the ISAT Composite (from 74.1% to 78.9%).  In the high school, CMSA's attendance rate has averaged to 93.4% for the past three years (from 2006 to 2008).  In addition, 51.4% of students met/exceeded state standards on the PSAE Composite in 2008.  The charter school also met Adequate Yearly Progress targets in 2006-2007 and 2007-2008.  From 2004-2005 to 2007-2008, CMSA received 21 out of 28 high ratings and 7 out of 28 middle ratings on their absolute student indicators found in the framework put forth by the district..."

[4] Concept believes that its schools perform better as the students have more time in their system so that results suffer in schools that are newly opened or are adding a significant number of new students.  They believe this is reflected in the results shown above for HSA Lorain and HSA Dayton High School, both of which opened in the 2009-2010 school year.  The uneven results in HSA Cincinnati, in Concept's view, reflect a lower than average retention rate for that school, which results in a large number of students new to the Concept system in many years. Retention for HSA Cincinnati has averaged about 60% while the average retention rate for Concept is 75%.  Concept believes that the retention rate for HSA Cincinnati is adversely effected by the physical condition of the Facility, which has not undergone a major renovation since it was constructed in 1930.  this Facility is planned to address this issue.

A-30

**Concept's Services**

Start-Up Services:  Concept communicates with sponsors/authorizers, developing proposals and market analysis and providing financial support to the local board when start-up grants are not available. If the school receives a federal charter school planning grant, Concept charges a mutually agreed upon fee for the start-up services.

Human Resources:  Concept supports schools to recruit highly qualified teachers and administrators from national and international pools, provides schools with necessary handbooks, policies, and forms and assigns a school leader and a business manager.

Curriculum and Organizational Structure Design:  Concept provides the schools with a curriculum that is aligned to the state standards.  Concept also helps determine the organizational structure that best fits to realize the vision and mission of the school.

Student Information System:  Concept provides and maintains a student information system providing data tracking, performance reports, grade keeping and online access to parents and students. Concept also provides staff training on the student information system.

Assessment:  Concept helps schools monitor student learning through interim assessments which are developed and analyzed at the main office.  Such interim assessments mirror the state standardized tests and are aligned to the school's curriculum.  Analyses of scores are available online to teachers, students and parents with a very quick turnaround. Teachers use this data to guide their on-going and continuous instruction.  Staff is also provided training on how to use the formative assessment and the data to guide instruction.

Marketing:  Concept provides its schools with marketing materials to recruit students and teachers.  These materials include brochures, flyers, newsletters and posters.  However, printing and distribution of such materials are done by the schools.  Therefore, individual schools budget money to print and distribute marketing materials, banners, yard signs, presentations and other community outreach efforts and advertise in local media for student and teacher recruitment.  Concept also provides web-site design to its schools.

Financial Services:  Concept provides its schools with a business manager who handles budgeting, financial management, maintenance of internal control and reporting.  The schools also benefit from economies of scale through Concept's purchasing services.  Concept also financially supports a school when needed through loans and other means.

In addition to such services from Concept, individual schools retain an independent audit firm that audits the school's financials, as well as compliance with laws and policies on an annual basis. Annual audit reports that are developed by the independent audit firm are sent to the authorizer.

Extra-curricular activities:  Concept organizes annual competition events in which all schools within its network participate, i.e., basketball tournament, spelling bee competition, writing competition, science fair and math competition.  The summer cultural exchange program that Concept organized three years ago has been very popular since its inception.

School Visits and Evaluations:  Concept regularly visits schools with a team of experienced educators to visit classrooms, meet with teachers and administrators, evaluate teachers and provide feedback to the schools for improvement.

<u>Professional Development</u>: Concept brings the key personnel, school principals, deans, college counselors and department heads together in monthly meetings where best practices are shared. Concept provides staff with trainings on the Concept model, expectations, standards and educational philosophy.

## Academic Standards

Concept is dedicated to providing a diverse population of students with an outstanding education focused on math, science and technology. The standards, which are much higher than most traditional public schools, are developed to ensure student proficiency on state standards as well as a 100% graduation rate and acceptance into colleges. In addition to aligning the curriculum to each State's learning standards; the high school curriculum will also be aligned with the ACT College Readiness Standards and the American Diploma Project. Also serving as a reference will be the National Common Core Standards a set of standards developed across 49 states.

Middle and elementary school grades typically have 40 periods a week and each period is approximately 45 minutes long, depending on the school. This allows a greater number of periods to be allotted to science, math and communication arts.

Middle School students are required to pass all core courses in order to be promoted to the next grade level. The core courses are English, Mathematics, Science and Social Studies. Middle School Students who fail to pass more than one core class must repeat the same year. Students are required to pass at least four out of six non-core classes in order to be promoted to the next grade.

High school students also have 40 periods a week, with a greater number of periods allotted to science, math and communication arts. Concept-managed high schools have a promotion policy that helps ensure that students are equipped with the necessary academic skills to be successful in college when they graduate from a Concept managed high school. If students cannot get a passing grade in any of their courses, they are required to retake the course. Students who fail to pass a class are not permitted to take summer school, night school or online courses outside of regular school hours.

## Concept Schools Management and Governance

### ***Concept's Board of Directors***

**Vedat Akgun, Ph.D.**
***Board President***

Dr. Vedat Akgun works for JDA Software as a Senior Consultant for the implementation of revenue management applications in services industries.

Dr. Akgun became one of the founding board members of Horizon Science Academy charter schools in 1999 and played a major role in starting other sister schools in the Midwest. He became a founding board member of Concept in 2002. He is also one of the founders of NPL. He currently serves as the President of the Board for Concept.

Dr. Akgun has a Bachelor's of Science Degree in Industrial Engineering and a Doctorate of Philosophy Degree from the State University of New York at Buffalo in Industrial Engineering and Operations Research. Married with two children, Dr. Akgun enjoys community service.

**Ayhan Zora, Ph.D.**
*Vice President*

Dr. Ayhan Zora currently works as senior engineer analyst at John Deere Power Systems. The company specializes in off-road machinery (Agriculture, Constructions, Forestry, Turf, etc.).

Dr. Zora received his Bachelor's Degree in Mechanical Engineering, Master's Degree in both Mechanical and Industrial Engineering, and a Doctoral Degree in Industrial Technology.

**Hakan Yildiz, Ph.D.**
*Treasurer*

Dr. Hakan Yildiz is an Assistant Professor of Logistics in the Department of Supply Chain Management at Michigan State University (MSU). He has a Bachelor of Science in Industrial Engineering from Bilkent University in Turkey, where he has received full scholarship for undergraduate studies.

Before joining MSU in August 2008, Dr. Yildiz studied and worked as a research and teaching assistant and instructor at Carnegie Mellon University's (CMU) Tepper School of Business, where he earned his Doctorate of Philosophy Degree and Master of Philosophy Degree in Industrial Administration (Operations Research). Dr. Yildiz was a recipient of William Larimer Mellon Fellowship for graduate studies at CMU. As part of his Doctorate of Philosophy Degree studies, he worked on the optimization of customer and supplier logistics operations at Robert Bosch LLC's Charleston, South Carolina plant as an intern during the summer of 2007 and continued his consulting through Carnegie Bosch Institute until April, 2008.

Dr. Yildiz is a member of the Institute for Operations Research and the Management Sciences (INFORMS) and the Decision Sciences Institute (DSI).

**Fatih Celiker, Ph.D.**
*Board Member*

Dr. Fatih Celiker holds a Bachelor of Science Degree in Teaching Mathematics from Bogazici University in Istanbul, Turkey. He earned his Doctorate of Philosophy Degree in Applied Mathematics from the University of Minnesota. His doctoral research was supported by U.S. Army Research Center.

Before joining the Mathematics Department at Wayne State University in 2006 as a tenure-track Assistant Professor, Dr. Celiker spent a year as a Postdoctoral Scholar at the Institute for Computational and Mathematical Engineering at Stanford University.

**Serdar Aktolga, MD**
*Board Member*

Dr. Serdar Aktolga graduated from Marmara University School of Medicine in Istanbul. Dr. Aktolga works at the University of Chicago in the Head and Neck Oncology Department with Dr. Ezra Cohen and Dr. Tanguy Seiwert.

### *Concept's Executive Officers*

**Sedat Duman**
*President & CEO*

Mr. Sedat Duman is part of the team that started Concept eleven years ago in Ohio, after graduating from Marmara University with a Bachelor's Degree in Physics Education in 1995.

Upon serving as an assistant principal at Horizon Science Academy-Cleveland for one year, Mr. Duman become the principal and served in that capacity until 2005. Under his leadership, Horizon Science Academy-Cleveland became one of the top public schools in the city of Cleveland and a flagship school for Concept. His leadership laid the groundwork for a school that would be recognized by the US News & World Report magazine, win the federal Title I award, and the federal Blue Ribbon award in 2009.

**Salim Ucan**
*Vice President*

Mr. Salim Ucan is responsible for new developments, professional development, and public relations at Concept Schools. Mr. Ucan's experience in education has always been with Concept Schools as he has been involved in the organization in various capacities since 1997. He graduated from Marmara University in Istanbul-Turkey and received his Post baccalaureate teacher certification at John Carroll University in Cleveland.

Upon approval of the proposal by Chicago Public Schools in 2004, Mr. Ucan became the start-up coordinator and later the founding principal of the new CMSA. He worked at that capacity for four years until the summer of 2008 when he moved to Concept's central office as Vice President. Mr. Ucan has participated in many valuable professional development opportunities from Harvard University to the Kellogg School of Management at Northwestern University. He was able to bring back many ideas, implement them at CMSA, and share these ideas with the school administrators and teachers within the Concept network.

**Mustafa (Steve) Gulkesen**
*CFO*

Mr. Mustafa (Steve) Gulkesen is currently working as the Chief Financial Officer of Concept. He graduated from Istanbul University School of Law. Mr. Gulkesen started his accounting career in 1998 at AEA laboratories in Chicago. He was hired by Concept as a business manager at Horizon Science Academy in Columbus in 2004. He became the southern Ohio schools Treasurer in 2006 and moved to Cleveland as the northern Ohio schools Treasurer the following year. He was transferred to work at Concept's headquarters in Chicago in 2008.

**Recent News Articles**

There have been recent news articles in Ohio about Concept Schools and, in the New York Times, concerning other charter school organizations headed by immigrants from Turkey. With respect to Concept, allegations were made that Concept Schools had inappropriately paid travel expenses for family members of some employees, used the H1B visa program inappropriately to bring Turkish teachers to its schools and inappropriate business relationships with persons of Turkish descent.

NPL and Concept strongly believe these allegations have no merit, as addressed below.

With respect to the issue of employee relocation expenses, in 2001, several Concept managed schools in Ohio reimbursed the State of Ohio approximately $13,000 for travel expenses for family members of teachers, based on a 2001 audit. There have been no other such payments since that date.

With respect to H-1B (Temporary Worker) visas, approximately 8 % of the workforce in all Concept managed schools, and approximately 6 % of the workforce in the six Financed Schools, are working under H1B visas issued by the United States government. Concept Schools currently employs 33 (thirty three) staff members of which, 4 (four) employees are H-1B visa holders, 5 (five) employees work based on their OPT (Optional Practical Training), and 1 (one) employee is a TN (Temporary Worker) visa holder. NPL and its subsidiaries do not have any H-1B employees.

Neither Concept Schools nor any Concept managed school is designated as a "Dependent Employer" under the H-1B regulations. According to H-1B regulations, if an employer hires H-1B employees beyond certain percentages, the employer becomes a "Dependent Employer" and is subject to additional displacement and recruitments attestation requirements. The percentage of H-1B employees of Concept and each of its managed schools are below the "Dependent Employer" percentages.

A charter school union affiliated with the American Federation of Teachers filed a complaint with the U.S. Department of Labor regarding Concept Schools and Chicago Math and Science Academy's employment of teachers with H1B visas. To the best of their knowledge, neither Concept nor Chicago Math and Science Academy believe these visas were granted inappropriately or illegally.

With respect to a complaint filed by a former employee of Horizon Science Academy Denison in July 2008, a decision was made in favor of the employee. The decision was appealed and currently a hearing date is to be scheduled by the Department of Labor.

With respect to business relationships for construction and other services, NPL generally puts significant contracts out to competitive bid. However, its design-build contracts with Star were not so bid, as NPL and Star have had an ongoing relationship on prior projects. NPL has had a working relationship with Star on facilities rehabilitations matters since 2004. Star does intend to competitively bid all contracts for work on the Financed Schools, totaling in excess of $14,300,000.

## THE MANAGEMENT AGREEMENTS

*Each of the Financed Charter Schools in Ohio will be managed by Concept pursuant to substantially identical management contracts (each a "Management Agreement" and, collectively, the "Management Agreements"). The Management Agreement for the Chicago Math & Science Academy is similar but includes specific state requirements. The discussion below, however, is only a brief description of the Management Agreements and is qualified in its entirety by reference to such Management Agreements, copies of which may be obtained during the underwriting period from: RBC Capital Markets, 2398 E. Camelback Road, Suite 700, Phoenix, AZ 85016.*

**Term**

The term of the Management Agreements shall be effective on the date of delivery of the Bonds and continue until June 30, 2013. The Management Agreement will automatically renew for additional, successive three (3) year terms unless one party notifies the other party on or before the February 1st prior to the expiration of the then current term of its intention not to renew the Management Agreement. The initial term and the renewal terms of the Management Agreement will automatically convert to five (5) years upon delivery of a legal opinion, to the effect that (i) Concept is an organization described in Section 501(c)(3) of the Code and (ii) the activities of Concept in performing services under the

Management Agreement are not unrelated trade or business activities as defined in Section 513(a) of the Code (a "501(c)(3) Opinion").

**Financial Services**

In the Management Agreement, Concept acknowledges that it has received and reviewed copies of Financed Charter School's Lease (the "Lease") and all other documents and instruments delivered by the Financed Charter School in connection with the Bonds and is familiar with the obligations and covenants made by Financed Charter School therein. Concept and Financed Charter School agree under the Management Agreement that Financed Charter School budget must be calculated to assure compliance with the Lease financial covenants and shall project operating revenues equal to or greater than payments due under the Lease, all management and operating expenses and Management Fees. The parties acknowledge and agree that compliance with the Lease requires coordination of Financed Charter School's budget with the budgets established by the parties pursuant to the other management agreements with other schools financed with the Bonds and that an equitable portion of the Bond costs should be allocated to (i) Financed Charter School's budget under the Management Agreement and (ii) each of the other budgets.

**Charter Renewal**

Concept shall assist Financed Charter School in preparing all information necessary in order to renew the Charter for Financed Charter School.

**Fees: Subordination to Lease Payments, Operating Costs; Clawback of Concept Fee**

For each month of the Management Agreement, Concept's fee payable thereunder shall be a fee equal to (i) the number of students reported to the state as being full time enrolled (FTE) for such month, multiplied by (ii) a percentage* of all funds received from the state per student, excluding restricted CCIP grants for the Financed Charter School for such month. Upon delivery of a 501(c)(3) Opinion, Concept 's fee payable under the Management Agreement shall be twelve percent (12%) of the funds received by the Financed Charter School from the State. All fees payable under the Management Agreement shall, at Concept's option, be made via electronic funds transfer. The Financed Charter Schools shall cooperate with Concept to set up and establish necessary accounts and procedures such that Financed Charter School shall automatically transfer Concept's fee from the funds received from the State, immediately when such funds are available in Financed Charter School's accounts. Notwithstanding the foregoing, the obligation of a Financed Charter School to pay Concept's fee under its Management Agreement shall be subordinate to its payment of operating expenses of Financed Charter School, including Lease payments.

In the event Financed Charter School defaults under its Lease by failing to pay rent, the obligation of Financed Charter School to pay Concept's fee shall be temporarily suspended until such default has been cured and Financed Charter School shall receive a temporary refund from Concept within ten (10) days of written notice from Financed Charter School to Concept. The temporary refund will be in an amount necessary to cure such Lease payment default, provided such refund amount shall not exceed the total fees received by Concept during the current fiscal year of Financed Charter School. The temporary refund shall be made by Concept to the Bond Trustee identified in the Bond Indenture to the extent permitted by law, and if not permitted by law, then made by Concept to such Financed Charter School and then immediately delivered to the Bond Trustee by Financed Charter School. Any fees temporarily suspended or refunded pursuant to the provisions of the preceding sentence shall remain due

---

* See "THE FINANCED CHARTER SCHOOLS" and projection charts for management fee percentage information for each Financed Charter School.

A-36

and payable by Financed Charter School to Concept, but shall only be payable upon and after the cure of such Lease agreement default provided that such repayment shall remain subordinate to the payment of operating expenses of Financed Charter School.  So long as such amounts remain unpaid, any unpaid balance shall accrue interest daily at a rate of 5.00% per annum.

To the extent Concept 's fee in any month is not paid due to delays in state funding as compared to a schedule of equal monthly payments, the unpaid fees will be paid without any additional penalties or interest as and to the extent that state funding catches up to a schedule of equal monthly payments.  To the extent Concept 's fee in any month is not paid for any other reason, the unpaid fees continue to be due and owing to Concept and will be paid by the applicable Financed Charter School as funds are available.

**Termination by the Financed Charter School**

Beginning two years after the effective date of the Management Agreements and continuing until the following February 1, a Financed Charter School may terminate its Management Agreement without cause or penalty upon ninety (90) days written notice to Concept.  The earliest termination date under the immediately preceding sentence is the second anniversary of the effective date of the Management Agreement.  The immediately preceding two sentences do not apply upon delivery of a 501(c)(3) Opinion.  In addition, a Financed Charter School may terminate its Management Agreement in the event Concept materially breaches the Management Agreement and Concept does not cure said material breach within sixty (60) days, or such other cure period required by law or the Sponsor, of its receipt of written notice from the Financed Charter School, unless said breach cannot reasonably be cured within said sixty (60) day period, in which case, Concept shall promptly undertake and continue efforts to cure said material breach within a reasonable time.  For purposes of this provision, such a "material breach" shall include, without limitation, any of the following occurrences:

(a)  Concept files for bankruptcy or has a bankruptcy suit filed against it which is not dismissed within ninety (90) days, or Concept is insolvent, ceases its operations, admits in writing its inability to pay its debts when they become due or appoints a receiver for the benefit of its creditors;

(b)  Concept fails to provide services as necessary to satisfy any material terms of the Contract;

(c)  The parties agree in writing to terminate the Management Agreement;

(d)  Financed Charter School loses its charter or if the law changes in a way to prevent management organizations from operating charter schools; and

(e)  Concept assigns the Management Agreement and, on or before June 30th of the then current term, Financed Charter School notifies the assignee that the Management Agreement shall terminate at the end of the then-current term.

**Qualified Management Agreement**

Qualified Management Agreement; Severability.  Unless and until Concept is determined to be an organization described in Section 501(c)(3) of the Code and performance by Concept of its obligations under the Management Agreements does not constitute an unrelated trade or business activity of Concept under Section 513(a) of the Code, the Management Agreements are intended to and shall constitute "qualified management agreements" in compliance with applicable requirements of Section 141 of the 1986 Code and Revenue Procedure 97-13 and shall be interpreted in accordance with such requirements.

Concept represents to each Financed Charter School that Concept has reviewed the applicable requirements of Section 141 of the 1986 Code and Revenue Procedure 97-13.

Tax Covenants. Concept agrees that it will operate and manage the Financed Charter School in a manner which, to the extent of its rights and authority under the Management Agreement and as otherwise authorized by the Financed Charter School in writing, preserves the exemption from federal income tax of interest on the Bonds and, in particular, to the extent of its rights and authority under this Agreement and as otherwise authorized by Concept in writing, will comply with the requirements of Section 141(b) of the Code, Section 1.141-3 of the Treasury Regulations and Revenue Procedure 97-13 relating to conditions under which tax-exempt bond-financed property will be considered used for an impermissible private business use; provided, however that the foregoing shall not require a Financed Charter School to breach any of the provisions of its Management Agreement unless such action is authorized and such breach is waived in writing by Concept.  In the event that such requirements impose a material adverse financial burden on the Financed Charter School not otherwise contemplated by the Management Agreement, or if it becomes necessary to amend its Management Agreement in order to preserve the exemption from federal income tax of interest on the Bonds, the applicable Financed Charter School and Concept agree to negotiate in good faith and amend such Management Agreement, including the compensation to be paid to the Financed Charter School, in a manner which maintains or restores to such Financed Charter School the benefits expected to be received by it pursuant to the original terms of the Management Agreement.

## FORWARD-LOOKING STATEMENTS
## IN THIS APPENDIX AND OFFICIAL STATEMENT

Certain statements included or incorporated in this Official Statement including, but not limited to, this Appendix, constitute "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995, Section 21E of the United States Exchange Act of 1934, as amended, and Section 27A of the United States Securities Act of 1933, as amended.  Such statements are generally identifiable by the termination used such as "plan," "expect," "estimate," "budge" or other similar words.

THE ACHIEVEMENT OF CERTAIN RESULTS OR OTHER EXPECTATIONS CONTAINED IN SUCH FORWARD-LOOKING STATEMENTS INVOLVES KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER FACTORS WHICH MAY CAUSE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS DESCRIBED TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS EXPRESSED OR IMPLIED BY SUCH FORWARD-LOOKING STATEMENTS.  THE BORROWER DOES NOT PLAN TO ISSUE ANY UPDATES OR REVISIONS TO THOSE FORWARD-LOOKING STATEMENTS IN THIS APPENDIX IF OR WHEN ITS EXPECTATIONS, OR EVENTS, CONDITIONS, OR CIRCUMSTANCES ON WHICH SUCH STATEMENTS ARE BASED OCCUR OR FAIL TO OCCUR.

# APPENDIX B

## FINANCIAL STATEMENTS OF THE BORROWER AND THE FINANCED CHARTER SCHOOLS

**AUDITED FINANCIAL STATEMENTS OF THE BORROWER FOR FISCAL YEAR ENDED JUNE 30, 2010**

**UNAUDITED FINANCIAL STATEMENTS OF THE BORROWER FOR THE FISCAL YEAR ENDED JUNE 30, 2011**

**AUDITED FINANCIAL STATEMENTS OF CHICAGO MATH & SCIENCE ACADEMY FOR FISCAL YEAR ENDED JUNE 30, 2010**

**UNAUDITED FINANCIAL STATEMENTS OF CHICAGO MATH & SCIENCE ACADEMY FOR THE FISCAL YEAR ENDED JUNE 30, 2011**

**AUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY OF SPRINGFIELD FOR FISCAL YEAR ENDED JUNE 30, 2010**

**UNAUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY OF SPRINGFIELD FOR THE FISCAL YEAR ENDED JUNE 30, 2011**

**AUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY TOLEDO HIGH FOR FISCAL YEAR ENDED JUNE 30, 2010**

**UNAUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY TOLEDO HIGH FOR THE FISCAL YEAR ENDED JUNE 30, 2011**

**AUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY DAYTON HIGH FOR FISCAL YEAR ENDED JUNE 30, 2010**

**UNAUDITED FINANCIAL STATEMENTS OF HORIZON SCIENCE ACADEMY DAYTON HIGH FOR THE FISCAL YEAR ENDED JUNE 30, 2011**

(THIS PAGE IS INTENTIONALLY LEFT BLANK)

NEW PLAN LEARNING, INC.
AND SUBSIDIARIES

\* \* \*

REPORT ON AUDIT OF CONSOLIDATED
FINANCIAL STATEMENTS

YEAR ENDED JUNE 30, 2010

\* \* \*

NEW PLAN LEARNING, INC.
AND SUBSIDIARIES

YEAR ENDED JUNE 30, 2010

## CONTENTS

|  | Page |
|---|---|
| Independent auditor's report | 1 |
| Consolidated statement of financial position | 2 |
| Consolidated statement of activities | 3 |
| Consolidated statement of cash flows | 4 |
| Notes to consolidated financial statements | 5-8 |

(847) 635-0793
(847) 635-0884 FAX
(847) 635-0882 FAX

## *Arnold N. Schorn & Co., LLC*

CERTIFIED PUBLIC ACCOUNTANTS

2860 RIVER ROAD, SUITE 350     DES PLAINES, ILLINOIS 60018

JGRIECO@SCHORNCO.COM
DRIPOLI@SCHORNCO.COM

V. JAMES GRIECO, C.P.A.
DONALD P. RIPOLI, C.P.A.

MEMBERS
AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS
ILLINOIS SOCIETY OF
CERTIFIED PUBLIC ACCOUNTANTS

ARNOLD N. SCHORN, C.P.A.
1946-1976
RAYMOND A. WOLF, C.P.A.
1953-1996
BENJAMIN S. DANIEL, C.P.A.
1958-2006

INDEPENDENT AUDITOR'S REPORT

To the Board of Directors
New Plan Learning, Inc.
Des Plaines, Illinois

     We have audited the accompanying consolidated statement of financial position of
New Plan Learning, Inc., (a not-for-profit organization) and subsidiaries as of
June 30, 2010, and the related consolidated statements of activities and cash flows for
the year then ended. These consolidated financial statements are the responsibility of
the Organization's management. Our responsibility is to express an opinion on these
consolidated financial statements based on our audit.

     We conducted our audit in accordance with auditing standards generally accepted in
the United States of America. Those standards require that we plan and perform the audit
to obtain reasonable assurance about whether the consolidated financial statements are
free of material misstatement. An audit includes examining, on a test basis, evidence
supporting the amounts and disclosures in the consolidated financial statements. An audit
also includes assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation. We
believe that our audit provides a reasonable basis for our opinion.

     In our opinion, the consolidated financial statements referred to above present
fairly, in all material respects, the financial position of New Plan Learning, Inc. and
subsidiaries as of June 30, 2010, and the changes in their net assets and their cash
flows for the year then ended in conformity with accounting principles generally accepted
in the United States of America.

*Arnold N Schorn + Co, LLC*

October 21, 2010

1.

B-4

NEW PLAN LEARNING, INC.
AND SUBSIDIARIES

CONSOLIDATED STATEMENT OF FINANCIAL POSITION

JUNE 30, 2010

### ASSETS

| | | |
|---|---|---:|
| Current assets: | | |
| Cash | $ | 627,895 |
| Accounts and notes receivable | | 375,510 |
| Total current assets | | 1,003,405 |
| | | |
| Property and equipment: | | |
| Automobile | | 23,503 |
| Land | | 2,963,013 |
| Buildings | | 18,877,441 |
| Equipment | | 20,327 |
| Less - accumulated depreciation | | (1,200,758) |
| Net fixed assets | | 20,683,526 |
| | | |
| Other assets: | | |
| Accounts and notes receivable (net of current portion) | | 378,034 |
| Deposits | | 90,000 |
| Prepaid costs | | 279,986 |
| Loan costs - net of amortization | | 621,968 |
| Total other assets | | 1,369,988 |
| | | |
| Total assets | | $23,056,919 |

### LIABILITIES AND NET ASSETS

| | | |
|---|---|---:|
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ | 195,114 |
| Deferred rent credit - current portion | | 104,304 |
| Notes payable - current portion | | 838,521 |
| Accrued real estate taxes | | 943,773 |
| Accrued state taxes | | 2,005 |
| Loan payable - other | | 200,000 |
| Total current liabilities | | 2,283,717 |
| | | |
| Long-term liabilities: | | |
| Lease security deposits | | 112,806 |
| Deferred rent credit - (net of current portion) | | 721,462 |
| Notes payable (net of current portion) | | 19,504,485 |
| Total long-term liabilities | | 20,338,753 |
| | | |
| Net assets: | | |
| Unrestricted | | 434,449 |
| Total net assets | | 434,449 |
| | | |
| Total liabilities and net assets | | $23,056,919 |

The appended notes are an integral part
of the financial statements.                                    2.

NEW PLAN LEARNING, INC.
AND SUBSIDIARIES

CONSOLIDATED STATEMENT OF ACTIVITIES

YEAR ENDED JUNE 30, 2010

| | |
|---|--:|
| Revenue: | |
| Gross rental income | $ 2,364,180 |
| Total revenue | 2,364,180 |
| | |
| Expenses: | |
| Amortization - loan fees | 50,744 |
| Automobile | 1,063 |
| Bank service fees | 330 |
| Conference and seminars | 325 |
| Contributions | 131,000 |
| Tenant support | 8,000 |
| Depreciation | 427,325 |
| Dues and subscriptions | 644 |
| Insurance | 767 |
| Miscellaneous | 4,339 |
| New projects | 20,601 |
| Office expense and postage | 12,952 |
| Payroll taxes | 7,156 |
| Penalties | 1,533 |
| Professional fees | 105,481 |
| Real estate taxes | 264,107 |
| Rent | 7,145 |
| Repairs and maintenance | 6,226 |
| Salaries and wages | 64,980 |
| Travel/Entertainment | 9,207 |
| Utilities | 492 |
| Total expenses | 1,124,417 |
| | |
| Net assets before other income (expense) and provision for income taxes | 1,239,763 |
| | |
| Other income (expense) and provision for income taxes: | |
| Interest income | 133,760 |
| Interest expense | (1,171,987) |
| Provision for income taxes | (33,417) |
| Total other income (expense) and provision for income taxes | (1,071,644) |
| | |
| Change in net assets | 168,119 |
| | |
| Unrestricted net assets - beginning of year | 266,330 |
| | |
| Unrestricted net asset - end of year | $    434,449 |

The appended notes are an integral part
of the financial statements.

3.

B-6

NEW PLAN LEARNING, INC.
AND SUBSIDIARIES

CONSOLIDATED STATEMENT OF CASH FLOWS

YEAR ENDED JUNE 30, 2010

| | |
|---|---:|
| Cash flows from operating activities: | |
| Change in net assets | $   168,119 |
| Adjustments to reconcile change in net assets to net cash provided by operating activities: | |
| Depreciation and amortization | 478,068 |
| Change in operating assets and liabilities: | |
| Accounts and notes receivable | 283,516 |
| Deposits | (50,998) |
| Accounts payable and accrued expenses | 365,527 |
| Deferred rent credit | 633,893 |
| Net cash provided by operating activities | 1,878,125 |
| | |
| Cash flows from investing activities: | |
| Acquisitions of property and improvements | (5,821,813) |
| Deposits and loan costs - net | (5,203) |
| Net cash (used in) investing activities | (5,827,016) |
| | |
| Cash flows from financing activities: | |
| Loan payable - other | 200,000 |
| Proceeds from notes payable | 4,618,682 |
| Principal repayments of notes payable | (394,353) |
| Reduction of deposits | 63,806 |
| Net cash provided by financing activities | 4,488,135 |
| | |
| Net increase in cash | 539,224 |
| | |
| Cash, beginning of year | 88,651 |
| | |
| Cash, end of year | $   627,895 |
| | |
| Supplementary information: | |
| Interest paid | $1,171,987 |
| Taxes paid | $     31,412 |

The appended notes are an integral part
of the financial statements.                                               4.

B-7

NEW PLAN LEARNING, INC.
AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

JUNE 30, 2010

1.  Nature of organization and significant accounting policies:

New Plan Learning, Inc., a not-for-profit Organization, is the parent Organization that primarily operates the management and rental of real estate to tax-exempt entities operating as charter schools. The Organization operates Ohio owned-properties in Cincinnati, Cleveland (Denison Avenue and Marginal Avenue), Columbus, and Toledo, Ohio. The Organization received tax-exempt status under 501(c)(3) of the Internal Revenue Service Code. with an effective date of July 14, 2009. The wholly owned subsidiary Breeze, Inc. received their tax exempt status as a 501(c)(2) organization on August 30, 2010. However, they are not recognizing their tax exempt status until their recognition of the parent's exempt status on July 14, 2009. Breeze, Inc serves not-for-profit organizations.

Revenue recognition and contributions

The Organization recognizes rental revenue as called for by the lease with the charter school. Per capita funding received from government sources is fixed, regardless of higher first year costs and lower enrollment. The Organization recognizes that a portion of the rents in earlier years may be uncollectible, which, if so determined, is characterized as a contribution to the charter school.

Principles of consolidation

The accompanying consolidated financial statements include the accounts of the parent, New Plan Learning, Inc., and its subsidiaries, Breeze, Inc., 250 Shoup Mill, LLC, 2350 Morse, LLC, NOG Ohio, LLC and OG Ohio, LLC. The Organization has 100% ownership in the subsidiaries.

Property and equipment

Property and equipment are carried at cost. Depreciation and amortization are computed using the straight-line method and accelerated basis over the estimated useful lives: buildings and improvements - thirty nine years; equipment - seven years; loan fees and costs - over the loan term. In the acquisition year, buildings and improvements are depreciated on a mid-month convention and equipment is depreciated using a one-half year convention. When improved real property is acquired without a specific contract allocation, 25% of the costs are treated as land costs and the remainder (75%) is allocated to the building improvement. For the year ended June 30, 2010, property and equipment depreciation amounted to $427,325 and amortization of loan costs amounted to $50,744. In addition, the carrying values of buildings and improvements are in excess of the appraised values. However, because of the current market conditions, the difference is deemed to be temporary.

Use of estimates

The preparation of consolidated financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

5.

NEW PLAN LEARNING, INC.
AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

JUNE 30, 2010

1.  Nature of organization and significant accounting policies: (continued)

Income taxes

For the period July 14 through year end and all future periods, the Organization will file Federal Form 990 - Return of Organization Exempt From Income Tax.

Federal Form 1120 and required state returns will be filed for Breeze, Inc. for the short period in which they were recognized as a taxable entity. The net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes are immaterial. The income taxes in the amount of $33,417 include federal, state, and local taxes. These amounts are estimated based on the ongoing communications with the Internal Revenue Service, state and local agencies. Since exempt status is being recognized at a date other than the Organization fiscal year end, additional returns are required to be filed which may lead to differences in prior returns filed, taxes paid and penalties assessed. These differences will be recorded prospectively unless material in which reissued financial statements would be required.

2.  Accounts and Notes receivable:

The composition of accounts and notes receivable at June 30, 2010 is as follows:

| | |
|---|---|
| Concept Schools, NFP | $  439,025 |
| Horizon Science Academy - Cincinnati | 36,000 |
| Horizon Science Academy - Columbus | 52,000 |
| Horizon Science Academy - Dayton | 149,031 |
| Horizon Science Academy - Springfield | 71,400 |
| Sprint/Nextel | 2,088 |
| Tax refunds | 4,000 |
| | 753,544 |
| Less - current portion | (375,510) |
| Non-current accounts and notes receivable | $  378,034 |

Concept Schools, NFP has executed a promissory note dated July 14, 2009 in the principal amount of $499,133. The note bears interest at the rate of 7.5% per annum and matures June 14, 2014. Payments of principal and interest are $7,975 payable in monthly installments.

3.  Mortgage and Contract notes payable:

| Description of mortgage or contract balance | Maturity date | Balance |
|---|---|---|
| 8.625% mortgage note, secured by Cleveland (Denison and Marginal Ave.), and Cincinnati properties, principal and interest payable monthly at $3,147 - estimated balloon payment of $319,478 due at maturity. | 6/12/17 | $  372,669 |

6.

B-9

NEW PLAN LEARNING, INC.
AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

JUNE 30, 2010

3.  Mortgage and contract notes payable: (continued)

| Description of mortgage or contract balance | Maturity date | Balance |
|---|---|---|
| 8% mortgage note secured by Columbus property, 20 year amortization, payable monthly at $19,238, including interest (after 6/30/07 interest at 10-year U.S. Treasury note rate plus 1.9%), estimated balloon balance of $1,487,580 due at maturity. | 7/01/17 | $ 2,086,897 |
| 7.21% mortgage note, secured by Cleveland (Denison and Marginal Ave.) and Cincinnati properties, principal and interest payable monthly at $52,924. | 8/1/32 | 7,007,629 |
| 7.00% mortgage note secured by Cleveland, Columbus and Toledo property, ten year note, principal and interest payable monthly at $1,272 - estimated balloon of the loan of $141,000. | 9/1/19 | 178,201 |
| Note payable, Toyota Financial Services, sixty month loan dated 10/13/08, 1.9% payable monthly at $376. | 10/13/13 | 14,561 |
| 7.75% mortgage note payable, secured by Columbus, Ohio (2350 Morse Road), principal and interest payable monthly at $26,002. | 6/1/20 | 3,423,412 |
| 6.78% mortgage note secured by Cleveland, Columbus and Toledo property, twenty-five year note, principal and interest payable monthly at $23,694. | 9/1/19 | 3,384,637 |
| 3.5% mortgage note payable secured by property in Dayton, Ohio (Shoup Mill). The note will be converted to a maximum principal amount of $3,375,000, interest only paid on loan through 6/30/10. | 6/1/20 | 3,375,000 |
| 6.25% notes secured by Concept Schools, NFP, one year note, interest paid quarterly, principal payable at maturity. Note is dated 6/7/10. | | 500,000 |
| | | 20,343,006 |
| Less current portion | | (838,521) |
| Total long-term debt - net of current portion | | $19,504,485 |

7.

NEW PLAN LEARNING, INC.
AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

JUNE 30, 2010

4. Deferred rent credit:

The Organization has extended a rent credit to HSA Cleveland High School to allow for payments made by the tenant on behalf of the Organization. The credit is to be amortized over the lease term ending in June, 2018. The reduction in the monthly scheduled lease payment is $8,692.

5. Interest expense:

Interest expense is composed of the following components:

| | |
|---|---|
| Mortgage interest | $1,097,858 |
| Interest related to property tax assessments | 47,571 |
| Unsecured debt | 26,558 |
| | $1,171,987 |

6. Long-term operating leases - as lessor:

The Organization leased it own properties under non-cancellable operating leases with lease terms of five years to ten years. Generally, each lease required the tenant to reimburse for casualty insurance and maintenance expenses. Pursuant to the new financing concluded in July 2007, none of the charter schools now guarantee the mortgage obligations. The minimum annual rentals under the revised operating leases over the next five years are as follows:

| | |
|---|---|
| 6/30/11 | $2,986,256 |
| 6/30/12 | $3,088,712 |
| 6/30/13 | $3,194,867 |
| 6/30/14 | $3,404,860 |
| 6/30/15 | $3,418,333 |

7. Subsequent events:

Subsequent events were evaluated through October 21, 2010, which is the date the financial statements were available to be issued. As of that date no material events were noted.

8.

**As of June 30, 2011**
**Balance Sheet**

NPL Consolidated

|  | Jun 30, 11 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| Total Checking/Savings | 160,557 |
| Total Accounts Receivable | 274,365 |
| Total Other Current Assets | 1,421,044 |
| **Total Current Assets** | 1,855,967 |
| **Total Fixed Assets** | 20,264,293 |
| **Total Other Assets** | 1,005,290 |
| **TOTAL ASSETS** | 23,125,550 |
| **LIABILITIES & EQUITY** | |
| Total Current Liabilities | 2,716,825 |
| Total Long Term Liabilities | 19,491,374 |
| **Total Liabilities** | 22,208,199 |
| **Total Equity** | 917,351 |
| **TOTAL LIABILITIES & EQUITY** | 23,125,550 |

0.00

## NPL Consolidated
## Profit & Loss
### July through June 2011

Consolidated

Accrual Basis

Jul 10 - Jun 11

**Ordinary Income/Expense**

**Income**

**Rental**

| | Jul 10 - Jun 11 |
|---|---|
| HSA-Youngstown | 165,000 |
| HSA-Dayton High | 415,817 |
| HSA-Colombus Middle | 369,000 |
| HSA-Cleveland Middle | 278,018 |
| HSA Springfield | 175,200 |
| HSA-Columbus | 384,000 |
| HSA-Cincinnati | 252,000 |
| HSA-Cleveland High | 348,297 |
| HSA-Denison | 405,263 |
| Sprint Nextel | 25,063 |
| **Total Income** | **2,817,658** |
| **Total Expense** | **2,381,682** |
| **Net Ordinary Income** | **435,976** |
| **Total Other Income** | **46,414** |
| **Net Income** | **482,389** |

MIRZA BAIG & COMPANY
*Certified Public Accountants*

THE CHICAGO MATHEMATICS AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

YEAR ENDED JUNE 30, 2010

THE CHICAGO MATHEMATICS AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

Year Ended June 30, 2010

## TABLE OF CONTENTS

| | PAGE |
|---|---|
| INDEPENDENT AUDITOR'S REPORT | 1-2 |
| | |
| FINANCIAL STATEMENTS | |
| Statement of Financial Position | 3 |
| Statement of Activities | 4 |
| Statement of Cash Flows | 5 |
| Statement of Functional Expenses | 6 |
| | |
| NOTES TO FINANCIAL STATEMENTS | 7-13 |
| | |
| Independent Auditor's Report on Internal Control Over Financial Reporting and Other Matters Based on an Audit of Financial Statements Performed in Accordance with Government Auditing Standards | 14-16 |
| Independent Auditor's Report on Compliance with Requirements of Applicable Laws and regulations Prescribed by Administering agency | 17-18 |
| SCHEDULE OF FINDINGS AND QUESTIONED COSTS | |
| Schedule of findings | 19 |
| Schedule of Prior Year Findings | 21 |

# MIRZA BAIG & COMPANY

*Certified Public Accountants*

333 N. Michigan Ave., Suite 2032
Chicago, IL 60601
Tel: (312) 236-2077
Fax: (312) 726-9520

2925 W. Granville, Unit 209
Chicago, IL 60659
Tel: (773) 770-6124
Fax: (773) 733-0825

INDEPENDENT AUDITOR'S REPORT

Board of Directors
The Chicago Mathematics and Science
   Academy Charter School, Inc.
Chicago, Illinois

We have audited the accompanying statements of financial position of The Chicago Mathematics and Science Academy Charter School, Inc. (the School) as of June 30, 2010, and the related statements of activities, functional expenses and cash flows for the year then ended.  These financial statements are the responsibility of the School's management.  Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audit provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of The Chicago Mathematics and Science Academy Charter School, Inc. as of June 30, 2010, and the changes in its net assets and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

In accordance with *Government Auditing Standards*, we have also issued our reports dated October 27, 2010 on our consideration of The Chicago Mathematics and Science Academy Charter School, Inc.'s internal control over financial reporting and our tests of its compliance with certain provisions of laws, regulations, contracts and grants and other matters. The purpose of that report is to describe the scope of our testing and not to provide an opinion on the internal control over financial reporting or on compliance. That

*Members: AICPA • Illinois CPA Society • Association of Government Accountants*

**MIRZA BAIG & COMPANY**
*Certified Public Accountants*

report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be read in conjunction with this report in considering the results of our audit.

Chicago, Illinois
October 27, 2010

THE CHICAGO MATHEMATIC AND SCIENCE ACADEMY CHARTER SCHOOL, INC

STATEMENT OF FINANCIAL POSITION
For the year ended June 30, 2010

|  | Unrestricted | Temporarily Restricted | Total |
|---|---|---|---|
| **ASSETS:** | | | |
| Current assets. | | | |
| Cash and cash equivalents | $ 947,102 | $ - | $ 947,102 |
| Prepaid and Deposits | 67,192 | - | 67,192 |
| Total current assets | 1,014,294 | - | 1,014,294 |
| Fixed assets - at cost (net of accumulated depreciations and amortizations of $599,841 and $338,702) | 11,548,152 | - | 11,548,152 |
| Total assets | 12,562,446 | - | 12,562,446 |
| **LIABILITIES AND NET ASSETS** | | | |
| Current liabilities. | | | |
| Accounts payable and accrued expenses | 494,971 | - | 494,971 |
| Mortgage note payable - current portion | 294,792 | - | 294,792 |
| Total current liabilities | 789,763 | - | 789,763 |
| Long term liabilities: | | | |
| Mortgage note payable, less current portion | 10,362,499 | - | 10,362,499 |
| Total long term liabilities | 10,362,499 | - | 10,362,499 |
| Total liabilities | 11,152,262 | - | 11,152,262 |
| Net assets: | | | |
| Unrestricted | 1,410,184 | - | 1,410,184 |
| Temporarily restricted | - | - | - |
| Total net assets | 1,410,184 | - | 1,410,184 |
| Total liabilities and net assets | $ 12,562,446 | $ - | $ 12,562,446 |

The accompanying notes are an integral part of the financial statements

B3:18

THE CHICAGO MATHEMATIC AND SCIENCE ACADEMY CHARTER SCHOOL, INC.

STATEMENT OF ACTIVITIES
For the year ended June, 30 2010

| | Unrestricted | Temporarily Restricted | Total |
|---|---|---|---|
| REVENUE: | | | |
| Chicago Public Schools: | | | |
| Per capita tuition | $ 4,967,596 | $ - | $ 4,967,596 |
| Special education - state source | 250,989 | - | 250,989 |
| Title I - Low income - federal source | 112,200 | - | 112,200 |
| Title II - Teachers quality - federal source | 29,750 | - | 29,750 |
| Enlish Language Learners - state source | 38,122 | - | 38,122 |
| SCGSA - state source | 304,141 | - | 304,141 |
| Other: | | | |
| Community Schools Grant - state source | - | 75,000 | 75,000 |
| Case manager Stipend - state source | 2,704 | - | 2,704 |
| Contributed goods and services | 241,705 | - | 241,705 |
| Student fees and activities | 142,690 | - | 142,690 |
| Contributions and grants | 55,250 | 30,000 | 85,250 |
| Miscellaneous | 4,720 | - | 4,720 |
| Special events: | | | |
| Gross proceeds | 20,868 | - | 20,868 |
| Expenses | (4,032) | - | (4,032) |
| Net Assets released from restrictions: | | | |
| Satisfaction of purpose restrictions | 150,200 | (150,200) | - |
| Total revenue | 6,316,903 | (45,200) | 6,271,703 |
| EXPENSES | | | |
| Program services | 3,724,017 | - | 3,724,017 |
| Supporting services | | | |
| Management and general | 1,858,425 | - | 1,858,425 |
| Fund-raising | 95,186 | - | 95,186 |
| Total supporting services | 1,953,611 | - | 1,953,611 |
| Total expenses | 5,677,628 | - | 5,677,628 |
| Changes in net assets | 639,275 | (45,200) | 594,075 |
| Net assets, beginning of year | 770,909 | 45,200 | 816,109 |
| Net assets, end of year | $ 1,410,184 | $ - | $ 1,410,184 |

The accompanying notes are an integral part of the financial statements

THE CHICAGO MATHEMATIC AND SCIENCE ACADEMY CHARTER SCHOOL, INC.

STATEMENT OF CASH FLOWS
For the year ended June 30, 2010

CASH FLOW FROM OPERATING ACTIVITIES

| | | |
|---|---|---|
| Change in net assets | $ | 594,075 |
| Adjustments to reconcile increase in net assets to net cash | | |
| Provided by operating activities | | |
| Depreciation | | 263,140 |
| (Increase) Decrease in operating assets: | | |
| Decrease in prepaid and deposits | | 40,941 |
| Increase (Decrease) in operating assets: | | |
| Increase in accounts payable and accrued expenses | | 220,260 |
| (Decrease) in accrued construction cots | | (1,158,527) |
| Net cash used/ provided by operating activities | | (40,111) |

CASH FLOWS FROM INVESTING ACTIVITIES:

| | | |
|---|---|---|
| Additions to property and equipment | | (4,340,001) |
| Net cash used by investing activities | | (4,340,001) |

CASH FLOWS FROM FINANCING ACTIVITIES

| | | |
|---|---|---|
| Payments on note payable | | (41,589) |
| Net loan proceeds | | 4,915,149 |
| Net cash provided/ used from financing activities | | 4,873,560 |
| Net increase in cash and cash equivalents | | 493,448 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF YEAR | | 453,664 |
| CASH AND CASH EQUIVALENTS, END OF YEAR | $ | 947,102 |

| | | |
|---|---|---|
| SUPPLEMENTARY DISCLOSURES OF CASH FLOW INFORMATION | | |
| Cash paid for interest | $ | 108,591 |

The accompanying notes are an integral part of the financial statements

B-20

THE CHICAGO MATHEMATIC AND SCIENCE ACADEMY CHARTER SCHOOL, INC.

STATEMENT OF FUNCTONAL EXPENSES
For the year ended June 30, 2010

|  | Program services | SUPPORTING SERVICES | | Total |
|---|---|---|---|---|
|  |  | Management and general | Fundraising |  |
| Salaries and related expenses |  |  |  |  |
| Salaries | $ 2,149,595 | $ 859,838 | $ 61,417 | $ 3,070,850 |
| Employee benefits and payroll taxes | 435,162 | 174,065 | 12,433 | 621,660 |
| Total salaries and related expenses | 2,584,757 | 1,033,903 | 73,850 | $ 3,692,510 |
| Advertising | 3,293 | 1,317 | 94 | 4,704 |
| Athletic equipment | 4,972 | - | - | 4,972 |
| Bank Service Charges | - | 456 | - | 456 |
| Computer and technology | 3,564 | 1,426 | 102 | 5,092 |
| Curriculum materials | 14,313 | - | - | 14,313 |
| Dues and subscriptions | 184 | 74 | 5 | 263 |
| Educational books and supplies | 150,904 | - | - | 150,904 |
| Equipment – non capitalized | 1,686 | 675 | 48 | 2,409 |
| Extracurricular activities | 68,243 | - | - | 68,243 |
| Field Trips | 50,626 | - | - | 50,626 |
| Graduation | 32,774 | - | - | 32,774 |
| Insurance | 29,395 | 11,758 | 840 | 41,993 |
| Interest | 76,014 | 30,405 | 2,172 | 108,591 |
| Contributed goods and services | 241,705 | - | - | 241,705 |
| Management and consulting fees | - | 525,863 | - | 525,863 |
| Meeting and Conference | 5,893 | 2,357 | 168 | 8,418 |
| Miscellaneous | 1,554 | 622 | 48 | 2,224 |
| Occupancy | 8,852 | 3,541 | 253 | 12,646 |
| Office supplies and expense | 20,595 | 8,235 | 588 | 29,421 |
| Postage and printing | 10,707 | 4,283 | 306 | 15,296 |
| Professional development | 81,415 | - | - | 81,415 |
| Professional fees | 52,840 | 21,136 | 1,510 | 75,486 |
| Repairs and maintenance | 23,806 | 9,522 | 680 | 34,008 |
| Science Fair material | 4,451 | - | - | 4,451 |
| Students transportation | 17,336 | - | - | 17,336 |
| Substitute teachers and other instruction costs | 37,480 | - | - | 37,480 |
| Telephone and internet access | 10,351 | 4,140 | 296 | 14,787 |
| Uniforms | 34,380 | - | - | 34,380 |
| Utilities | 71,206 | 28,482 | 2,034 | 101,722 |
| Total expenses before depreciation | 3,643,296 | 1,688,198 | 82,994 | 5,414,488 |
| Depreciation | 184,198 | 73,679 | 5,263 | 263,140 |
| TOTAL EXPENSES | $ 3,827,494 | $ 1,761,877 | $ 88,257 | $ 5,677,628 |

The accompanying notes are an integral part of the financial statements

THE CHICAGO MATHEMATIC AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

NOTES TO FINANCIAL STATEMENTS

## NOTE 1 – ORGANIZATION AND PURPOSE

The Chicago Mathematics and Science Academy Charter School, Inc. (the School) located in Chicago, Illinois was formed in October 2003 to prepare students for college by creating an effective learning community of higher standards and expectations with a rigorous curriculum focusing on science, math and technology.

The School is partially managed and supported by Concept Schools, Inc., a Chicago based non-profit educational management and consulting organization. Concept Schools, Inc. first initiated Horizon Science Academies, a science and math emphasized school model in Cleveland and Columbus, Ohio in 1999. See Note 8.

The School adopted the same educational model that is used by Horizon Science Academies. Pillars of this successful model are: a comprehensive college-prep curriculum, small class size, positive relationship among the trial' of students, teachers and parents, high level of student participation and a safe and encouraging learning environment.

During the year ended June 30, 2010, the School served approximately 595 students in grades six through twelve.

The School is supported primarily through per-capita tuition payments from the Chicago Public Schools and grants from state and federal agencies. The School may also receive and solicit outside funding from various corporate and community foundations and the general public. During the years ended June 30, 2010, the School received approximately 79% of its support from per-capita tuition paid by Chicago Public Schools.

The School is subject to a "Charter Agreement" with the Chicago School Reform Board of Trustees (Chicago Public Schools). The agreement was extended from July1, 2009 to June 30, 2014.

The School is governed by a Board of Directors that is comprised of at least five, but no more than nine members that are to be selected according to the School's bylaws.

Under State law, the Chicago Public Schools has oversight responsibility to verify that the School complies with and meets the expectation of a public educational system. The School is expected to satisfy regulations and compliance requirements by the Chicago Public Schools.

THE CHICAGO MATHEMATIC AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

NOTES TO FINANCIAL STATEMENTS

## NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The significant accounting policies of the School are summarized below:

### Basis of accounting:

The School's financial statements are prepared on the accrual basis of accounting in accordance with generally accepted accounting principles.

### Basis of presentation:

Financial statement presentation follows the recommendations of the Financial Accounting Standards Board in its Statement of Financial Accounting Standards (SFAS) No. 117, *Financial Statements of Non-for-Profit Organizations*. Under SFAS No. 117, the School is required to report information regarding its financial position and activities according to three classes of net assets: unrestricted net assets, temporarily restricted net assets, and permanently restricted net assets.

> Unrestricted - Unrestricted net assets are available to finance the general operations of the School. The only limits on the use of unrestricted net assets are the broad limits resulting from the nature of the School, the environment in which it operates and the purposes specified in its articles of incorporation.

> Temporarily restricted - Temporarily restricted net assets result (a) from contributions and other inflows of assets, the use of which by the School is limited by donor-imposed stipulations that either expire by passage of time or can be fulfilled and removed by action of the School pursuant to those stipulations, (b) from other asset enhancements and diminishments subject to the same kinds of stipulations and (c) from reclassifications to (or from) other classes of net assets as a consequence of donor-imposed stipulations, their expiration by passage of time or their fulfillment and removal by actions of the School pursuant to those stipulations. See Note 6.

> Permanently restricted - Permanently restricted net assets (generally referred to as Endowment funds) are assets that have donor-imposed restrictions that stipulate that the contributed resources be maintained permanently, but permit the School to use up all of the income or other economic benefits derived from the donated assets. The School has no permanently restricted net assets.

### Unrestricted and restricted revenue and support:

Contributions received are recorded as unrestricted, temporarily restricted or permanently restricted support depending on the existence and/or nature of any donor restrictions.

THE CHICAGO MATHEMATIC AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

NOTES TO FINANCIAL STATEMENTS

NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - CONITUE

Donor-restricted support is reported as an increase in temporarily or permanently restricted net
assets depending on the nature of the restriction. When a restriction expires (that is, when a
stipulated time restriction ends or purpose of restriction is accomplished), temporarily restricted
net assets are reclassified to unrestricted net assets and reported in the statement of activities as
net assets released from restrictions.

Expense allocation:

The costs of providing various programs and other activities have been summarized on a
functional basis in the statement of activities. Accordingly, certain costs have been allocated
among the programs and supporting services benefited.

Property and equipment:

Property and equipment are stated at cost if purchased or fair market value at date of donation, if
donated. Amortization of leasehold improvements was provided ratably over the lesser of the
term of the lease or the estimated life of the improvements. Depreciation of equipment is
computed on the straight-line method over the estimated useful lives of the assets using the
straight-line method over three to seven years. Additions over $1,000 are capitalized while
replacements, maintenance and repairs which do not improve or extend the lives of the
respective assets are expensed as incurred.

Estimates:

The preparation of financial statements in conformity with generally accepted accounting
principles requires management to make estimates and assumptions that affect certain reported
amounts and disclosures in the financial statements. Accordingly, actual results could differ from
those estimates.

Valuation:

During the year ended June 30, 2009, the School adopted Statement of Financial Accounting
Standards (SFAS) No. 157, *Fair Value Measurements*. SFAS No. 157 defines fair value, expands
the disclosure requirements around fair value and specifies a hierarchy of valuation techniques
based on whether the inputs to those valuation techniques are observable or unobservable. The
value of all of the School's assets and liabilities which are required to be carried at fair value are
valued at quoted prices in active markets for identical assets and liabilities and are, therefore,
considered Level I assets and liabilities.

THE CHICAGO MATHEMATIC AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

NOTES TO FINANCIAL STATEMENTS

NOTE 2 – SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES - CONTINUE

Reclassification:

Certain amounts from the prior year have been reclassified to conform to the current year's
financial statement preparation.

Tax status:

The School is a tax-exempt organization as described in Section 501(c)(3) of the Internal
Revenue Code (Code) and is exempt from federal income taxes on related income pursuant to
Section 501(a) of the Code. In addition, the Internal Revenue Service has determined that the
School is not a private foundation within the meaning of Section 509(a) of the Code.

Cash and Cash Equivalent:

The School considers all highly liquid investments with maturity of three months or less when
purchased to be cash equivalents.  Cash and cash equivalents for purpose of the statement of
cash flows exclude permanently restricted cash and cash equivalents.

NOTE 3 – FIXED ASSETS

The components of fixed assets at June 30, 2010 are as follows:

| | |
|---|---:|
| Land | $     825,000 |
| Building | 10,217,248 |
| Computer equipment | 342,195 |
| Computer software | 12,681 |
| Furniture and Equipment | 725,857 |
| Vehicles | 25,013 |
| | $12,147,993 |
| Less: accumulated depreciation | 599,841 |
| Fixed assets net | $11,548,152 |

NOTE 4 - CONTINGENCIES

The School has received funds from state federal grants which are subject to audits by the
granting agencies. Management believes that any adjustments that might arise from those audits
would be insignificant to the School's operation.

THE CHICAGO MATHEMATIC AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

NOTES TO FINANCIAL STATEMENTS

NOTE 5 – MORTGAGE NOTES PAYABLE

The following is a summary of the School's mortgage notes payable at June 30, 2010:

Illinois Facilities Fund:

| | |
|---|---:|
| Equipment loan - $420,000 dated May 5, 2009, monthly principal and interest payments of $7,926 beginning when advanced, 50.00% annual interest, due July 1, 2014; collateralized by facility | $ 371,013 |
| Facility loan - $3,000,000 dated May 5, 2009, principal and interest payments of $21,493 beginning on November 1, 2009, 6.00% annual interest, due November 1, 2012; collateralized by facility; subordinate to Delaware Place Bank/IFF loan | 2,986,981 |

Delware Place Bank:

| | |
|---|---:|
| Facility loan - $7,369,928 dated May 5, 2009, monthly principal Payments of $24,566 plus interest beginning May 1, 2010, with balance due on May 5, 2012, 6.00% annual interest; collateralized by facility | 7,299,297 |
| Total | $10,657,291 |

Principal payments on the mortgage note payable at June 30:

| | |
|---|---:|
| 2010 | $ 369,801 |
| 2011 | 424,937 |
| 2012 | 6,897,782 |
| 2013 | 2,831,170 |
| 2014 | 105,843 |
| There after | 28,558 |
| Total | $10,657,291 |

The School intends to refinance both the IFF facility loan of $3,000,000 and Delaware Place Bank/IFF facility loan of $7,369,928 on or before May 5, 2012 and may consider a possible tax-exempt bond proceeds to finance the transaction.

THE CHICAGO MATHEMATIC AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

NOTES TO FINANCIAL STATEMENTS

## NOTE 6 – TEMPORARILY RESTRICED NET ASSETS

During the years ended June 30, 2010, net assets were released from donor restrictions by incurring expenses satisfying the following restrictions specified by donors as follows:

Grant funds, restricted due to purpose:

| | |
|---|---:|
| Chicago Public Schools - Community Schools Grant – after school program | $ 75,000 |
| S & C Foundation – Curriculum and teacher training | 30,000 |
| Math education | 15,000 |
| Science equipment | 30,200 |
| | $150,200 |

## NOTE 7 – RETIREMENT FUND COMMITMENTS

The School participates in the Public School Teachers' Pension and Retirement Fund of Chicago (the Fund), a defined-benefit plan. Employees who enter the School as members of the Public School's pension plan will continue their participation. They will contribute at the rate established by CPS. The School will make contribution to the pension plan in the amount of 7% of the teacher's annual salary. Additional 2% of the annual salary will be deducted from the employee for pension plan. During the year ended June 30, 2010, the School paid $169,956, in pension contributions to the Fund. The Fund does not maintain separate actuarial records for the School.

## NOTE 8 – CONCEPT SCHOOLS, INC.

During the year ended June 30, 2010, the School has entered into an annual management and consulting agreement with Concept Schools, Inc. for Concepts Schools, Inc. to provide an educational program and management and administrative services, including a principal and business manager. The annual management fee including salaries of the principal and business manager is equal to 10% per pupil revenue and it was increased on October 1, 2009 to 12% per pupil revenue received by the School plus grant funding. The agreement renews automatically unless terminated by either party. During the year ended June 30, 2010, the School paid Concept Schools, Inc. $525,863.

THE CHICAGO MATHEMATIC AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

NOTES TO FINANCIAL STATEMENTS

## NOTE 9 – CONTRIBUTED GOODS AND SERVICES

Statement of Financial Accounting Standards (SFAS) No. 116, *Accounting for Contributions Received and Contributions Made*, requires an organization to recognize as revenue the fair value of contributed (donated) goods and services. During the year ended June 30, 2010, the School was the recipient of the following contributed goods and services from Chicago Public Schools:

| | |
|---|---|
| Food service | $176,705 |
| Specialized services | 65,000 |
| | $241,705 |

# MIRZA BAIG & COMPANY
### *Certified Public Accountants*

*333 N. Michigan Ave., Suite 2032*
*Chicago, IL 60601*
*Tel: (312) 236-2677*
*Fax: (312) 726-9520*

*2025 W. Granville, Unit 269*
*Chicago, IL 60659*
*Tel: (773) 770-6124*
*Fax: (773) 733-0825*

### Independent Auditor's Report on Internal Control Over
### Financial Reporting and on Compliance and Other Matters
### Based on an Audit of Financial Statements Performed
### in Accordance with *Government Auditing Standards*

Board of Directors
The Chicago Mathematics and Science
  Academy Charter School, Inc.
Chicago, Illinois

We have audited the financial statements of The Chicago Mathematics and Science Academy Charter School, Inc. (the School) as of and for the year ended June 30, 2010 and have issued our report thereon dated October 22, 2010. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States of America.

**Internal Control Over Financial Reporting**

In planning and performing our audit, we considered the School's internal control over financial reporting as a basis for designing our auditing procedures for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the School's internal control over financial reporting. Accordingly, we do not express an opinion on the effectiveness of the School's internal control over financial reporting.

Our consideration of internal control over financial reporting was for the limited purpose described in the preceding paragraph and would not necessarily identify all deficiencies in internal control over financial reporting that might be significant deficiencies or material weaknesses. However, as discussed below, we identified certain deficiencies in internal control over financial reporting that we consider to be a material weakness and significant deficiencies.

A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A significant deficiency is a control deficiency or combination of control deficiencies, that adversely affects the School's ability to initiate, authorize, record, process or report financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of the School's financial statements that is more than inconsequential will not be prevented or detected by the School's internal control.

*Members: AICPA • Illinois CPA Society • Association of Government Accountants*

**MIRZA BAIG & COMPANY**
*Certified Public Accountants*

A material weakness is a significant deficiency or combination of significant deficiencies, which results in more than a remote likelihood that a material misstatement of the financial statements will not be prevented or detected by the School's internal control.

We consider the following deficiency to be a material weakness in internal control over financial reporting.

Material audit adjustments

Material audit adjustments were required in order to fairly state the year-end balances, as follows:

- To adjust inventory $108,785
- To adjust property and equipment $5,226,260
- To adjust prepaid expenses $46,283
- To adjust accounts payable and accrued expenses $425,741
- To adjust notes payable $4,957,479
- To adjust net assets $582,734

Management has reviewed and posted these adjustments. We recommend management review these types of entries and post them as necessary throughout the year for recurring items and as needed for major transactions when required by generally accepted accounting principles.

*Management Response*

The School will review these types of entries throughout the year and make necessary postings.

We consider the following deficiencies to be significant deficiencies in internal control over financial reporting.

Auditor assists in drafting the financial statements

The School engages Mirza Baig & Company to assist in preparing its financial statements and accompanying disclosures. However, as independent auditors, we cannot be considered part of the School's internal control system. To establish proper internal controls over the preparation of its financial statements, including disclosures, the School should design and implement a comprehensive review procedure to ensure that the financial statements, including disclosures, are complete and accurate. Such review procedures should be performed by an individual possessing a thorough understanding of generally accepted accounting principles and knowledge of the School's activities and operations. In lieu of performing a detailed review internally, the School may hire an experienced part time CPA or consider outsourcing this function to an independent CPA firm, familiar with not-for-profit accounting to help provide a high level of assurance that any potential material omissions or other errors would be identified and corrected.

**MIRZA BAIG & COMPANY**
*Certified Public Accountants*

*Management Response*

The School will consider outsourcing this function to an experience independent CPA who will reconcile books and prepare financial statements on a Monthly basis to increase the level of assurance that any potential material omissions or other errors can be identified and corrected accordingly.

Capitalization of property and equipment

Purchases of property and equipment are not properly capitalized and adjusting entries were necessary to properly capitalize and depreciate certain assets that were previously expensed. We recommend that the School follow its capitalization policy and capitalize and depreciate property and equipment on a consistent basis.

*Management Response*

The School will continue to follow its capitalization policy and capitalize and depreciate property and equipment on a consistent basis.

Accounts payable and accrued expenses

Numerous audit adjustments were necessary to correct the balance in accounts payable and accrued expenses. We recommend that the School review its cut-off procedures and correctly record accounts payable and accrued expenses as necessary, including reviewing and updating appropriate aging summaries.

*Management Response*

The School will review its cut-off procedures, record accounts payable and accrued expenses as necessary and update appropriate aging summaries.

Mortgage notes payable

Audit adjustments were necessary to correct the balance in mortgage notes payable. We recommend that the School correctly record all principal disbursements and principal and interest payments as the related events occur.

*Management Response*

The School will record all principal disbursements and principal and interest payments accordingly.

Our consideration of the internal control over financial reporting was for the limited purpose described in the first paragraph of this section and would not necessarily identify all deficiencies in internal control that might be significant deficiencies and, accordingly, would not necessarily disclose all significant deficiencies that are also considered to be material weaknesses.

**MIRZA BAIG & COMPANY**
*Certified Public Accountants*

**Compliance and Other Matters**

As part of obtaining reasonable assurance about whether the School's financial statements are free of material misstatement, we performed tests of its compliance with certain provisions of laws, regulations, contracts and grant agreements, noncompliance with which could have a direct and material effect on the determination of financial statement amounts. However, providing an opinion on compliance with those provisions was not an objective of our audit and, accordingly, we do not express such an opinion. The results of our tests disclosed no instances of noncompliance or other matters that are required to be reported under Government Auditing Standards.

We noted certain matters that we reported to management of the School in separate letter dated October 27, 2010.

The School's responses to the findings identified in our audit are described above. We did not audit the School's responses and, accordingly, we express no opinion on them.

This report is intended for the information and use of the Board of Directors and management of The Chicago Mathematics and Science Academy Charter School, Inc. and the Chicago Public Schools and is not intended to be and should not be used by anyone other than these specified parties.

Chicago, Illinois
October 27, 2010

17
B-32

# MIRZA BAIG & COMPANY
*Certified Public Accountants*

*333 N. Michigan Ave., Suite 2032*
*Chicago, IL 60601*
*Tel: (312) 236-2077*
*Fax: (312) 726-9520*

*2025 W. Granville, Unit 209*
*Chicago, IL 60659*
*Tel: (773) 770-6124*
*Fax: (773) 733-0825*

### Independent Auditors' Report on Compliance
### with Requirements of Applicable Laws and Regulations
### Prescribed by Administering Agency

Board of Directors
The Chicago Mathematics and Science
 Academy Charter School, Inc.
Chicago, Illinois

We have audited the compliance of The Chicago Mathematics and Science Academy Charter School, Inc. (the School) with the types of compliance requirements provided by its administering agency, the Chicago Public Schools, that are applicable to the School for the year ended June 30, 2010. The Chicago Public Schools provided the compliance requirements subject to audit to the School in a memorandum dated June 24, 2010 and an accountability plan included in the charter school agreement dated July 1, 2009.

Compliance with the requirements of laws, regulations, contracts and applicable grants is the responsibility of management. Our responsibility is to express an opinion on the School's compliance based on our audit. The applicable laws and regulations that were tested included the following:

- Open Meetings Act (5 ILCS 120/1.01 *et seq.*)
- Fingerprint-based Criminal Background Investigations and checks of the Statewide Sex Offender Database and Statewide Child Murderer and Violent Offender Against Youth Database (105 ILCS 5/10-21.9 and 105 ILCS 5/34-18.5)
- Illinois School Student Records Act (105 ILCS 10/1 *et seq.*)
- Administration of Medication (105 ILCS 5/10-22.21b)
- Hazardous Materials Training (105 ILCS 5/10-20.17a)
- School Safety Drill Act (105 ILCS 128/1 *et seq.*)
- Abused and Neglected Child Reporting Act (325 ILCS 5/1 *et seq.*)
- Eye Protection in School Act (105 ILCS 115/0.01. *et seq.*)
- Toxic Art Supplies in Schools Act (105 ILCS 135/1 *et seq.*)
- Infectious Disease Policies and Rules (105 ILCS 5/10-21.11)
- Conformance with the following sections of the Charter School Agreement ("the Agreement"):
  - Section 4: Enrollment
  - Section 4: Governance and Operation
  - Section 5: Maintenance of Corporate Status and Good Standing
  - Section 5: Facility
  - Section 6: Pension Payments
  - Section 6: Management and Financial Controls
  - Section 8: Insurance

*Members: AICPA • Illinois CPA Society • Association of Government Accountants*

**MIRZA BAIG & COMPANY**
*Certified Public Accountants*

We conducted our audit of compliance in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in Government Auditing Standards, issued by the Comptroller General of the United States of America. Those standards require that we plan and perform an audit to obtain reasonable assurance about whether noncompliance with the types of compliance requirements referred to above that could have a direct and material effect occurred. An audit includes examining, on a test basis, evidence about the School's compliance with those requirements and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion. Our audit does not provide a legal determination of the School's compliance with those requirements.

In our opinion, the School complied, in all material respects, with the Chicago Public Schools' requirements referred to above for the year ended June 30, 2010.

This report is intended for the information and use of the Board of Directors and management of The Chicago Mathematics and Science Academy Charter School, Inc. and the Chicago Public Schools and is not intended to be and should not be used by anyone other than these specified parties.

Chicago, Illinois
October 27, 2010

THE CHICAGO MATHEMATICS AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

SCHEDULE OF FINDINGS

YEAR ENDED JUNE 30, 2010

There were no findings during the fiscal year ended June 30, 2010.

THE CHICAGO MATHEMATICS AND SCIENCE
ACADEMY CHARTER SCHOOL, INC.

SCHEDULE OF PRIOR YEAR FINDINGS

YEAR ENDED JUNE 30, 2010

## Finding 09-1 School Safety Drill Act

The School did not conduct one bus evacuation drill as well as one severe weather and shelter-in-place drill during the school year.

## Status

During the fiscal year the School had one bus evacuation drill, a severe weather and shelter-in-place drill, two fire alarm drills, and one additional school evacuation drill conducted at the new school building. We reviewed the documentation of drills held during the fiscal year ended June 30, 2010. Accordingly, this finding was resolved and not repeated in 2010.

# CMSA
# Balance Sheet
### As of June 30, 2011

|  | Jun 30, 11 |
|---|---|
| **ASSETS** |  |
| Total Current Assets | 1,322,727.92 |
| Total Fixed Assets | 11,550,574.89 |
| Total Other Assets | 34,953.00 |
| **TOTAL ASSETS** | 12,908,255.81 |
| **LIABILITIES & EQUITY** |  |
| Total Liabilities | 10,625,953.93 |
| Total Equity | 2,282,301.88 |
| **TOTAL LIABILITIES & EQUITY** | 12,908,255.81 |

B-37

# CMSA
# Profit & Loss
### July 2010 through June 2011

| | Jul '10 - Jun 11 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **CPS - Categorical Funding** | |
| Per Capita Tuition | 4,342,201.50 |
| Small Schools Supplement | 177,450.00 |
| Non-CPS Facility Supplement | 251,387.50 |
| SGSA | 328,306.92 |
| Title I - NCLB | 137,266.23 |
| ELL | 34,856.00 |
| Special Education | 353,413.99 |
| Other Public Funds | |
| Title II | 26,775.00 |
| Community Schools Grant | 75,000.00 |
| Case Manager Stipend | 2,812.16 |
| Total Other Public Funds | 104,587.16 |
| **Total CPS - Categorical Funding** | 5,729,469.30 |
| **Total Private Fundraising** | 1,647.07 |
| **Total Student Fees** | 101,867.05 |
| **Total Other Income** | 101,482.41 |
| **Total Income** | 5,934,465.83 |
| **Gross Profit** | 5,934,465.83 |
| **Expense** | |
| Total Temporary Expense Accounts | 2,212.49 |
| Total Transportation Expenses | 4,469.55 |
| Purchased Services | 5,132.13 |
| Administrative Expenses | |
| Meeting Expenses | 1,088.04 |
| Total Administrative Expenses | 1,088.04 |
| Managment fees - Concept School | 521,064.18 |
| Total Direct Student Cost | 295,646.88 |
| Total Salaries and Benefits | 3,173,305.25 |
| Total Occupancy of Facilities | 150,157.39 |
| Total Office Expenses | 50,904.23 |
| Total Other Expenses | 858,367.76 |
| **Total Expense** | 5,062,347.90 |
| **Net Ordinary Income** | 872,117.93 |
| **Net Income** | 872,117.93 |

B-38

Horizon Science Academy of Springfield
Lucas County, Ohio

Single Audit

July 1, 2009 through June 30, 2010
Fiscal Year Audited Under GAGAS: 2010



## Balestra, Harr & Scherer, CPAs, Inc.

528 South West St, P.O. Box 687, Piketon, Ohio 45661  Phone:  740.289.4131  Fax:  740.289.3639
9076 Ohio River Road, Wheelersburg, Ohio 45694   Phone: 740.876.9121   Fax: 800.210.2573



# Dave Yost · Auditor of State

Board Members
Horizon Science Academy of Springfield
630 South Reynolds Road
Toledo, OH 43615

We have reviewed the *Independent Auditor's Report* of the Horizon Science Academy of
Springfield, Lucas County, prepared by Balestra, Harr & Scherer, CPAs, Inc., for the audit
period July 1, 2009 through June 30, 2010.  Based upon this review, we have accepted these
reports in lieu of the audit required by Section 117.11, Revised Code.  The Auditor of State did
not audit the accompanying financial statements and, accordingly, we are unable to express, and
do not express an opinion on them.

Our review was made in reference to the applicable sections of legislative criteria, as reflected by
the Ohio Constitution, and the Revised Code, policies, procedures and guidelines of the Auditor
of State, regulations and grant requirements.  The Horizon Science Academy of Springfield is
responsible for compliance with these laws and regulations.

*Dave Yost*

Dave Yost
Auditor of State

April 8, 2011

**Horizon Science Academy of Springfield**
*Table of Contents*
*For the Fiscal Year Ended June 30, 2010*

| Title | Page |
|---|---|
| Independent Auditor's Report | 1-2 |
| Management's Discussion and Analysis | 3-6 |
| Financial Statements: | |
|     Statement of Net Assets | 7 |
|     Statement of Revenues, Expenses and Change in Net Assets | 8 |
|     Statement of Cash Flows | 9 |
|     Notes to the Basic Financial Statements | 10-20 |
| Schedule of Federal Awards Receipts and Expenditures | 21 |
| Notes to the Schedule of Federal Awards Receipts and Expenditures | 22 |
| Report on Internal Control Over Financial Reporting and on Compliance and Other Matters Required By *Government Auditing Standards* | 23-24 |
| Report on Compliance With Requirements Applicable to Each Major Federal Program and on Internal Control Over Compliance Required By OMB Circular A-133 | 25-26 |
| Schedule of Findings – OMB Circular A-133 §.505 | 27 |

 Balestra, Harr & Scherer, CPAs, Inc.

Members American Institute of Certified Public Accountants          Members Ohio Society of Certified Public Accountants

**Independent Auditor's Report**

Members of the Board
Horizon Science Academy of Springfield
630 South Reynolds Road
Toledo, OH 43615

We have audited the accompanying financial statements of the business-type activities of the Horizon Science Academy of Springfield, Lucas County, Ohio, (the Academy), as of and for the year ended June 30, 2010, which collectively comprise the Academy's basic financial statements as listed in the table of contents. These financial statements are the responsibility of the Academy's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in the Comptroller General of the United States' *Government Auditing Standards*. Those standards require that we plan and perform the audit to reasonably assure whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the business-type activities of the Horizon Science Academy of Springfield, Lucas County, Ohio, as of June 30, 2010, and the respective changes in financial position and cash flows thereof for the year then ended in conformity with accounting principles generally accepted in the United States of America.

In accordance with *Government Auditing Standards*, we have also issued our report dated March 11, 2011 on our consideration of the Academy's internal control over financial reporting and our tests of its compliance with certain provisions of laws, regulations, contracts and grant agreements and other matters. While we did not opine on the internal control over financial reporting or on compliance, that report describes the scope of our testing of internal control over financial reporting and compliance and the results of that testing. That report is an integral part of an audit performed in accordance with *Government Auditing Standards*. You should read it in conjunction with this report in assessing the results of our audit.

Management's Discussion and Analysis is not a required part of the basic financial statements but is supplementary information accounting principles generally accepted in the United States of America requires. We have applied certain limited procedures, consisting principally of inquiries of management regarding the methods of measuring and presenting the required supplementary information. However, we did not audit the information and express no opinion on it.

1

Members of the Board
Horizon Science Academy of Springfield
Independent Auditor's Report
Page 2

We conducted our audit to opine on the financial statements that collectively comprise the Academy's basic financial statements.  The accompanying Schedule of Federal Awards Receipts and Expenditures is presented for purposes of additional analysis as required by the U.S. Office of Management and Budget Circular A-133, *Audits of States, Local Governments, and Non-Profit Organizations*, and is not a required part of the basic financial statements.  We subjected the Schedule of Federal Awards Receipts and Expenditures to the auditing procedures applied in the audit of the basic financial statements. In our opinion, this information is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Balestra, Harr & Scherer*

Balestra, Harr & Scherer, CPAs, Inc.

March 11, 2011

2

**Horizon Science Academy of Springfield**
*Management's Discussion and Analysis*
*For the Fiscal Year Ended June 30, 2010*
*(Unaudited)*

The discussion and analysis of Horizon Science Academy of Springfield's (the Academy) financial performance provides an overall review of the financial activities for the fiscal year ended June 30, 2010.  Readers should also review the financial statements and notes to enhance their understanding of the Academy's financial performance.

**Financial Highlights**

Key financial highlights for fiscal year 2010 are as follows:

- Total assets were $288,810.
- Total liabilities were $159,416.
- Total net assets increased $136,082.

**Using this Financial Report**

This report consists of three parts: the MD&A, the basic financial statements, and notes to those statements.  The basic financial statements include a statement of net assets, a statement of revenues, expenses and change in net assets, and a statement of cash flows.

**Reporting the Academy as a Whole**

One of the most important questions asked about the Academy is, "As a whole, what is the Academy's financial condition as a result of the year's activities?"  The statement of net assets and the statement of revenues, expenses and change in net assets, which appear first in the Academy's financial statements, report information on the Academy as a whole and its activities in a way that helps you answer this question. We prepare these statements to include all assets and liabilities, using the accrual basis of accounting, which is similar to the accounting used by most private-sector companies.  All of the current year's revenues and expenses are taken into account regardless of when the cash is received or paid.

These two statements report the Academy's net assets – the difference between assets and liabilities, as reported in the statement of net assets – as one way to measure the Academy's financial health or financial position.  Over time, increases or decreases in the Academy's net assets – as reported in the statement of revenues, expenses and change in net assets – are indicators of whether its financial health is improving or deteriorating.  The relationship between revenues and expenses is the Academy's operating results.  However, the Academy's goal is to provide services to our students, not to generate profits as commercial entities do.  One must consider many other non-financial factors, such as the quality of the education provided and the safety of the Academy, to assess the overall health of the Academy.

The statement of net assets and the statement of revenues, expenses and change in net assets report the activities of the Academy, which encompass all the Academy's services, including instruction, supporting services, community services, and food services.  Unrestricted state aid and state and federal grants finance most of these activities.

**Horizon Science Academy of Springfield**
*Management's Discussion and Analysis*
*For the Fiscal Year Ended June 30, 2010*
*(Unaudited)*

Table 1 provides a comparison of net assets as of June 30, 2010 with net assets as of June 30, 2009.

Table 1

| Net Assets | | |
|---|---|---|
| | 2010 | 2009 |
| **Assets** | | |
| Current and Other Assets | $97,285 | $26,329 |
| Capital Assets, Net | 191,525 | 212,483 |
| Total Assets | 288,810 | 238,812 |
| | | |
| **Liabilities** | | |
| Current Liabilities | 150,228 | 233,957 |
| Non-Current Liabilities | 9,188 | 11,543 |
| Total Liabilities | 159,416 | 245,500 |
| | | |
| **Net Assets** | | |
| Invested in Capital Assets | 182,337 | 200,940 |
| Unrestricted | (52,943) | (207,628) |
| Total Net Assets | $129,394 | ($6,688) |

Total assets increased $49,998. This increase is due mainly to an increase in cash. Capital assets decreased by $20,958 primarily due to depreciation and a deletion of assets, which were partially offset by capitalized additions. Intergovernmental receivables increased by $9,181. Total liabilities decreased $86,084. This decrease is due mainly to payments in accounts payable of $83,799.

**Horizon Science Academy of Springfield**
*Management's Discussion and Analysis*
*For the Fiscal Year Ended June 30, 2010*
*(Unaudited)*

Table 2 shows the changes in net assets for the fiscal years 2010 and 2009.

Table 2

|  | 2010 | 2009 |
|---|---|---|
| **OPERATING REVENUES:** | | |
| Foundation payments | $1,606,980 | $1,334,533 |
| Food services | 2,802 | 2,517 |
| Classroom fees | 1,552 | 957 |
| Extracurricular activities | 4,423 | 2,082 |
| Donated management fee | 33,310 | 120,563 |
| Other revenue | 7,731 | 13,746 |
| Total operating revenues | 1,656,798 | 1,474,398 |
| **OPERATING EXPENSES:** | | |
| Salaries | 851,418 | 680,835 |
| Fringe benefits | 235,442 | 160,974 |
| Purchased services | 898,621 | 774,046 |
| Materials and supplies | 79,806 | 67,410 |
| Depreciation | 55,702 | 15,622 |
| Miscellaneous | 41,632 | 32,356 |
| Total operating expenses | 2,162,621 | 1,731,243 |
| Operating loss | (505,823) | (256,845) |
| **NON-OPERATING REVENUES (EXPENSES):** | | |
| Interest expense | (755) | (1,059) |
| Contributions and donations | 12,500 | 15,000 |
| Restricted grants in aid - federal | 622,985 | 398,576 |
| Restricted grants in aid - state | 7,175 | 5,000 |
| Total non-operating revenues (expenses) | 641,905 | 417,517 |
| Change in net assets | 136,082 | 160,672 |
| Net assets, beginning  of year | (6,688) | (167,360) |
| Net assets, end of year | $129,394 | ($6,688) |

Foundation support and Federal grants increased $272,447 and $224,409, respectively, primarily due to an increase in enrollment and ARRA funding. Donated management fees decreased $87,253 due to more payments to Concept Schools in 2010 as compared to 2009.  Salaries and benefits increased $245,051 due to increases in student enrollment and increase in pay rates and benefits costs.  Purchased services increased $124,575 due primarily to higher pupil transportation and utility costs.

**Horizon Science Academy of Springfield**
*Management's Discussion and Analysis*
*For the Fiscal Year Ended June 30, 2010*
*(Unaudited)*

Foundation support is the primary support of the Academy, comprising 97% of operating revenue and 70% of total revenues. The Academy also received a significant portion of federal grants, which represent 27% of total revenue. Salaries and benefits comprise the largest portion of operating expenses, representing 50% of total expenses. Purchased services also represent a large portion of operating expenses, or 42%. Net assets increased $136,082, resulting from revenues in excess of expenses.

**Capital Assets**

At the end of fiscal year 2010 the Academy had $191,525, invested in furniture, fixtures and equipment, and leasehold improvements (net of $87,613 in accumulated depreciation). Table 3 shows fiscal year 2010 and fiscal year 2009:

Table 3

| Capital Assets | | | |
|---|---|---|---|
| | Balance* July 1, 2009 | Additions | Deletions | Ending June 30, 2010 |
| Furniture and Equipment | $ 246,600 | $ 34,744 | $ (6,992) | $ 274,352 |
| Leasehold Improvements | 4,786 | 0 | 0 | 4,786 |
| Total Fixed Assets | 251,386 | 34,744 | (6,992) | 279,138 |
| Less: Accumulated Depreciation | | | | |
| Furniture and Equipment | (37,309) | (54,107) | 6,992 | (84,424) |
| Leasehold Improvements | (1,594) | (1,595) | 0 | (3,189) |
| Total Accumulated Depreciation | (38,903) | (55,702) | 6,992 | (87,613) |
| Net Fixed Assets | $ 212,483 | $ (20,958) | $ - | $ 191,525 |

*Certain reclassifications were made between asset classes
For more information on capital assets see Note 4 to the Basic Financial Statements.

**Debt**

The Academy also entered into a capital lease in November 2008 for a copier machine. Table 4 shows fiscal year 2010 as compared to fiscal year 2009:

Table 4

| Outstanding Debt Balances | | |
|---|---|---|
| | 2010 | 2009 |
| Capital Lease | $9,188 | $11,543 |
| Total | $9,188 | $11,543 |

For more information on the Academy's debt see Note 10 to the Basic Financial Statements.

**Contacting the School's Financial Management**

This financial report is designed to provide our citizens, taxpayers, and creditors with a general overview of the Academy's finances.  Questions concerning any of the information in this report or requests for additional information should be directed to Aman Gurdov, Treasurer, Horizon Science Academy of Springfield, Inc., 630 S. Reynolds Road, Toledo, Ohio  43615-6314.

**Horizon Science Academy Springfield**
*Statement of Net Assets*
*For the Fiscal Year Ended  June 30, 2010*

**ASSETS:**
**Current Assets:**

| | |
|---|---:|
| Cash and cash equivalents | $86,953 |
| Prepaid Items | 1,151 |
| Intergovernmental receivable | 9,181 |
| Total current assets | 97,285 |

**Noncurrent Assets:**

| | |
|---|---:|
| Depreciable capital assets (Net of Accumulated Depreciation) | 191,525 |
| Total assets | 288,810 |

**LIABILITIES:**
**Current Liabilities:**

| | |
|---|---:|
| Accounts payable | 71,400 |
| Accrued wages and benefits payable | 78,828 |
| Total current liabilities | 150,228 |

**Non-Current Liabilities:**

| | |
|---|---:|
| Due within one year | 2,530 |
| Due in more than one year | 6,658 |
| Total non-current liabilities | 9,188 |
| Total liabilities | 159,416 |

**NET ASSETS:**

| | |
|---|---:|
| Invested in capital assets, net of related debt | 182,337 |
| Unrestricted (deficit) | (52,943) |
| Total net assets | $129,394 |

See accompanying notes to the basic financial statements.

**Horizon Science Academy Springfield**
*Statement of Revenues, Expenses and Change in Net Assets*
*For the Fiscal Year Ended  June 30, 2010*

**OPERATING REVENUES:**

| | |
|---|---:|
| Foundation payments | $1,606,980 |
| Food services | 2,802 |
| Classroom fees | 1,552 |
| Extracurricular activities | 4,423 |
| Donated management fee | 33,310 |
| Other revenue | 7,731 |
| Total operating revenues | 1,656,798 |

**OPERATING EXPENSES:**

| | |
|---|---:|
| Salaries | 851,418 |
| Fringe benefits | 235,442 |
| Purchased services | 898,621 |
| Materials and supplies | 79,806 |
| Depreciation | 55,702 |
| Miscellaneous | 41,632 |
| Total operating expenses | 2,162,621 |
| Operating loss | (505,823) |

**NON-OPERATING REVENUES (EXPENSES):**

| | |
|---|---:|
| Interest expense | (755) |
| Contributions and donations | 12,500 |
| Restricted grants in aid - federal | 622,985 |
| Restricted grants in aid - state | 7,175 |
| Total non-operating revenues (expenses) | 641,905 |
| Change in net assets | 136,082 |
| Net assets, beginning  of year | (6,688) |
| Net assets, end of year | $129,394 |

See accompanying notes to the basic financial statements.

**Horizon Science Academy Springfield**
*Statement of Cash Flows*
*For the Fiscal Year Ended  June 30, 2010*

## INCREASE IN CASH AND CASH EQUIVALENTS

### CASH FLOWS FROM OPERATING ACTIVITIES:

| | |
|---|---:|
| Cash received from State of Ohio | $1,597,797 |
| Cash received from other operating revenues | 16,508 |
| Cash payments to suppliers for goods and services | (1,028,916) |
| Cash payments to employees for services and benefits | (1,075,866) |
| Other cash payments | (41,632) |
| Net cash used for operating activities | (532,107) |

### CASH FLOWS FROM NONCAPITAL FINANCING ACTIVITIES:

| | |
|---|---:|
| Contributions and Donations | 12,500 |
| Federal grants received | 622,985 |
| State grants received | 7,175 |
| Net cash provided by noncapital financing activities | 642,660 |

### CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES:

| | |
|---|---:|
| Principal paid on capital lease payable | (2,355) |
| Interest paid on capital lease payable | (755) |
| Payment for capital acquisitions | (34,744) |
| Net cash used for capital and related financing activities | (37,854) |
| | |
| Net increase in cash and cash equivalents | 72,699 |
| Cash and cash equivalents at beginning of year | 14,254 |
| Cash and cash equivalents at end of year | $86,953 |

## RECONCILIATION OF OPERATING LOSS TO NET CASH
## USED FOR OPERATING ACTIVITIES

| | |
|---|---:|
| Operating loss | ($505,823) |

### ADJUSTMENTS TO RECONCILE OPERATING LOSS TO NET
### CASH USED FOR OPERATING ACTIVITIES:

| | |
|---|---:|
| Depreciation | 55,702 |
| Increase in accounts receivable (Foundation payments) | (9,181) |
| Decrease in accounts payable | (83,799) |
| Increase in accrued wages and benefits payable | 70 |
| Decrease in prepaid items | 10,924 |
| | |
| Total adjustments | (26,284) |
| | |
| Net cash used for operating activities | ($532,107) |

### NONCASH TRANSACTIONS:

| | |
|---|---:|
| Donated management fee | $33,310 |
| Purchased services | (33,310) |

See accompanying notes to the basic financial statements.

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

| | |
|---|---|
| **1.** | **DESCRIPTION OF THE ACADEMY AND REPORTING ENTITY** |

Horizon Science Academy of Springfield (the Academy), is a nonprofit corporation established pursuant to Ohio Revised Code Chapters 3314 and 1702 to address the needs of students in grades K through eight in Toledo. The Academy, which is part of the State's education program, is independent of any Academy and is nonsectarian in its programs, admission policies, employment practices, and all other operations.

The Academy may sue and be sued, acquire facilities as needed, and contract for any services necessary for the operation of the Academy. The Academy qualifies as an exempt organization under Section 501(c) (3) of the Internal Revenue Code. Management is not aware of any course of action or series of events that have occurred that might adversely affect the Academy's tax-exempt status.

The Academy was approved for operation under contract with the Lucas County Educational Service Center (the Sponsor) for a period of five years commencing June 21, 2005. This contract was extended during the fiscal year until May 30, 2011.

The Academy operates under the direction of a self-appointed five-member Board of Trustees. The Board is responsible for carrying out the provisions of the contract, which include, but are not limited to, state mandated provisions regarding student population, curriculum, academic goals, performance standards, admission standards, and qualifications of teachers. The Board of Trustees controls the Academy's facility, which is currently staffed by 34 full and part time personnel who provide services to up to 250 students during the year.

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The basic financial statements of the Academy have been prepared in conformity with generally accepted accounting principles as applied to governmental nonprofit organizations. The Governmental Accounting Standards Board (GASB) is the accepted standard-setting body for establishing governmental accounting and financial reporting principles. The Academy also applies Financial Accounting Standards Board (FASB) statements and interpretations issued on or before November 30, 1989, provided they do not conflict with or contradict GASB pronouncements. The Academy does not apply FASB statements issued after November 30, 1989. The more significant of the School's accounting policies are described below.

**A. Basis of Presentation**

The Academy's basic financial statements consist of a statement of net assets; a statement of revenues, expenses, and change in net assets; and a statement of cash flows.

The Academy uses enterprise accounting to report its financial activities. Enterprise accounting focuses on the determination of operating income, changes in net assets, financial position, and cash flows.

**B. Measurement Focus and Basis of Accounting**

The accounting and financial reporting treatment is determined by its measurement focus. Enterprise accounting uses a flow of economic resources measurement focus. With this measurement focus, all assets and all liabilities associated with the operation of the Academy are included on the statement of net assets. The statement of revenues, expenses, and change in net assets present increases (e.g., revenues) and decreases (e.g., expenses) in total net assets. The statement of cash flows provides information about how the Academy finances and meets the cash flow needs of its enterprise activities.

10

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

B.    **Measurement Focus and Basis of Accounting (Continued)**

Basis of accounting refers to when revenues and expenses are recognized in the accounts and reported in the financial statements. The full accrual basis of accounting is used for reporting purposes. Revenue resulting from exchange transactions, in which each party gives and receives essentially equal value, is recorded on the accrual basis when the exchange takes place. Revenues resulting from non-exchange transactions, in which the Academy receives value without directly giving equal value in return, such as grants, entitlements and donations are recognized in the period in which all eligibility requirements have been satisfied. Deferred revenue arises when assets are recognized before revenue recognition criteria have been satisfied. Grants and entitlements received before eligibility requirements are met are recorded as deferred revenue. Expenses are recognized at the time they are incurred.

C.    **Budgetary Process**

The contract between the Academy and its Sponsor prescribes an annual budget requirement in addition to preparing a 5-year forecast, which is to be updated on an annual basis. Chapter 5705.391(A) of the Ohio Revised Code also requires the School to prepare a 5-year forecast, update it annually, and submit it to the Superintendent of Public Instruction at the Ohio Department of Education.

D.    **Cash**

To improve cash management, all cash received by the Academy is pooled in a central bank account. The Academy did not have any investments during fiscal year 2010.

E.    **Capital Assets and Depreciation**

Capital assets are capitalized at cost (or estimated historical cost) and updated for additions and retirements during the year. Donated capital assets are recorded at their fair market values as of the date received. The Academy maintains a capitalization threshold of one thousand dollars. The costs of normal maintenance and repairs that do not add to the value of the asset or materially extend an asset's life are not capitalized.  Improvements are capitalized. The Academy does not capitalize interest.

Furniture, fixtures and equipment are depreciated using the straight-line method over the following estimated useful lives. Improvements to capital assets are depreciated over the remaining useful lives of the related capital assets. Leasehold improvements are depreciated using the straight-line method over the life of the lease.

|  | Useful Life |
|---|---|
| Leasehold Improvements | 5 to 10 years |
| Buildings | 30 years |
| Heavy Duty Office or Classroom Furniture | 10 years |
| Computers and Other Electronic Equipment | 3 years |

11

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

2. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

    F. **Intergovernmental Revenues**

        The Academy currently participates in the State Foundation Program, Special Education Program, and Federal CCIP Program. Revenues received from the State Foundation Program, Special Education Program and other State programs are recognized as operating revenues whereas revenues from the Federal CCIP Program and other State Grants are recognized as non-operating revenues in the accounting period in which all eligibility requirements have been met.

        Eligibility requirements include timing requirements, which specify the year when the resources are required to be used or the fiscal year when use is first permitted, matching requirements, in which the Academy must provide local resources to be used for a specified purpose, and expenditure requirements, in which the resources are provided to the Academy on a reimbursement basis.

    G. **Operating Revenues and Expenses**

        Operating revenues are those revenues that are generated directly from the primary activity of the Academy.  Operating expenses are necessary costs incurred to provide the service that is the primary activity of the Academy.  All revenues and expenses not meeting these definitions are reported as non-operating.

    H. **Compensated Absences**

        Academy policy indicates that all leave earned by employees must be used in the current period and balances are not carried forward and, therefore, are not recorded as a liability.

    I. **Net Assets**

        Net assets represent the difference between assets and liabilities. Net assets invested in capital assets consist of capital assets, net of accumulated depreciation.  Net assets are reported as restricted when there are limitations imposed on their use, either through enabling legislation adopted by the Academy or through external restrictions imposed by creditors, grantors, or contracts.  The Academy applies restricted resources first when an expense is incurred for purposes for which both restricted and unrestricted net assets are available.

    J. **Estimates**

        The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results may differ from those estimates.

3. **DEPOSITS**

    As of June 30, 2010, the Academy's bank balance of $103,673 was either covered by FDIC or collateralized by the financial institution's public entity deposit pool in the manner described above.

12

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

| 3. | DEPOSITS (Continued) |
|---|---|

Custodial credit risk is the risk that in the event of a bank failure, the Academy's deposits may not be returned to it. According to state law, public depositories must give security for all public funds on deposit in excess of those funds that are insured by the Federal Deposit Insurance Corporation (FDIC) or by any other agency or instrumentality of the federal government. These institutions may either specifically collateralize individual accounts in lieu of amounts insured by the FDIC, or may pledge a pool of government securities valued at least 105% of the total value of public monies on deposit at the institution. The Academy has no policy regarding custodial credit risk.

**4.  CAPITAL ASSETS**

Capital asset activity for the fiscal year ended June 30, 2010, was as follows:

| Capital Assets | | | |
|---|---|---|---|
| | **Balance\*** | | | **Ending** |
| | **July 1, 2009** | **Additions** | **Deletions** | **June 30, 2010** |
| Furniture and Equipment | $ 246,600 | $ 34,744 | $ (6,992) | $ 274,352 |
| Leasehold Improvements | 4,786 | 0 | 0 | 4,786 |
| Total Fixed Assets | 251,386 | 34,744 | (6,992) | 279,138 |
| Less: Accumulated Depreciation | | | | |
| Furniture and Equipment | (37,309) | (54,107) | 6,992 | (84,424) |
| Leasehold Improvements | (1,594) | (1,595) | 0 | (3,189) |
| Total Accumulated Depreciation | (38,903) | (55,702) | 6,992 | (87,613) |
| **Net Fixed Assets** | $ 212,483 | $ (20,958) | $        - | $ 191,525 |

\*Certain reclassifications were made between asset classes

**5.  DEFINED BENEFIT PENSION PLANS**

**A. School Employees Retirement System**

The Academy contributes to the School Employees Retirement System of Ohio (SERS), a cost-sharing multiple-employer defined benefit pension plan. SERS provides retirement, disability, and survivor benefits, annual cost-of-living adjustments, and death benefits to plan members and beneficiaries. Authority to establish and amend benefits is provided by state statute per Chapter 3309 of the Ohio Revised Code. SERS issues a publicly available, stand-alone financial report that includes financial statements and required supplementary information. That report can be obtained by contacting SERS, 300 East Broad Street, Suite 100, Columbus, Ohio 43215-3746 or by calling toll free (800) 878-5853. It is also posted on SERS' website at www.ohsers.org under *Employers/Audit Resources*.

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

| 5. | **DEFINED BENEFIT PENSION PLANS (Continued)** |
|---|---|

Plan members are required to contribute 10% of their annual covered salary and [name of your school district] is required to contribute 14% of annual covered payroll. The contribution requirements of plan members and employers are established and may be amended, up to statutory maximum amounts, by the SERS' Retirement Board. The Retirement Board acting with the advice of the actuary, allocates the employer contribution rate among four of the funds (Pension Trust Fund, Death Benefit Fund, Medicare B Fund, and Health Care Fund) of the System. For fiscal year ending June 30, 2010, the allocation to pension and death benefits is 12.78%. The remaining 1.22% of the 14% employer contribution rate is allocated to the Health Care and Medicare B Funds. The Academy's contributions to SERS for the fiscal years ended June 30, 2010, 2009 and 2008 were $4,920, $9,474, and $6,144, respectively; which equaled the required contributions each year.

**B. State Teachers Retirement System**

State Teachers Retirement System of Ohio (STRS Ohio) is a cost-sharing, multiple-employer public employee retirement system.

STRS Ohio is a statewide retirement plan for licensed teachers and other faculty members employed in the public schools of Ohio or any school, community school, college, university, institution or other agency controlled, managed and supported, in whole or in part, by the state or any political subdivision thereof.

**Plan Options** – New members have a choice of three retirement plan options. In addition to the Defined Benefit (DB) Plan, new members are offered a Defined Contribution (DC) Plan and a Combined Plan. The DC Plan allows members to allocate all their member contributions and employer contributions equal to 10.5 percent of earned compensation among various investment choices. The Combined Plan offers features of the DC Plan and the DB Plan. In the Combined Plan, member contributions are allocated to investment choices by the member, and employer contributions are used to fund a defined benefit payment at a reduced level from the regular DB Plan. Contributions into the DC Plan and the Combined Plan are credited to member accounts as employers submit their payroll information to STRS Ohio, generally on a biweekly basis. DC and Combined Plan members will transfer to the DB Plan during their fifth year of membership unless they permanently select the DC or Combined Plan.

**DB Plan Benefits** – Plan benefits are established under Chapter 3307 of the Revised Code. Any member may retire who has (i) five years of service credit and attained age 60; (ii) 25 years of service credit and attained age 55; or (iii) 30 years of service credit regardless of age. The annual retirement allowance, payable for life, is the greater of the "formula benefit" or the "money-purchase benefit" calculation. Under the "formula benefit," the retirement allowance is based on years of credited service and final average salary, which is the average of the member's three highest salary years. The annual allowance is calculated by using a base percentage of 2.2% multiplied by the total number of years of service credit (including Ohio-valued purchased credit) times the final average salary. The 31st year of earned Ohio service credit is calculated at 2.5%. An additional one-tenth of a percent is added to the calculation of every year of earned Ohio service over 31 years (2.6% for 32 years, 2.7% for 33 years and so on) until 100% of final average salary is reached. For members with 35 or more years of Ohio contributing service, the first 30 years will be calculated at 2.5% instead of 2.2%. Under the "money-purchase benefit" calculation, a member's lifetime contributions plus interest at specified rates are matched by an equal amount from other STRS Ohio funds. This total is then divided by an actuarially determined annuity factor to determine the maximum annual retirement allowance.

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

| 5. | DEFINED BENEFIT PENSION PLANS (Continued) |
|---|---|

**DC Plan Benefits** – Benefits are established under Sections 3307.80 to 3307.89 of the Revised Code. For members who select the DC Plan, all member contributions and employer contributions at a rate of 10.5% are placed in an investment account. The member determines how to allocate the member and employer money among various investment choices. A member is eligible to receive a retirement benefit at age 50 and termination of employment. The member may elect to receive a lifetime monthly annuity or a lump-sum withdrawal. Employer contributions into members' accounts are vested after the first anniversary of the first day of paid service. Members in the DC Plan who become disabled are entitled only to their account balance. If a member dies before retirement benefits begin, the member's designated beneficiary is entitled to receive the member's account balance.

**Combined Plan Benefits** – Member contributions are allocated by the member, and employer contributions are used to fund a defined benefit payment. A member's defined benefit is determined by multiplying 1% of the member's final average salary by the member's years of service credit. The defined benefit portion of the Combined Plan payment is payable to a member on or after age 60. The defined contribution portion of the account may be taken as a lump sum or converted to a lifetime monthly annuity at age 50.

A retiree of STRS Ohio or another Ohio public retirement system is eligible for reemployment as a teacher following the elapse of two months from the date of retirement. Contributions are made by the reemployed member and employer during the reemployment. Upon termination of reemployment or age 65, whichever comes later, the retiree is eligible for an annuity benefit or equivalent lump-sum payment in addition to the original retirement allowance. A reemployed retiree may alternatively receive a refund of only member contributions with interest before age 65, once employment is terminated.

Benefits are increased annually by 3% of the original base amount for DB Plan participants.

The DB and Combined Plans offer access to health care coverage to eligible retirees who participated in the plans and their eligible dependents. Coverage under the current program includes hospitalization, physicians' fees, prescription drugs and partial reimbursement of monthly Medicare Part B premiums. By Ohio law, health care benefits are not guaranteed.

A DB or Combined Plan member with five or more years' credited service who becomes disabled may qualify for a disability benefit. Eligible spouses and dependents of members who die before retirement may qualify for survivor benefits. A death benefit of $1,000 is payable to the beneficiary of each deceased retired member who participated in the DB Plan. Death benefit coverage up to $2,000 can be purchased by participants in the DB, DC or Combined Plans. Various other benefits are available to members' beneficiaries.

Chapter 3307 of the Revised Code provides statutory authority for member and employer contributions. Contribution rates are established by the State Teachers Retirement Board, upon recommendations of its consulting actuary, not to exceed statutory maximum rates of 10% for members and 14% for employers.

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

| 5. | DEFINED BENEFIT PENSION PLANS (Continued) |
|---|---|

For the fiscal years ended June 30, 2010, 2009, and 2008, plan members were required to contribute 10 percent of their annual covered salaries. For these fiscal years, the Academy was required to contribute 14 percent; 13 percent was the portion used to fund pension obligations. Contribution rates are established by STRS Ohio, upon recommendations of its consulting actuary, not to exceed statutory maximum rates of 10% for members and 14% for employers. The Academy's required contributions for pension obligations to STRS Ohio for the fiscal years ended June 30, 2010, 2009, and 2008 were $88,302, $79,368 and $71,448, respectively; 100% has been contributed for fiscal years 2010, 2009, and 2008.

STRS Ohio issues a stand-alone financial report. Copies of STRS Ohio's Comprehensive Annual Financial Report can be requested by writing to STRS Ohio, 275 E. Broad St., Columbus, OH 43215-3771, by calling (888) 227-7877, or by visiting the STRS Ohio website at www.strsoh.org .

| 6. | POSTEMPLOYMENT BENEFITS |
|---|---|

**A. State Teachers Retirement System**

STRS Ohio administers a pension plan that is comprised of: a defined benefit plan; a self-directed defined contribution plan and a combined plan which is a hybrid of the defined benefit and defined contribution plan.

Ohio law authorizes STRS Ohio to offer a cost-sharing, multiple-employer health care plan. STRS Ohio provides access to health care coverage to eligible retirees who participated in the defined benefit or combined plans. Coverage under the current program includes hospitalization, physicians' fees, prescription drugs and reimbursement of monthly Medicare Part B premiums.

Pursuant to 3307 of the Revised Code, the Retirement Board has discretionary authority over how much, if any, of the associated health care costs will be absorbed by STRS Ohio. All benefit recipients, for the most recent year, pay a portion of the health care costs in the form of a monthly premium.

STRS Ohio issues a stand-alone financial report. Interested parties can view the most recent Comprehensive Annual Financial Report by visiting www.strsoh.org or by requesting a copy by calling toll-free 1-888-227-7877.

Under Ohio law, funding for post-employment health care may be deducted from employer contributions. Of the 14 percent employer contribution rate, 1 percent of covered payroll was allocated to post-employment health care for the years ended June 30, 2010, 2009, and 2008. The 14 percent employer contribution rate is the maximum rate established under Ohio law. For the Academy, these amounts equaled $6,307, $6,373, and $5,103 for fiscal years 2010, 2009, and 2008, respectively.

**B. School Employees Retirement System**

In addition to a cost-sharing multiple-employer defined benefit pension plan, the School Employees Retirement System of Ohio (SERS) administers two postemployment benefit plans.

16

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

6.   **POSTEMPLOYMENT BENEFITS (Continued)**

Medicare Part B Plan

The Medicare B plan reimburses Medicare Part B premiums paid by eligible retirees and beneficiaries as set forth in Ohio Revised Code (ORC) 3309.69. Qualified benefit recipients who pay Medicare Part B premiums may apply for and receive a monthly reimbursement from SERS. The reimbursement amount is limited by statute to the lesser of the January 1, 1999 Medicare Part B premium or the current premium. The Medicare Part B monthly premium for calendar year 2010 was $96.40 for most participants, but could be as high as $353.60 per month depending on their income. SERS' reimbursement to retirees was $45.50.

The Retirement Board, acting with the advice of the actuary, allocates a portion of the current employer contribution rate to the Medicare B Fund. For fiscal year 2010, 2009, and 2008 the actuarially required allocation was 0.76%, 0.75% and 0.66%, respectively. The Academy's contributions for the fiscal years ended June 30, 2010, 2009 and 2008 were $264, $480 and $356, respectively, which equaled the required contributions for those years.

Health Care Plan

ORC 3309.375 and 3309.69 permit SERS to offer health care benefits to eligible retirees and beneficiaries. SERS' Retirement Board reserves the right to change or discontinue any health plan or program. SERS offers several types of health plans from various vendors, including HMOs, PPOs, Medicare Advantage and traditional indemnity plans. A prescription drug program is also available to those who elect health coverage. SERS employs two third-party administrators and a pharmacy benefit manager to manage the self-insurance and prescription drug plans, respectively.

The ORC provides the statutory authority to fund SERS' postemployment benefits through employer contributions. Active members do not make contributions to the postemployment benefit plans.

The Health Care Fund was established under, and is administered in accordance with Internal Revenue Code 105(e). Each year after the allocation for statutorily required benefits, the Retirement Board allocates the remainder of the employer 14% contribution to the Health Care Fund. For the year ended June 30, 2010, the health care allocation is .46%. An additional health care surcharge on employers is collected for employees earning less than an actuarially determined minimum compensation amount, pro-rated according to service credit earned. Statutes provide that no employer shall pay a health care surcharge greater than 2% of that employer's SERS-covered payroll; nor may SERS collect in aggregate more than 1.5% of the total statewide SERS-covered payroll for the health care surcharge. For fiscal year 2010, the minimum compensation level was established at $35,800. The surcharge, added to the unallocated portion of the 14% employer contribution rate is the total amount assigned to the Health Care Fund. For the Academy contributions assigned to health care for the years ended June 30, 2010, 2009, and 2008 were $1,462, $1,894, and $2,254, respectively.

The SERS Retirement Board establishes the rules for the premiums paid by the retirees for health care coverage for themselves and their dependents or for their surviving beneficiaries. Premiums vary depending on the plan selected, qualified years of service, Medicare eligibility, and retirement status.

The financial reports of SERS' Health Care and Medicare B plans are included in its Comprehensive Annual Financial Report. The report can be obtained by contacting SERS, 300 East Broad Street, Suite 100, Columbus, Ohio 43215-3746 or by calling toll free (800) 878-5853. It is also posted on SERS' website at www.ohsers.org under Employers/Audit Resources.

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

## 7.  RISK MANAGEMENT

### A.  Property and Liability

The Academy is exposed to various risks of loss related to torts; theft of, damage to and destruction of assets; errors and omissions; injuries to employees; and natural disasters. During fiscal year 2010, the Academy contracted with Great American Insurance Company for property and general liability insurance with a $1,000,000 single occurrence limit and $3,000,000 annual aggregate and no deductible. There has been no reduction in coverage from the prior year. There have been no settlements exceeding coverage in any of the last three fiscal years.

### B.  Workers Compensation

The Academy pays the State Workers Compensation System a premium for employee injury coverage. The premium is calculated by multiplying the monthly total gross payroll by a factor that is calculated by the State. 100% of this premium was paid for fiscal year 2010.

## 8.  EMPLOYEE MEDICAL AND DENTAL BENEFITS

The Academy has contracted with a private carrier to provide employee medical/surgical benefits. The Academy pays 60% of the monthly premium and the employee is responsible for the remaining 40%. The Academy has also contracted with private carriers to provide dental coverage. The Academy pays 60% of the monthly premium and the employee is responsible for the remaining 40%.

## 9.  PURCHASED SERVICES

Purchased service expenses during fiscal year 2010 were as follows:

| Type | Amount |
|------|--------|
| Professional Services | $289,153 |
| Rent and Property Services | $198,852 |
| Travel | $5,942 |
| Advertising and Communications | $24,811 |
| Utilities | $32,479 |
| Pupil Transportation | $251,058 |
| Other Purchased Services | $96,326 |
| **Total** | **$898,621** |

## 10.  LONG-TERM LIABILITIES

Long-term liability activity during fiscal year 2010 was as follows:

| | Balance at 6/30/09 | Additions | Deletions | Balance at 6/30/10 | Due Within One Year |
|------|------|------|------|------|------|
| Capital Lease | $11,543 | $0 | $2,355 | $9,188 | $2,530 |
| Total | $11,543 | $0 | $2,355 | $9,188 | $2,530 |

18

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

---

**11.     OPERATING LEASES**

The Academy has entered into a lease for a building facility with Niagara Educational Services Inc. for a period of April 1, 2005 to June 30, 2010.  On November 1, 2006, Breeze Inc., a sister company of Concept Schools, purchased the property and took over the existing lease agreement with the Academy. On June 20, 2008, there was an amendment to the lease agreement with terms of 4% increase in rent per year through June 30, 2018. According to the current agreement, the monthly rent for the facilities during fiscal year 2010 was $14,600.  Of the $175,200 rent that was owed to Breeze Inc. during fiscal year 2010, $71,400 was still outstanding as of June 30, 2010 and is recorded as a liability in accounts payable.

The Academy entered into a lease for two copiers with US Banc Corporation.  The copiers have a lease period of August 4, 2005 through November 4, 2010.  Payments, including interest totaled $5,216 for the fiscal year ended June 30, 2010.

The following is a schedule of the future payments required under the operating leases as of June 30, 2010.

| Fiscal Year Ending June 30, | Facility Lease | Copier Lease |
|---|---|---|
| 2011 | $182,208 | $1,748 |
| 2012 | 189,496 | 0 |
| 2013 | 197,076 | 0 |
| 2014 | 204,959 | 0 |
| 2015 | 213,157 | 0 |
| 2016-2018 | 692,008 | 0 |
| Total minimum lease payments | $1,678,904 | $1,748 |

**12.     CAPITALIZED LEASE – LESSEE DISCLOSURE**

The Academy entered into a capital lease in November 2008 for a color copier.  The lease meets the criteria of a capital lease as defined by Statement of Financial Accounting Standards No. 13, "Accounting for Leases," which defines a capital lease generally as one which transfers benefits and risk of ownership to the lessee.  The capital lease was recorded at the present value of the future minimum lease payments as of the inception date.  Principal payments made during fiscal year 2010 total $2,355.

The following is a schedule of the future minimum lease payments required under the capital lease as of June 30, 2010.

| Fiscal Year Ending June 30, | |
|---|---|
| 2011 | $3,108 |
| 2012 | 3,108 |
| 2013 | 3,108 |
| 2014 | 1,813 |
| Minimum Lease Payments | 11,137 |
| Less: Amount representing interest at the School's incremental borrowing rate of interest | (1,949) |
| Present Value of Minimum Lease Payments | $9,188 |

19

**Horizon Science Academy of Springfield**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

13. **CONTINGENCIES**

    **A.**     **Grants**

        The Academy received financial assistance from federal and state agencies in the form of grants. The disbursement of funds received under these programs generally requires compliance with terms and conditions specified in the grant agreements and are subject to audit by the grantor agencies. Any disallowed claims resulting from such audits could become a liability of the Academy. However, in the opinion of management, any such disallowed claims will not have a material effect on the financial position of the Academy. In fiscal year 2010, the Academy received grants from State and Federal agencies total of $630,160.

    **B.**     **Ohio Department of Education Enrollment Review**

        The Ohio Department of Education (ODE) conducts reviews of enrollment data and full time equivalency (FTE) calculations made by the Academy. These reviews are conducted to ensure the Community School is reporting accurate student enrollment data to the State, upon which state foundation funding is calculated. The review for fiscal year 2010 showed the School was underpaid by $9,181, which is reported as an intergovernmental receivable in the statement of net assets.

14. **SPONSORSHIP AGREEMENT**

    On June 25, 2005, Lucas County Educational Service Center assumed responsibility for sponsorship of the Academy. The Sponsor is responsible for evaluating the performance of the Academy and has the authority to deny renewal of the contract at its expiration or terminate the contract prior to its expiration. On May 2, 2010, the original contract was extended until May 30, 2011. According to the contract, the Academy pays 1.5% of its foundation revenues to the Sponsor. In fiscal year 2010, the Academy's compensation to the Sponsor was $24,713.

15. **MANAGEMENT COMPANY AGREEMENT**

    On January 1, 2005, the Academy contracted with Concepts Schools, Inc. to serve as the Academy's management company. The contract is renewed automatically every year in one year terms unless the Academy or the management company decides otherwise. According to the contract, the Academy transfers 12% of the funds received from the State. In fiscal year 2010, the Academy paid $165,273 to Concept Schools for management services. The rest of the fees, amounting to $33,310 were forgiven by Concept Schools, and are reflected in the statement of revenues, expenses and change in net assets as donated management fee.

16. **RELATED PARTIES**

    The Board members for the Academy are also Board members for other Horizon Science Academy Schools that are managed by the same management company, Concept Schools.

    A Board member for the Academy owns a restaurant and the Academy has purchased non-contractual food services in amount of $2,079 from that restaurant.

**Horizon Science Academy of Springfield**
Lucas County
Schedule of Federal Awards Receipts and Expenditures
For the Fiscal Year Ended June 30, 2010

| Federal Grantor/<br>Pass Through Grantor/<br>Program Title | Pass Through<br>Entity<br>Number | Federal<br>CFDA<br>Number | Receipts | Disbursements |
|---|---|---|---|---|
| **United States Department of Agriculture** | | | | |
| *Passed through Ohio Department of Education* | | | | |
| *Nutrition Cluster:* | | | | |
| National School Lunch Program | 3L60 | 10.555 | $ 74,517 | $ 74,517 |
| School Breakfast Program | 3L70 | 10.553 | 31,732 | 31,732 |
| Total Nutrition Cluster | | | 106,249 | 106,249 |
| | | | | |
| **Total United States Department of Agriculture** | | | 106,249 | 106,249 |
| | | | | |
| **United States Department of Education** | | | | |
| *Passed through Ohio Department of Education* | | | | |
| *Title I, Part A Cluster:* | | | | |
| Title I Grants to Local Educational Agencies | 3M00 | 84.010 | 223,837 | 253,879 |
| Title I Grants to Local Educational Agencies, ARRA | 3DK0 | 84.389 | 95,184 | 108,707 |
| Total Title I, Part A Cluster | | | 319,021 | 362,586 |
| | | | | |
| *Special Education Cluster:* | | | | |
| Special Education - Grants to States | 3M20 | 84.027 | 40,601 | 37,236 |
| Special Education - Grants to States, ARRA | 3DJ0 | 84.391 | 8,680 | 11,567 |
| Total Special Education Cluster | | | 49,281 | 48,803 |
| | | | | |
| Safe and Drug-Free Schools and Communities - | | | | |
| State Grants | 3D10 | 84.186 | 1,709 | 1,699 |
| State Grants for Innovative Programs | 3M10 | 84.298 | 15 | - |
| Education Technology State Grants | 3S20 | 84.318 | 2,180 | 2,180 |
| Improving Teacher Quality State Grants | 3Y60 | 84.367 | 10,121 | 10,121 |
| State Fiscal Stabilization Fund (SFSF) - Education State Grants, ARRA | GRF | 84.394 | 109,116 | 50,879 |
| | | | | |
| **Total United States Department of Education** | | | 491,443 | 476,268 |
| | | | | |
| **Total Federal Financial Assistance** | | | $ 597,692 | $ 582,517 |

See accompanying notes to the Schedule of Federal Awards Receipts and Expenditures.

21

**Horizon Science Academy of Springfield**
*Notes to the Schedule of Federal Awards Receipts and Expenditures*
*For the Fiscal Year Ended June 30, 2010*

## NOTE A – SIGNIFICANT ACCOUNTING POLICIES

The accompanying Schedule of Federal Awards Receipts and Expenditures (the Schedule) summarizes activity of the Academy's federal award programs.  The Schedule has been prepared on the cash basis of accounting.

## NOTE B – NATIONAL SCHOOL LUNCH AND BREAKFAST PROGRAMS

Federal funds received from the National School Lunch and Breakfast Programs were commingled with state subsidy and local revenue from the sale of meals.  It was assumed that federal dollars were expended first.



Balestra, Harr & Scherer, CPAs, Inc.

Members American Institute of Certified Public Accountants          Members Ohio Society of Certified Public Accountants

### REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND ON COMPLIANCE AND OTHER MATTERS REQUIRED BY *GOVERNMENT AUDITING STANDARDS*

Members of the Board
Horizon Science Academy of Springfield
630 South Reynolds Road
Toledo, Ohio 43615

We have audited the financial statements of the business-type activities of the Horizon Science Academy of Springfield, Lucas County, Ohio (the Academy) as of and for the year ended June 30, 2010, which collectively comprise the Academy's basic financial statements and have issued our report thereon dated March 11, 2011. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in the Comptroller General of the United States' *Government Auditing Standards*.

#### Internal Control Over Financial Reporting

In planning and performing our audit, we considered the Academy's internal control over financial reporting as a basis for designing our audit procedures for the purpose of expressing our opinion on the financial statements, but not for the purpose of opining on the effectiveness of the Academy's internal control over financial reporting. Accordingly, we have not opined on the effectiveness of the Academy's internal control over financial reporting.

A deficiency in internal control exists when the design or operation of a control does not allow management or employees, when performing their assigned functions, to prevent, or detect and timely correct misstatements. A material weakness is a deficiency, or combination of internal control deficiencies resulting in more than a reasonable possibility that a material misstatement of the Academy's financial statements will not be prevented, or detected and timely corrected.

Our consideration of internal control over financial reporting was for the limited purpose described in the first paragraph of this section and was not designed to identify all deficiencies in internal control over financial reporting that might be deficiencies, significant deficiencies or material weaknesses. We did not identify any deficiencies in internal control over financial reporting that we consider material weaknesses, as defined above.

#### Compliance and Other Matters

As part of reasonably assuring whether the Academy's financial statements are free of material misstatement, we tested its compliance with certain provisions of laws, regulations, contracts and grant agreements, noncompliance with which could directly and materially affect the determination of financial statement amounts. However, providing an opinion on compliance with those provisions was not an objective of our audit and accordingly, we do not express an opinion. The results of our tests disclosed no instances of noncompliance or other matters we must report under *Government Auditing Standards*.

23

Members of the Board
Horizon Science Academy of Springfield
REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING AND ON COMPLIANCE AND
OTHER MATTERS REQUIRED BY *GOVERNMENT AUDITING STANDARDS*
Page 2

We intend this report for the information and use of management, Members of the Board, the Community School's
sponsor, federal awarding agencies, pass-through entities, and others within the Academy.  We intend it for no one
other than these specified parties.

*Balestra, Harr & Scherer*

Balestra, Harr & Scherer, CPAs, Inc.

March 11, 2011

24



Balestra, Harr & Scherer, CPAs, Inc.

Members American Institute of Certified Public Accountants     Members Ohio Society of Certified Public Accountants

### REPORT ON COMPLIANCE WITH REQUIREMENTS APPLICABLE TO EACH MAJOR FEDERAL PROGRAM AND ON INTERNAL CONTROL OVER COMPLIANCE REQUIRED BY OMB CIRCULAR A-133

Members of the Board
Horizon Science Academy of Springfield
630 South Reynolds Road
Toledo, Ohio 43615

#### Compliance

We have audited the compliance of Horizon Science Academy of Springfield (the Academy) with the types of compliance requirements described in the U.S. Office of Management and Budget (OMB) *Circular A-133 Compliance Supplement* that could directly and materially affect Horizon Science Academy of Springfield's major federal program for the year ended June 30, 2010. The summary of auditor's results section of the accompanying schedule of findings identifies the Academy's major federal program. The Academy's management is responsible for complying with the requirements of laws, regulations, contracts and grants applicable to each major federal program. Our responsibility is to express an opinion on the Academy's compliance based on our audit.

We conducted our audit of compliance in accordance with auditing standards generally accepted in the United States of America; the standards applicable to financial audits included in the Comptroller General of the United States' *Government Auditing Standards*; and OMB Circular A-133, *Audits of States, Local Governments, and Non-Profit Organizations*. Those standards and OMB Circular A-133 require that we plan and perform the audit to reasonably assure whether noncompliance occurred with the compliance requirements referred to above that could directly and materially affect a major federal program. An audit includes examining, on a test basis, evidence about the Academy's compliance with those requirements and performing other procedures we considered necessary in the circumstances. We believe our audit provides a reasonable basis for our opinion. Our audit does not provide a legal determination of the Academy's compliance with those requirements.

In our opinion, the Horizon Science Academy of Springfield complied, in all material respects, with the requirements referred to above that could directly and materially affect its major federal program for the year ended June 30, 2010.

#### Internal Control Over Compliance

The Academy's management is responsible for establishing and maintaining effective internal control over compliance with the requirements of laws, regulations, contracts and grants applicable to federal programs. In planning and performing our audit, we considered the Academy's internal control over compliance with the requirements that could directly and materially affect a major federal program, to determine our auditing procedures for the purpose of opining on compliance and to test and report on internal control over compliance in accordance with OMB Circular A-133, but not for the purpose of opining on the effectiveness of internal control over compliance. Accordingly, we have not opined on the effectiveness of the Academy's internal control over compliance.

25

Members of the Board
Horizon Science Academy of Springfield
REPORT ON COMPLIANCE WITH REQUIREMENTS APPLICABLE TO EACH MAJOR FEDERAL PROGRAM
AND ON INTERNAL CONTROL OVER COMPLIANCE REQUIRED BY OMB CIRCULAR A-133
Page 2

A deficiency in internal control over compliance exists when the design or operation of a control over compliance does not allow management or employees, when performing their assigned functions, to prevent, or to timely detect and correct, noncompliance with a federal program compliance requirement. A material weakness in internal control over compliance is a deficiency, or combination of deficiencies, in internal control over compliance, such that there is a reasonable possibility that material noncompliance with a federal program compliance requirement will not be prevented, or timely detected and corrected.

Our consideration of the internal control over compliance was for the limited purpose described in the first paragraph of this section and would not necessarily identify all deficiencies in internal control over compliance that might be deficiencies, significant deficiencies or material weaknesses. We did not identify any deficiencies in internal control over compliance that we consider to be material weaknesses, as defined above.

We intend this report solely for the information and use of management, Members of the Board, the Community School's sponsor, federal awarding agencies, pass-through entities, and others within the Academy. It is not intended for anyone other than these specified parties.

*Balestra, Harr & Scherer*

Balestra, Harr & Scherer, CPAs, Inc.
March 11, 2011

**Horizon Science Academy of Springfield**
*Schedule of Findings*
*OMB Circular A-133 Section .505*
*June 30, 2010*

| Summary of Auditor's Results | | |
| --- | --- | --- |
| *(d)(1)(i)* | Type of Financial Statement Opinion | Unqualified |
| *(d)(1)(ii)* | Were there any material control weaknesses reported at the financial statement level (GAGAS)? | No |
| *(d)(1)(ii)* | Were there any significant deficiencies in internal control reported at the financial statement level (GAGAS)? | No |
| *(d)(1)(iii)* | Was there any reported material non-compliance at the financial statement level (GAGAS)? | No |
| *(d)(1)(iv)* | Were there any material control weaknesses reported for major federal programs? | No |
| *(d)(1)(iv)* | Were there any significant deficiencies in internal control reported for major federal programs? | No |
| *(d)(1)(v)* | Type of Major Programs Compliance Opinion | Unqualified |
| *(d)(1)(vi)* | Are there any reportable findings under Section .510? | No |
| *(d)(1)(vii)* | Major Program(s) (list): | Title I Cluster: Title I - CFDA #84.010 Title I (ARRA) – CFDA #84.389 |
| *(d)(1)(viii)* | Dollar Threshold: Type A/B Programs | Type A: > $300,000 Type B: all others |
| *(d)(1)(ix)* | Low Risk Auditee? | No |

2. FINDINGS RELATED TO THE FINANCIAL STATEMENTS REQUIRED TO BE REPORTED IN ACCORDANCE WITH GAGAS

None.

3. FINDINGS AND QUESTIONED COSTS FOR FEDERAL AWARDS

None.



# Dave Yost · Auditor of State

**HORIZON SCIENCE ACADEMY OF SPRINGFIELD**

**LUCAS COUNTY**

**CLERK'S CERTIFICATION**

This is a true and correct copy of the report which is required to be filed in the Office of the
Auditor of State pursuant to Section 117.26, Revised Code, and which is filed in Columbus, Ohio.

*Susan Babbitt*

**CLERK OF THE BUREAU**

**CERTIFIED**
**MAY 5, 2011**

88 East Broad Street, Fifth Floor, Columbus, Ohio 43215-3506
Phone: 614-466-4514 or 800-282-0370      Fax: 614-466-4490
www.auditor.state.oh.us

B-69

## Horizon Science Academy - Springfield
# Balance Sheet
### As of June 30, 2011

|  | Jun 30, 11 |
|---|---|
| **ASSETS** | |
| **Total Current Assets** | 212,241.23 |
| **Total Fixed Assets** | 223,597.58 |
| **TOTAL ASSETS** | 435,838.81 |
| **LIABILITIES & EQUITY** | |
| **Total Current Liabilities** | 99,235.99 |
| **Total Liabilities** | 99,235.99 |
| **Total Equity** | 336,602.82 |
| **TOTAL LIABILITIES & EQUITY** | 435,838.81 |

B-70

## Horizon Science Academy - Springfield
# Profit & Loss
### July 2010 through June 2011

| | Jul '10 - Jun 11 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| 1510-Food Services | 4,848.90 |
| 1690-Extracurricular Activities | 3,836.33 |
| 1790-Classroom Fees | 6,435.35 |
| 1820-Contributions and Donation | 934.15 |
| 1890-Misc Local Revenue | 7,027.77 |
| 3110-Foundation Basic | 1,775,850.73 |
| Total 3200-Restricted Grant In-Aid | 7,808.25 |
| Total 4220-Restr. Grant In-Aid Fed. | 663,304.09 |
| | |
| **Total Income** | 2,470,045.57 |
| | |
| **Expense** | |
| Total 100-Employee  Salaries | 872,998.96 |
| Total 200-Benefits | 263,407.76 |
| Total 400-Purchased Services | 944,914.59 |
| Total 500-Supplies and Materials | 136,891.09 |
| Total 600-Capital Outlay | 0.00 |
| Total 800-Other Objects | 44,624.04 |
| | |
| **Total Expense** | 2,262,836.44 |
| | |
| **Net Ordinary Income** | 207,209.13 |
| | |
| **Net Income** | **207,209.13** |

B-71

Horizon Science Academy of Toledo
Lucas County, Ohio

Single Audit

July 1, 2009 through June 30, 2010
Fiscal Year Audited Under GAGAS: 2010



## Balestra, Harr & Scherer, CPAs, Inc.

528 South West St, P.O. Box 687, Piketon, Ohio 45661  Phone:  740.289.4131  Fax:  740.289.3639
9076 Ohio River Road, Wheelersburg, Ohio 45694  Phone:  740.876.9121  Fax:  800.210.2573



# Dave Yost · Auditor of State

Board Members
Horizon Science Academy of Toledo
425 Jefferson Avenue
Toledo, Ohio 43604

We have reviewed the *Independent Auditor's Report* of the Horizon Science Academy of
Toledo, Lucas County, prepared by Balestra, Harr & Scherer, CPAs, Inc., for the audit period
July 1, 2009 through June 30, 2010.  Based upon this review, we have accepted these reports in
lieu of the audit required by Section 117.11, Revised Code.  The Auditor of State did not audit
the accompanying financial statements and, accordingly, we are unable to express, and do not
express an opinion on them.

Our review was made in reference to the applicable sections of legislative criteria, as reflected by
the Ohio Constitution, and the Revised Code, policies, procedures and guidelines of the Auditor
of State, regulations and grant requirements.  The Horizon Science Academy of Toledo is
responsible for compliance with these laws and regulations.

*Dave Yost*

Dave Yost
Auditor of State

April 15, 2011

**Horizon Science Academy of Toledo**
*Table of Contents*
*For the Fiscal Year Ended June 30, 2010*

| Title | Page |
|---|---|
| Independent Auditor's Report | 1-2 |
| Management's Discussion and Analysis | 3-6 |
| Financial Statements: | |
| Statement of Net Assets | 7 |
| Statement of Revenues, Expenses and Change in Net Assets | 8 |
| Statement of Cash Flows | 9 |
| Notes to the Basic Financial Statements | 10-21 |
| Schedule of Federal Awards Receipts and Expenditures | 22 |
| Notes to the Schedule of Federal Awards Receipts and Expenditures | 23 |
| Report on Internal Control Over Financial Reporting and on Compliance and Other Matters Required By *Government Auditing Standards* | 24-25 |
| Report on Compliance With Requirements Applicable to Each Major Federal Program and on Internal Control Over Compliance Required by OMB Circular A-133 | 26-27 |
| Schedule of Findings – OMB Circular A-133 §.505 | 28 |



Balestra, Harr & Scherer, CPAs, Inc.

Members American Institute of Certified Public Accountants          Members Ohio Society of Certified Public Accountants

**Independent Auditor's Report**

Members of the Board
Horizon Science Academy of Toledo
425 Jefferson Avenue
Toledo, OH 43604

We have audited the accompanying financial statements of the business-type activities of the Horizon Science Academy of Toledo, Lucas County, Ohio, (the Academy), as of and for the year ended June 30, 2010, which collectively comprise the Academy's basic financial statements as listed in the table of contents. These financial statements are the responsibility of the Academy's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in the Comptroller General of the United States' *Government Auditing Standards*. Those standards require that we plan and perform the audit to reasonably assure whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the business-type activities of the Horizon Science Academy of Toledo, Lucas County, Ohio, as of June 30, 2010, and the respective changes in financial position and cash flows thereof for the year then ended in conformity with accounting principles generally accepted in the United States of America.

In accordance with *Government Auditing Standards*, we have also issued our report dated March 18, 2011 on our consideration of the Academy's internal control over financial reporting and our tests of its compliance with certain provisions of laws, regulations, contracts and grant agreements and other matters. While we did not opine on the internal control over financial reporting or on compliance, that report describes the scope of our testing of internal control over financial reporting and compliance and the results of that testing. That report is an integral part of an audit performed in accordance with *Government Auditing Standards*. You should read it in conjunction with this report in assessing the results of our audit.

Management's Discussion and Analysis is not a required part of the basic financial statements but is supplementary information accounting principles generally accepted in the United States of America requires. We have applied certain limited procedures, consisting principally of inquiries of management regarding the methods of measuring and presenting the required supplementary information. However, we did not audit the information and express no opinion on it.

1

Members of the Board
Horizon Science Academy of Toledo
Independent Auditor's Report
Page 2

We conducted our audit to opine on the financial statements that collectively comprise the Academy's basic financial statements. The accompanying Schedule of Federal Awards Receipts and Expenditures is presented for purposes of additional analysis as required by the U.S. Office of Management and Budget Circular A-133, *Audits of States, Local Governments, and Non-Profit Organizations*, and is not a required part of the basic financial statements. We subjected the Schedule of Federal Awards Receipts and Expenditures to the auditing procedures applied in the audit of the basic financial statements. In our opinion, this information is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Balestra, Harr & Scherer*

Balestra, Harr & Scherer, CPAs, Inc.

March 18, 2011

2

**Horizon Science Academy of Toledo**
*Management's Discussion and Analysis*
*For the Fiscal Year Ended June 30, 2010*
*(Unaudited)*

The discussion and analysis of Horizon Science Academy of Toledo's (the Academy) financial performance provides an overall review of the financial activities for the fiscal year ended June 30, 2010.  Readers should also review the financial statements and notes to enhance their understanding of the Academy's financial performance.

**Financial Highlights**

Key financial highlights for fiscal year 2010 are as follows:

- Total assets were $332,742.
- Total liabilities were $150,756.
- Total net assets increased $307,037.

**Using this Financial Report**

This report consists of three parts: the MD&A, the basic financial statements, and notes to those statements.  The basic financial statements include a statement of net assets, a statement of revenues, expenses and change in net assets, and a statement of cash flows.

**Reporting the School as a Whole**

One of the most important questions asked about the Academy is, "As a whole, what is the Academy's financial condition as a result of the year's activities?"  The statement of net assets and the statement of revenues, expenses and change in net assets, which appear first in the Academy's financial statements, report information on the Academy as a whole and its activities in a way that helps you answer this question. We prepare these statements to include all assets and liabilities, using the accrual basis of accounting, which is similar to the accounting used by most private-sector companies.  All of the current year's revenues and expenses are taken into account regardless of when the cash is received or paid.

These two statements report the Academy's net assets – the difference between assets and liabilities, as reported in the statement of net assets – as one way to measure the Academy's financial health or financial position.  Over time, increases or decreases in the Academy's net assets – as reported in the statement of revenues, expenses and change in net assets – are indicators of whether its financial health is improving or deteriorating.  The relationship between revenues and expenses is the Academy's operating results.  However, the Academy's goal is to provide services to our students, not to generate profits as commercial entities do.  One must consider many other non-financial factors, such as the quality of the education provided and the safety of the Academy, to assess the overall health of the Academy.

The statement of net assets and the statement of revenues, expenses and change in net assets report the activities of the Academy, which encompass all the Academy's services, including instruction, supporting services, community services, and food services.  Unrestricted state aid and state and federal grants finance most of these activities.

**Horizon Science Academy of Toledo**
*Management's Discussion and Analysis*
*For the Fiscal Year Ended June 30, 2010*
*(Unaudited)*

Table 1 provides a comparison of net assets as of June 30, 2010 with net assets as of June 30, 2009.

Table 1

| Net Assets | 2010 | 2009* |
|---|---|---|
| **Assets** | | |
| Current and Other Assets | $214,680 | $22,324 |
| Capital Assets, Net | 118,062 | 132,863 |
| Total Assets | 332,742 | 155,187 |
| | | |
| **Liabilities** | | |
| Current Liabilities | 144,759 | 201,545 |
| Non-Current Liabilities | 5,997 | 78,693 |
| Total Liabilities | 150,756 | 280,238 |
| | | |
| **Net Assets** | | |
| Invested in Capital Assets | 109,489 | 130,811 |
| Unrestricted | 72,497 | (255,862) |
| Total Net Assets | $181,986 | ($125,051) |

* Certain reclassifications were made for consistency with current year reporting. There is no effect on net assets.

Total assets increased by $177,555. This increase is due mainly to increase in cash and cash equivalents. Capital assets decreased by $14,801. This decrease is due to depreciation of $37,112 exceeding additions of $22,311 in the current year. Intergovernmental receivables increased by $32,658. Total liabilities decreased $129,482. This decrease is due mainly to payments in notes payable of $113,696 and accounts payable of $6,004.

**Horizon Science Academy of Toledo**
*Management's Discussion and Analysis*
*For the Fiscal Year Ended June 30, 2010*
*(Unaudited)*

Table 2 shows the changes in net assets for the fiscal years 2010 and 2009.

Table 2

Revenues, Expenses and Change in Net Assets

|  | 2010 | 2009 |
|---|---|---|
| **Operating Revenue/Expense** |  |  |
| Revenue |  |  |
| Foundation Payments | $1,823,132 | $1,737,737 |
| Food Services | 3,136 | 4,241 |
| Classroom Fees | 5,854 | 9,413 |
| Extracurricular Activities | 18,177 | 11,707 |
| Donated Management Fee | 19,772 | 161,344 |
| Other Local Revenue | 27,439 | 10,910 |
| Total Operating Revenues | 1,897,510 | 1,935,352 |
| Expense |  |  |
| Salaries | 1,084,263 | 1,059,116 |
| Fringe Benefits | 259,537 | 228,441 |
| Purchased Services | 809,540 | 704,670 |
| Materials and Supplies | 65,713 | 83,941 |
| Miscellaneous Expenses | 37,112 | 48,544 |
| Depreciation Expense | 56,465 | 53,064 |
| Total Operating Expenses | 2,312,630 | 2,177,776 |
| Net Operating Loss | (415,120) | (242,424) |
| **Non-Operating Revenues/Expenses** |  |  |
| Restricted Grant-In-Aid- Federal | 718,599 | 359,695 |
| Restricted Grant In-Aid- State | 6,848 | 6,000 |
| Interest Expense | (3,290) | (9,637) |
| Total Non-Operating Revenues/Expenses | 722,157 | 356,058 |
| **Net Assets** |  |  |
| Change in Net Assets | 307,037 | 113,634 |
| Net Assets at Beginning of Year | (125,051) | (238,685) |
| Net Assets at End of Year | $181,986 | ($125,051) |

Foundation support and federal grant revenue increased $85,395 and $358,904, respectively, primarily as a result of an increase in student enrollment.  The Academy also received in-kind support (donated management fee) in the amount of $19,772 in 2010.  Purchased services increased $104,870 also as a result of increased need for services resulting from an increase in student enrollment.

Foundation support is the primary support of the Academy, comprising 96% of operating revenue and 70% of total revenues. The Academy also received a significant portion of federal grants, which represents 27% of total revenue. Salaries and benefits comprise the largest portion of operating expenses, representing 58 % of total operating expenses. Purchased services also represent a large portion of operating expenses, at 35% of total expenses. Net assets increased $307,037 resulting from revenues in excess of expenses.

**Horizon Science Academy of Toledo**
*Management's Discussion and Analysis*
*For the Fiscal Year Ended June 30, 2010*
*(Unaudited)*

**Capital Assets**

At the end of fiscal year 2010 the Academy had $118,062, invested in furniture and equipment(net of $142,425 in accumulated depreciation). Table 3 shows fiscal year 2010 and fiscal year 2009:

Table 3

Capital Assets
(Net of Depreciation)

|  | 2010 | 2009 |
|---|---|---|
| Furniture and Equipment | $118,062 | $132,862 |
| Totals | $118,062 | $132,862 |

For more information on capital assets see Note 4 to the basic financial statements.

**Debt and Capital Leases**

The Academy entered into a promissory note with Horizon Science Academy – Cleveland on March 18, 2005, in the amount of $200,000, at an interest rate of 6 percent. The note was used to pay for general operations of the Academy. In 2008, the Academy also obtained a loan from Concept Schools in the amount of $90,000 which was used to pay for general operations of the Academy.  As of June 30, 2010 and 2009, the Academy has outstanding note balances as follows:

Table 4

Outstanding Note Balances

|  | 2010 | 2009 |
|---|---|---|
| HSA Cleveland | $0 | $113,196 |
| Concept Schools | 0 | 500 |
| Total | $0 | $113,696 |

For more information on the Academy's debt see Note 10 to the basic financial statements.

**Contacting the School's Financial Management**

This financial report is designed to provide our citizens, taxpayers, and creditors with a general overview of the Academy's finances.  Questions concerning any of the information in this report or requests for additional information should be directed to Aman Gurdov, Treasurer, Horizon Science Academy of Toledo, 425 Jefferson Avenue, Toledo, Ohio 43604-1060.

**Horizon Science Academy Toledo**
*Statement of Net Assets*
*For the Fiscal Year Ended June 30, 2010*

**ASSETS:**
**Current Assets:**

| | |
|---|---:|
| Cash and cash equivalents | $121,081 |
| Prepaid Payroll Liability | 47,347 |
| Intergovernmental receivable | 46,252 |
| Total current assets | 214,680 |

**Noncurrent Assets:**

| | |
|---|---:|
| Depreciable capital assets | 118,062 |
| Total assets | 332,742 |

**LIABILITIES:**
**Current Liabilities:**

| | |
|---|---:|
| Accounts payable | 38,744 |
| Accrued wages and benefits payable | 103,439 |
| Capital Lease - current portion | 2,576 |
| Total current liabilities | 144,759 |

**Noncurrent Liabilities:**

| | |
|---|---:|
| Capital Lease - noncurrent portion | 5,997 |
| Total noncurrent liabilities | 5,997 |
| Total liabilities | 150,756 |

**NET ASSETS:**

| | |
|---|---:|
| Invested in capital assets, net of related debt | 109,489 |
| Unrestricted (deficit) | 72,497 |
| Total net assets | $181,986 |

See accompanying notes to the basic financial statements.

**Horizon Science Academy Toledo**
*Statement of Revenues, Expenses and Change in Net Assets*
*For the Fiscal Year Ended June 30,2010*

**OPERATING REVENUES:**

| | |
|---|---:|
| Foundation payments | $1,823,132 |
| Food services | 3,136 |
| Classroom fees | 5,854 |
| Extracurricular activities | 18,177 |
| Donated management fee | 19,772 |
| Other revenue | 27,439 |
| Total operating revenues | 1,897,510 |

**OPERATING EXPENSES:**

| | |
|---|---:|
| Salaries | 1,084,263 |
| Fringe benefits | 259,537 |
| Purchased services | 809,540 |
| Materials and supplies | 65,713 |
| Depreciation | 37,112 |
| Miscellaneous | 56,465 |
| Total operating expenses | 2,312,630 |
| Operating loss | (415,120) |

**NON-OPERATING REVENUES (EXPENSES):**

| | |
|---|---:|
| Interest expense | (3,290) |
| Restricted grants in aid - federal | 718,599 |
| Restricted grants in aid - state | 6,848 |
| Total non-operating revenues (expenses) | 722,157 |
| Change in net assets | 307,037 |
| Net assets, beginning of year | (125,051) |
| Net assets, end of year | $181,986 |

See accompanying notes to the basic financial statements.

**Horizon Science Academy Toledo**
*Statement of Cash Flows*
*For the Fiscal Year Ended June 30, 2010*

**INCREASE IN CASH AND CASH EQUIVALENTS**

**CASH FLOWS FROM OPERATING ACTIVITIES:**

| | |
|---|---:|
| Cash received from State of Ohio | $1,790,474 |
| Cash received from other operating revenues | 54,606 |
| Cash payments to suppliers for goods and services | (861,485) |
| Cash payments to employees for services and benefits | (1,392,678) |
| Other cash payments | (56,465) |
| Net cash used for operating activities | (465,548) |

**CASH FLOWS FROM NONCAPITAL FINANCING ACTIVITIES:**

| | |
|---|---:|
| Federal grants received | 718,599 |
| State grants received | 6,848 |
| Net cash provided by noncapital financing activities | 725,447 |

**CASH FLOWS FROM CAPITAL AND RELATED FINANCING ACTIVITIES:**

| | |
|---|---:|
| Principal paid on notes payable | (113,696) |
| Interest paid on notes payable | (5,743) |
| Principal paid on capital lease payable | (2,397) |
| Interest paid on capital lease payable | (711) |
| Payment for capital acquisitions | (22,311) |
| Net cash used for capital and related financing activities | (144,858) |
| | |
| Net increase in cash and cash equivalents | 115,041 |
| Cash and cash equivalents at beginning of year | 6,040 |
| | |
| Cash and cash equivalents at end of year | $121,081 |

**RECONCILIATION OF OPERATING LOSS TO NET CASH USED FOR OPERATING ACTIVITIES**

| | |
|---|---:|
| Operating loss | ($415,120) |

**ADJUSTMENTS TO RECONCILE OPERATING LOSS TO NET CASH USED FOR OPERATING ACTIVITIES:**

| | |
|---|---:|
| Depreciation | 37,112 |
| Increase in intergovernmental receivable (Foundation payments) | (32,658) |
| Decrease in accounts payable | (6,004) |
| Decrease in accrued wages and benefits payable | (4,221) |
| Increase in prepaid payroll liabilities | (44,657) |
| Total adjustments | (50,428) |
| | |
| Net cash used for operating activities | ($465,548) |

**NONCASH TRANSACTIONS:**

| | |
|---|---:|
| Donated management fee | $19,772 |
| Purchased services | (19,772) |

See accompanying notes to the basic financial statements.

**Horizon Science Academy of Toledo**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

1. **DESCRIPTION OF THE ACADEMY AND REPORTING ENTITY**

   Horizon Science Academy of Toledo (the Academy), is a nonprofit corporation established pursuant to Ohio Revised Code Chapters 3314 and 1702 to address the needs of students in grades nine through twelve in Toledo. The Academy, which is part of the State's education program, is independent of any Academy and is nonsectarian in its programs, admission policies, employment practices, and all other operations.

   The Academy may sue and be sued, acquire facilities as needed, and contract for any services necessary for the operation of the Academy. The Academy qualifies as an exempt organization under Section 501(c) (3) of the Internal Revenue Code.  Management is not aware of any course of action or series of events that have occurred that might adversely affect the Academy's tax-exempt status.

   The Academy was approved for operation under contract with the Lucas County Educational Service Center (the Sponsor) for a period of five years commencing March 11, 2004.  On May 2, 2007 the original contract was extended until June 30, 2012.

   The Academy operates under the direction of a self-appointed five-member Board of Trustees. The Board is responsible for carrying out the provisions of the contract, which include, but are not limited to, state mandated provisions regarding student population, curriculum, academic goals, performance standards, admission standards, and qualifications of teachers. The Board of Trustees controls the Academy's facility, which is currently staffed by 40 full and part time personnel who provide services to up to 270 students during the year.

2. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

   The basic financial statements of the Academy have been prepared in conformity with generally accepted accounting principles as applied to governmental nonprofit organizations. The Governmental Accounting Standards Board (GASB) is the accepted standard-setting body for establishing governmental accounting and financial reporting principles.  The Academy also applies Financial Accounting Standards Board (FASB) statements and interpretations issued on or before November 30, 1989, provided they do not conflict with or contradict GASB pronouncements. The Academy does not apply FASB statements issued after November 30, 1989. The more significant of the Academy's accounting policies are described below.

   A. **Basis of Presentation**

      The Academy's basic financial statements consist of a statement of net assets; a statement of revenues, expenses, and change in net assets; and a statement of cash flows.

      The Academy uses enterprise accounting to report its financial activities. Enterprise accounting focuses on the determination of operating income, changes in net assets, financial position, and cash flows.

   B. **Measurement Focus and Basis of Accounting**

      The accounting and financial reporting treatment is determined by its measurement focus. Enterprise accounting uses a flow of economic resources measurement focus.  With this measurement focus, all assets and all liabilities associated with the operation of the Academy are included on the statement of net assets. The statement of revenues, expenses, and change in net assets present increases (e.g., revenues) and decreases (e.g., expenses) in total net assets. The statement of cash flows provides information about how the Academy finances and meets the cash flow needs of its enterprise activities.

10

**Horizon Science Academy of Toledo**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

2. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

   B.   **Measurement Focus and Basis of Accounting (Continued)**

   Basis of accounting refers to when revenues and expenses are recognized in the accounts and reported in the financial statements. The full accrual basis of accounting is used for reporting purposes. Revenue resulting from exchange transactions, in which each party gives and receives essentially equal value, is recorded on the accrual basis when the exchange takes place. Revenues resulting from non-exchange transactions, in which the Academy receives value without directly giving equal value in return, such as grants, entitlements and donations are recognized in the period in which all eligibility requirements have been satisfied. Deferred revenue arises when assets are recognized before revenue recognition criteria have been satisfied. Grants and entitlements received before eligibility requirements are met are recorded as deferred revenue. Expenses are recognized at the time they are incurred.

   C.   **Budgetary Process**

   Unlike traditional public schools located in the State of Ohio, community Schools are not required to follow budgetary provisions set forth in Ohio Revised Code Chapter 5705, except House Bill 364, which took effect April 8, 2003, added Ohio Rev. Code Section 3314.03 (11)(d), which states that community schools must comply with Ohio Rev. Code Section 5705.391. This requires each community school to submit to the Ohio Department of Education (ODE) a five year forecast no later than October 31 of each year.

   D.   **Cash**

   To improve cash management, all cash received by the Academy is pooled in a central bank account. The Academy did not have any investments during fiscal year 2010.

   E.   **Capital Assets and Depreciation**

   Capital assets are capitalized at cost (or estimated historical cost) and updated for additions and retirements during the year. Donated capital assets are recorded at their fair market values as of the date received. The Academy maintains a capitalization threshold of one thousand dollars. The costs of normal maintenance and repairs that do not add to the value of the asset or materially extend an asset's life are not capitalized. Improvements are capitalized. The Academy does not capitalize interest.

   Furniture and equipment are depreciated using the straight-line method over the following estimated useful lives. Improvements to capital assets are depreciated over the remaining useful lives of the related capital assets. Leasehold improvements are depreciated using the straight-line method over the life of the lease.

   |                                            | Useful Life   |
   |--------------------------------------------|---------------|
   | Leasehold Improvements                     | 5 to 10 years |
   | Heavy Duty Office or Classroom Furniture   | 10 years      |
   | Computers and Other Electronic Equipment   | 3 years       |

11

**Horizon Science Academy of Toledo**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

2.  **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

F.  **Intergovernmental Revenues**

The Academy currently participates in the State Foundation Program, Special Education Program, and Federal CCIP Program. Revenues received from the State Foundation Program, Special Education Program and other State programs are recognized as operating revenues whereas revenues from the Federal CCIP Program and other State Grants are recognized as non-operating revenues in the accounting period in which all eligibility requirements have been met.

Eligibility requirements include timing requirements, which specify the year when the resources are required to be used or the fiscal year when use is first permitted, matching requirements, in which the Academy must provide local resources to be used for a specified purpose, and expenditure requirements, in which the resources are provided to the Academy on a reimbursement basis.

G.  **Operating Revenues and Expenses**

Operating revenues are those revenues that are generated directly from the primary activity of the Academy.  Operating expenses are necessary costs incurred to provide the service that is the primary activity of the Academy.  All revenues and expenses not meeting these definitions are reported as non-operating.

H.  **Compensated Absences**

Academy policy indicates that all leave earned by employees must be used in the current period and balances are not carried forward and, therefore, are not recorded as a liability.

I.  **Net Assets**

Net assets represent the difference between assets and liabilities.  Net assets invested in capital assets consists of capital assets, net of accumulated depreciation.  Net assets are reported as restricted when there are limitations imposed on their use, either through enabling legislation adopted by the Academy or through external restrictions imposed by creditors, grantors, or contracts.  The Academy applies restricted resources first when an expense is incurred for purposes for which both restricted and unrestricted net assets are available.

J.  **Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Actual results may differ from those estimates.

3.  **DEPOSITS**

As of June 30, 2010, the Academy's bank balance of $147,971 was either covered by FDIC or collateralized by the financial institution's public entity deposit pool in the manner described below.

12

**Horizon Science Academy of Toledo**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

**3.    DEPOSITS (Continued)**

Custodial credit risk is the risk that in the event of a bank failure, the Academy's deposits may not be returned to it. According to state law, public depositories must give security for all public funds on deposit in excess of those funds that are insured by the Federal Deposit Insurance Corporation (FDIC) or by any other agency or instrumentality of the federal government.  These institutions may either specifically collateralize individual accounts in lieu of amounts insured by the FDIC, or may pledge a pool of government securities valued at least 105% of the total value of public monies on deposit at the institution. The School has no policy regarding custodial credit risk.

**4.    CAPITAL ASSETS**

Capital asset activity for the fiscal year ended June 30, 2010, was as follows:

| Capital Assets | | | | |
|---|---|---|---|---|
| | **Balance July 1, 2009** | **Additions** | **Deletions** | **Ending June 30, 2010** |
| Furniture and Equipment | $    259,641 | $    22,311 | $ (21,465) | $    260,487 |
| Total Fixed Assets | 259,641 | 22,311 | (21,465) | 260,487 |
| Less: Accumulated Depreciation | (126,778) | (37,112) | 21,465 | (142,425) |
| **Net Fixed Assets** | **$    132,863** | **$    (14,801)** | **$          -** | **$    118,062** |

**5.    DEFINED BENEFIT PENSION PLANS**

**A.  School Employees Retirement System**

The Academy contributes to the School Employees Retirement System of Ohio (SERS), a cost-sharing multiple-employer defined benefit pension plan. SERS provides retirement, disability, and survivor benefits, annual cost-of-living adjustments, and death benefits to plan members and beneficiaries. Authority to establish and amend benefits is provided by state statute per Chapter 3309 of the Ohio Revised Code. SERS issues a publicly available, stand-alone financial report that includes financial statements and required supplementary information. That report can be obtained by contacting SERS, 300 East Broad Street, Suite 100, Columbus, Ohio 43215-3746 or by calling toll free (800) 878-5853. It is also posted on SERS' website at www.ohsers.org under *Form and Publications*.

**Horizon Science Academy of Toledo**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

5. **DEFINED BENEFIT PENSION PLANS (Continued)**

Plan members are required to contribute 10% of their annual covered salary and Academy is required to contribute 14% of annual covered payroll. The contribution requirements of plan members and employers are established and may be amended, up to statutory maximum amounts, by the SERS' Retirement Board. The Retirement Board acting with the advice of the actuary, allocates the employer contribution rate among four of the funds (Pension Trust Fund, Death Benefit Fund, Medicare B Fund, and Health Care Fund) of the System. For fiscal year ending June 30, 2010, the allocation to pension and death benefits is 12.78%. The remaining 1.22% of the 14% employer contribution rate is allocated to the Health Care and Medicare B Funds. The Academy's contributions to SERS for the fiscal years ended June 30, 2010, 2009 and 2008 were $20,172, $12,252, and $22,665, respectively; which equaled the required contributions each year.

**B. State Teachers Retirement System**

State Teachers Retirement System of Ohio (STRS Ohio) is a cost-sharing, multiple-employer public employee retirement system.

STRS Ohio is a statewide retirement plan for licensed teachers and other faculty members employed in the public schools of Ohio or any school, community school, college, university, institution or other agency controlled, managed and supported, in whole or in part, by the state or any political subdivision thereof.

**Plan Options** – New members have a choice of three retirement plan options. In addition to the Defined Benefit (DB) Plan, new members are offered a Defined Contribution (DC) Plan and a Combined Plan. The DC Plan allows members to allocate all their member contributions and employer contributions equal to 10.5 percent of earned compensation among various investment choices. The Combined Plan offers features of the DC Plan and the DB Plan. In the Combined Plan, member contributions are allocated to investment choices by the member, and employer contributions are used to fund a defined benefit payment at a reduced level from the regular DB Plan. Contributions into the DC Plan and the Combined Plan are credited to member accounts as employers submit their payroll information to STRS Ohio, generally on a biweekly basis. DC and Combined Plan members will transfer to the DB Plan during their fifth year of membership unless they permanently select the DC or Combined Plan.

**DB Plan Benefits** – Plan benefits are established under Chapter 3307 of the Revised Code. Any member may retire who has (i) five years of service credit and attained age 60; (ii) 25 years of service credit and attained age 55; or (iii) 30 years of service credit regardless of age. The annual retirement allowance, payable for life, is the greater of the "formula benefit" or the "money-purchase benefit" calculation. Under the "formula benefit," the retirement allowance is based on years of credited service and final average salary, which is the average of the member's three highest salary years. The annual allowance is calculated by using a base percentage of 2.2% multiplied by the total number of years of service credit (including Ohio-valued purchased credit) times the final average salary. The 31st year of earned Ohio service credit is calculated at 2.5%. An additional one-tenth of a percent is added to the calculation of every year of earned Ohio service over 31 years (2.6% for 32 years, 2.7% for 33 years and so on) until 100% of final average salary is reached. For members with 35 or more years of Ohio contributing service, the first 30 years will be calculated at 2.5% instead of 2.2%. Under the "money-purchase benefit" calculation, a member's lifetime contributions plus interest at specified rates are matched by an equal amount from other STRS Ohio funds. This total is then divided by an actuarially determined annuity factor to determine the maximum annual retirement allowance.

**Horizon Science Academy of Toledo**
*Notes to the Basic Financial Statements*
*For the Fiscal Year Ended June 30, 2010*

5.   **DEFINED BENEFIT PENSION PLANS (Continued)**

**DC Plan Benefits** – Benefits are established under Sections 3307.80 to 3307.89 of the Revised Code.  For members who select the DC Plan, all member contributions and employer contributions at a rate of 10.5% are placed in an investment account.  The member determines how to allocate the member and employer money among various investment choices.  A member is eligible to receive a retirement benefit at age 50 and termination of employment.  The member may elect to receive a lifetime monthly annuity or a lump-sum withdrawal.  Employer contributions into members' accounts are vested after the first anniversary of the first day of paid service.  Members in the DC Plan who become disabled are entitled only to their account balance.  If a member dies before retirement benefits begin, the member's designated beneficiary is entitled to receive the member's account balance.

**Combined Plan Benefits** – Member contributions are allocated by the member, and employer contributions are used to fund a defined benefit payment.  A member's defined benefit is determined by multiplying 1% of the member's final average salary by the member's years of service credit.  The defined benefit portion of the Combined Plan payment is payable to a member on or after age 60.  The defined contribution portion of the account may be taken as a lump sum or converted to a lifetime monthly annuity at age 50.

A retiree of STRS Ohio or another Ohio public retirement system is eligible for reemployment as a teacher following the elapse of two months from the date of retirement.  Contributions are made by the reemployed member and employer during the reemployment.  Upon termination of reemployment or age 65, whichever comes later, the retiree is eligible for an annuity benefit or equivalent lump-sum payment in addition to the original retirement allowance.  A reemployed retiree may alternatively receive a refund of only member contributions with interest before age 65, once employment is terminated.

Benefits are increased annually by 3% of the original base amount for DB Plan participants.

The DB and Combined Plans offer access to health care coverage to eligible retirees who participated in the plans and their eligible dependents.  Coverage under the current program includes hospitalization, physicians' fees, prescription drugs and partial reimbursement of monthly Medicare Part B premiums.  By Ohio law, health care benefits are not guaranteed.

A DB or Combined Plan member with five or more years' credited service who becomes disabled may qualify for a disability benefit.  Eligible spouses and dependents of members who die before retirement may qualify for survivor benefits.  A death benefit of $1,000 is payable to the beneficiary of each deceased retired member who participated in the DB Plan.  Death benefit coverage up to $2,000 can be purchased by participants in the DB, DC or Combined Plans.  Various other benefits are available to members' beneficiaries.

Chapter 3307 of the Revised Code provides statutory authority for member and employer contributions.  Contribution rates are established by the State Teachers Retirement Board, upon recommendations of its consulting actuary, not to exceed statutory maximum rates of 10% for members and 14% for employers.